UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LUIS MENDEZ,

                     Plaintiff,

v.

                 9:21-cv-01090
                 (BKS/TWD)

CAYUGA COUNTY,

                    Defendant.

_____

APPEARANCES:                            OF COUNSEL:

LUIS MENDEZ
*Plaintiff, pro se*
99001021
Onondaga County Justice Center
555 South State Street
Syracuse, NY 13202

BURKE, SCOLAMIERO LAW FIRM        JUDITH B. AUMAND, ESQ.
*Attorneys for Defendant*
7 Washington Square
Albany, NY 12205

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

### I.    INTRODUCTION

      This matter has been referred for a report and recommendation by the Honorable Brenda

K. Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Plaintiff Luis Mendez commenced this *pro se* action pursuant to 42 U.S.C. § 1983

("Section 1983") asserting claims arising out of his confinement at the Cayuga County Jail as a

federal pretrial detainee.  (Dkt. No. 11.)  Plaintiff, who is presently confined at the Onondaga

County Justice Center, paid the full statutory filing fee.  (Dkt. No. 9.)  Following the Court's

initial review of Plaintiff's amended complaint pursuant to 28 U.S.C. § 1915A, only Plaintiff's

Section 1983 medical indifference claim against Defendant Cayuga County remains.  (Dkt. Nos.

26, 29.)  Currently before the Court is Defendant's unopposed motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 34.)  For the reasons discussed below, the

Court recommends Defendant's motion be granted.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action in October of 2021.  (Dkt. No. 11.)  On January 19,

2022, the Court reviewed the complaint pursuant to 28 U.S.C. § 1915A, and found it failed to

state a claim upon which relief may be granted.  (Dkt. No. 12.[1])  In light of Plaintiff's *pro se*

status, he was afforded an opportunity to submit an amended complaint.  *Id*. at 22-24.[2]  Plaintiff

was specifically advised that his failure to comply with the January 2022 Order within thirty

days would result in dismissal of the action.  *Id*.  Plaintiff was also ordered to promptly notify the

Clerk's Office, in writing, of any change in his address and was warned his failure to do so may

result in the dismissal of this action.  *Id*. at 23-24.

On April 20, 2022, following several extensions of the amended pleading deadline and

the return of certain mail as undeliverable, the Court dismissed this action without prejudice

pursuant to 28 U.S.C.§ 1915A(b)(1), Federal Rule of Civil Procedure 41(b), and Local Rule

41.2(b), based on Plaintiff's failure to comply with the January 2022 Order and maintain a

current address in accordance with Local Rule 10.1(c).  (Dkt. No. 22.)  That same day, judgment

---

[1]  The procedural history of this case leading up to the January 2022 Order was discussed at length therein.

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

was entered dismissing this action.  (Dkt. No. 23.)  Both the April 2022 Order and the Order of Judgement were returned to the Court as undeliverable.  (Dkt. No. 24.)

On September 8, 2022, the Court received a letter from Plaintiff's friend or relative, which provided a new address for Plaintiff, and requested an update on this case.  (Dkt. No. 25.) In light of this submission, the Clerk sent a copy of the April 2022 Order and Order of Judgement to Plaintiff at this new address.  *See id*.  Shortly thereafter, Plaintiff filed a letter requesting this action be re-opened.  (Dkt. No. 26.)  On October 5, 2022, the Court granted Plaintiff's request to vacate the Judgment and afforded him a final opportunity to file an amended complaint within thirty days.  (Dkt. No. 27.)

Thereafter, Plaintiff timely submitted the amended complaint.  (Dkt. No. 28.)  Unlike the original, which named only employees of Cayuga County Jail and a treating physician as defendants, the caption of the amended complaint named the United States of America as the only defendant, and the body of the pleading asserted Section 1983 claims against only Cayuga County Jail.  *Id*.

On initial review, the Court liberally construed the amended complaint to assert a Section 1983 medical indifference claim against Cayuga County based on a delay in medical treatment under the Due Process Clause of the Fifth Amendment,[3] and a medical negligence claim against the United States of America pursuant to the Federal Tort Claims Act ("FTCA").  (Dkt. No. 29.) As detailed therein, only Plaintiff's Section 1983 medical indifference claim against Cayuga

---

[3]  In *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit made clear that the standard governing conditions of confinement claims, which encompass claims for medical indifference, is the same whether brought by a state or federal pretrial detainee.  *Id*. at 21 n.3 ("This case implicates the Due Process Clause of the Fourteenth Amendment because it involves state pretrial detainees who are seeking to vindicate their constitutional rights. . . . However, the analysis in this decision should be equally applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment.").

County survived initial review and required a response. *Id*. In so ruling, the Court expressed no opinion as to whether this claim could withstand a properly filed dispositive motion. *Id*. All remaining federal claims were dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *Id*. at 8-9.

By Text Order entered January 11, 2023, Plaintiff was informed that because he paid the filing fee for this action, he was responsible for serving the summons and amended complaint on Cayuga County in accordance with Federal Rule of Civil Procedure 4. (Dkt. No. 30.) In relevant part, Plaintiff was advised Rule 4(c) of the Federal Rules of Civil Procedure also provides that "[a]t the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court." *Id*. On January 27, 2023, Plaintiff filed a letter request for the Marshals to effectuate service on his behalf and provided payment of the $8.00 service fee to the U.S. Marshal. (Dkt. No. 31.) On February 15, 2023, the Court granted Plaintiff's letter request and directed the Clerk to issue a summons and forward it along with a copy of the amended complaint to the U.S. Marshal for service of process on Cayuga County. (Dkt. Nos. 32, 33.)

On May 1, 2023, Cayuga County filed the instant counseled motion to dismiss for failure to state a claim upon which relief may be granted and for lack of personal jurisdiction. (Dkt. No. 34.) The Court notified Plaintiff his response was due by May 22, 2023. (Dkt. No. 35.) However, that text notice was returned as undeliverable. (Dkt. No. 36.) On June 12, 2023, the Court *sua sponte* granted Plaintiff a 30-day extension of time to respond to Defendant's motion. (Dkt. No. 37.) On June 15, 2023, Plaintiff filed a change of address. (Dkt. No. 38.) On June 29, 2023, the June 12, 2023, text order was returned as undeliverable. (Dkt. No. 39.) Because it was unclear if Plaintiff received a copy of the text order entered on June 12, 2023, on August 16,

2023, the Court *sua sponte* granted a second 30-day extension of time to respond to Defendant's motion. (Dkt. No. 41.)  Plaintiff's response was therefore due by September 15, 2023.  *Id*.  To date, Plaintiff has not filed a response to Defendant's motion, and the time to do has expired.  On October 12, 2023, the Clerk received a letter from Plaintiff requesting an update on the case and the Clerk mailed a copy of the docket sheet to Plaintiff. (Dkt. No. 42.)

## III.    FACTUAL BACKGROUND

The facts are drawn from the amended complaint.  (Dkt. No. 28.)  On December 29, 2020, Plaintiff was housed in the Special Housing Unit at Cayuga County Jail as a federal pretrial detainee.  *Id*. at 1.  At approximately 4:30 p.m., Plaintiff ingested "pieces" of a "metal wire" that were served in his dinner.  *Id*.  Plaintiff felt "great pain and started spitting out blood." *Id*.  He immediately contacted "Cayuga staff to obtain medical assistance."  *Id*.  Corrections Officer Cowan responded to his request for assistance, spotted the metal wire, and contacted Corrections Sergeant ("Sgt.") Marvintino.  *Id*.  Sgt. Marvintino "arrived and witnessed [Plaintiff] spitting out blood and saw pieces of wire still in the food tray[.]"  *Id*.  He "took a slew of photos of the metal and blood spit up by [Plaintiff] with his cell phone."  *Id*.  Sgt. Marvintino told Plaintiff arrangements would be made for his transport to a hospital, but thereafter advised Plaintiff "the hospitals were closed and no medical was present[.]"  *Id*. at 1-2.  As a result, liberally construed, Plaintiff alleges he experienced a delay in medical treatment.  *Id*. at 2.[4]

---

[4] As the Court noted on initial review of the amended complaint, the nature of the alleged delay is unclear.  (Dkt. No. 29 at 4 n.3.)  Plaintiff states he received x-rays at Cayuga County Jail two days after the alleged incident, and was evaluated by a physician at a hospital "[a] month later." (Dkt. No. 28 at 2.)  However, documents attached to the original complaint indicate that Plaintiff was taken for abdominal radiographs the morning after he allegedly swallowed metal material, and again a few days later.  (Dkt. No. 2 at 1-2.)  In addition, Plaintiff alleged in the original complaint that he spoke to a nurse the day after the alleged incident, and again less than two weeks later.  (Dkt. No. 11 at 7.)

## IV.    STANDARD OF REVIEW

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face."  *Twombly*, 550 at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted).

"A plaintiff's failure to respond to a motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims," and "'[i]f a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond . . . does not warrant dismissal.'"  *Malloy v. Sopchak*, No. 1:18-CV-1460 (BKS/DJS), 2020 WL 4432631, at *2 (N.D.N.Y. July 31, 2020) (quoting *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000)).

## V.    DISCUSSION

Defendant argues Plaintiff's amended complaint must be dismissed for (1) failure to state a claim of municipal liability; (2) failure to state a claim for deliberate indifference to a serious medical need; and (3) for lack of personal jurisdiction.  (Dkt. No. 34-2.)

### A.    Personal Jurisdiction

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  While Defendant's motion cites only Federal Rule

of Civil Procedure 12(b)(6) as the basis of its motion, the Court construes it as, in part, being made under Rule 12(b)(5) for insufficient service of process.[5]  To survive a motion to dismiss for insufficient service of process under Rule 12(b)(5), "the plaintiff bears the burden of establishing that service was sufficient." *Allstate Ins. Co. v. Rosenberg*, 771 F. Supp. 2d 254, 260 (E.D.N.Y. 2011) (quoting *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order)).

"In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010).  Under Rule 4, a plaintiff must serve the summons and complaint on a defendant within 90 days of filing the complaint. Fed. R. Civ. P. 4(c)(1), (m).  If a plaintiff fails to effect service on a defendant, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).  If, however, "the plaintiff shows good cause for the failure, the court *must* extend the time for service for an appropriate period." *Id.* (emphasis added); *Canady v. Correct Care Sols.*, No. 15-CV-4893 (KMK), 2017 WL 4280552, at *9 (S.D.N.Y. Sept. 25, 2017) (noting that when a plaintiff has demonstrated good cause, the extension to serve is mandatory) (citing *Blessinger v. United States*, 174 F.R.D. 29, 31 (E.D.N.Y. 1997)).  Accordingly, there are two means by which a court can grant an extension: (1) upon a showing of good cause; or (2) within its discretion. Fed. R. Civ. P. 4(m).

"The following two factors are relevant in a court's evaluation of good cause: (1) the reasonableness and diligence of plaintiff's efforts to serve; and (2) the prejudice to defendants from the delay." *Lopez v. Guziczek*, No. 21 CV 10099 (NSR), 2023 WL 6973732, at *1

---

[5]  A Rule 12(b)(5) motion to dismiss "is the proper vehicle for challenging the mode of delivery or lack of delivery of the summons and complaint." *Mhina v. Citizens Bank, N.A.*, No. 5:22-CV-427 (BKS/ML), 2022 WL 16572045, at *2 (N.D.N.Y. Nov. 1, 2022).

(S.D.N.Y. Oct. 23, 2023) (citations omitted); *see Patel v. Singh*, No. 21-CV-00759, 2023 WL 2262792, at *5 (E.D.N.Y. Feb. 28, 2023) ("[I]f a defendant has received actual notice of a lawsuit, 'regardless of whether service was initially proper or whether good cause is found, the Court may still grant an extension of time given to a plaintiff to serve the defendant in its discretion.'") *Id*. (declining to dismiss complaint for lack of service).

Moreover, "[t]here is a strong federal policy in favor of resolving disputes on the merits." *Byrd v. Town of DeWitt*, No. 5:23-CV-390 (DNH), 2023 WL 6467921, at *4 (N.D.N.Y. Oct. 5, 2023). "Consequently, as long as 'it appears that proper service may still be obtained,' *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972), the right remedy is typically to direct the plaintiff to re-serve the pleading." *Byrd*, 2023 WL 6467921 at *4; see *Zapata v. City of New York*, 502 F.3d 192, 195-96 (2d Cir. 2007) (granting an extension "even in the absence of good cause").

As detailed above, the Court directed the U.S. Marshals to serve the summons and amended complaint on Cayuga County. (*See* Dkt. Nos. 32, 33.) As such, Plaintiff was "entitled to rely on the U.S. Marshals to effect service." *Burris v. Nassau Cnty. Dist. Att'y*, No. 14-CV-5540, 2023 WL 6450398, at *5 (E.D.N.Y. Sept. 30, 2023).

Upon review, it appears the U.S. Marshals inadvertently served the amended complaint on Cayuga County District Attorney's Office on March 2, 2023. (Dkt. No. 34-2 at 3-5, 10-11; Dkt. No. 34-1 at 1-3.) As Defendant correctly points out, the Cayuga County District Attorney's Office is not authorized to accept service on behalf of Cayuga County. (Dkt. No. 34-2 at 10-11;

Fed. R. Civ. P. 4(j), N.Y. C.P.L.R. § 311.[6])  Plaintiff has therefore failed to effect proper service

on Cayuga County.

However, a *pro se* plaintiff may avoid dismissal under Rule 4(m) if he "indicated to the

court his reliance on service by the Marshals[.]"  *Romandette v. Weetabix Co.*, 807 F.2d 309, 311

(2d Cir. 1986).  Such is the case here.  (Dkt. Nos. 31, 32.)  Thus, on the current record, the Court

finds "the Marshals' failure to effect service automatically constitutes good cause within the

meaning of Rule 4(m)."  *Ruddock v. Reno*, 104 F. App'x 204, 206-07 (2d Cir. 2004).

Accordingly, Court recommends denying Defendant's motion to dismiss for improper

service and lack of personal jurisdiction.[7]

### B.    Municipal Liability

Defendant argues Plaintiff has failed to state a claim for municipal liability.  *See Monell*

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  The Court agrees.

Under *Monell*, a municipality may be liable for deprivation of constitutional rights "when

execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id*. at 694.

"The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of*

---

[6]  Rule 4(j) of the Federal Rules of Civil Procedure permits service of process on a local
government "by delivering a copy of the summons and of the complaint to its chief executive
officer" or "serving a copy of each in the manner prescribed by the state's law for serving a
summon or like process on such a defendant."  Fed. R. Civ. P. 4(j).  Pursuant to New York law,
personal service upon a governmental subdivision shall be made by delivering the summons . . .
upon a county, to the chair or clerk of the board of supervisors, clerk, attorney or treasurer[.]"
N.Y. C.P.L.R. § 311.

[7]  Ordinarily, the Court would further recommend that Plaintiff be granted an extension of time
under Federal Rule of Civil Procedure 4(m) to effectuate proper service on Cayuga County and
direct the U.S. Marshals to re-attempt service of the amended complaint and summons within
that time frame.  However, because the Court recommends granting Defendant's motion to
dismiss under Rule 12(b)(6), the Court declines to do so at this time.

*Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and it may be "reflected in either action or inaction," *Cash v. Cnty. of Erie*, 654 F.3d 324, 341-42 (2d Cir. 2011).

The existence of a municipal policy or custom may be plead in any of four ways: "(1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order)). "Boilerplate statements" that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim. *See Brown v. Oneida Cnty.*, No. 6:15-CV-0849, 2016 WL 4275727, at *4 (N.D.N.Y. Aug. 12, 2016).

"To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016) (internal quotation marks and ellipsis omitted); *see also Cruz v. Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at *6 (S.D.N.Y. Feb. 11, 2022) (collecting cases). Put simply, to allege "there is a policy does not make it so." *Vassallo v. City of New York*, No. 15-CV-7125, 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,'

between the policy and the deprivation of his constitutional rights." *Deferio*, 770 F. App'x at 589 (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).[8]

   As noted, Plaintiff alleges that after he ingested metal material and was told by Sgt. Marvintino that arrangements would be made for his transport to a hospital, Sgt. Marvintino thereafter advised Plaintiff that he could not receive emergency medical treatment because "the hospitals were closed and no medical was present[.]"  (Dkt. No. 28 at 1-2.)  Plaintiff suggests his injuries "all originat[e] from lack of care and professional ethics and safety of the Cayuga County Jail" and the "County Jail . . . violated their duty to serve safe and sanitary meals to inmates without mold, mercury or metal." *Id.* at 3.

   Here, the Court finds Plaintiff has failed to plausibly allege Cayuga County maintained a policy or custom which deprived him of a constitutional right.  (Dkt. No. 34-2 at 7.)  To that end, Plaintiff has not identified any formal policy that delayed his medical treatment and, while the policy or practice need not be formally memorialized, in order to establish the existence of a municipal policy or custom for purposes of Section 1983 Plaintiff must demonstrate that Cayuga County has a "persistent and widespread" practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Ruiz v. City of New York*, No. 14-cv-5231, 2015 WL 5146629, at *11 (S.D.N.Y. Sept. 2, 2015).  The allegations in the amended complaint

---

[8]  Generally, "[e]stablishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors [acting in furtherance of the municipality's] custom or policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).  However, the Second Circuit has also recognized that "constitutional injuries may be found to exist . . . in the absence of individual liability, [where] the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("[E]ven in situations where the acts or omissions of individual employees do not violate an individual's constitutional rights, 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate' those rights.").

fall short of this high standard.[9] *See Schnauder v. Gibens*, 679 F. App'x 8, 10 (2d Cir. 2017) (no

*de facto* policy alleged where "apart from a detailed recounting of his own experiences," the

complaint contained "only general conclusory allegations that there was a policy") (internal

quotation marks omitted); *Iacovangelo v. Correctional Med. Care, Inc.*, 624 F. App'x 10, 14 (2d

Cir. 2015) (widespread practice not pled where other than the plaintiff, the pleading provides

only one additional example of a similar incident); *Santana v. City of New York*, No. 15-CV-

6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[I]t is well-settled that a "single

incident alleged in a complaint, especially if it involved only actors below the policy-making

level, does not suffice to show a municipal policy.").

    Further, Plaintiff has not identified any actions taken by policymaking individuals

resulting in the alleged delay, nor does the amended complaint contain allegations describing a

failure by policymakers to provide adequate training or supervision to subordinates.  *See, e.g.*,

_____

[9] The Court notes "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citation omitted); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims . . . seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191-92 (2d Cir. 2007) (citation omitted).  When a municipality "does not have an adequate policy . . . *Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192).  "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id*.  Plaintiff's amended complaint does not plausibly allege a "pattern of misconduct." (Dkt. No. 28.)  Rather, as Defendant points out, the facts alleged indicate singular interactions with employees of the jail done in response to his specific situation.  (Dkt. No. 34-2 at 7.)  *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

*Dosiak v. Town of Brookhaven*, No. 16-cv-6658, 2017 WL 7048912, at * 11 (E.D.N.Y. Nov. 27, 2017); *Boonmalert v. City of New York*, 2017 WL 1378274, at * 7 (S.D.N.Y. Apr. 12, 2017).

Moreover, Plaintiff has not responded to Defendant's motion to dismiss, and therefore he "has failed to identify how any of the allegations contained in his amended complaint support imposing municipal liability on [Cayuga] County." *Rowles v. Doe*, No. 19-CV-6933, 2021 WL 3946291, at *3 (W.D.N.Y. Sept. 3, 2021); *see, e.g.*, *Isaac v. City of New York*, No. 17-CV-1021, 2018 WL 1322196, at *6 (S.D.N.Y. Mar. 13, 2018) (*de facto* policy not plausibly alleged where plaintiff merely asserted that "the City of New York has been aware of the routine, dangerous, and constitutionally inadequate medical care [in its jail]").

Because Plaintiff has failed to plausibly allege municipal liability on the part of Cayuga County, the Court recommends granting Defendant's motion for failure to state a claim upon which relief may be granted and recommends dismissing Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County.[10]

## VI.    LEAVE TO AMEND

Despite the rather extensive history of this litigation, it remains only in the earliest stages. As noted, Plaintiff did not oppose Defendant's motion to dismiss or seek leave to amend. However, given Plaintiff's *pro se* status, the Court recommends Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County be dismissed without prejudice and with leave to amend. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 555 (S.D.N.Y. 2003) (noting that courts routinely grant leave to replead following judgment on the pleadings, unless amendment would be futile); *see Levinson v. United States Fed. Bureau of Prisons, Metro. Corr. Ctr. - New York*, 594 F. Supp. 3d 559, 567 (S.D.N.Y.

---

[10]  As such, the Court does not reach Defendant's remaining argument.  (Dkt. No. 34-2 at 7-10.)

2022) ("[W]hen a motion to dismiss is granted, the usual practice is to dismiss the claims without prejudice and grant plaintiff leave to amend the complaint.").

## VII.    CONCLUSION

**WHEREFORE**, for the reasons set forth herein, it is hereby

**RECOMMENDED** that Defendant's motion to dismiss (Dkt. No. 34) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk serve a copy of the Report-Recommendation and Order on all parties in accordance with Local Rules, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

---

[11]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

**IT IS SO ORDERED.**

Dated: February 1, 2024
Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

Malloy v. Sopchak, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 17 of 217

2020 WL 4432631

2020 WL 4432631
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javar MALLOY, Plaintiff,

v.

Jacob SOPCHAK, et al., Defendants.

1:18-cv-1460 (BKS/DJS)
|
Signed 07/31/2020

**Attorneys and Law Firms**

Plaintiff pro se: Javar Malloy, 199-A-1946, Washington Correctional Facility, Box 180, 72 Lock 11 Lane, Comstock, NY 12821.

For Defendants Megan Spillane, P. David Soares, and County of Albany: Daniel C. Lynch, Albany County Attorney, Michael L. Goldstein, Assistant Albany County Attorney, 112 State Street, 6th Floor, Albany, NY 12207.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*1 Plaintiff *pro se* Javar Malloy brings this action asserting claims under 42 U.S.C. §§ 1983, 1985 and 1986; 42 U.S.C. § 2000d and 3789d; and New York state law arising out of his arrest by Albany Police Department Officers and subsequent prosecution. (Dkt. No. 1). Presently before the Court is Assistant District Attorney ("ADA") Megan Spillane, District Attorney ("DA") P. David Soares, and the County of Albany's ("Defendants" or "Moving Defendants") motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 24). Plaintiff has failed to respond to Moving Defendants' motion, and the last two text orders mailed to Plaintiff were returned as undeliverable. (Dkt. Nos. 28, 30). For the following reasons, Moving Defendants' motion is granted.

**II. PROCEDURAL HISTORY**

Plaintiff commenced this action on December 19, 2018, and sought leave to proceed *in forma pauperis*. (Dkt. Nos. 1–2). This matter was assigned to United States

Magistrate Judge Daniel J. Stewart who reviewed the Complaint under 28 U.S.C. §§ 1915(e) and 1915A and, on January 28, 2019, issued a Report-Recommendation and Order, granting Plaintiff leave to proceed *in forma pauperis* and recommending that certain claims be dismissed. *Malloy v. Sopchak ("Malloy I")*, No. 18-cv-1460, 2019 WL 1024354, at *4–5, 2019 U.S. Dist. LEXIS 14099, at *12–13 (N.D.N.Y. Jan. 28, 2019), *report and recommendation adopted*, 2019 WL 1025765, 2019 U.S. Dist. LEXIS 33460 (N.D.N.Y. Mar. 4, 2019). Specifically, Magistrate Judge Stewart recommended that the following claims be dismissed with prejudice: 1) conspiracy to commit false arrest and prosecution (the Fifth Cause of Action); 2) claims under 42 U.S.C. § 2000d; and 3) claims against Defendants Albany County District Attorney's Office and Albany Police Department. *Id.* He recommended that Plaintiff's First Cause of Action, an alleged violation of 42 U.S.C. § 1983 without reference to a constitutional violation, and his claim under 34 U.S.C. § 10228 be dismissed without prejudice to amendment, and that Plaintiff's remaining claims, assault and battery, false arrest, First Amendment retaliatory arrest, and municipal liability under *Monell* proceed. *Id.* The Court adopted the Report-Recommendation in its entirety. *Malloy v. Sopchak ("Malloy II")*, No. 18-cv-1460, 2019 WL 1025765, at *1, 2019 U.S. Dist. LEXIS 33460, at *2 (N.D.N.Y. Mar. 4, 2019).

**III. FACTS** [1]

[1]    The facts are drawn from the Complaint. (Dkt. No. 1). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

On July 4, 2018, Plaintiff attended an Independence Day celebration "with family and friends" at his aunt's house in the City of Albany, New York. (Dkt. No. 1, ¶ 18). "Shortly after 12:30 am" on July 5, 2018, Plaintiff "exited [his] [a]unt's residence with two (2) African-American males attending [the] family gathering" to go to a store nearby. (*Id.* ¶ 19). Plaintiff, who is African-American, was "wearing [a] white T-shirt, blue and black Hawaiian shorts with blue and black sneakers." (*Id.* ¶¶ 9, 23). He was "on parole" and was "within ... Albany County/City beyond curfew mandates." (*Id.* ¶ 24).

*2 "At approximately 1:14 am" two members of the Albany Police Department ("APD"), Jacob Sopchak and Matthew Seeber, "received a dispatch call alleging ... that

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 18 of 217

Malloy v. Sopchak, Not Reported in Fed. Supp. (2020)

2020 WL 4432631

one (1) 'Black Male,' wearing [a] white T-shirt, black pants, black and white sneakers was observed possessing [a] gun in [the] vicinity of 175 Second Street." (*Id.* ¶¶ 10, 20). "Neither Plaintiff or [the] two (2) African-American males accompanying him to the store matched the description provided to" Sopchak and Seeber. (*Id.* ¶ 24). As Plaintiff and his companions were "returning to [his] [a]unt's residence" on foot, Sopchak and Seeber "quickly approached" them "with [a] police cruiser, then immediately exited [the] police cruiser with hands on their guns in [a] threatening manner implying imminent unwarrantable police contact." (*Id.* ¶ 25).

"Plaintiff ran in route to [his] [a]unt's house and into [a] dark alley." (*Id.* ¶ 26). Despite having "no affirmative basis for arrest," Sopchak and Seeber "overzealously pursued Plaintiff." (*Id.* ¶ 27). Two other police officers "came to the aid of" Sopchak and Seeber. (*Id.*). "Defendants tackled Plaintiff to [the] ground, twisted [his] arm to [the] point of extreme pain and forced handcuffs on Plaintiff" while repeatedly screaming "stop resisting" even though "Plaintiff was not resisting arrest during this assault." (*Id.* ¶ 28). Plaintiff was then taken in for processing. (*Id.* ¶ 29). Plaintiff "sustained bruises on [his] body, swelling/bruising and soreness on wrists, back, [and] arms." (*Id.* ¶ 35).

Sopchak "manufactured false police arrest business records alleging Plaintiff 'fled on foot ... through a yard, ignoring multiple lawful commands to stop.' " (*Id.* ¶ 31). ADA Spillane, "acting under the direction of" DA Soares, "introduced APD testimony misrepresenting to the Albany County/City grand jury that:" (1) "Plaintiff's arrest was based upon probable cause," (2) APD defendants "acted upon specific and/or identical description given depicting Plaintiff as 'Black Male' possessing alleged gun," (3) "Plaintiff was the 'Black Male' suspect APD police defendants were looking for," and (4) "Plaintiff obstructed APD police defendants' valid post-pursuit arrest." (*Id.* ¶ 34(a)–(d)).

## IV. STANDARD OF REVIEW

The standard of review for a motion under Rule 12(c) is the same as for a motion under Rule 12(b)(6). *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "For both motions, the Court must accept the allegations contained in the pleadings as true and draw all inferences in the non-movant's favor." *Neopharm Ltd. v. Wyeth–Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 614 (S.D.N.Y. 2016) (citing *Bank of N.Y.*, 607 F.3d at 922). A complaint "must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d

Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

The Court accepts as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "While *pro se* complaints must contain sufficient factual allegations to meet the plausibility standard, we read them with 'special solicitude' and interpret them 'to raise the strongest arguments that they *suggest*.' " *Roman v. Donelli*, 347 Fed. Appx. 662, 663 (2d Cir. 2009) (summary order) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006)). "A plaintiff's failure to respond to a motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims," and " '[i]f a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond ... does not warrant dismissal.' " *Crenshaw v. Dondrea*, 278 F. Supp. 3d 667, 669 (W.D.N.Y. 2017) (quoting *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000)). The Court will grant a motion for judgment on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 340 (S.D.N.Y. 2008).

## V. DISCUSSION

**\*3** The Complaint asserts three causes of action against Moving Defendants. (Dkt. No. 1). Plaintiff brings a claim under 42 U.S.C. § 1983 alleging that ADA Spillane and DA Soares violated his constitutional rights (First Claim) and a claim alleging that they conspired to falsely arrest and prosecute Plaintiff, violating 42 U.S.C. §§ 1985 & 1986 (Fifth Claim). (*Id.* ¶¶ 41–42, 52–54). He also brings a *Monell*[2] claim against Albany County (Seventh Claim). (*Id.* ¶¶ 57–63).

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 19 of 217

Malloy v. Sopchak, Not Reported in Fed. Supp. (2020)
2020 WL 4432631

2    *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### A. Previously Dismissed Claims

The Report-Recommendation recommended dismissing Plaintiff's First and Fifth Claims. *Malloy I*, 2019 WL 1024354, at *4–5, 2019 U.S. Dist. LEXIS 14099, at *12–13. Specifically, Magistrate Judge Stewart recommended that Plaintiff's First Claim arising under § 1983 "be dismissed with leave to reple[a]d so that Plaintiff can specifically identify the factual and legal basis" of the claim because "he fails to articulate precisely what constitutional rights are at issue." *Malloy I*, 2019 WL 1024354, at *2, 2019 U.S. Dist. LEXIS 14099, at *6. As for Plaintiff's Fifth Claim, Magistrate Judge Stewart recommended that it be dismissed with prejudice because "Defendant Spillane ... is protected by absolute immunity," and that DA "Soares is entitled to the same absolute immunity." *Malloy I*, 2019 WL 1025765, at *3 & n.4, 2019 U.S. Dist. LEXIS 14099, at *9 & *10 n.4. The Court adopted the Report-Recommendation in its entirety, dismissing Plaintiff's First Claim without prejudice —"grant[ing] [Plaintiff] leave to file an Amended Complaint within thirty (30) days"—and dismissing the Fifth Claim with prejudice. *Malloy II*, 2019 WL 1025765, at *1, 2019 U.S. Dist. LEXIS 33460, at *3 (emphasis omitted).

Moving Defendants contend that both claims should now be dismissed with prejudice, because "ADA Spillane and DA Soares are entitled to absolute immunity." (Dkt. No. 24-1, at 11). As to Plaintiff's Fifth Claim, as described above, it has already been dismissed with prejudice and thus Moving Defendants' argument is moot. As to Plaintiff's First Claim against ADA Spillane and DA Soares, Moving Defendants argue that it should now be dismissed with prejudice because "[t]he entirety of Plaintiff's allegations asserted against ADA Spillane revolve around the district attorney's decision to introduce false or misleading testimony at a grand jury proceeding," and "[i]t is well recognized that a district attorney's actions before a grand jury constitute 'circumstances intimately associated with the judicial phase of the criminal process' and an attorney acting in that realm is entitled to absolute immunity." (*Id.* at 12 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976))).

"To determine whether an official enjoys absolute immunity," courts take a " 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who

performed it.' " *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)) (internal quotation marks omitted)). A prosecutor "acting in the role of an advocate in connection with a judicial proceeding is entitled to absolute immunity for all act 'intimately associated with the judicial phase of the criminal process.' " *Id.* (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984)). "Examples of 'intimately associated' prosecutorial acts include ... evaluating and organizing evidence for presentation at a trial or *grand jury.*" *Turner v. Boyle*, 116 F. Supp. 3d 58, 79 (D. Conn. 2015) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (emphasis added)); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (holding that a prosecutor had absolute immunity for "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury"); *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (determining that a prosecutor had absolute immunity for alleged misrepresentations to a grand jury).

**\*4** The Court agrees with Moving Defendants that ADA Spillane and DA Soares have absolute immunity. Though the Court granted him leave to replead, Plaintiff failed to "identify the factual and legal basis" for his First Claim. *Malloy I*, 2019 WL 1024354, at *2, 2019 U.S. Dist. LEXIS 14099, at *6. The only allegations pertaining to ADA Spillane and DA Soares in the Complaint involve ADA Spillane's misrepresentations to the grand jury, which she gave "acting under the direction of" DA Soares. (Dkt. No. 1, ¶ 34). Thus, any § 1983 claims arising out of these actions would be barred because their actions were "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. Given that leave to amend a complaint "need not be given when amendment would be futile," *Castro v. Cusack*, No. 15-cv-6714, 2019 WL 3385218, at *9, 2019 U.S. Dist. LEXIS 125411, at *25 (E.D.N.Y. July 26, 2019) (quoting *Sodhi v. Mercedes Benz Fin. Servs., USA, LLC*, 957 F. Supp. 2d 252, 255 (E.D.N.Y. 2013)), and Plaintiff, who did not respond to Moving Defendants' motion, has identified no facts suggesting a viable claim. Thus, the Court dismisses Plaintiff's First Claim against ADA Spillane and DA Soares with prejudice.

### B. *Monell* Claim

The Complaint asserts *Monell* claims against the City and County of Albany, alleging that they had a "longstanding perpetual policy, custom, or practice" to "inadequately supervise and train police officials, [and] support retaliatory

2020 WL 4432631

arrest animus conduct" including the "defendant officers and coconspirator prosecuting defendant attorneys, thereby failing to adequately discourage further constitutional violations." (Dkt. No. 1, ¶ 60). According to Plaintiff, the City and County of Albany "did not require appropriate in-service training or re-training of APD officials or prosecuting attorneys who were known to have engaged in police or prosecutorial conduct," and "as a consequence" the defendants in this case "believed that their actions and omissions would not be properly monitored ... and that misconduct would not be investigated or sanctioned." (*Id.* ¶ 62). Plaintiff describes three "incidents" that illustrate this "policy and/or custom," including: (1) "On November 9, 1988, Roland James was unlawfully arrested and imprisoned," (2) "In 2006 civilian Constance Hines' vehicle was unlawfully seized and retained," and (3) "In June of 2014 civilian Andre Cantay was unlawfully arrested." (*Id.* ¶ 59(a)–(c)). Moving Defendants contend that Plaintiff's *Monell* claim should be dismissed as to Albany County because Plaintiff "asserts in conclusory fashion that the County inadequately supervises and trains its prosecuting attorneys without providing any detail or factual support." (Dkt. No. 24-1, at 16).

"It is well established that 'under § 1983, local governments are responsible only for 'their own illegal acts.' " *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). Local governments "are not vicariously liable under § 1983 for their employees' actions." *Id.* (quoting *Connick*, 563 U.S. at 60, 131 S.Ct. 1350); *see also, e.g.*, *Bd. of Cty Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior.*").

"To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). " '[A] municipal policymaker's failure to act, generally pleaded as a failure to train/supervise claim, can trigger municipal liability where was a failure 'amounts to deliberate indifference to the rights' of those with whom municipal employees will come into contact.' " *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)). A plaintiff "must do more than simply state that a municipal policy or custom exist" but that "must allege facts tending to support, at least circumstantially,

an inference that such a municipal policy or custom exists." *Id.* (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). "Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality].' " *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)). "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983," a complaint "does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.' " *Id.* (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

**\*5** The Court agrees with Moving Defendants that the Complaint is insufficient to allege a *Monell* claim against Albany County based on a custom of tolerating prosecutorial misconduct. "Plaintiff has not alleged any facts to support an inference that [the County] has a custom or practice of tolerating [prosecutorial misconduct], or of failing to discipline and supervise miscreant [prosecutors]." *Triano*, 895 F. Supp. 2d at 535 (S.D.N.Y. 2012) (dismissing a *Monell* claim based on failure to train/supervise because, inter alia, "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details"). As Moving Defendants argue, Plaintiff "does not reference a single previous incident of alleged prosecutorial misconduct." (Dkt. No. 24-1, at 16). While the Complaint lists three other "incidents" related to Plaintiff's *Monell* claim, these pertain to unlawful arrests and seizures, and Plaintiff does not connect them in any way to prosecutorial misconduct.

To the extent Plaintiff is attempting to bring a *Monell* claim against the County based on the actions of the APD officers —rather than the prosecutors—it likewise fails because the allegations regarding the County's alleged involvement with the City of Albany Police Department policies are conclusory and do not lead to a plausible inference that they caused Plaintiff's unlawful arrest. *See Outlaw*, 884 F.3d at 373 (explaining that a *Monell* claim requires the plaintiff to show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation") (citation omitted); *see also Grantley v. City of New York*, No. 12-cv-8294, 2013 WL 6139688, at \*3, 2013 U.S. Dist. LEXIS 165800, at \*8 (S.D.N.Y. Nov. 21, 2013) (dismissing a plaintiff's *Monell* claim where the complaint was "light on facts and heavy on conclusory language").

Malloy v. Sopchak, Not Reported in Fed. Supp. (2020)

2020 WL 4432631

Accordingly, the Court dismisses Plaintiff's *Monell* claim against the County of Albany. [3] Given Plaintiff's *pro se* status, this claim is dismissed with leave to replead so that Plaintiff can specifically identify facts which lead to a reasonable inference that he suffered a denial of a constitutional right that was caused by an Albany County policy or custom. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.,* 292 F. Supp. 2d 535, 555 (S.D.N.Y. 2003) (noting that courts routinely grant leave to replead following judgment on the pleadings, unless amendment would be futile).

[3]      Given that the City of Albany is not a party to the current motion, the Court has not considered the *Monell* claim to the extent it is alleged against the City.

#### C. Duty to Update Address

The last two text orders mailed to Plaintiff were returned as undeliverable, and Plaintiff failed to file a response to Moving Defendants' motion despite the Court granting him an extension. (Dkt. Nos. 27–28, 30). "Parties have an obligation to notify the Court of any change of address," and "[t]his rule applies to both represented parties as well as *pro se* litigants." *Kalamaras v. Sposato,* No. 16-cv-459, 2017 WL 6459567, at *1, 2017 U.S. Dist. LEXIS 206721, at *3 (E.D.N.Y. Nov. 3, 2017) (citing *Rossman v. Suffolk Times,* No. 13-cv-3142, 2013 WL 4065020, at *1, 2013 U.S. Dist. LEXIS 113072, at *3 (E.D.N.Y. Aug. 12, 2013)), *report and recommendation adopted,* 2017 WL 6493229, 2017 U.S. Dist. LEXIS 206677 (E.D.N.Y. Dec. 14, 2017); *see also* Northern District of New York Local Rule 10.1(c)(2) ("All ... *pro se* litigants must immediately notify the Court of any change of address."). The Court therefore orders Plaintiff to provide the Clerk of the District Court with a current address within thirty (30) days of this Order. The Court advises Plaintiff that failure to follow this order and "the failure to maintain such an address with the Court is a ground for

failure to prosecute," *Laney v. Ramirez,* No. 10-cv-9063, 2011 WL 6594491, at *1, 2011 U.S. Dist. LEXIS 147770, at *2 (S.D.N.Y. Dec. 22, 2011) (collecting cases), and will result in the dismissal of this case. *See LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209–11 (2d Cir. 2001).

#### VI. CONCLUSION

**\*6** For these reasons, it is

**ORDERED** that Moving Defendants' Motion to Dismiss (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's § 1983 claim (First Claim) against ADA Spillane and DA Soares is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's *Monell* claim (Seventh Claim) against Albany County is **DISMISSED without prejudice with leave to amend**; and it is further

**ORDERED** that Plaintiff is granted leave to file an Amended Complaint **within thirty (30) days** of the date of this Order. Any Amended Complaint must be a complete pleading which will replace the current Complaint in total; and it is further

**ORDERED** that Plaintiff must provide his address to the Court **within thirty (30) days** of this Order; and it is further

**ORDERED** that if no Amended Complaint is filed within thirty (30) days of the date of this Order, the Clerk is directed to terminate Albany County as a defendant in this case.

**IT IS SO ORDERED.**

#### All Citations

Not Reported in Fed. Supp., 2020 WL 4432631

---

**End of Document**                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 22 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

2017 WL 4280552
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jiya CANADY, Plaintiff,
v.
CORRECT CARE SOLUTIONS;
Doctor Hamad Skinner; Sgt. Roberts;
and Westchester County, Defendants.

No. 15-CV-4893 (KMK)
|
Signed 09/25/2017

**Attorneys and Law Firms**

Jiya Canady, Bronx, NY Pro Se.

James C. Freeman, Esq., Kent Hazzard, LLP, White Plains, NY Counsel for Defendants Correct Care Solutions, LLC and Hamad Skinner, DDS.

Taryn A. Chapman-Langrin, Esq., Office of the Westchester County Attorney, White Plains, NY Counsel for Defendants Sergeant Roberts and Westchester County.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

*1  Plaintiff Jiya Canady ("Plaintiff") brings this pro se Action asserting claims under 42 U.S.C. § 1983 and New York State law, alleging that Correct Care Solutions, LLC ("CCS"), Hamad Skinner, DDS ("Dr. Skinner," and together with CCS, "CCS Defendants"), Sergeant Roberts ("Roberts") and Westchester County, (the "County," and together with Roberts, "County Defendants"), violated his constitutional rights in connection with dental care provided to Plaintiff at Westchester County Jail. (See Compl. (Dkt. No. 1).) [1] Before the Court is a Motion for Summary Judgment on behalf of CCS Defendants, (see Dkt. No. 41), and a Motion To Dismiss on behalf of County Defendants, (see Dkt. No. 48). For the reasons to follow, the Motions are granted.

[1]   Since the time of the alleged violations, Defendant Roberts has been promoted to the position of Captain. (See Defs.' Cty. of Westchester and

Sergeant Roberts Mem. of Law in Supp. of Mot. To Dismiss the Compl. 1 (Dkt. No. 50).)

I. Background

Due to the posture of this Action, in recounting the factual background, the Court cites to both the allegations in the Complaint and the Parties' Local Civil Rule 56.1 statements. To the extent these documents differ in their presentation of the facts, the Court notes as such.

A. Factual Background

On February 26, 2013, Plaintiff underwent an annual dental evaluation by Dr. Skinner and a dental assistant. (See Compl. 3 (Dkt. No. 1); 56.1 Statement ("Defs.' 56.1") ¶ 6 (Dkt. No. 46); Pl.'s Statement in Opp'n to Rule 56.1 Mot. for Summ. J. ("Pl.'s 56.1") ¶ 6 (Dkt. No. 53).) [2] Both an x-ray and exam were performed, during which Dr. Skinner determined that Plaintiff had four cavities requiring treatment. (See Compl. 3; Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) Plaintiff declined treatment at that time, "[b]ut agreed to think about it over the month or so it would take to schedule the procedure." (Compl. 3; see also Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) One month later, Plaintiff "was called back to have the procedure" and again declined treatment, stating that he "ha[d] no problems with [his] teeth and ... no pain." (Compl. 3; see also Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)

[2]       Plaintiff's Complaint consists of a standard prisoner complaint form, along with several handwritten pages and attachments. (See generally Compl.) Page numbers refer to the ECF-generated page number in the upper right-hand corner of the page.

On January 28, 2014, Plaintiff had a second annual evaluation where an exam and x-ray were again performed. (See Compl. 3; Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) Dr. Skinner informed Plaintiff that he had "[eight] cavities that needed treatment as soon as possible." (Compl. 3; see also Defs.' 56.1 ¶¶ 7–8; Pl.'s 56.1 ¶¶ 7–8.) Plaintiff was "[e]xtremely alarmed by this information" and agreed to begin treatment that day on the left side of his mouth. (Compl. 3–4; see also Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) Five hours after the treatment, Plaintiff informed the facility medical director that he was experiencing discomfort in his mouth. (See Compl. 4.) Plaintiff's blood pressure was taken, reported elevated, and ordered to be monitored. (See id.)

2017 WL 4280552

**\*2** On January 29, 2014, while attempting to eat for the first time since the procedure, Plaintiff "felt a most powerful pain slowly spread from [his] teeth to the whole left side of [his] face, for several minutes." (*Id.*) When Plaintiff avoided using the left side of his mouth to eat and drink, the pain slowly subsided. (*See id.*)

On February 12, 2014, Plaintiff was called to the facility dentist office "to complete the treatment on the right side of [his] mouth," but due to the pain that Plaintiff was experiencing on the left side of his mouth, he declined to complete treatment on the right side. (*Id.*; *see also* Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.) Plaintiff was given a "refusal of treatment form to sign," but was not given a "plan to address [his] inability to chew using the teeth ... treated a month prior." (Compl. 4; *see* Decl. in Supp. of Mot. for Summ. J. ("Freeman Decl.") Ex. C, at 2 (Dkt. No. 43).)

On February 21, 2014, Plaintiff filed a grievance with Roberts, providing the details of his procedure and pain and "several possible solutions as a way of resolving [his] complaint against dental staff." (Compl. 4; *see also* Defs.' 56.1 ¶ 10(a); Pl.'s 56.1 ¶ 10(a).) [3] Plaintiff's grievance and a subsequent appeal were denied. (*See* Compl. 5; *see also* Defs.' 56.1 ¶ 10(a); Pl.'s 56.1 ¶ 10(a).) Plaintiff alleges that Roberts refused to give him any copies of the grievance or appeal. (*See* Compl. 8.)

[3]     CCS Defendants' statement pursuant to Local Civil Rule 56.1 includes two paragraphs labelled "10." (*See* Defs.' 56.1.) The Court will refer to the first of the two paragraphs as 10(a), and the second as 10(b).

On March 3, 2014, "the day after [his] appeal," Plaintiff was transferred from Westchester County Jail to Queens Private Detention Center. (*Id.* at 5, 8; *see also* Defs.' 56.1 ¶ 10(b); Pl.'s 56.1 ¶ 10(b).) Upon arrival at the new facility, Plaintiff submitted an emergency request to see a dentist and was given an appointment with American Mobile Dental. (*See* Compl. 5; Defs.' 56.1 ¶ 10(b); Pl.'s 56.1 ¶ 10(b).) The dentist recommended that certain "fillings that [Dr.] Skinner did[ ] be replaced," and subsequently replaced them. (Compl. 5; *see also* Defs.' 56.1 ¶ 10(b); Pl.'s 56.1 ¶ 10(b).) Plaintiff continued to experience pain following this procedure. (*See* Compl. 5.)

In April 2015, Plaintiff had an annual dental evaluation with American Mobile Dental, during which an x-ray and exam were performed. (*See id.*; Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) The

dentist determined that Plaintiff needed replacement of two additional fillings done by Dr. Skinner. (*See* Compl. 5; Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) The replacements were performed on May 8, 2015. (*See* Compl. 5; Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) Following the procedure, the dentist conducted an x-ray and an exam and determined that "there was no decay found in any of [Plaintiff's] teeth." (Compl. 5.) [4] Plaintiff was "[s]hocked beyond belief" and requested and received a copy of his patient chart and x-ray. (*Id.*)

[4]     In their 56.1 statement, CCS Defendants assert that the dentist for American Mobile Dental, Dr. Richter, "removed the decay in these teeth," and "replaced the temporary fillings with composite fillings." (Defs.' 56.1 ¶ 11.) Plaintiff objects to the statement regarding the removal of decay. (*See* Pl.'s 56.1 ¶ 11.)

In light of the information that there was no treatment needed in the teeth Dr. Skinner had scheduled for treatment, Plaintiff determined that he had "required no treatment at all" and that "[t]he procedures already performed [were] unnecessary." (*Id.* at 6.)

**\*3** Plaintiff seeks "an injunction against Correct Care Solutions and [Dr.] Hamad Skinner, to prohibit any further unnecessary medical procedures on County Jail inmates," as well as "[a]n order that Westchester County [Department of Corrections and Community Supervision ('DOCCS') ] and it[ ]s staff honor [p]atient/inmate request[s] for information, including copies of medical records and paper generated due to formal complaints," and "that all inmate complaints of pain to medical personnel at least [b]e scheduled for prompt evaluation, if not immediately addressed." (*Id.* at 8.) Plaintiff also seeks compensation in the amount of $500 per day from CCS and $500 per day from Westchester County, $100,000 "for whole mouth restoration by a competent dentist," punitive damages in the amount of $3,000,000," and legal fees. (*Id.* at 9.)

    B. Procedural History

Plaintiff filed his Complaint on June 19, 2015. (*See* Dkt. No. 1.) The Court issued an Order of Service on July 14, 2015. (*See* Dkt. No. 3.) CCS Defendants filed an Answer on November 9, 2015. (*See* Dkt. No. 8.) On June 3, 2016, Magistrate Judge Judith C. McCarthy issued an Order of Service for County Defendants. (*See* Dkt. No. 27.)

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 24 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

On September 14, 2016, CCS Defendants filed their Motion for Summary Judgment and accompanying papers. (*See* Dkt. Nos. 41–46.) On September 16, 2016, County Defendants filed their Motion To Dismiss and accompanying papers. (*See* Dkt. Nos. 48–50.) [5] Plaintiff filed his oppositions to both Motions on October 12, 2016, (*see* Dkt. Nos. 53–55), and CCS Defendants filed their papers in reply on November 1, 2016, (*see* Dkt. Nos. 56–57.) County Defendants did not file a reply. (*See* Dkt.)

[5]    During a telephonic conference on August 19, 2016, Plaintiff indicated that he believed discovery was complete. (*See* Dkt. (minute entry for Sept. 28, 2016).) County Defendants confirmed as much in a letter to the Court dated September 27, 2016. (*See* Dkt. No. 52.) Accordingly, on September 28, 2016, Judge McCarthy deemed discovery complete. (*See id.*)

## II. Discussion

The Court first addresses CCS Defendants' Motion for Summary Judgment and then turns to County Defendants' Motion To Dismiss.

### A. Motion for Summary Judgment

#### 1. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However,

when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

**\*4** "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 25 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

## 2. Analysis

### a. Eighth Amendment

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners....' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (footnote and internal quotation marks omitted), *overruled on other grounds*, *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).[6] "There are two elements to a claim of deliberate indifference to a serious medical condition." *Id.* at 72. "First, the plaintiff must establish that he suffered a sufficiently serious constitutional deprivation. Second, the plaintiff must demonstrate that the defendant acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *10 (S.D.N.Y. Mar. 30, 2017).

[6]   The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment. Until recently, "[c]laims for deliberate indifference to a ... serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment." *Caiozzo*, 581 F.3d at 72. However, the Second Circuit's recent decision in *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35. While the decision in *Darnell* proscribed a new analysis for claims brought by pretrial detainees, *see id.*, the analysis under the Eighth Amendment remains intact.
      Here, Plaintiff's Complaint and the briefing on the instant Motions did not indicate whether Plaintiff was a convicted prisoner or a pretrial detainee at the time of the alleged violations.

However, results from a New York State inmate information search indicate that Plaintiff (or someone with the same name and date of birth as Plaintiff) was first received into custody July 1995 and has an earliest release date of November 2017. *See* Inmate Information, New York State Department of Corrections and Community Supervision, http://nysdoccslookup.docs.ny.gov/GCA00P00/WIQ3/WINQ130. Thus, it appears that Plaintiff is a convicted prisoner when the alleged constitutional violations occurred in 2014. Accordingly, the Court analyzes Plaintiff's claims under the Eighth Amendment standard.

**\*5** "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Analyzing this objective requirement involves two inquiries: "[t]he first inquiry is whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and the second "asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. To meet the objective requirement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Under the second prong, the question is whether the defendant "knew of and disregarded an excessive risk to [a plaintiff's] health or safety and that [the defendant was] both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted). In other words, "[i]n medical-treatment cases not arising

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 26 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)
2017 WL 4280552

from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal quotation marks omitted). Mere negligence is not enough to state a claim for deliberate indifference. *See Walker*, 717 F.3d at 125; *Vail v. City of New York*, 68 F. Supp. 3d 412, 424 (S.D.N.Y. 2014). Relatedly, "mere disagreement over the proper treatment does not create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

With respect to the objective component, Plaintiff alleges that he suffered from "a most powerful pain ... [on] the whole left side of [his] face" following treatment, and experiences persistent discomfort to this day. (Compl. 4.) A sufficiently serious condition is "a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702. The Second Circuit has held that "not all claims regarding improper dental care will be constitutionally cognizable" and that "[d]ental conditions, like other medical conditions, may be of varying severity." *Id.* "A cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff." *Id.* at 703. Even though "[p]risoners are not entitled to a 'perfect plan for dental care,' " *Alster v. Goord*, 745 F. Supp. 2d 317, 333 (S.D.N.Y. 2010) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)), tooth decay and cavities may qualify as serious medical conditions, *see Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000); *see also Brown v. Mewar*, No. 07-CV-551, 2011 WL 573566, at *15 (W.D.N.Y. Feb. 14, 2011) (finding that a dental condition that "present[ed] medical urgency that might produce not death, but degeneration or extreme pain, including an inability to eat ... constituted a sufficiently serious condition as defined under the Eighth Amendment"); *Rashid v. McGraw*, No. 01-CV-10996, 2006 WL 1378945, at *7 (S.D.N.Y. May 18, 2006) (noting that claims of inadequate dental care "can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities" (internal quotation marks omitted)).

While CCS Defendants assert that "Plaintiff has ... failed to submit proof that he suffered a serious injury as a direct result of [CCS] Defendants' actions," (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("CCS Defs.' Mem.") 5 (Dkt. No. 42)), they do not dispute the genuineness of Plaintiff's complaints of pain, (*see, e.g.*, *id.* at 6 ("Plaintiff still has pain on his lower left side of his mouth.")). Construing the record, including Plaintiff's allegations, in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court assumes that Plaintiff's dental pain constituted a sufficiently serious condition as defined under the Eighth Amendment.

With respect to the second prong, however, Plaintiff has not adequately alleged that CCS Defendants "acted with a sufficiently culpable state of mind." *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017). Simply put, Plaintiff's dental needs were not ignored. The Parties do not dispute that Plaintiff underwent an annual dental evaluation on February 26, 2013, where Dr. Skinner identified four teeth in need of treatment. (*See* Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) The record further reflects that Plaintiff declined treatment on March 26, 2013, because he was in "no pain" at the time. (*See* Freeman Decl. Ex. C, at 2.) The following year, on January 28, 2014, Plaintiff again had an annual dental review, during which Dr. Skinner identified four additional teeth with cavities. (*See* Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) CCS Defendants contend that "Dr. Skinner encouraged [Plaintiff] to have dental work performed on some of his cavities at that same visit on January 28, 2014," (Defs.' 56.1 ¶ 8), while Plaintiff asserts that Dr. Skinner "ignored Plaintiff[']s initial refusal of treatment" and "proceeded to strongly try and persuade Plaintiff to have this treatment by emphasizing the seriousness of the decay," (Pl.'s 56.1 ¶ 8). In any event, "[P]laintiff agreed to have [these teeth] treated." (*Id.* ¶ 8(a); *see also* Defs.' 56.1 ¶ 8.) At a follow-up visit on February 12, 2014, Plaintiff refused the scheduled dental treatment to the remaining teeth on the right side of his mouth "because of pain." (*See* Defs.' 56.1 ¶ 9 (internal quotation marks omitted); Pl.'s 56.1 ¶ 9; Freeman Decl. Ex. C, at 7–8.)

*6 CCS Defendants argue that "Plaintiff's federal civil rights claims against [Dr.] Skinner appear to be based solely on his own subjective belief that Dr. Skinner could have done something on February 12, 2014 to get him out of pain, even though Plaintiff refused to be seen." (CCS Defs.' Mem. 5.) In response, Plaintiff contends that he "did make a complaint concerning pain, and treatment for that pain," and

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 27 of 217
Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

that "treatment for that pain was immediately ruled out." (Pl.'s Mem. of Law ("Pl.'s Summ. J. Opp'n") 6 (Dkt. No. 54).) The record does not support this assertion. (*See* Freeman Decl. Ex. H, at 20 ("Q: Did you ask about Plaintiff's pain? A: I'm sure I did. I don't recall exactly, but with any patient, I would always ask why and what we can do to try and help...."); *id.* at 24 ("Q: [W]as there any discussion about painkillers for [P]laintiff? A: ... [T]here could have been. Usually there is, but sometimes the inmate will sign the refusal and just leave because they're upset that they're in pain.... But if they stick around and we try to talk about it, we would offer Motrin.").)

As to the refusal to be treated, Plaintiff contends that his "signing of a refusal form" and its use "as a blanket instrument is misguided" because the form does not indicate "what exactly [was] being refused." (Pl.'s Summ. J. Opp'n 6.) Plaintiff asserts that "[i]f medication for pain was offered and refused by [P]laintiff," as Dr. Skinner testified, "the refusal form provides an area for dental staff to record this very specific refusal." (*Id.*) Plaintiff is correct that the "Refusal of Treatment" form provides spaces for "Refused medication" and "Refused dental care," and only the latter is checked. (Freeman Decl. Ex. C, at 7.) However, Plaintiff in his deposition testified that on February 12, 2014, he did not ask Dr. Skinner or the dental assistant for treatment for his pain. (*See* Freeman Decl. Ex. F, at 64–65 ("Q: ... [D]id you ... ask [the dental assistant] if you could have treatment for your pain? Or at least see the dentist, because he wasn't seeing you at that time? ... A: No, I did not specifically ask [the dental assistant] for that."); *id.* at 65 ("Q: ... [D]id you ask [Dr. Skinner], can you please see me for the pain on the left side of my mouth? A: I don't think that I said those words, no.").) Thus, the record does not establish that "treatment for that pain was immediately ruled out" or unaddressed. (Pl.'s Summ. J. Opp'n 6.) Indeed, the record does not indicate that Plaintiff ever even made a request for treatment of his pain to Dr. Skinner or any employee of CCS. To the extent Plaintiff claims that Roberts or Westchester County refused his requests to treat his pain, the Court addresses those allegations below. Accordingly, the Motion for Summary Judgment is granted as to Plaintiff's deliberate indifference claims.

### b. Right to Medical Information

In his opposition to CCS Defendants' Motion for Summary Judgment, Plaintiff includes arguments supporting the violation of his right to medical information in connection

with his right to refuse the treatment he ultimately underwent. (*See generally id.* at 2–4.) CCS Defendants contend in reply that "[P]laintiff provides no evidence that he was not told of the risks and benefits of the treatment," but that "the issue is moot as the use of temporary filling material is irrelevant to the issue of whether Dr. Skinner was deliberately indifferent or committed malpractice which are the allegations contained in Plaintiff's Complaint." (CCS Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("CCS Defs.' Reply") 4 (Dkt. No. 56).)

To the extent CCS Defendants argue that such allegation that Plaintiff was not informed of the risks of the procedures are not explicitly included in Plaintiff's Complaint, the Court agrees. However, in his Complaint, Plaintiff alleges that "[o]n February 21[,] 2014[,] [he] filed a formal grievance ... contain[ing] the ... information [about his treatment], in addition [to] ... several possible solutions as a way of resolving [his] complaint against dental staff." (Compl. 4.) Plaintiff cites to "exhibit D-1"—his grievance—which is attached to the Complaint. (*See id.* at 21–24.) In the grievance, Plaintiff requests that "dental staff ... notify patients that they will only rec[ei]ve temporary fillings *before* treatment is started," and requests "an answer to the question of why [Plaintiff] wasn't informed that [his] tooth was in danger of being pulled *before* treatment." (*Id.* at 21.)

*7 While "a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment," *Almonte v. Florio*, No. 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (italics omitted), where a plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes," *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also, e.g., Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1998) (noting that where a pro se complaint is sworn, the pleading and its attached exhibits may be considered on a motion for summary judgment). Here, Plaintiff's Complaint is signed and dated and he "declare[s] under penalty of perjury that the foregoing is true and correct." (Compl. 11.) Thus, the Court considers the allegations made in Plaintiff's grievance and referenced and attached to his Complaint, and turns to the merits of those claims.

2017 WL 4280552

A "person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).

> While decisions regarding medical treatment are normally private matters to be resolved between an individual and his or her physician, when these decisions occur in the prison setting, the government has a role. The state is obligated to provide medical care to those that it has incarcerated and thus made dependent on the care and services that it provides.

*Pabon v. Wright*, 459 F.3d 241, 249 (2d Cir. 2006). The Second Circuit has further explained that

> an individual cannot exercise his established right to refuse medical treatment in a meaningful and intelligent fashion unless he has sufficient information about proposed treatment. Absent knowledge of the risks or consequences that a particular treatment entails, a reasoned decision about whether to accept or reject that treatment is not possible. We therefore hold that, in order to permit prisoners to exercise their right to refuse unwanted treatment, there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment.

*Id.* at 249–50. The Second Circuit held, however, that the right to this information "is far from absolute." *Id.* at 250. "To assert a claim for a violation of this due process right to adequate information, an inmate must allege: '(1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure

was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment.' " *Alston v. Bendheim*, 672 F. Supp. 2d 378, 384 (S.D.N.Y. 2009) (quoting *Pabon*, 459 F.3d at 246). Put another way, "[t]he plaintiff must show that the doctor withheld information with the intent that the prisoner agree to treatment that he otherwise would refuse." *Vega v. Rell*, No. 09-CV-737, 2012 WL 2860793, at *8 (D. Conn. July 9, 2012).

While Plaintiff argues that "if [he] would have known that he would be rec[ei]ving temporary fillings he would have been more firm in his refusal," this does not demonstrate that he would have declined the procedure altogether. (Pl.'s Summ. J. Opp'n 3.) In any event, even were the Court to assume Plaintiff would have refused the fillings had he been given this information, he has not established that Dr. Skinner withheld information about the temporary nature of the fillings with the *intent* of having Plaintiff undergo treatment. *See Smith v. Corizon Health Servs.*, No. 14-CV-8839, 2015 WL 6123563, at *2 (S.D.N.Y. Oct. 16, 2015) ("The ... test for deliberate indifference requires that [the] [p]laintiff prove that [the] [d]efendants deliberately withheld information about the [medical treatment], specifically for the purpose of inducing an inmate to accept [it]. It is not enough for the health worker to merely fail to inform a prisoner of the risks and side effects...." (footnote and citations omitted)); *Lara v. Bloomberg*, No. 04-CV-8690, 2008 WL 123840, at *5 (S.D.N.Y. Jan. 8, 2008) (holding that the plaintiff failed to satisfy a claim of failure to receive medical information because he "[did] not, and indeed ... [could not], allege that the doctors' purported failure to inform [him] of the side effects of his medication were driven by the doctors' desire to require [the plaintiff] to accept the treatment offered"); *see also Pierce v. Pillai*, No. 14-CV-1477, 2016 WL 6774225, at *5 (D. Conn. Nov. 15, 2016) ("[The] [p]laintiff must show that the doctor withheld information with the intent that the prisoner agree to treatment that he otherwise would refuse."). Indeed, attached to Plaintiff's opposition is a letter from CCS Defendants' counsel stating that "Dr. Skinner's rate of pay is based on a full-time salaried position with CCS, and [he] does not receive any 'incentive' " based on procedures performed. (Pl.'s Summ. J. Opp'n 14.) "Inadvertent failures to impart medical information," "simple lack of due care," and "simple negligence do not make out a violation of either the substantive or procedural aspects of the Due Process Clause." *Lara*, 2008 WL 123840, at *4 (italics and internal quotation marks omitted). [7] Therefore, the Court grants the Motion for Summary Judgment as to Plaintiff's claims regarding the right to medical information. [8]

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 29 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

7    As to Plaintiff's claims that he "wasn't informed that [his] tooth was in danger of being pulled *before* treatment," (Compl. 21), further in his grievance, Plaintiff contradicts this claim by stating "[t]hey emphasized the rapid decaying and told me that I was in danger of having several teeth pulled if I didn't get the fillings," (*id.* at 22).

8    In his opposition to CCS Defendants' Motion for Summary Judgment, Plaintiff also raises arguments in support of an access to the courts claim against County Defendants. (*See* Pl.'s Summ. J. Opp'n 11 ("Roberts refused to provide copies [of the grievance] to [P]laintiff."); *id.* at 12 ("Roberts refused to give [P]laintiff copies of documents that policy allowed for [P]laintiff to have at the time."); *id.* at 12–13 ("Roberts['] actions created an unjust economic burden on [P]laintiff. These actions also prevented [P]laintiff from providing these withheld documents as exhibits in the [C]omplaint."); *id.* at 13 ("Roberts['] testimony that inmates are not provided with copies of their lawful documents is further evidence of another suspect policy/practice and custom of Westchester County.").)
The Court declines to consider these arguments in deciding the Motion for Summary Judgment brought by CCS Defendants. (*See* CCS Defs.' Reply 6 ("CCS Defendants have not responded to any arguments by Plaintiff involving [County Defendants], as they are represented by separate counsel who has filed its own pending Motion [T]o Dismiss.").)

### c. Supplemental Jurisdiction

**\*8** The Court also construes Plaintiff's Complaint as asserting claims of malpractice and negligence against CCS Defendants for the performance of unnecessary dental work. (*See* Compl. 6 (Plaintiff determined that he had "required no treatment at all" and that "[t]he procedures already performed [were] unnecessary").) As the Court ultimately dismisses the federal claims against these Defendants, it need not exercise its discretion to maintain supplemental jurisdiction over any pending state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...."). Thus, the Court declines to exercise supplemental jurisdiction over

these claims arising under state tort law. *See Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008) ("[I]f [the plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims."); *Thomas v. Ariel West*,—F. Supp. 3d —, 2017 WL 1031277, at \*9 (S.D.N.Y. Mar. 15, 2017) (granting summary judgment on the plaintiff's federal claims and "declin[ing] to exercise supplemental jurisdiction of [the] [p]laintiff's state- and city-law claims relating to those alleged violations"). The Court thus turns to County Defendants' Motion To Dismiss.

### B. Motion To Dismiss

#### 1. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' ") (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)); *id.* at 678–79 ("Rule 8 marks

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 30 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

**\*9** Because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (same). This admonition "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet*, 640 F. Supp. 2d at 348; *see also McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (same). However, the liberal treatment afforded to pro se litigants does not excuse a pro se party "from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (internal quotation marks omitted).

## 2. Analysis

### a. Insufficient Service

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). Valid service is a prerequisite for a federal court to assert personal jurisdiction over a claim. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). "When a

defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010) (alteration and internal quotation marks omitted); *see also Tomney v. Int'l Ctr. for the Disabled*, No. 02-CV-2461, 2003 WL 1990532, at \*3 (S.D.N.Y. Apr. 29, 2003) ("Once a defendant raises a challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy." (internal quotation marks omitted)). In determining the sufficiency of service, the Court "must look to matters outside the complaint to determine what steps, if any, the plaintiff took to effect service." *C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 427 (S.D.N.Y. 2005) (internal quotation marks omitted); *see also PH Int'l Trading Corp. v. Nordstrom, Inc.*, No. 07-CV-10680, 2009 WL 859084, at \*3 (S.D.N.Y. Mar. 31, 2009) ("A court may, on a Rule 12(b)(5) motion to dismiss, consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56." (alteration and internal quotation marks omitted)).

Rule 4(m) requires a plaintiff to effect proper service on a defendant within 90 days of the filing of the complaint. *See* Fed. R. Civ. P. 4(m).[9] If a plaintiff fails to do so, the Court "must dismiss the action without prejudice against [the] defendant or order that service be made within a specified time." *Id.* However, if the plaintiff has demonstrated good cause for a failure to effect service, the court *must* extend the time to effect service. *Id.*; *see also Blessinger v. United States*, 174 F.R.D. 29, 31 (E.D.N.Y. 1997) (noting that if a plaintiff demonstrates good cause, "the extension [to serve] is mandatory"). To determine whether a plaintiff has demonstrated good cause, "[c]ourts generally consider three factors ...: (1) whether the delay resulted from inadvertence or whether a reasonable effort to effect service has occurred, (2) prejudice to the defendant, and (3) whether the plaintiff has moved for an enlargement of time to effect service under Rule 6(b) of the Federal Rules of Civil Procedure." *Echevarria v. Dep't of Corr. Servs. of N.Y.C.*, 48 F. Supp. 2d 388, 392 (S.D.N.Y. 1999).

9    Although not relevant for purposes of this Opinion, the Court notes that, at the time Plaintiff filed this Action in June 2015, the former 120-day period provided for by Rule 4(m) was in effect. *See, e.g.*, *Rosado-Acha v. Red Bull Gmbh*, No. 15-CV-7620, 2016 WL 3636672, at \*9 (S.D.N.Y. June 29, 2016) ("[U]nder Federal Rule of Civil Procedure 4(m), prior to its December 2015 amendment, a plaintiff

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 31 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

was required to serve a defendant with a summons and a copy of the complaint within 120 days after the complaint was filed.").

**\*10** Here, the docket reflects that service was executed upon Roberts on June 6, 2016 and accepted by Officer Eveans. (*See* Dkt. No. 32.) County Defendants contend that Officer Eveans was not authorized to accept personal service on behalf of Roberts and that "Plaintiff has neither alleged the existence of nor cited to/produced from the public records maintained by the Westchester County Clerk, any filing by Christopher Roberts appointing Officer Ev[e]ans as an agent to accept personal service on behalf of Roberts." (Defs.' Cty. of Westchester and Sergeant Roberts Mem. of Law in Supp. of Mot. To Dismiss the Compl. ("Cty. Defs.' Mem.") 4–5 (Dkt. No. 50).)

Although the "special solicitude afforded to pro se civil rights litigants does not give them license to violate the Federal Rules of Civil Procedure," *Self v. LaValley*, No. 10-CV-1463, 2013 WL 1294448, at \*3 (N.D.N.Y. Mar. 27, 2013) (italics omitted), the Court has an obligation "to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training," *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (italics omitted). Moreover, the Second Circuit has a "clearly expressed preference that litigation disputes be resolved on the merits." *Mejia v. Castle Hotel, Inc.*, 164 F.R.D. 343, 346 (S.D.N.Y. 1996); *see also Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995) (same).

In an Order of Service dated June 3, 2016, the Court instructed the Clerk of Court "to fill out a U.S. Marshals Service Process Receipt and Return form" for County Defendants "and deliver to the Marshals Service all of the paperwork necessary for the Marshals Service to effect service upon these defendants." (Dkt. No. 27.) The Marshals Service was additionally directed to effect service upon County Defendants within 14 days of the date of the Order. (*See id.*)

At the Court's instruction, Plaintiff relied on the Marshals Service to carry out his service obligations in the allotted time and was seemingly unaware that service was ineffective. Additionally, County Defendants do not allege any prejudice to Roberts. The Court thus finds that Plaintiff has demonstrated good cause for his failure to serve Roberts and is unwilling to dismiss the claims against him on this basis.

b. Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

**\*11** As a general matter, the New York State Department of Corrections and Community Supervision Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 701 et seq.; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at \*2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). The second step in the tripartite framework is for the grievant or any direct party to appeal the Inmate Grievance Review Committee's decision to the prison superintendent within seven calendar days after receipt of the written response, although the

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the Central Office Review Committee (CORC), which the prisoner must do within seven days of the superintendent's written response to the grievance. *Id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit. *See id.* "[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

The PLRA does, however, "contain[ ] its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently explained:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust ... has real content.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting *Booth*, 532 U.S. at 738).

There are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), but they do "guide the [c]ourt's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

A plaintiff need not plead that one of these three circumstances exists or that he did in fact exhaust his administrative remedies because the "[f]ailure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement." *Williams*, 829 F.3d at 122. Instead, County Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies. *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003) ("[The] defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity."); *see also Williams*, 829 F.3d at 122 ("[I]nmates are not required to specifically plead or demonstrate exhaustion in their complaints." (internal quotation marks omitted)). Thus, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint." *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13-CV-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

**\*12** In their Motion To Dismiss, County Defendants assert that "[P]laintiff did not appeal to the State of New York's Citizen Policy and Complaint Review Council, which is the final step in the grievance process regarding appeals of an inmate's grievance." (Cty. Defs.' Mem. 6.) County Defendants acknowledge that "[P]laintiff has annexed to his [C]omplaint evidence of a grievance concerning his alleged inadequate medical treatment," but contend that "this was not the entire grievance executed by the [P]arties." (*Id.*) County Defendants reference Exhibit D to their Motion, "which contains ... [P]laintiff's entire grievance documents, including Sergeant Roberts' determination, [P]laintiff's appeal, and Warden Orlando's denial of [P]laintiff's appeal, and acceptance by [P]laintiff of the [d]ecision of Warden Orlando as evidenced by his signature indicating the same," as well as Exhibit C, an affidavit of Roberts, "indicat[ing] ... [P]laintiff did not appeal to the State of New York's Citizen's Policy and Complaint Review Council." (*Id.*)

It is not clear from the face of the Complaint that Plaintiff failed to fully exhaust his administrative remedies before commencing this Action. In the section of the standard prisoner complaint form that asks, "[w]hat steps, in any, did [Plaintiff] take to appeal [the denial]? Describe all efforts to

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 33 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

appeal to the highest level of the grievance process," (Compl. 7), Plaintiff responds that he "notified the staff member in charge, S[ergeant] Roberts[,] of [his] desire to appeal the denial," (*id.*). It is unclear whether the appeal Plaintiff references is the third and final step. While Plaintiff further contends that he "was transferred the day after [his] appeal was denied, making any further action at the administrative level moot," Plaintiff does not clarify whether he actually *took* any further action, despite its alleged futility. (*Id.* at 8.) Additionally, it is not clear if Plaintiff is contending that his transfer rendered his administrative remedies unavailable under *Ross. See* 136 S. Ct. at 1858. Thus, the Court cannot find that "nonexhaustion is clear from the face of the complaint." *Lovick,* 2014 WL 3778184, at *4. Accordingly, the Court declines to dismiss Plaintiff's Complaint on the basis of County Defendants' exhaustion defense.


### c. *Monell*

County Defendants further contend that "[t]here are no allegations that the County had a policy, custom or practice of any kind which was unconstitutional on its face" and that "[t]here is no respondeat superior theory of liability available as against the County in its position as merely an employe[r] of Defendant Roberts." (Cty. Defs.' Mem. 10.) The Court agrees.

A municipal defendant "cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 691 (1978) (italics omitted); *see also Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (reaffirming that "a municipality cannot be held liable on a respondeat superior basis for the tort of its employee" (italics omitted)). Rather, to prevail on a § 1983 claim against a municipal employer, Plaintiff must satisfy the requirements set forth in *Monell* and its progeny, which adhere to the well-settled principle that "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691; *see also Hunter v. City of New York,* 35 F. Supp. 3d 310, 322 (E.D.N.Y. 2014) ("In order to sustain a claim for relief pursuant to § 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

**\*13** *Brandon v. City of New York,* 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). In addition, a plaintiff must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir. 2008) (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury" (internal quotation marks omitted)); *Tieman v. City of Newburgh,* No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) ("[T]here must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." (internal quotation marks omitted)); *Johnson v. City of New York,* No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that "a plaintiff must establish a causal connection—an affirmative link— between the [municipal] policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

"Normally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Tieman,* 2015 WL 1379652, at *12 (internal quotation marks omitted); *see also City of Oklahoma City v. Tuttle,* 471 U.S. 808, 841 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 34 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

of the incident includes proof that it was caused by an existing, unconstitutional municipal policy ... [that] can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). There are at least two circumstances that courts have expressly identified as constituting a municipal policy: "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008). "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker," *id.*, but nonetheless "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (internal quotation marks omitted); *see also Tieman*, 2015 WL 1379652, at \*16 ("To prevail on this theory of municipal liability, ... a plaintiff must prove that the custom at issue is permanent and well-settled.").

Plaintiff's Complaint neither cites to nor describes any official municipal policy or practice, nor does he allege that any individual had official policymaking authority and took action pursuant to that authority. Additionally, the Complaint is devoid of any mention of the County's actions, let alone facts that support the existence of a tacit, widespread custom sufficient to sustain a claim for relief under *Monell*. While Plaintiff's opposition to County Defendants Motion To Dismiss for the first time makes mention of policies and customs of the County, (Pl.'s Statement in Opp'n to 12(b)(6) Mot. ("Pl.'s Mot. To Dismiss Opp'n") 6 (Dkt. No. 55) ("The record in this case establishes that the custom and policy of Westchester County is to be aware that there are inmates who are suffering in their pain"); *id.* at 11 ("Roberts['] testimony that inmates are not provided with copies of their lawful documents is further evidence of another suspect policy/ practice and custom of Westchester County.")), "[c]onclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim," *Maynard v. City of New York*, No. 13-CV-3412, 2013 WL 6667681, at \*4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or custom would be insufficient if wholly conclusory"); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d

268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise—that violates the Federal Constitution"); *cf. Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"). Accordingly, Plaintiff's claims against the County are dismissed.

### d. Qualified Immunity

**\*14** County Defendants further contend that Roberts is entitled to qualified immunity and thus "immune to the allegations in the instant lawsuit." (Cty. Defs.' Mem. 9–10.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions ... by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

County Defendants argue that "[b]ecause S[ergeant] Roberts properly processed [P]laintiff's grievance by first receiving it, signing it, and then forwarding the grievance to Michael Kelly, CCS employee, and then basing his determination on the information received from Mr. Kelly, he complied with all rules and regulations regarding the adjudication of grievances." (Cty. Defs.' Mem. 9 (citation omitted).) [10]

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 35 of 217

Canady v. Correct Care Solutions, Not Reported in Fed. Supp. (2017)

2017 WL 4280552

10    In their argument for qualified immunity, (*see* Cty. Defs.' Mem. 9), County Defendants cite to the Affidavit of Captain Christopher Roberts (the "Roberts Affidavit"), attached as Exhibit C to their Motion To Dismiss, (*see* Decl. in Supp. of Defs.' Mot. To Dismiss the Compl. Ex. C (Dkt. No. 49)). The Court generally cannot consider affidavits and exhibits on a motion to dismiss. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see also Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (noting a court ruling on a Rule 12(b)(6)) motion "may consider the complaint[,] ... any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit" (alterations and internal quotation marks omitted); *Leonard F.*, 199 F.3d at 107 ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)). The Roberts Affidavit is neither attached to the Complaint, nor incorporated in it by reference, and the Court cannot take judicial notice of this exhibit.

To the extent Plaintiff's allegations against Roberts relate simply to Roberts' denial of Plaintiff's grievance, (*see* Compl. 4 ("On February 21[,] 2014[,] [Plaintiff] filed a formal grievance with facility staff member ... Roberts. The grievance contained ... several possible solutions as a way of resolving [Plaintiff's] complaint.... The entire grievance, including each of [Plaintiff's] suggestions to resolve the complaint, w[as] denied.")), the Court agrees with County Defendants that Roberts is entitled to qualified immunity on this claim, *see McIntosh v. United States*, No. 14-CV-7889, 2016 WL 1274585, at *20 (S.D.N.Y. Mar. 31, 2016) ("[Q]ualified immunity may shield the prison official who denies an inmate's grievance following an investigation."); *see also Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 145–46 (S.D.N.Y. 2002) (same). Plaintiff does not allege any malfeasance on behalf of Roberts with respect to the denial itself, but rather, appears displeased with the outcome of the process.

**\*15** As to Plaintiff's claim that Roberts denied him *copies* of his grievance, (*see* Compl. 8 ("Roberts refused to give [Plaintiff] any copies of [his] formal grievance and the resulting appeal, stating if [Plaintiff] want[ed] copies, [he would] have to 'sign off.' ")), the circumstances surrounding the alleged denial are unclear from Plaintiff's Complaint. Plaintiff does not assert why he could not or did not "sign off" to receive the records as Roberts requested, though Plaintiff's opposition suggests that the imposition of a fee associated with the copies, "created an unjust economic burden on [P]laintiff." (Pl.'s Mot. To Dismiss Opp'n 10–11.) County Defendants offer no response to Plaintiff's allegations regarding the refusal to provide Plaintiff with copies, (*see* Cty. Defs.' Mem. 9–10), but in response to County Defendants' Motion, Plaintiff asserts that the "all copies should have been provided for free to [P]laintiff," (Pl.'s Mot. To Dismiss Opp'n 10). [11] "Courts in the Second Circuit have repeatedly held that a prisoner does not have a constitutional right to free copies and prison regulations that limit access to such copies are reasonably related to legitimate penological interests." *Muhammad v. Hodge*, No. 07-CV-232, 2010 WL 1186330, at *5 (W.D.N.Y. Mar. 24, 2010) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Therefore, Roberts actions "did not violate clearly established law." *Johnson*, 239 F.3d at 250. Roberts is thus entitled to qualified immunity and Plaintiff's claims against him are dismissed. [12]

11    Additionally, to extent Plaintiff's allegations relate to the denial of copies of his medical records, (*see* Compl. 8 (requesting an order that DOCCS "staff honor patient/inmate request[s] for information, including copies of medical records")), the Court notes that at least one court within the Second Circuit has held that "a prisoner has no constitutional right to access or obtain copies of his prison mental health records," *Moore v. Chapedelaine*, No. 15-CV-775, 2015 WL 4425799, at *3 (D. Conn. July 17, 2015); *see also Noel v. Brian Moore*, No. 16-CV-1328, 2017 WL 435813, at *3 (N.D.N.Y. Feb. 1, 2017) (holding "that [the] [p]laintiff's allegations regarding the destruction of his copies of his medical records do not give rise to a claim for the violation of his constitutional rights cognizable under 42 U.S.C. § 1983").

12    Should Plaintiff choose to file an Amended Complaint, he should include details as to whether

2017 WL 4280552

he filed an appeal of the superintendent's decision and whether Roberts' failure to provide copies of Plaintiff's grievances impeded Plaintiff's ability to administratively exhaust his claims.

### III. Conclusion

For the reasons stated above, CCS Defendants' Motion for Summary Judgment and County Defendants' Motion To Dismiss are granted. In light of Plaintiff's prose status, and because this is the first adjudication of Plaintiff's claims on the merits, Plaintiff's claims against the County Defendants, and County Defendants only, are dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above with respect to County Defendants, Plaintiff must do so within 30 days of the date of this Opinion & Order. The failure to do so may result in the dismissal of the claims against County Defendants with prejudice.

Within seven days of the date of this Opinion & Order, County Defendants shall provide the Court with a service address for Defendant Roberts or confirm that the current address is still the proper address at which to effect service. Should Plaintiff choose to file an Amended Complaint, the Court will issue an Order of Service.

The Clerk of Court is respectfully directed to terminate the pending Motions, (see Dkt. Nos. 41, 48), enter judgment in favor of Defendants CCS and Dr. Skinner, and mail a copy of this Opinion & Order to Plaintiff at the address listed on the docket.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4280552

---

**End of Document**                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6973732
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Crystal LOPEZ, Plaintiff,

v.

Police Officer Christopher GUZICZEK, John
Doe Police Officers 1-5, their true names and
identities are presently unknown, sued individually
and in their capacity as police officers of the
Westchester County police department, Defendants.

21 CV 10099 (NSR)
|
Signed October 23, 2023

**Attorneys and Law Firms**

Marlon Geoffrey Kirton, Kirton Law Firm, Hempstead, NY,
for Plaintiff.

MaryBeth Catherine Allen-Knecht, Westchester County Law
Department, White Plains, NY, for Defendant Police Officer
Christopher Guziczek.

ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Presently before the Court is Plaintiff's motion for an
extension of time to serve Defendant. For the reasons stated
below, Plaintiff's request is granted.

On November 26, 2021, Crystal Lopez ("Plaintiff")
commenced the instant federal action by her filing of the
Complaint. (ECF No. 1.) On March 6, 2023, the Court
issued an Order to Show Cause (the "OSC"; ECF No. 3),
ordering that Plaintiff show cause in writing on or before
March 27, 2023 why her claims against Defendants should
not be dismissed without prejudice for want of prosecution
pursuant to Fed. R. Civ. P. 41(b), as there had been no
further activity in the case since it was commenced. The Court
noted that failure to comply with the OSC would result in
dismissal of this action for want of prosecution. On March
27, 2023, Plaintiff filed a letter response to the OSC notifying
the Court of Plaintiff's intention to prosecute this action.
(ECF No. 5.) Accordingly, on March 29, 2023, this Court
vacated the OSC and directed Plaintiff to file an Amended

Complaint on ECF. (ECF No. 6.) Plaintiff subsequently
filed an Amended Complaint on March 31, 2023, which
Plaintiff served on Defendant Officer Christopher Guziczek
("Defendant Guziczek") and Defendants John Doe #1 and #2
on June 23, 2023. (ECF Nos. 7-10.) Proof of such service
was not filed until July 29, 2023. (*Id.*) However, service
was defective because Plaintiff failed to attach a court-issued
summons pursuant to Federal Rule of Civil Procedure 4(a).
(ECF Nos. 8-10.)

Counsel for Defendant Guziczek noted the deficient service
in their Letter Motion dated September 6, 2023. (ECF No.
11.) In that Letter Motion, Defendant also requested the Court
compel Plaintiff to show cause why the case should not be
dismissed for failure to provide an executed 160.50 release
pursuant to Local Rule 83.10. (*Id.*) Plaintiff's counsel filed
a declaration in response stating he had not realized the
summons had not been issued, he sent the 160.50 release to
Plaintiff and instructed her how to complete the forms, and
he retained a licensed process server to serve Defendants with
the Amended Complaint, Summons, and 160.50 waiver. (ECF
No. 16.) Plaintiff also requested an issuance of summons on
September 11, 2023, which the Clerk of the Court issued the
next day. (ECF No. 13, 17.) As of the date of this Order,
Plaintiff has not filed further proof of service on Defendant
Guziczek or indicated she has provided the executed 160.50
release.

Federal Rule of Civil Procedure 4(m) provides that "[i]f a
defendant is not served within 90 days after the complaint is
filed, the court—on motion or on its own after notice to the
plaintiff—must dismiss the action without prejudice against
that defendant ...." Fed. R. Civ. P 4(m). If, however, "the
plaintiff shows good cause for the failure, the court *must*
extend the time for service for an appropriate period." *Id.*
(emphasis added). Accordingly, there are two means by which
a court can grant an extension: (1) upon a showing of good
cause; or (2) within its discretion. *Id.*; *see also Zapata v. City
of New York*, 502 F.3d 192, 195–96 (2d Cir. 2007) (holding
an extension proper "even in the absence of good cause"). "The
following two factors are relevant in a Court's evaluation of
good cause: (1) the reasonableness and diligence of plaintiff's
efforts to serve; and (2) the prejudice to defendants from the
delay." *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d
458, 465 (S.D.N.Y. 2017) (internal quotation marks omitted)
(quoting *Vantone Grp. Ltd. Liab. Co. v. Yangpu Ngt. Indus.
Co.*, 13-CV-7639 (LTS) (FM), 2016 WL 3926449 (S.D.N.Y.
July 15, 2016)).

**\*2** Here, the Court will exercise its discretion to grant the extension on the service deadline. *See e.g., Zapata,* 502 F.3d at 196. The Second Circuit has consistently held that Rule 4 should be construed liberally and that "incomplete or improper service will lead the court to dismiss the action unless it appears that proper service may still be obtained." *Romandette v. Weetabix Co.,* 807 F.2d 309, 311 (2d Cir. 1986). Plaintiff promptly responded to the Court's orders and deadlines, filing an Amended Complaint by the date set by the OSC and requesting an issuance of summons less than a week after the Court ordered Plaintiff to respond to Defendant's September 6, 2023 Letter Motion. Moreover, Plaintiff did attempt to execute service within the 90-day deadline of Rule 4, serving the Amended Complaint (albeit without the court-issued Summons) 84 days after filing. Finally, Plaintiff's status reports *voluntarily* filed on September 20, September 21, September 28, and October 13, 2023 (ECF Nos. 18-22)

further demonstrate Plaintiff's and her counsel's continued due diligence to sign the 160.50 waiver. While she has not filed an affidavit of service, Plaintiff has also indicated she served Defendant Guziczek with the Summons and Amended Complaint. (ECF No. 22); (Pl. Mem. at 6).

Plaintiff's request for an extension of time is GRANTED for good cause. The deadline for Plaintiff to serve Defendant Guziczek with the Amended Complaint and Summons and to provide him with an executed 160.50 release is November 17, 2023. Such extension is deemed the final extension.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 6973732

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2262792
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Pratik PATEL and Lalit Patel, Plaintiffs,
v.
Noddy SINGH and Arjun Singh, Defendants.

21-CV-00759 (HG) (LGD)
|
Signed February 28, 2023

**Attorneys and Law Firms**

Alex Kadochnikov, Shiryak, Bowman, Anderson, Gill & Kadochnikov, LLP, Kew Gardens, NY, for Plaintiffs.

Bobby Walia, Walia & Walia, PLLC, Flushing, NY, for Defendants.

## MEMORANDUM & ORDER

HECTOR GONZALEZ, United States District Judge:

*1 This decision resolves Defendants' motion to dismiss Plaintiffs' complaint, *see* ECF No. 22, and Plaintiffs' motion to dismiss Defendants' counterclaims, *see* ECF No. 19, including the issues related to those motions about which Judge Seybert requested additional briefing while she presided over this case, *see* ECF No. 28. As further set forth below, the Court has considered the parties' submissions both related to their original motions and in response to Judge Seybert's order and finds that diversity jurisdiction exists over Plaintiffs' claims. The Court therefore denies Defendants' motion to dismiss and grants Plaintiffs' motion seeking permission to file their proposed amended complaint. The Court also denies Plaintiffs' motion to dismiss Defendants' counterclaims.

## PROCEDURAL HISTORY

Plaintiff Pratik Patel alleges that he received $50,000 from Plaintiff Lalit Patel to invest with Defendants in a food services business, Pan King, Inc. ECF No. 1 ¶¶ 2–3. As a result of that investment, Pratik Patel allegedly received a 25% ownership interest in Pan King, and Defendants Noddy Singh and Arjun Singh split evenly between themselves the

remaining 75% ownership interest in the corporation. *Id.* ¶¶ 2–4. Plaintiffs allege that despite Pratik Patel having done substantial work on behalf of Pan King, they never received any profits from the business, and Defendants instead caused Pratik Patel to become liable for unpaid taxes and penalties of $5,723.45 attributable to Pan King's supposed profits. *Id.* ¶¶ 7–14; *see* ECF No. 1-2. Plaintiffs' complaint asserted a variety of claims, some of which have been withdrawn in their proposed amended complaint, all of which were based on New York law and premised on the Court's diversity jurisdiction. ECF No. 1 ¶ 5.

Defendants' answer asserted counterclaims for attorneys' fees and to recoup losses that Plaintiffs supposedly caused Pan King to incur. ECF No. 12 ¶¶ 143–54. They also moved to dismiss the complaint on the grounds that Plaintiffs did not adequately serve Arjun Singh and that Plaintiffs failed adequately to plead the amount-in-controversy requirement necessary for diversity jurisdiction. ECF No. 22. Plaintiffs moved to dismiss Defendants' counterclaims. ECF No. 19.

Judge Seybert, who previously presided over this case, responded to the parties' motions by seeking further briefing about jurisdictional issues and directing Plaintiffs to file a proposed amended complaint addressing those issues. ECF No. 28. First, she directed Plaintiffs to address the states of citizenship of the Patels and the Singhs. *Id.* at 4. Second, since Plaintiffs assert some derivative claims on behalf of Pan King, she directed Plaintiffs to address in their proposed amended complaint and supplemental memorandum of law whether Pan King should be aligned as a plaintiff or defendant in this case and whether the Court may exercise diversity jurisdiction based on that alignment. *Id.* at 5.

Plaintiffs responded by filing an amended complaint with new allegations about the parties' states of citizenship, along with allegations designed to show that Defendants exercised control over Pan King and that Pan King should, therefore, be aligned as a Defendant for purposes of Plaintiffs' derivative claims. ECF No. 34. Plaintiffs' proposed amended complaint asserts direct claims, in Plaintiffs' individual capacity, for breach of contract and an accounting. *Id.* ¶¶ 32–37, 65–68. Plaintiffs also assert a derivative claim on behalf of Pan King for conversion and assert a breach of fiduciary duty claim that they allege as a derivative claim or, alternatively, as a direct claim. *Id.* ¶¶ 38–64. Plaintiffs had previously asserted each of these claims in their original complaint. *See* ECF No. 1. However, Plaintiffs' proposed amended complaint also asserts several new claims on behalf of Pratik Patel for alleged

violations of the New York Labor Law related to the work that Pratik Patel performed on behalf of Pan King. ECF No. 34 ¶¶ 69–84. Specifically, Pratik Patel alleges that Defendants failed to pay him the full amount of minimum wages and overtime that he was owed for his work and failed to provide him with written statements of his wages at the time he was hired and with each paycheck. *Id.*

## LEGAL STANDARD

**\*2** To withstand a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). [1] "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. When a defendant makes a facial challenge to the sufficiency of the allegations in a plaintiff's complaint related to subject matter jurisdiction, rather than offering extrinsic evidence that attempts to rebut those allegations, the Court must still "accept[ ] the allegations in the complaint as true and draw[ ] all reasonable inferences in favor of the plaintiff." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022) (applying same pleading standard to "district court's grant of a motion to dismiss under Rules 12(b)(1) and 12(b)(6)"); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (explaining the difference between "facial" and "fact-based" challenges to subject matter jurisdiction).

[1]    Unless noted, case law quotations in this order accept all alterations and omit all internal quotation marks, citations, and footnotes.

## DISCUSSION

### I. Diversity Jurisdiction

#### A. Diversity of Citizenship Exists Between the Individual Parties

The simplest issue that the Court must resolve to determine whether it has diversity jurisdiction is whether the citizenship of the parties is diverse. The Court concludes that Plaintiffs'

proposed amended complaint addresses the concerns raised by Judge Seybert regarding the individual parties' states of citizenship and properly alleges that the individual Defendants are citizens of different states than Plaintiffs. "An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile[,] in other words the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Van Buskirk v. United Grp. of Cos.*, 935 F.3d 49, 53 (2d Cir. 2019). Plaintiffs allege that they are domiciled in New Jersey, at the specific address identified in the proposed amended complaint, and intend to remain there, and that Defendants are domiciled in New York and intend to remain there. ECF No. 34 ¶¶ 6–8. Defendants argue that Plaintiffs' allegations about Defendants' domicile are conclusory, but Defendants proffer no facts disputing that they are citizens of New York. If Defendants have contrary facts, then they may challenge Plaintiffs' assertions of diversity of citizenship on summary judgment.

#### B. Aligning the Corporation as a Defendant Preserves Diversity of Citizenship

Next, the Court must resolve the issue of Pan King's citizenship and whether it should be aligned as a plaintiff or defendant. Pan King is a citizen of New York because it is a corporation organized under the laws of the state of New York with its principal place of business in Hicksville, New York. This information is alleged in Plaintiffs' proposed amended complaint, *see* ECF No. 34 ¶ 1, and corroborated by Pan King's certificate of incorporation, which Defendants filed as an attachment to their amended answer, *see* ECF No. 12-1. Although Defendants argue that Plaintiffs' complaint is unclear as to whether Pan King is a corporation or some other type of business entity, *see* ECF No. 35 at 6, the certificate of incorporation that Defendants filed eliminates any uncertainty about this issue. *See Harty*, 28 F.4th at 441 (explaining that courts "may refer to evidence outside the pleadings" when resolving issues of subject matter jurisdiction at the pleadings stage).

For purposes of Plaintiffs' derivative claims, Pan King should be aligned with Defendants, thereby preserving diversity of citizenship between Plaintiffs, who are citizens of New Jersey, and Defendants, who, including Pan King, are citizens of New York. "The general rule is that the corporation in a derivative suit should be aligned as a plaintiff since it is the real party in interest. However, if aligning the corporation as a plaintiff would not provide a real collision of issues, then the court should realign the corporation in order to

produce one." *Kitzen v. Hancock*, No. 17-cv-2966, 2017 WL 4892173, at \*3 (E.D.N.Y. Oct. 27, 2017). "[A] corporation is properly considered a defendant if it is actively antagonistic to the plaintiff's interests." *Gold Coast Transp. Serv. LLC v. NTI-NY, Inc.*, No. 21-cv-5396, 2022 WL 2135264, at \*5 (E.D.N.Y. Mar. 9, 2022), *report and recommendation adopted in relevant part*, 2022 WL 1468770, at \*5 n.2 (E.D.N.Y. May 10, 2022) (aligning corporation as defendant). "Antagonism is generally present in cases involving claims of fraud, breach of trust, and illegality on behalf of the management in control of the corporation, as well as circumstances where management is hostile to the interests of the shareholders." *Id.* Furthermore, "[w]hen the dominant official of the corporation is accused of fraud, the corporation is appropriately aligned as a defendant." *Hebei Tiankai Wood & Land Constr. Co., Ltd. v. Chen*, 348 F. Supp. 3d 198, 204 (E.D.N.Y. 2018) (aligning corporation as defendant).

**\*3** The type of antagonism required to realign a corporation as a defendant exists in this case. Plaintiffs' proposed amended complaint alleges that even though Pratik Patel worked for Pan King, he was prevented from accessing the company's books and records, thereby depriving him of any information demonstrating whether the business was profitable and, if so, the amount of profits to which Plaintiffs were entitled. ECF No. 34 ¶¶ 16, 27–28. Plaintiffs further allege that Defendants misappropriated corporate funds by causing Pan King to apply for loans made available to companies struggling during the restrictions on doing business imposed during the COVID-19 pandemic—and then paying a substantial portion of that money to themselves. *Id.* ¶¶ 22, 24–26, 46. Additionally, Plaintiffs have only a 25% ownership interest in the corporation compared to Defendants' collective 75% ownership interest, which enables Defendants to control the corporation in a manner detrimental to Plaintiffs. *Id.* ¶¶ 2, 4, 9; *cf. Kitzen*, 2017 WL 4892173, at \*4 (aligning corporation as plaintiff because 50-50 ownership split between plaintiff and defendants prevented defendants from controlling corporation in a manner antagonistic to plaintiff's interests).

## C. The Amount-in-Controversy Requirement Is Satisfied

The Court further concludes that Plaintiffs' proposed amended complaint satisfies the amount-in-controversy requirement for diversity jurisdiction. "[A] plaintiff invoking federal jurisdiction must demonstrate a reasonable probability that the amount-in-controversy requirement is satisfied," but the Second Circuit "recognize[s] a rebuttable presumption

that the face of the complaint is a good faith representation of the actual amount in controversy." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017). In order successfully to challenge diversity jurisdiction at the pleadings stage, a defendant must therefore "demonstrat[e] to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Id.* " 'If the right of recovery is uncertain, the doubt should be resolved in favor of the subjective good faith of the plaintiff.' " *Peoples Club of Nigeria Int'l, Inc. v. Peoples Club of Nigeria Int'l – N.Y. Branch, Inc.*, 821 F. App'x 32, 34 (2d Cir. 2020) (quoting *Tongkook Am. v. Shipton Sportswear Co.*, 14 F.3d 781, 785–86 (2d Cir. 1994)). When a plaintiff demands both actual and punitive damages—and the plaintiff's state law claims authorize an award of punitive damages—then potential punitive damages "must be considered ... in determining [the] jurisdictional amount." *Id.* at 35 (citing *Bell v. Preferred Life Assur. Soc'y of Montgomery*, 320 U.S. 238, 240 (1943)).

Defendants have argued that Plaintiffs cannot state a claim for more than $75,000 because Pan King was not profitable, and Plaintiffs therefore are entitled, at most, to the return of their $50,000 investment and repayment of their approximately $5,000 tax penalty. ECF No. 22 at 10–11; ECF No. 35 at 7–12. [2] In making this argument, Defendants rely on deposition testimony and tax filings that the parties have obtained through discovery. ECF No. 35 at 7–12. However, this type of evidence is insufficient to demonstrate at the pleadings stage that Plaintiffs cannot, as a legal certainty, recover more than $75,000 through a combination of their investment in Pan King and their share of the company's alleged profits. To the extent that Defendants seek to demonstrate, based on the evidence revealed during discovery, that Pan King earned no profits or that Defendants did not misappropriate corporate funds, they may challenge the merits of Plaintiffs' claims through a motion for summary judgment at the conclusion of discovery. Since Plaintiffs have alleged, however, that Defendants blocked their access to corporate records, the Court will not hold Plaintiffs to the burden of pleading a specific amount of profits they are owed, or specific facts to substantiate that amount, in order to satisfy the amount-in-controversy requirement.

[2]     Defendants also assert that discovery has revealed that the State of New York ultimately never required Plaintiffs to pay this tax penalty. ECF No. 35 at 8.

**\*4** Additionally, Plaintiffs have alleged that they are entitled to punitive damages for their claims for breach of fiduciary duty and conversion, which are based on Defendants' alleged misappropriation of loans received by Pan King. ECF No. 34 ¶¶ 38–64. Under New York law, "[p]unitive damages are available for conversion where circumstances show that the conversion was accomplished with malice, insult, reckless and willful disregard for [a] plaintiff's rights, or by other proof evidencing the aggravated nature of the act." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 198–99 (S.D.N.Y. 2018) (declining at summary judgment stage to strike request for punitive damages because "the decision to award punitive damages and their amount are questions which primarily reside in the jury's discretion"). New York law also permits punitive damages for breach of fiduciary duty claims. *See Dixon v. Stedman*, No. 22-cv-3581, 2022 WL 16924178, at \*2 (E.D.N.Y. Nov. 14, 2022) (refusing to remand based on failure to meet amount in controversy requirement because plaintiff's breach of fiduciary duty claim "permit[ted] the recovery of punitive damages" under New York law). Since these claims for punitive damages may count towards the amount-in-controversy requirement, Plaintiffs have adequately alleged damages satisfying that requirement, even if Plaintiffs' compensatory damages were limited in the manner that Defendants have argued.

## II. Leave to Amend Plaintiffs' Complaint

The Court grants Plaintiffs leave to file their proposed amended complaint, with respect to both its: (i) new factual allegations of the parties' citizenship and Defendants' alleged antagonism in controlling Pan King, and (ii) Plaintiffs' new claims under the New York Labor Law. Rule 15 requires Plaintiffs to receive permission from either Defendants or the Court to amend their complaint more than 21 days after either serving their original complaint or receiving Defendants' answer or a motion to dismiss. Fed. R. Civ. P. 15(a)(2). "Federal Rule of Civil Procedure 15(a) provides that courts should freely give leave to amend when justice so requires. A district court may in its discretion deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Bensch v. Est. of Umar*, 2 F.4th 70, 81 (2d Cir. 2021).

"The period of liberal amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up[on] a showing of the good cause that is required to modify a scheduling order under Rule 16(b)

(4)." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021). Since Magistrate Judge Locke previously set a deadline of May 29, 2021, for filing motions to amend pleadings, *see* ECF No. 17, and Plaintiffs filed their proposed amended complaint in April 2022, *see* ECF No. 34, Plaintiffs " 'must satisfy *both* Federal Rules of Civil Procedure 15 and 16 to be permitted to amend.' " *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 850 F. App'x 38, 43 (2d Cir. 2021) (quoting *Pasternack v. Shrader*, 863 F.3d 162, 174 n.10 (2d Cir. 2017)). The good cause standard in Rule 16 "requires the moving party to have acted diligently," and "[a] lack of diligence is therefore reason alone to deny leave to amend." *Id.*

Good cause exists here to allow Plaintiffs to add the new jurisdictional allegations in their proposed amended complaint related to Defendants' states of citizenship and the antagonism between Plaintiffs and Pan King. Judge Seybert specifically invited those amendments in her order on the parties' earlier motions to dismiss, and they cure the potential jurisdictional issues that Judge Seybert raised.

The Court likewise concludes that Plaintiffs have demonstrated good cause for adding Pratik Patel's claims under the New York Labor Law. Plaintiffs' stated basis for adding these claims is information revealed during the deposition of Arjun Singh, which did not occur until February 2022, *see* ECF No. 26, after the deadline to amend pleadings had already expired, and only two months before Plaintiffs filed their proposed amended complaint. Although the Second Circuit, "ha[s] not set out a specific definition for undue delay" that would preclude a plaintiff from amending his complaint, "most delays warranting denial of leave to amend are several years in length." *Schvimmer v. Off. of Court Admin.*, 857 F. App'x 668, 673 (2d Cir. 2021).

**\*5** The Court also finds that the additional discovery associated with Pratik Patel's New York Labor Law claims is likely to be minimal, and therefore will not prejudice Defendants. The parties should not need much discovery beyond any records that Defendants maintained related to the hours Pratik Patel worked and the amounts he was paid, and the Court understands, based on the record of the parties' conferences with Magistrate Judge Dunst, that the parties have been pursuing this discovery while the parties' motions have been pending. If anything, since the New York Labor Law's six-year statute of limitations has not expired, Defendants would face a greater discovery burden if Pratik Patel were to pursue these claims in a separate state court lawsuit rather than in this lawsuit.

Since the Court is granting Plaintiffs leave to amend to assert Pratik Patel's New York Labor Law claims, the damages associated with these claims also count towards the amount-in-controversy requirement. Those damages therefore further support the Court's holding, described in Section I.C above, that diversity jurisdiction exists.

### III. The Court Rejects the Parties' Various Additional Bases for Dismissal

Prior to Judge Seybert's decision, the parties made various additional arguments in their motions about why Plaintiffs' claims should be dismissed, *see* ECF No. 22, or why Defendants' counterclaims should be dismissed, *see* ECF No. 19. The Court rejects each of these arguments for the reasons described in this section.

The Court denies Defendants' motion to dismiss Plaintiffs' claims against Arjun Singh for lack of proper service. The Second Circuit has held that the service requirements in Rule 4 are "to be construed liberally 'to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice.' " *Zhou v. Slim Grass Beauty Corp.,* No. 18-cv-5761, 2021 WL 54058, at *2 (E.D.N.Y. Jan. 6, 2021) (quoting *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir. 1986)). Therefore, although courts may dismiss complaints for improper service, they should not do so if "it appears that proper service may still be obtained." *Id.*; *see also Swayze v. LaFontant,* No. 21-cv-4867, 2022 WL 2209148, at *2 (S.D.N.Y. June 21, 2022) (describing same standard).

Plaintiffs' affidavit of service states that Plaintiffs served Arjun Singh by personally delivering a summons and complaint to co-defendant Noddy Singh at an address in Hicksville, New York, which Noddy Singh confirmed to Plaintiffs' process server was Arjun Singh's place of residence at that time. ECF No. 10. Plaintiffs' process server followed up by mailing the summons and complaint to the same address. *Id.* Plaintiffs served Noddy Singh by personal delivery at the same address, at the same time, without the subsequent mailing. ECF No. 9. Defendants argue that, contrary to the process server's sworn affidavit, Noddy Singh, whom they concede is Arjun Singh's brother, was wrong to tell the process server that Arjun Singh resided at the address where Plaintiffs attempted service and that Arjun Singh had, in fact, moved elsewhere. ECF No. 22 at 12–14; ECF No. 22-1. Defendants have made no argument that Noddy Singh was improperly served.

Defendants are correct that serving a defendant at his former dwelling, even if the mistake was reasonable, is improper service. *See Swayze,* 2022 WL 2209148, at *3. However, if a defendant has received actual notice of a lawsuit, "regardless of whether service was initially proper or whether good cause is found, the Court may still grant an extension of time given to a plaintiff to serve the defendant in its discretion." *Id.* (declining to dismiss complaint for lack of service).

Granting Plaintiffs additional time to complete service on Arjun Singh is the appropriate remedy for Plaintiffs' initial, purportedly inadequate service. Defendants appeared and answered Plaintiffs' complaint less than a month after it was filed, thereby demonstrating that they received actual notice of this lawsuit, and they have participated extensively in the case since then. *See Shuford v. City of New York,* No. 17-cv-6349, 2020 WL 3129262, at *2 (E.D.N.Y. June 12, 2020) (explaining that extending the service deadline is proper when defendants have actual notice of plaintiff's lawsuit before the statute of limitations has expired). Since Noddy Singh apparently told Plaintiffs' process server that Arjun Singh lived at the address where Plaintiffs attempted service, Plaintiffs were "under a reasonable belief that [their] attempted service was proper," thereby demonstrating good cause for an extension. *Wilmington PT Corp. v. Parker,* No. 19-cv-2380, 2021 WL 4122992, at *4 (E.D.N.Y. Sept. 9, 2021) (granting extension when a co-occupant told plaintiff's process server that defendant lived at the property where plaintiff attempted service). The fact that both Defendants are represented by the same attorney, and only Arjun Singh is disputing the validity of service, further supports that allowing Plaintiffs to re-attempt service is not prejudicial to any of the parties. *See Zhou,* 2021 WL 54058, at *4 (refusing to dismiss defendant for improper service because her representation by the same attorney as another defendant, to whom she was related, showed that she had actual notice of the lawsuit).

\*6 The Court also denies Plaintiffs' motion to dismiss Defendants' counterclaim for attorneys' fees. *See* ECF No. 19-1 at 5–6. Although under New York law, "attorneys' fees are considered an incident of litigation and are not recoverable unless authorized by statute, court rule, or written agreement of the parties," New York allows "an exception to this general rule." *Porrini v. McRizz, LLC,* No. 19-cv-3979, 2020 WL 1676101, at *7 (E.D.N.Y. Apr. 6, 2020). That exception permits parties to recover attorneys' fees when their adversary "intentionally seeks to inflict economic injury ... by forcing

them to engage legal counsel." *Id.* Since this exception exists, courts typically consider it "premature to dismiss or strike a demand for attorneys' fees" even if a party's likelihood of ultimately recovering attorneys' fees is relatively small. *Id.* Plaintiffs may challenge whether Defendants are entitled to attorneys' fees after the merits of the parties' claims have been fully resolved either through summary judgment or trial.

The Court also denies Plaintiffs' motion to dismiss Defendants' counterclaim seeking to recover losses that Plaintiffs supposedly caused to Pan King. *See* ECF No. 19-1 at 6–7. Plaintiffs argue that Arjun and Noddy Singh cannot bring this claim on their own behalf because the claim belongs to Pan King rather than to the Singhs personally. *Id.* However, since the Court is granting Plaintiffs leave to file their proposed amended complaint, Defendants will need to file a new answer responding to the amended complaint. Especially now that the Court has ruled that Pan King must be aligned as a Defendant, Defendants will have an opportunity to clarify in their amended answer whether the Singhs are pleading this counterclaim derivatively on behalf of Pan King or whether Defendants' counsel is also representing Pan King and asserting this claim on the company's behalf.

## **CONCLUSION**

For the reasons set forth above, the Court DENIES Defendants' motion to dismiss Plaintiffs' complaint, *see*

ECF No. 22, and Plaintiffs' motion to dismiss Defendants' counterclaims, *see* ECF No. 19. The Court accepts Plaintiffs' proposed amended complaint, *see* ECF No. 34, and shall treat it as the operative complaint going forward.

Defendants shall file an answer to Plaintiffs' amended complaint, which may include any new factual or procedural allegations related to Defendants' existing counterclaims, on or before March 21, 2023, but they may not assert new counterclaims without first seeking the Court's leave. If Plaintiffs still take issue with Defendants' second counterclaim after the filing of Defendants' answer to Plaintiffs' amended complaint, then Plaintiffs shall file a pre-motion letter that complies with Section IV.A of the Court's Individual Practices no later than March 28, 2023.

Plaintiffs shall serve a copy of their amended complaint and a summons on Arjun Singh no later than March 21, 2023. If Defendants' counsel does not agree to waive service on Arjun Singh's behalf, then the Court will consider reasonable further extensions of this deadline and will entertain a motion by Plaintiffs to impose the cost of service on Arjun Singh, pursuant to Rule 4(d)(2).

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2262792

---

2023 WL 6467921
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tanjenik BYRD and Tyreana Edmonds, Plaintiffs,
v.
TOWN OF DEWITT, Town of DeWitt Police
Department, DeWitt Police Officer Corey Buyck,
and DeWitt Police Officer Rory Spain, Defendants.

5:23-CV-390
|
Signed October 5, 2023

**Synopsis**
**Background:** Arrestees brought § 1983 action against town,
its police department, and its police officers, alleging that
officers violated their civil rights by falsely arresting them.
Defendants moved to dismiss for failure to state a claim and
arrestees cross-moved to amend their complaint.


**Holdings:** The District Court, David N. Hurd, J., held that:

[1] proposed amended complaint would be considered the
operative pleading;

[2] defendants failed to articulate any prejudice from
arrestees' failure to properly serve their initial complaint;

[3] state-court action involved same transaction or common
nucleus of operative facts;

[4] fact that arrestees filed federal-court action two days
before state-court action did not preclude finding that state-
court action could have res judicata effect;

[5] state court's dismissal of tort action did not have claim-
preclusive effect under New York law in arrestees' § 1983
action; and

[6] arrestees failed to state § 198 municipal liability claim.


Defendants' motion to dismiss granted in part and denied in
part; plaintiffs' cross-motion to amend granted in part and
denied in part.

**Procedural Posture(s):** Motion to Amend the Complaint;
Motion to Dismiss for Failure to State a Claim.


West Headnotes (39)

**[1]    Federal Civil Procedure**  🔑  **Form and
sufficiency of amendment; futility**

Leave to amend a complaint need not be granted
where amendment would be futile. Fed. R. Civ.
P. 15.


**[2]    Federal Civil Procedure**  🔑  **Form and
sufficiency of amendment; futility**

An amendment to a pleading is "futile" if the
proposed claim could not withstand a motion to
dismiss for failure to state a claim. Fed. R. Civ.
P. 12(b)(6), 15.


**[3]    Federal Civil Procedure**  🔑  **Motion and
proceedings thereon**

When a party cross-moves to amend a complaint
in response to the filing of a motion to dismiss
for failure to state a claim, the court evaluates the
pending motion to dismiss in light of the facts
alleged in the proposed amended pleading. Fed.
R. Civ. P. 12(b)(6), 15.


**[4]    Federal Civil Procedure**  🔑  **Form and
sufficiency of amendment; futility**

If the facts alleged in the proposed amended
pleading would be insufficient to pass muster
under a motion to dismiss for failure to state a
claim, then a cross-motion to amend based on
those facts can safely be denied as futile. Fed. R.
Civ. P. 12(b)(6), 15.


**[5]    Federal Civil Procedure**  🔑  **Time of
determination; reserving decision**

Where a proposed amended complaint, filed in
response to a motion to dismiss for failure to state
a claim, names new defendants or asserts distinct
claims based on different or additional facts,

the better course of action is likely to permit amendment and invite another round of pre-answer briefing rather than determining whether the proposed pleading passes muster on the motion to dismiss. Fed. R. Civ. P. 12(b)(6), 15.

**[6]**    **Federal Civil Procedure**  🗝  Motion and proceedings thereon

Arrestees' proposed amended § 1983 complaint would be considered the operative pleading for purposes of evaluating motion to dismiss for failure to state a claim by town, its police department, and its police officers; arrestees abandoned previously raised emotional-distress claim and recharacterized their claim for respondeat superior liability by formulating it as *Monell* claim against town, arrestees had not added new defendants or added any set of facts unrelated to underlying arrest, and existing named defendants had opportunity to respond to proposed amended pleading by filing a reply in opposition to arrestees' cross-motion to amend. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6), 15.

**[7]**    **Federal Civil Procedure**  🗝  Motion and proceedings thereon

Town and its police officers failed to articulate any prejudice from arrestees' failure to properly serve their initial § 1983 complaint, and thus permitting defendants to amend their motion to dismiss for failure to state a claim to include improper-service defense was not warranted; defendants were on notice of action as they appeared through counsel and had received notifications of filings through court's electronic docketing system, defendants received notice of arrestees' proposed amended complaint that was filed with their cross-motion to amend, and defendants were able to respond in opposition to that cross-motion. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 4(e)(1).

**[8]**    **Process**  🗝  Cure of defects by subsequent proceedings

There is a strong federal policy in favor of resolving disputes on the merits; consequently, as long as it appears that proper service may still be obtained, the right remedy is typically to direct the plaintiff to re-serve the pleading.

**[9]**    **Federal Civil Procedure**  🗝  Matters considered in general

Extraneous materials are often inappropriate to consider on a pre-answer motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[10]**    **Res Judicata**  🗝  Motion, demurrer, or exception

A court may consider a res judicata defense on a motion to dismiss for failure to state a claim when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice. Fed. R. Civ. P. 12(b)(6).

**[11]**    **Evidence**  🗝  Particular Cases
**Federal Civil Procedure**  🗝  Matters considered in general

District court would take judicial notice of arrestees' state-court complaint and its decision that dismissed arrestees' state-court action with prejudice that were publicly filed in New York's court filing system to address argument by town and police officers, on its motion to dismiss arrestees' § 1983 action for failure to state a claim, that state court decision had claim-preclusive effect on arrestees' § 1983 action. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

**[12]**    **Res Judicata**  🗝  Purpose or function of doctrines
**Res Judicata**  🗝  Claims or Causes of Action in General

Res judicata assures finality of judgments by precluding party to lawsuit from litigating claim more than once.

[13]  **Res Judicata** 🔑 Res Judicata

**Res Judicata** 🔑 Claim preclusion in general

Under the doctrine of "res judicata," or "claim preclusion," a final judgment on the merits of the action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

[14]  **Res Judicata** 🔑 Collateral estoppel and issue preclusion in general

"Issue preclusion," sometimes called collateral estoppel, means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated by the same parties in a future lawsuit.

[15]  **Federal Courts** 🔑 Conclusiveness; res judicata and collateral estoppel

New York law determines the claim-preclusive effect of a New York state-court decision dismissing a state-court complaint on a pending federal action.

[16]  **Res Judicata** 🔑 Res Judicata

Under New York law, res judicata bars successive litigation based upon the same transaction or series of connected transactions if: (1) there is a judgment on the merits rendered by a court of competent jurisdiction, and (2) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was.

[17]  **Res Judicata** 🔑 Res Judicata

**Res Judicata** 🔑 Claim preclusion in general

Four conditions are to be analyzed when determining whether res judicata applies, and each must be met for claim preclusion to apply: (1) the earlier decision was a final judgment on the merits, (2) the decision was rendered by a court of competent jurisdiction, (3) the same

parties or their privies were involved, and (4) the decision involved the same cause of action.

[18]  **Judgment** 🔑 Dismissal and nonsuit

**Judgment** 🔑 Particular Federal Proceedings

State court decision dismissing arrestees' state court tort action against town and its police officers with prejudice was rendered by court of competent jurisdiction, as required to find that state court decision had res judicata effect on arrestees' § 1983 federal court action against town and its police officers; state-court complaint asserted common-law tort claims that could be considered in New York's trial court, which was court of general jurisdiction, state-court complaint also alleged that defendants' conduct violated arrestees' constitutional rights, and state courts were competent to hear § 1983 claims. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; N.Y. Judiciary Law § 140-B.

[19]  **Judgment** 🔑 Persons Concluded

**Judgment** 🔑 Particular Federal Proceedings

Same parties or their privies were involved in arrestees' state-court action that was dismissed with prejudice, as required to find that state-court decision had res judicata effect on arrestees' § 1983 federal court action against town and its police officers, where the same named plaintiffs filed suit against same named defendants in § 1983 action. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[20]  **Judgment** 🔑 Issues or Questions Presented

**Judgment** 🔑 Particular Federal Proceedings

Arrestees' state-court action, which was dismissed with prejudice, and federal court § 1983 action involved same transaction or common nucleus of operative facts, as required to find that state-court decision had res judicata effect on arrestees' § 1983 federal court action against town and its police officers, where both complaints concerned alleged incident between arrestees' and police officers at the same place

and date. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[21]    Res Judicata**  🔑  **Act, occurrence, or transaction**

New York courts take a "transactional" approach to claim preclusion, under which the claim preclusion rule extends beyond attempts to relitigate identical claims to all other claims arising out of the same transaction or series of transactions.

**[22]    Judgment**  🔑  **Dismissal and nonsuit**

**Judgment**  🔑  **Particular Federal Proceedings**

Fact that arrestees filed federal-court § 1983 action two days before state-court action, which ended with final judgment dismissing action with prejudice, did not preclude finding that New York state-court action could have res judicata effect on ongoing federal-court action; New York courts were likely to follow view of federal courts within Second Circuit that where parallel actions are commenced, res judicata attached to action in which a judgment was first entered. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[23]    Judgment**  🔑  **Time;  Condition of Cause**

Under New York law, a dismissal of a state-court action on statute-of-limitations grounds qualifies as a merits decision that can have claim-preclusive effect on a second action.

**[24]    Action**  🔑  **Proceedings constituting commencement**

In New York, the failure to file the initial papers necessary to institute an action constitutes a nonwaivable, jurisdictional defect, rendering the action a nullity.

**[25]    Process**  🔑  **Defects and irregularities in service or return or proof thereof**

New York courts treat non-service of a summons as a defect in their subject matter jurisdiction.

**[26]    Res Judicata**  🔑  **Lack of jurisdiction**

In New York, a dismissal based solely on a jurisdictional defect is not considered to be "on the merits" and therefore does not have res judicata effect.

**[27]    Res Judicata**  🔑  **Erroneous, Irregular, or Voidable Determination**

The doctrine of res judicata does not depend on whether the prior judgment was free from error.

**[28]    Res Judicata**  🔑  **Untimeliness; limitations and laches**

The traditional rule is that expiration of the applicable statute of limitations merely bars the remedy and does not extinguish the substantive right, so that dismissal on that ground does not have claim-preclusive effect in other jurisdictions with longer, unexpired limitations periods.

**[29]    Res Judicata**  🔑  **Untimeliness; limitations and laches**

In jurisdictions that follow this so-called "traditional rule," a dismissal on timeliness grounds does not have claim-preclusive effect because it does not extinguish the underlying right.

**[30]    Judgment**  🔑  **Dismissal and nonsuit**

**Judgment**  🔑  **Particular Federal Proceedings**

State court's dismissal of arrestees' tort action against town and its police officers "with prejudice," on basis of statute of limitations and failure to serve a summons, did not have claim-preclusive effect under New York law in arrestees' § 1983 action against town and officers alleging unlawful seizure, excessive force, and other claims; issue of whether statute-

of-limitations dismissal was a final judgment on the merits with preclusive effect in subsequent action remained unsettled in Second Circuit, dismissal "with prejudice" did not always mean that res judicata should attach under New York law, and non-service of a summons was a nonwaivable jurisdictional defect under New York law, which would deprive state court of authority to enter any kind of binding judgment on the dispute. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[31]    **Civil Rights**  Nature and elements of civil actions

Section 1983 a creates species of tort liability. 42 U.S.C.A. § 1983.

[32]    **Civil Rights**  Liability of Municipalities and Other Governmental Bodies

Unlike state law, § 1983 does not permit liability based on a theory of respondeat superior, i.e., government entity cannot be held liable under § 1983 just because it employed the tortfeasor; instead, local governments are responsible only for their own illegal acts. 42 U.S.C.A. § 1983.

[33]    **Civil Rights**  Governmental Ordinance, Policy, Practice, or Custom

Under *Monell* and its progeny, for § 1983 municipal liability to apply, the agent's actions must implement rather than frustrate government's policy. 42 U.S.C.A. § 1983.

[34]    **Civil Rights**  Governmental Ordinance, Policy, Practice, or Custom

"Official municipal policy," for purposes of imposing liability on local governments under § 1983, includes the decisions of government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to actually have the force of law. 42 U.S.C.A. § 1983.

[35]    **Civil Rights**  Liability of Municipalities and Other Governmental Bodies

To establish municipal liability under § 1983, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury. 42 U.S.C.A. § 1983.

[36]    **Civil Rights**  Criminal law enforcement; prisons

County assistant district attorney's failure or refusal to disclose arresting police officers' personnel files to arrestees during their criminal proceedings, despite being required to do so under state criminal procedure law, was by itself insufficient to show that town had official municipal policy that caused injuries to arrestees, as required to state § 1983 municipal liability claim against town; assistant district attorney was not town employee, and arrestees did not allege that arresting officers had any supervisory or policymaking authority or that there was pattern of false arrests, excessive force, or malicious prosecutions by particular officers or any other town employees. 42 U.S.C.A. § 1983.

[37]    **Civil Rights**  Lack of Control, Training, or Supervision; Knowledge and Inaction

For purposes of a § 1983 municipal liability claim, a municipality's policy or custom need not be memorialized in a specific rule or regulation, but may be pronounced or tacit, and reflected in either action or inaction; so, whether it is formal or informal, or express or implied, the plaintiff must still plausibly allege the existence of a policy or custom or its equivalent. 42 U.S.C.A. § 1983.

[38]    **Civil Rights**  Governmental Ordinance, Policy, Practice, or Custom

An isolated constitutional violation by non-policymaking employees is almost never enough to hold a municipal defendant liable under § 1983. 42 U.S.C.A. § 1983.

[39]    **False Imprisonment**  🔑  Nature and form of remedy

> A false arrest is just a kind of false imprisonment, the intentional, unprivileged confinement of another by someone acting with law enforcement authority; so, courts typically treat these two claims the same when they are brought against a law enforcement officer.

**Attorneys and Law Firms**

JASPER LEE MILLS, III, ESQ., MILLS LAW GROUP, PLLC, Attorneys for Plaintiffs, 99 Pine Street, Suite 204, Albany, NY 12207.

JEFFREY S. SHELLY, ESQ., Attorneys for Plaintiff, 300 Tamarack, Summit, NY 12175.

PAUL V. MULLIN, ESQ., BRITTANY LEE HANNAH, ESQ., CORY J. SCHOONMAKER, ESQ., SUGARMAN LAW FIRM LLP, Attorneys for Defendants, 211 West Jefferson Street, Syracuse, NY 13202.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiffs Tanjenik Byrd ("Byrd") and Tyreana Edmonds ("Edmonds") have filed this 42 U.S.C. § 1983 action alleging defendants the Town of Dewitt (the "Town"), the Town's Police Department, Police Officer Corey Buyck ("Officer Buyck"), and Police Officer Rory Spain ("Officer Spain") violated their civil rights by, *inter alia*, falsely arresting them as they tried to exit a Wal-Mart retail store in the Village of East Syracuse, situated in the Town of DeWitt. [1]

[1]    Plaintiffs initially named as a defendant the "Village of East Syracuse," Dkt. No. 1, but later voluntarily dismissed all of their claims against that defendant-entity, Dkt. Nos. 28, 30.

Plaintiffs' eight-count proposed [2] amended complaint asserts § 1983 claims against Officer Buyck and Officer Spain for

unlawful seizure (Count One), excessive force (Count Two), false arrest (Count Three), false imprisonment (Count Four), assault (Count Five), and battery (Count Six); a § 1983 claim against Officer Buyck, Officer Spain, and the Town for malicious prosecution (Count Seven); and a § 1983 claim for municipal liability against the Town pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Count Eight).

[2]    For reasons discussed *infra*, plaintiffs' proposed amended complaint, Dkt. No. 21-2, will be considered the operative pleading for this motion practice.

On May 15, 2023, defendants moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiffs' complaint in its entirety. Dkt. No. 10. Plaintiffs opposed and cross-moved to amend. Dkt. Nos. 20–22. Both parties replied. Dkt. Nos. 25, 31. The cross-motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

**II. BACKGROUND**

On July 4, 2021, Byrd and Edmonds, two Black women, went shopping with their children and nephew at a Wal-Mart retail store in the Town of DeWitt. Proposed Am. Compl. ¶¶ 3–4, 9–10. Inside the store, the family was "approached by a group of females who had previously attempted to assault Byrd." *Id.* ¶ 10. According to the proposed amended complaint, "[t]his group of females became aggressive, and after a brief encounter, Byrd and Edmonds [ ] attempt[ed] to leave the store." *Id.* ¶ 11.

The proposed amended complaint alleges that Officer Buyck and Officer Spain intercepted plaintiffs as they attempted to exit the store. Proposed Am. Compl. ¶¶ 12–13. According to plaintiffs, defendants immediately tried to place them under arrest and "proceeded to forcibly slam" both women to the ground. *Id.* When plaintiffs objected to the officers' behavior, defendants' conduct escalated. [3] *Id.* ¶ 13. Plaintiffs were arrested and charged with one or more crimes, which were later dismissed in December of 2022. *Id.* ¶ 18.

[3]    For instance, plaintiffs allege that Byrd "was visibly pregnant" at the time and "was experiencing a high-risk pregnancy." Proposed Am. Compl. ¶ 14. Even so, the proposed complaint alleges that defendants "dragged" Byrd and Edmonds

**Byrd v. Town of DeWitt, --- F.Supp.3d ---- (2023)**
Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 51 of 217
2023 WL 6467921

across the floor, causing Byrd to suffer "internal bleeding" and other injuries. *Id.* ¶¶ 14–15. Plaintiffs further allege defendants "pummeled and violently punched" Edmonds "in the throat and face." *Id.* ¶ 15. Finally, plaintiffs allege that Byrd "became partially disrobed" during the "fracas," and was then "paraded through the store" by defendants, which caused her to suffer "additional embarrassment and humiliation." *Id.* ¶ 16.

**\*2** On January 20, 2023, plaintiffs, through their counsel, used New York State's electronic filing system to file a complaint in Supreme Court, Onondaga County. Ex. A to Schoonmaker Decl., Dkt. No. 10-2. Just like their proposed amended complaint in this federal case, plaintiffs' state-court complaint named as defendants the Town, the Town's Police Department, Officer Buyck, and Officer Spain. [4] *Id.* And just like their proposed amended complaint in this federal case, plaintiffs' state-court complaint alleged that Officer Buyck and Officer Spain subjected them to excessive force during a false arrest at a Wal-Mart retail store in DeWitt on July 4, 2021. *Id.*

[4]   This state-court pleading also named as a defendant the Village of East Syracuse.

On February 21, 2023, defendants moved in Supreme Court, Onondaga County to dismiss plaintiffs' state-court complaint. Ex. B to Schoonmaker Decl., Dkt. No. 10-3. There, defendants argued that: (a) plaintiffs had failed to serve a summons with their complaint in violation of certain state-law civil procedure requirements; and (b) plaintiffs' claims were untimely because they were filed beyond the one-year and ninety-day limitations period. *Id.*

Plaintiffs did not oppose defendants' motion to dismiss in the state-court action. Ex. B to Schoonmaker Decl., Dkt. No. 10-3. Instead, plaintiffs filed this § 1983 action on March 28, 2023. Dkt. No. 1. Two days later, on March 30, 2023, Onondaga County Supreme Court Justice Gerard J. Neri granted defendants' unopposed motion and dismissed plaintiffs' state-court complaint "with prejudice." Ex. B to Schoonmaker Decl., Dkt. No. 10-3.

### III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929

(2007). So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

### IV. DISCUSSION

The central premise of defendants' motion to dismiss this action is that the doctrine of *res judicata*; *i.e.*, claim preclusion, bars plaintiffs from relitigating in this federal-court action a second lawsuit based on the exact same set of facts that were presented in the state-court action. That turns out to be an interesting legal question. But there are a few procedural issues to resolve beforehand.

####   A. The Proposed Amended Complaint

The first issue is which pleading should be considered for the purpose of analyzing defendants' motion to dismiss.

Where, as here, the time in which to amend the pleading as of right has expired, [5] Rule 15 of the Federal Rules of Civil Procedure states that "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(1)–(2).

[5]   Plaintiffs had twenty-one days after defendants served their 12(b) motion in which to amend as of right. FED. R. CIV. P. 15(a)(1)(B). Although the Court later extended that deadline to June 19, 2023, Dkt. No. 19, plaintiffs did not file their cross-motion until June 20, 2023, Dkt. No. 22. But the timing does not alter the analysis. *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299,

Byrd v. Town of DeWitt, --- F.Supp.3d ---- (2023)
Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 52 of 217
2023 WL 6467921

304 (2d Cir. 2020) (approving of lower court's consideration of proposed pleading against motion to dismiss where plaintiff amended as of right).

**\*3  [1]** Rule 15 goes on to state that "[t]he court should freely give leave when justice so requires," FED. R. CIV. P. 15(a)(2), but "it is well established that leave to amend a complaint need not be granted where amendment would be futile," *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

**[2]**  As relevant here, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 358 (N.D.N.Y. 2017) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

**[3]**  Consequently, when a party cross-moves to amend in response to the filing of a motion to dismiss, district courts often streamline their analysis with a time-saving strategy: they simply evaluate the pending motion to dismiss in light of the facts alleged in the proposed amended pleading. *See, e.g.*, *Morris*, 268 F. Supp. 3d at 358.

**[4]**  If the facts alleged in the proposed amended pleading would be insufficient to pass muster under Rule 12(b)(6), then a cross-motion to amend based on those facts can safely be denied as "futile." Indeed, our Circuit has recently endorsed this efficient practice as a "sound approach that promotes judicial economy by obviating the need for multiple rounds of briefing." *Pettaway*, 955 F.3d 299, 304 (2d Cir. 2020).

**[5]**  To be sure, this is not always the right analytical technique. For instance, it might be inappropriate if the proposed amendment names new defendants or asserts distinct claims based on different or additional facts. *See, e.g.*, *New Oriental Enter., PTE, Ltd. v. Mission Critical Sols., LLC*, 2021 WL 930616, at \*2 (S.D.N.Y. Mar. 11, 2021) (collecting cases). Under those circumstances, the better course of action is likely to permit the amendment and then invite another round of pre-answer briefing.

**[6]**  But those concerns are inapplicable here. In their proposed amendment, plaintiffs abandoned an emotional-distress claim and recharacterized their claim for *respondeat superior* liability by formulating it as a *Monell* claim against the Town. *Compare* Compl. at Dkt. No. 1-2, *with* Proposed Am. Compl. at Dkt. No. 21-2. Importantly, however, plaintiffs have not added new defendants or tried to add any set of facts unrelated to the July 4, 2021 incident at the Wal-Mart

retail store; *i.e.*, the same incident they alleged in their original pleading.

Equally important, the existing named defendants have also had an opportunity to respond to the proposed amended pleading—they filed a reply in opposition to plaintiffs' cross-motion to amend. Defs.' Reply, Dkt. No. 25. Accordingly, the proposed amended complaint will be considered the operative pleading for purposes of evaluating defendants' motion to dismiss.

## B. The Police Department

This threshold conclusion about which pleading to consider for the purpose of the motion to dismiss gives rise to a second housekeeping issue. In the original complaint, plaintiffs named as a defendant the "Town of Dewitt Police Department."

But the proposed amended complaint eliminates this defendant. This is because, as plaintiffs recognize in their own briefing, a § 1983 claim against this entity-defendant would be redundant of a *Monell* claim against the Town itself. FED. R. CIV. P. 17(b) (explaining capacity of an entity to sue or be sued is governed by state law); *Rose v. Cnty. of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012) (concluding that police department lacks separate identity under New York law).

**\*4**  Why mention this discrepancy? A review of the Court's docket report for this action shows that the "Town of Dewitt Police Department" is still listed as a named defendant. But as noted *supra*, the proposed amended complaint abandons any claims against this defendant. And as explained *supra*, even if plaintiffs had not voluntarily eliminated this defendant from the caption, the Police Department would still be subject to dismissal because it is redundant of the Town. Accordingly, the Clerk of Court will be directed to terminate the "Town of Dewitt Police Department" from this action.

## C. Service of Process

**[7]**  This leads to a third, unrelated issue. In their reply, defendants contend that plaintiffs failed to properly serve the first complaint on them. Defs' Reply, Dkt. No. 25 at 3–4. [6] Defendants acknowledge that they did not raise this issue in their moving papers. *Id.* But they have "request[ed] leave to amend their pending motion to include this ground." *Id.* at 4. As defendants explain, the "defect in service was not discovered" because plaintiffs failed to comply with the five-

Byrd v. Town of DeWitt, --- F.Supp.3d ---- (2023)
Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 53 of 217
2023 WL 6467921

day time limit for filing proofs of service under General Order 25. *Id.*

6      Pagination corresponds to CM/ECF.

Upon review, defendants' request to amend their motion will be denied without prejudice. As defendants note, a certified mailing is not one of the enumerated options available under the relevant Federal Rules of Civil Procedure. FED. R. CIV. P. 4(e)(2)(A)–(C). Nor does a mailing comport with the methods of service that can be borrowed from state law. FED. R. CIV. P. 4(e)(1); *see also Cassano v. Altshuler*, 186 F. Supp. 3d 318, 321 (S.D.N.Y. 2016); *Kennedy v. Peters*, 2023 WL 5977237, at *2 (N.D.N.Y. Sept. 14, 2023).

 [8]  Even so, there is a strong federal policy in favor of resolving disputes on the merits. Consequently, as long as "it appears that proper service may still be obtained," *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972), the right remedy is typically to direct the plaintiff to re-serve the pleading.

That is the right remedy in this case. After all, defendants were on notice of this action—they appeared through counsel. Since at least that time, they have received notifications of filings through the Court's electronic docketing system. This includes notice of the proposed amended complaint, which was filed with plaintiffs' cross-motion to amend. And defendants were able to respond in opposition to that cross-motion. So while defendants might have identified a technical defect in service, they have not really articulated any prejudice that might flow from that error.

In short, if plaintiffs' cross-motion for leave to amend is granted, either in whole or in part, plaintiffs will be directed to file and serve that pleading in accordance with the Federal Rules of Civil Procedure. But if plaintiffs fail to timely perfect service after that, a renewed motion to dismiss on defective-service grounds under Rule 12(b)(5) might well be appropriate. Accordingly, defendants' request for "leave to amend" their motion to dismiss to raise this argument will be denied without prejudice.

**D. Judicial Notice**
There is one more procedural issue to cover. In support of their argument that *res judicata* bars this lawsuit, defendants have submitted a copy of the summons and complaint filed electronically by plaintiffs in the state-court action as well as a copy of the state-court decision that dismissed plaintiffs'

state-court action with prejudice. Ex. A to Schoonmaker Decl., Dkt. No. 10-2 (complaint); Ex. B to Schoonmaker Decl., Dkt. No. 10-3 (decision).

 **\*5** [9]  [10]  Extraneous materials are often inappropriate to consider on a pre-answer motion to dismiss. Even so, "[a] court may consider a *res judicata* defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014).

 [11]  Defendants' *res judicata* argument easily fits within the contours of this exception. Plaintiffs' state-court complaint, and the state-court decision that dismissed their state-court action with prejudice, were publicly filed in New York's court filing system.

That makes them the kind of public records that are ordinarily subject to judicial notice. *See, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

Plaintiffs do not dispute that the prior state-court proceedings identified by defendants occurred. Nor do they dispute that the state court dismissed their state-court complaint with prejudice. Instead, plaintiffs offer various reasons why these state-court proceedings should not have claim-preclusive effect on this federal-court action.

Accordingly, the Court will take judicial notice of the state-court records offered by defendants for the purpose of determining whether the doctrine of *res judicata* bars this suit. *See, e.g., Williams v. N.Y. City Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020) (summary order) (approving of lower court's implicit decision to take judicial notice of state-court filings).

**E. Res Judicata**
This leads, finally, to the central argument raised by defendants: that the doctrine of *res judicata* bars this federal suit.

 [12]  [13]  [14]  "*Res judicata* assures the finality of judgments by precluding a party to a lawsuit from litigating

a claim more than once." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995). "Under the doctrine of *res judicata*, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.' " *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (emphasis in original)). [7]

[7]    Defendants' argument focuses on the question of claim preclusion. But as a historical matter, *res judicata* is sometimes considered a blanket term that also sweeps in principles of issue preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). Issue preclusion, sometimes called collateral estoppel, " 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated by the same parties in a future lawsuit.' " *Flaherty*, 199 F.3d at 612 (quoting *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994)).

Defendants argue the dismissal of plaintiffs' state-court action has claim-preclusive effect on this federal-court action. As defendants explain, both suits involve the same parties and allege the same facts; *i.e.*, the July 4, 2021 incident inside the Wal-Mart. Defs.' Mem. at 5–7. According to defendants, the dismissal of that state-court action "with prejudice" qualifies as a final judgment on the merits. *Id.* And although defendants acknowledge that plaintiffs' state-court complaint did not necessarily assert the same legal claims that are alleged in this federal-court action, defendants argue that they are nevertheless barred because plaintiffs *could have* done so—New York courts are equally competent to hear § 1983 claims. *Id.* at 6–7.

**\*6**  In opposition, plaintiffs contend that *res judicata* does not apply because this action was filed *before* the state-court action was dismissed. Pls.' Opp'n, Dkt. No. 20 at 6–10. Plaintiffs further argue that the state-court action does not qualify as a final judgment on the merits because it was merely dismissed for improper service. *Id.* Even assuming otherwise, plaintiffs argue that the state-court action would not preclude this federal-court lawsuit because the state-court litigation only involved state-law claims. Pls.' Opp'n at 6–10.

In reply, defendants insist that it is irrelevant that this federal action was commenced before the state-court action was terminated by the state-court decision dismissing it with prejudice. Defs.' Reply at 4. Further, defendants argue that the state-court action was not just dismissed on defective-service grounds. *Id.* As they explain, the state-court action was *also* dismissed on statute-of-limitations grounds. *Id.* Thus, in defendants' view, the state-court dismissal is a final judgment on the merits with claim-preclusive effect. *Id.*

**[15]**  New York law determines the claim-preclusive effect of the state-court decision dismissing plaintiffs' state-court complaint. *See, e.g.*, *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 543 (2d Cir. 2019) ("A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").

**[16]**  Under New York law, *res judicata* "bars successive litigation based upon the 'same transaction or series of connected transactions' if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 122, 863 N.Y.S.2d 615, 894 N.E.2d 1 (2008) (cleaned up).

**[17]**  The Second Circuit has articulated a more granular version of this same claim-preclusion test: "(1) the earlier decision was a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the same parties or their privies were involved; and (4) the decision involved the same cause of action." *Overview Books, LLC v. United States*, 755 F. Supp. 2d 409, 415 (E.D.N.Y. 2010), *aff'd*, 438 F. App'x 31 (2d Cir. 2011) (summary order).

**[18]**  Upon review, the second, third, and fourth elements of this test are easily satisfied. There is no question that the state-court decision was rendered by a court of competent jurisdiction. [8]  Plaintiffs' state-court complaint asserted common-law tort claims. Those claims can all be heard in Supreme Court, which is a court of general jurisdiction. N.Y. JUDICIARY LAW § 140-B. The state-court complaint also alleged that defendants' conduct violated plaintiffs' "constitutional rights." So this language could be understood as an attempt to assert § 1983 claims as well. But that would not change the analysis of this element, since state courts are competent to hear § 1983 claims, too. *See, e.g.*,

*Haywood v. Drown*, 556 U.S. 729, 731, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009).

[8]    An alternative way to read this element would be to think of it as a jurisdictional inquiry. *See Stone v. Williams*, 970 F.2d 1043, 1057 (2d Cir. 1992) ("[A] court's adjudication is conclusive only if it had power to pass on the merits of the action."). But the jurisdictional question is discussed *infra*.

**[19]**  There is no question that the same parties or their privies were involved in the state-court action. A comparison of the state-court complaint and the proposed amended pleading filed in this federal-court action confirms that the same named plaintiffs; *i.e.*, Byrd and Edmonds, have filed suit against the same named defendants; *i.e.*, the Town, Officer Buyck, and Officer Spain.

**\*7 [20] [21]**  There is no question that the prior decision involved the same cause of action. New York courts take a "transactional" approach to claim preclusion, under which "the claim preclusion rule extends beyond attempts to relitigate identical claims to all other claims arising out of the same transaction or series of transactions." *Simmons v. Trans Express Inc.*, 16 F.4th 357, 361 (2d Cir. 2021) (cleaned up).

A comparison of the state-court complaint and the proposed amended complaint filed in this federal-court action confirms that both suits arise out of the same transaction or occurrence; *i.e.*, the incident inside the Wal-Mart retail store on July 4, 2021. Thus, because both lawsuits involve the same "transaction" or "common nucleus of operative facts," it does not matter whether plaintiffs' raised in the state-court action all of the different legal claims or causes of action that could have been raised. *Cayuga Nation v. Tanner*, 6 F.4th 361, 375 (2d Cir. 2021).

### 1. Underlined Final Judgment on the Merits [9]

[9]    As noted *supra*, defendants submitted a copy of the March 30, 2023 state-court decision dismissing plaintiffs' state-court complaint with prejudice. It is unclear if a separate "judgment" was ever entered (or was ever required to be entered under state law), but the parties treat this written opinion as the "judgment," at least for purposes of their dispute over the application of *res judicata*.

The only question left to consider is the first element of the test, which asks whether the state-court decision dismissing plaintiffs' state-court complaint "with prejudice" qualifies as a "final judgment on the merits."

This turns out to be an absurdly complex legal question. As an initial matter, however, it is worth noting that the phrases "final judgment" and "on the merits" are both misnomers. Today, these phrases are just shorthand ways of describing judicial determinations that carry a preclusive effect on "successive" or "subsequent" litigation. *Kassenoff v. Kassenoff*, 2023 WL 2648844, at *4 (S.D.N.Y. Mar. 27, 2023) (collecting cases).

**[22]**  That leads to a few questions. First, does it matter that plaintiffs filed this federal-court action two days *before* the state-court action ended with a "final judgment"; *i.e.*, before that case was dismissed? In plaintiffs' view, this case cannot be considered a "successive" or "subsequent" action because the state-court action had not been concluded at the time that this second case was filed. Pls.' Opp'n at 7.

This argument has some logical appeal. But under the Restatement of Judgments, "[a] valid and final judgment rendered in one action is conclusive in another action between the parties although the other action was commenced before the rendition of the judgment or before the commencement of the action in which the judgment was entered." *Restatement of Judgments* § 43 (1942).

Consequently, various courts have held that "[w]here parallel actions are commenced, *res judicata* will attach to the action in which a judgment is first entered." *Official Publ'ns, Inc. v. Kable News Co., Inc.*, 811 F. Supp. 143, 146 (S.D.N.Y. 1993); *see also Milltex Indus. Corp. v. Jacquard Lace Co., Ltd.*, 922 F.2d 164, 167 (2d Cir. 1991) (relying on full-faith-and-credit principle to give *res judicata* effect to a state-court judgment rendered during pendency of a federal-court proceeding).

To be sure, neither of these cases identify a particular state-law basis on which to reject plaintiffs' argument about timing. But the rationale of these opinions appears to be sound. Their reasoning also conforms to the view set out in the *Restatement of Judgments*. And because New York and federal courts rely on the same essential test for *res judicata*, there is no reason to think that the New York Court of Appeals would reach a different or contrary result. *Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001). So *res judicata* may operate to bar this federal-court action regardless of the fact that it was filed two days *before* the state-court complaint was dismissed with prejudice.

**\*8** The second question is whether the state-court decision that dismissed plaintiffs' state-court complaint "with prejudice" qualified as a dismissal "on the merits" under state law. In plaintiffs' view, the state-court decision relied on non-service of a summons and therefore it has no claim-preclusive effect on this federal-court action. Pls.' Opp'n at 8. But according to defendants, the state-court decision *also* dismissed plaintiffs' state-court complaint on timeliness grounds, which does have preclusive effect. Defs.' Reply at 6–8.

A review of the state-court decision offered by defendants indicates that both of these legal issues were raised in defendants' motion to dismiss and considered—albeit in a pretty cursory fashion—by the state court in its dismissal order. Ultimately, the state court granted defendants' unopposed motion and dismissed plaintiffs' state-court complaint "with prejudice."

As defendants correctly argue, the New York Court of Appeals has held that a dismissal on statute-of-limitations grounds can have claim-preclusive effect. *Smith v. Russell Sage College* ("*Russell Sage*"), 54 N.Y.2d 185, 194, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981) (holding that such a dismissal "is at least sufficiently close to the merits for claim preclusion purposes to bar a second action").

 **[23]** In *Russell Sage*, the New York Court of Appeals emphasized that the prior action being given *res judicata* effect included the consideration of more than just the pleadings. *Id.* But later Appellate Division cases have applied *Russell Sage* without any reference to this qualification, *see, e.g., Sosa v. JP Morgan Chase Bank*, 33 A.D.3d 609, 822 N.Y.S.2d 122, 124 (2006), and the New York Court of Appeals has never revisited the issue to insist on its inclusion in the claim-preclusion analysis, *Marinelli Assocs. v. Helmsley-Noyes Co., Inc.*, 265 A.D.2d 1, 705 N.Y.S.2d 571, 574 (2000). So the statute-of-limitations dismissal issued by the state-court appears to qualify as a "merits" decision.

This leads to a final question. The state-court decision does not explicitly say whether the "with prejudice" dismissal was "on the merits." The general rule is that "[a] judgment dismissing a cause of action is not a dismissal on the merits unless it specifies otherwise." N.Y. C.P.L.R. 5013.

But the New York Court of Appeals has also held that "CPLR 5013 does not require that the prior judgment contain the

precise words 'on the merits' in order to be given [preclusive] effect; it suffices that it appears from the judgment that the dismissal was on the merits." *Strange v. Montefiore Hosp. & Med. Ctr.*, 59 N.Y.2d 737, 739, 463 N.Y.S.2d 429, 450 N.E.2d 235 (1983).

Instead, the New York Court of Appeals has explained that "[a] dismissal 'with prejudice' generally signifies that the court intended to dismiss the action 'on the merits,' that is, to bring the action to a final conclusion against the plaintiff." *Yonkers Contr. Co., Inc. v. Port Auth. Trans-Hudson Corp.*, 93 N.Y.2d 375, 380, 690 N.Y.S.2d 512, 712 N.E.2d 678 (1999).

In sum, then, the state court's dismissal of plaintiffs' state-court complaint "with prejudice" on statute-of-limitations grounds would appear to qualify as a "final judgment on the merits." Because the other three elements of the test for *res judicata* are also satisfied, the state court's dismissal of plaintiffs' state-court complaint should have claim-preclusive effect on a second suit arising from the same facts, such as this federal-court action.

But there are two wrinkles in this otherwise tidy analysis that require defendants' *res judicata* argument to be denied. First, as plaintiffs point out, the state-court decision dismissing plaintiffs' state-court complaint *also* noted that plaintiffs had failed to serve a summons.

 **\*9** **[24]** In New York, "the failure to file the initial papers necessary to institute an action constitutes a nonwaivable, jurisdictional defect, rendering the action a nullity." *O'Brien v. Contreras*, 126 A.D.3d 958, 6 N.Y.S.3d 273 (2015). Although New York's civil rules were amended in 2007 to give trial courts "broad discretion to correct or disregard mistakes, omissions, defects, or irregularities" in an action, *O'Brien*, 6 N.Y.S.3d at 273, the New York Court of Appeals has specifically held that this amendment does not permit the lower courts to disregard the non-service of a summons, *Goldenberg v. Westchester Cnty. Health Care Corp.*, 16 N.Y.3d 323, 921 N.Y.S.2d 619, 946 N.E.2d 717 (2011).

 **[25]** **[26]** New York courts treat non-service of a summons as a defect in their subject matter jurisdiction. *See, e.g., Maddux v. Schur*, 139 A.D.3d 1281, 30 N.Y.S.3d 590 (3d Dep't 2016). And in New York (as elsewhere), a dismissal based solely on a jurisdictional defect is not considered to be "on the merits" and therefore does not have *res judicata* effect. *Kokoletsos v. Semon*, 176 A.D.2d 786, 575 N.Y.S.2d 116 (1991) (refusing to apply *res judicata* where prior action was

dismissed for lack of personal jurisdiction); *Dutcher v. Town of Shandaken*, 97 A.D.2d 922, 470 N.Y.S.2d 767, 769 (1983) (holding same where prior action was "dismissed solely on jurisdictional grounds").

The problem here is that the state-court decision does not appear to have dismissed plaintiffs' state-court complaint *solely* on the basis of this apparent jurisdictional defect. Instead, the state court also appears to have considered the state-law merits question arising from defendants' statute-of-limitations argument, since it dismissed the state-court complaint "with prejudice."

This was probably legal error. After all, if non-service of a summons is a nonwaivable jurisdictional defect under state law, then the state court almost certainly lacked jurisdiction to entertain the merits. And if the state court lacked jurisdiction to entertain the merits, it certainly lacked authority to enter any kind of binding judgment on the dispute. At best, then, the state court should have dismissed the state-court complaint "without prejudice."

[27]   Even so, this issue alone would not necessarily be enough to avoid the application of *res judicata*. "The doctrine of res judicata does not depend on whether the prior judgment was free from error." *Mitchell v. Nat'l Broad. Co.*, 553 F.2d 265, 272 (2d Cir. 1977). And while it might seem strange, the Supreme Court has held that "principles of res judicata apply to jurisdictional determinations—both subject matter and personal." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

In other words, error or not, it is far from clear that the possible claim-preclusive effect of the state-court decision can be disregarded just because the state court may have wrongly applied its own state law. [10]   *Cf. Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (observing *res judicata* applies even if "the judgment may have been wrong or rested on a legal principle subsequently overruled").

[10]   The place to correct this error (assuming it is actually an error) would likely be in the state court itself. There, plaintiffs could have moved for an order amending the dismissal of their state-court complaint to be "without prejudice." *Cf. Landau v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8, 13, 862 N.Y.S.2d 316, 892 N.E.2d 380 (2008). If that

motion had been denied, plaintiffs might have taken a direct appeal that sought to modify the dismissal order accordingly. *Cf. Stone v. Williams*, 970 F.2d 1043, 1058 (2d Cir. 1992). And before the state-court dismissal was entered against them, plaintiffs could have instead sought to withdraw their complaint without prejudice rather than letting defendants' motion to dismiss go unopposed. *See* N.Y. C.P.L.R. 3217.

 **\*10**   As the New York Court of Appeals has explained, "[t]he policy against relitigation of adjudicated disputes is strong enough generally to bar a second action even where further investigation of the law or facts indicates that the controversy has been erroneously decided, whether due to oversight by the parties or error by the courts." *Reilly v. Reid*, 45 N.Y.2d 24, 28, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978).

But there is a second, even bigger problem here that warrants the denial of defendants' *res judicata* argument. It turns out that the Second Circuit has already spilled a lot of ink on the question of whether a New York court's dismissal on statute-of-limitations grounds precludes a party from bringing the same claim in another jurisdiction with a longer statute of limitations.

In *Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93 (2d Cir. 2009), the plaintiffs were a group of real estate developers who sought to challenge the validity of a special tax assessment levied against them by the local municipality. *Id.* at 94. The plaintiffs initially filed suit in New York state court alleging, *inter alia*, a violation of procedural due process. *Id.* But the state court dismissed their suit as untimely after concluding that a short, four-month state-law limitations period applied to their state-law claims. *Id.*

Thereafter, the plaintiffs filed a § 1983 action in federal court. *Cloverleaf Realty of N.Y., Inc.*, 572 F.3d at 94. Although this federal-court suit alleged an "essentially identical" procedural due process claim, the plaintiffs "sought to take advantage of the longer statute of limitations applied by federal courts to § 1983 actions." *Id.* But the federal district court soon dismissed their second suit on the pleadings too, "concluding that the federal court claim was precluded by the earlier state court dismissal." *Id.*

The plaintiffs took an appeal, where they argued that the district court had failed to apply an exception to claim preclusion that arises when the first claim is dismissed "solely for lack of timeliness" and the "second claim is brought in

another state or jurisdiction." *Cloverleaf Realty of N.Y., Inc.,* 572 F.3d at 95.

As relevant here, the Second Circuit agreed with the plaintiffs that the state court's dismissal of their state-court complaint on timeliness grounds did not have claim-preclusive effect on the federal-court action with the longer statute of limitations. *Cloverleaf Realty of N.Y., Inc.,* 572 F.3d at 95.

 **[28]**  As the *Cloverleaf* panel explained, "the traditional rule is that expiration of the applicable statute of limitations merely bars the remedy and does not extinguish the substantive right, so that dismissal on that ground does not have claim-preclusive effect in other jurisdictions with longer, unexpired limitations periods." *Cloverleaf Realty of N.Y., Inc.,* 572 F.3d at 95 (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 504, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001)).

 **[29]**  In jurisdictions that follow this so-called "traditional rule," a dismissal on timeliness grounds does not have claim-preclusive effect because it does not extinguish the underlying right. *Cloverleaf Realty of N.Y., Inc.,* 572 F.3d at 95. The *Cloverleaf* panel concluded that New York follows this "traditional rule"; *i.e.*, a dismissal on timeliness grounds does not have claim-preclusive effect in another jurisdiction, such as federal court. *Id.*

 **\*11**  Remember *Russell Sage*, the New York Court of Appeals opinion about statute-of-limitations dismissals discussed *supra*? In reaching its conclusion that New York followed the "traditional rule" on timeliness dismissals, the *Cloverleaf* panel acknowledged that *Russell Sage* stood for an apparently contrary result. *Id.* Indeed, *Cloverleaf* noted that the Second Circuit had previously read *Russell Sage* to establish the exact opposite proposition: that a dismissal on timeliness grounds actually carried claim-preclusive effect in other jurisdictions. *Id.* at 96 (citing two published Second Circuit opinions).

Even so, *Cloverleaf* declined to follow *Russell Sage*. Instead, the *Cloverleaf* panel characterized the holding from *Russell Sage* as "ambiguous," and chose instead to rely on a different decision from the New York Court of Appeals: a case called *Tanges v. Heidelberg N. Am., Inc.,* 93 N.Y.2d 48, 687 N.Y.S.2d 604, 710 N.E.2d 250 (1999). According to the *Cloverleaf* panel, the *Tanges* case supported their view that New York followed the "traditional rule" on statute-of-limitations dismissals. *Id.*

*Cloverleaf*'s conclusion makes a lot of sense. As noted *supra*, in giving the statute-of-limitations dismissal claim-preclusive effect in *Russell Sage*, the New York Court of Appeals seemed to qualify its holding as relying in some part on the fact that the prior action there had been dismissed on something other than merely the pleadings. And *Tanges*, which was decided by the New York Court of Appeals after *Russell Sage*, does not even mention *Russell Sage* at all. Instead, *Tanges* contains a short-and-sweet recitation of the so-called "traditional rule" for dismissals on limitations grounds: they merely bar the remedy without extinguishing the underlying right. 93 N.Y.2d at 55, 687 N.Y.S.2d 604, 710 N.E.2d 250. So it is no surprise that *Cloverleaf* would choose to rely on it.

But that is not the end of the story. Two years later, the Second Circuit expressed doubt about *Cloverleaf*'s treatment of the state-law decisions in *Russell Sage* and *Tanges*. In *Joseph v. Anthanasopoulos,* 648 F.3d 58, 67 (2d Cir. 2011), a different panel of the Circuit noted that although *Cloverleaf* had sidestepped the holding in *Russell Sage* and chosen instead to rely on *Tanges*, not a single New York court had followed *Cloverleaf*'s lead. *Id.* Instead, the state courts had continued to invoke *Russell Sage* to give claim-preclusive effect to state-court dismissals on limitations grounds. *Id.* at 67 & n.9 (collecting cases).

The Second Circuit tried to clarify this issue by certifying the question to the New York Court of Appeals. *Joseph,* 648 F.3d at 68. But the New York Court of Appeals eventually declined to consider the certified question after the appellant in the federal case withdrew the appeal. *Stapleton v. N.Y. City Dep't of Educ.,* 2023 WL 6163939, at \*6 (S.D.N.Y. Sept. 6, 2023) (explaining history); *King v. N.Y. City Emps.' Ret. Sys.,* 595 F. App'x 10, 11–12 (2d Cir. 2014) (summary order) (same).

 **[30]**  In short, this issue remains unsettled. *Cloverleaf*'s holding rests on a clear statement about the "traditional rule" set out in *Tanges*. But state-court decisions continue to rely on *Russell Sage* instead. And although this is technically a state-law issue, *Cloverleaf* is a published panel opinion of the Second Circuit. So if it controls then *res judicata* cannot apply. To that point, some lower federal courts have chosen to follow *Cloverleaf* despite the fact that state courts apparently do not. *See, e.g., King v. N.Y. City Emps.' Ret. Sys.,* 2015 WL 4718004, at \*22 (E.D.N.Y. Aug. 10, 2015) (following *Cloverleaf* on remand despite noting the uncertainty set out in *Joseph*). Others have just declined to wade into this area of law in the first place. *Stapleton,* 2023 WL 6163939, at \*6.

**\*12**  The upshot to this discussion is that defendants' motion to dismiss on the basis of *res judicata* must be denied. Neither party briefed or even flagged this vexatious line of Second Circuit authority, and the Court is not prepared to wade any farther into this swamp on its own. After all, New York courts have routinely cautioned that a dismissal "with prejudice" does not always mean that *res judicata* should attach. *State of New York Mortg. Agency v. Massarelli*, 167 A.D.3d 1296, 89 N.Y.S.3d 768 (2018).

In sum, given the absence of a sufficiently clear legal reason to conclude otherwise, and in light of the fact that a jurisdictional defect was involved in the first action, the state court's dismissal of plaintiffs' state-court complaint does not have claim-preclusive effect on this federal-court action.

### F. Municipal Liability under § 1983

Beyond their central claim-preclusion argument, defendants' motion to dismiss also raises a few arguments that go to the merits of the § 1983 claims alleged in the proposed amended complaint. First, defendants argue that the § 1983 municipal-liability claim against the Town (Count Eight) must be dismissed because the proposed amended complaint fails to plausibly allege a policy or custom attributable to the municipality. Defs.' Reply at 12–13.

**[31]**  **[32]**  Section 1983 "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). But unlike state law, § 1983 does not permit liability based on a theory of *respondeat superior*; *i.e.*, a government entity cannot be held liable under § 1983 just because it employed the tortfeasor. *Monell v. Dept' of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, "local governments are responsible only for 'their *own* illegal acts.' " *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

**[33]**  **[34]**  Under *Monell* and its progeny, "the agent's actions must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). As the Supreme Court has explained, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick*, 563 U.S. at 60, 131 S.Ct. 1350 (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). "Official municipal policy includes the decisions of

a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to actually have the force of law." *Connick*, 563 U.S. at 60, 131 S.Ct. 1350.

**[35]**  This "official policy" requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality." *Pembaur*, 475 U.S. at 479, 106 S.Ct. 1292. Stated differently, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

**[36]**  Measured against this general body of law, plaintiffs' proposed amended complaint fails to plausibly allege a § 1983 municipal-liability claim against the Town. In opposition to dismissal of this claim, plaintiffs correctly point out that they have alleged that the Assistant District Attorney assigned to prosecute the underlying state-court criminal proceedings against plaintiffs failed or refused to disclose Officer Buyck or Officer Spain's personnel files despite being required to do so under New York State's criminal procedure law. Proposed Am. Compl. ¶ 61. In plaintiffs' view, this factual allegation "provides a fair inference" that the undisclosed personnel files "contain prior incidents of similar misconduct" that "would have required corrective behavior or training." Pls.' Reply, Dkt. No. 31 at 5.

**\*13**  **[37]**  But that conclusion hardly follows the facts alleged in the proposed amended complaint. "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), "may be pronounced or tacit," *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011), and "reflected in either action or inaction," *id.* So whether it is formal or informal, or express or implied, the plaintiff must still plausibly allege the existence of a policy or custom (or its equivalent).

Plaintiffs have not done so. As an initial matter, the proposed amended complaint only plausibly ties this alleged non-disclosure to an Assistant District Attorney, who is not a Town employee at all. Even putting that issue aside, though, plaintiffs have not alleged that Officer Buyck or Officer Spain had any supervisory or policymaking authority. Nor have plaintiffs alleged a pattern of false arrests, excessive force, or malicious prosecutions, either by these particular officers or

by any other Town employees. Instead, plaintiffs have alleged a single incident that occurred on July 4, 2021.

 **[38]**  This does not satisfy the demanding standard imposed by *Monell* and its progeny. An isolated constitutional violation by non-policymaking employees is almost never enough to hold a municipal defendant liable under § 1983. To do so on these facts would be tantamount to approving the kind of *respondeat superior* liability under § 1983 that the Supreme Court has rejected since *Monell*. Accordingly, plaintiffs' § 1983 municipal-liability claim against the Town (Count Eight) must be dismissed. [11]

> [11]  In Count Seven, the proposed amended complaint also purports to assert a § 1983 claim directly against the Town for malicious prosecution. But as explained in this section, the only way to pursue a § 1983 claim against a municipality is to satisfy *Monell*'s requirements. To the extent plaintiffs intended to attempt such a feat with Count Seven, they have not done so. Accordingly, any such § 1983 claim against the Town also fails.

### G. Duplicative or Untimely

Second, defendants argue that many of the remaining claims asserted in plaintiffs' proposed amended pleading are either duplicative or untimely.

#### 1. Timeliness

To the extent that plaintiffs' proposed amended complaint re-asserts any state-law claims, defendants argue that those claims are time-barred by the applicable statute of limitations. In opposition, plaintiffs insist that they have not attempted to re-plead any state-law claims that were asserted in their state-court complaint. Pls.' Opp'n at 8–9. Because the Court accepts plaintiffs' representation and construes plaintiffs' proposed pleading to assert only § 1983 claims (that are subject to a longer, three-year statute of limitations), defendants' motion to dismiss on this ground will be denied.

#### 2. Duplicity

Finally, defendants argue that the proposed amended complaint asserts duplicative claims based on the same alleged constitutional violations. As noted *supra*, plaintiffs' proposed amended complaints contains eight counts (minus the *Monell* claim(s) against the Town that must be dismissed for the reasons explained elsewhere).

In particular, plaintiffs' proposed amended complaint asserts § 1983 claims against Officer Buyck and Officer Spain for unlawful seizure (Count One), excessive force (Count Two), false arrest (Count Three), false imprisonment (Count Four), assault (Count Five), battery (Count Six), and malicious prosecution (Count Seven).

 **\*14**  Defendants argue that these seven enumerated claims substantively amount to just three different constitutional violations: (A) unreasonable seizure, (B) excessive force, and (C) malicious prosecution. Defs.' Reply at 10. In opposition, plaintiffs argue that defendants engaged in multiple unlawful acts and insist that a single set of facts "can violate even a single Amendment in different ways." Pls.' Reply at 3.

Upon review, some of plaintiffs' claims will be dismissed as duplicative in order to streamline this litigation. To be sure, it is common for a civil rights plaintiff to bring certain claims together. For instance, plaintiffs often assert claims for "false arrest" and "false imprisonment."

 **[39]**  But a "false arrest" is just a kind of "false imprisonment"—the intentional, unprivileged confinement of another by someone acting with law enforcement authority. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (1995). So courts typically treat these two claims the same when they are brought against a law enforcement officer.

The same is true when a plaintiff brings claims for "excessive force" and "assault" and "battery." Because these claims are "substantially identical," *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991), courts typically lump them together for purposes of analysis, *Shaheed v. City of N.Y.*, 287 F. Supp. 3d at 438, 453 (S.D.N.Y. 2018).

Even so, it is sometimes helpful to leave these claims as separate causes of action in a pleading. For example, it can serve as a useful reminder that a plaintiff has brought state-law claims as well. *Cf. Ferguson v. City of N.Y.*, 2018 WL 3626427, at *2 (E.D.N.Y. July 30, 2018) ("[U]nder New York law, any use of force by a police officer outside the context of a lawful seizure or arrest ... is a technical assault or battery.").

But those concerns are inapplicable here. As discussed *supra*, plaintiffs have abandoned any state-law claims, which would be subject to dismissal on statute-of-limitations grounds anyway. And although plaintiffs insist there is no "rule requiring a plaintiff to do so," even they acknowledge that

the seven different § 1983 claims they have alleged "might have been joined and stated in seven Causes of Action." Pls.' Opp'n at 10. In short, because plaintiffs have asserted identical § 1983 claims as multiple causes of action, leave to amend to assert these claims will only be granted in part.

In particular, plaintiffs' claims for unreasonable seizure (Count Two) and false imprisonment (Count Three) will be dismissed as duplicative of a § 1983 claim for false arrest (Count One). Plaintiffs' claims for assault (Count Five) and battery (Count Six) will also be dismissed as duplicative of their § 1983 claim for excessive force (Count Two). Plaintiffs' § 1983 claim for malicious prosecution (Count Seven) will be left undisturbed except for its dismissal against the Town. [12]

[12]    Defendants have moved to dismiss this claim based on plaintiffs' failure to allege a sufficient post-arraignment seizure. Defs.' Reply at 11–12. But as plaintiffs point out, they have alleged that they were subjected to legal process following an arraignment. Pls.' Reply at 4. This is sufficient to plausibly allege the requisite post-arraignment "seizure" necessary to satisfy § 1983. *Wagner v. Hyra*, 518 F. Supp. 3d 613, 638 (N.D.N.Y. 2021).

Although these claims will be dismissed, defendants are cautioned that plaintiffs will remain able to pursue discovery into the underlying factual allegations asserted in these otherwise-duplicative claims. Accordingly, the motion to dismiss on this ground will be granted in part in denied in part.

## V. CONCLUSION

**\*15**  The state-court action does not appear to have claim-preclusive effect on this federal-court lawsuit. Although plaintiffs' § 1983 *Monell* claim(s) against the Town must be dismissed, plaintiffs have plausibly alleged § 1983 claims against Officer Buyck and Officer Spain for false arrest, excessive force, and malicious prosecution.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2. Plaintiffs' cross-motion to amend is GRANTED in part and DENIED in part;

3. Plaintiffs' proposed amended complaint is ACCEPTED FOR FILING as the operative pleading in this action;

4. The Clerk of the Court is directed to TERMINATE as a defendant the Town of DeWitt Police Department;

5. Plaintiffs' § 1983 municipal-liability claim (Count Eight) against the Town of DeWitt is DISMISSED;

6. The Clerk of the Court is directed to TERMINATE as a defendant the Town of DeWitt;

7. Plaintiffs' § 1983 claims for unreasonable seizure (Count Two) and false imprisonment (Count Three) are DISMISSED as duplicative of the § 1983 claim for false arrest (Count One);

8. Plaintiffs' § 1983 claims for assault (Count Five) and battery (Count Six) are DISMISSED as duplicative of the § 1983 claim for excessive force (Count Two);

9. Plaintiffs' § 1983 claims for false arrest (Count One), excessive force (Count Two), and malicious prosecution (Count Seven) remain for discovery against defendants Officer Buyck and Officer Spain;

10. Plaintiffs shall file and serve the amended complaint in accordance with the Federal Rules of Civil Procedure on or before October 13, 2023; and

11. Defendants Officer Buyck and Officer Spain shall file and serve a responsive pleading on or before October 27, 2023.

IT IS SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2023 WL 6467921

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6450398
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Darius BURRIS, Plaintiff,

v.

NASSAU COUNTY DISTRICT ATTORNEY,
Nassau County Police, Detective Dezelic, Detective
Gubelli, A.D.A. John/Jane Doe, Detective Puleo,
Sergeant Reilly, Detective J. Doe, P.O. Murphy,
P.O. J. Doe, Sergeant J. Doe, Lieutenant J. Doe, C.O.
Spatarella, and Captain Jane Doe, Defendants. [1]

[1]   The Court notes that Defendants Queens County
District Attorney, New York City Police,
Hempstead Police Department, Lieutenant Boden,
and Detective Tzimoratas were terminated from
this action on April 20, 2021 due to the fact
that they were not named as defendants in
Plaintiff's Second Amended Complaint. (*See* Dkt.
170, 14-CV-05540-PKC-ARL). Therefore, those
Defendants are removed from the case caption. In
addition, Captain Jane Doe, who Plaintiff did name
as a defendant in this action (*see id.*), has been
added to the case caption.

14-CV-5540 (PKC) (ARL)
|
Signed September 30, 2023

**Attorneys and Law Firms**

Darius Burris, Freeport, NY, Pro Se.

Callan Wright Tauster, Suffolk County Department of Law,
Hauppauge, NY, Sheharyar Ali, I, Liora M. Ben-Sorek,
Nassau County District Attorney's Office, Mineola, NY,
for Defendants The Office of the Nassau County District
Attorney, Nassau County Police, Detective Dezelic, Detective
Gubelli.

Luc Christopher Pierre-Louis, Herrick, Feinstein LLP, New
York, NY, for Defendant Officer Spattula.

Luc Christopher Pierre-Louis, Herrick, Feinstein LLP, New
York, NY, Mary Anderson, Nicolette Pellegrino, New York
City Law Department, New York, NY, for Defendant Robert
Spatarella.

Officer Spattula, Pro Se.

Captain Jane Doe, Pro Se.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*1**  Plaintiff Darius Burris ("Plaintiff") brings this *pro se*
action pursuant to 42 U.S.C. § 1983 ("Section 1983"),
alleging violations of his constitutional rights in connection
with his arrests on December 27, 2013, and April 25,
2014. (Complaint ("Compl."), Dkt. 1.) Before this Court
is Defendant New York City Department of Correction
("DOC") Officer Robert Spatarella's ("Spatarella") motion
to dismiss Plaintiff's excessive force claim in the Second
Amended Complaint ("SAC"). (Dkts. 189, 190.) For the
reasons explained below, Spatarella's motion is denied.

**BACKGROUND** [2]

[2]   For the purposes of this motion, the Court accepts
as true all factual allegations in the complaint.
*Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91
(2d Cir. 2021) (reiterating that, on a motion to
dismiss, the court must "accept as true all factual
allegations and draw from them all reasonable
inferences; but [is] not required to credit conclusory
allegations or legal conclusions couched as factual
allegations") (quoting *Dane v. UnitedHealthcare
Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)).

**I. Relevant Facts**

On April 25, 2014, Plaintiff was arrested by DOC and Nassau
County Police Department officers after being released from
DOC custody. (SAC, Dkt. 170, at ECF [3]  2–3.) Plaintiff
alleges that, during his arrest, he was subjected to excessive
force by Spatarella, an unidentified DOC officer, and several
Nassau County Police Department detectives. (*Id.*) Spatarella
"became verbal[ly] abusive with Plaintiff and made [ ] threats
of bodily harm upon Plaintiff" during the arrest. (*Id.* at ECF
2.) Spatarella "slam[med] Plaintiff while [Plaintiff's] hand
was cuffed, bringing Plaintiff to the ground by way of force,"
which "caused Plaintiff to be in excessive pain in [his] back,
arms[,] and face." (*Id.* at 3.) Spatarella "had Plaintiff's arms
stretched high behind his back with his wrists tightened"

while Plaintiff was being forced into the car. (*Id.*) During the car transfer, Plaintiff "requested medical attention," but did not receive any "until [the] process of [the] arrest was done," leaving him "in excessive pain[.]" (*Id.*) Plaintiff was subsequently transferred to a medical facility for treatment and then taken into custody at the Nassau County Correctional Center. (*Id.* at ECF 3–4.)

3    Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

## II. Procedural History
On September 17, 2014, Plaintiff commenced this action while still incarcerated on his April 25, 2014, arrest [4] (Compl., Dkt. 1) and moved to proceed *in forma pauperis* (Dkt. 2), which was granted (Dkt. 6). In the original Complaint, Plaintiff named the Nassau County District Attorney and Nassau County Police Department (collectively, the "Nassau County Defendants"), the Hempstead Police Department, and the New York City Police Department and Queens County District Attorney (collectively the "City Defendants") as defendants in the case caption. (Compl., Dkt. 1, at ECF 1.) Plaintiff did not name Spatarella or any John Doe defendants in the case caption of the original Complaint (*id.*), nor did he include Spatarella in the list of defendants [5] (*id.* at 3). Nonetheless, Plaintiff named Spatarella in the body of his original Complaint as "Spattla" and made allegations against him. (*Id.* at ECF 4.)

4    At the time Plaintiff filed his original Complaint, he was incarcerated at the Nassau County Correctional Center in East Meadow, New York. (*See* Compl., Dkt. 1-1, at ECF 1.) Plaintiff was released from custody in April 2018. (*See* Dkt. 138.)

5    In the list of defendants, Plaintiff included the governmental defendants (i.e., Nassau County District Attorney, Nassau County Police Department, Hempstead Police Department, New York City Police Department, and Queens County District Attorney), and multiple individually named and unnamed officials from those governmental entities. (Compl., Dkt. 1, at ECF 3.)

**\*2**  On October 2, 2014, the Court directed the United States Marshals Service ("U.S. Marshals Service") to effect service on Plaintiff's behalf. (Dkt. 6.) On October 30, 2014, noting that the U.S. Marshals Service "will not be able to

effect service of the summons and complaint on the unnamed defendants without more information," the Court issued an order, pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), requesting that the Office of Corporation Counsel for the City of New York ("Corporation Counsel") "ascertain the full names of the individuals alleged to have interacted with the plaintiff on ... April 25, 2014" and provide "address(es) where each defendant can be served." (Dkt. 7, at ECF 1–2 ("*Valentin* Order").) [6] On December 17, 2014, the Court stayed this action pending resolution of Plaintiff's parallel state criminal proceeding (Dkt. 20) and directed Corporation Counsel to respond to the *Valentin* Order no later than 30 days after the stay was lifted (Dkt. 35). By letter filed on November 18, 2015, "[P]laintiff notified the court that there ha[d] been a guilty verdict in his underlying criminal matter." (12/02/2015 Docket Order; *see* Pl.'s 11/18/15 Letter, Dkt. 37.) Plaintiff was sentenced on March 31, 2016. (*See* 03/30/2016 Docket Order.)

6    At that time, the Honorable Joseph F. Bianco was the presiding district judge in this matter.

Soon after Plaintiff's sentencing, the Nassau County and City Defendants, and Hempstead Police Department each filed a motion to dismiss Plaintiff's claims. (Dkts. 61, 65, 70.) "In light of the potentially dispositive nature of the motion," on June 2, 2016, the Court ordered that "defendants need not comply with the *Valentin* Order until the motion is resolved." (Dkt. 62.) On March 29, 2017, the Court dismissed all of Plaintiff's claims, except his excessive force claims against the Nassau County and City Defendants. *See Burris v. Nassau Cty. Dist. Att'y*, No. 14-CV-5540 (JFB) (GRB), 2017 WL 1187709, *2–3 (E.D.N.Y. Mar. 29, 2017).

On April 17, 2017, Plaintiff filed an amended complaint ("First Amended Complaint" or "FAC"), which specifically requested leave to add parties listed as "New York City Department of Corrections C.O. Spatula," a "Correction Officer employed at (E.M.T.C. C-76)," under the section "Defendant(s)," and referred to Spatarella as "Spattula" throughout the pleading. (Dkt. 108, at ECF 1–3, 6.) On April 20, 2021, Plaintiff filed the SAC, where Spatarella's name, spelled as "C/O Spattula," was listed as a defendant in the case caption and also appeared in the body of the complaint. (Dkt. 170, at ECF 1–4.)

On March 25, 2022, the Court denied the Nassau County Defendants' motion to dismiss Plaintiff's SAC regarding the excessive force and deliberate indifference claims. (Dkt. 175.)

In the same Memorandum & Order, the Court also held that for the same reasons, "Plaintiff has adequately stated excessive force and deliberate indifference claims against Officer Spattula," whose name, the Court noted, was "spelled throughout Plaintiff's filings as 'Spattula' or 'Spatula' " but was "not listed in the case caption as a defendant and has not appeared in this case." (*Id.* at ECF 2 n.3 (internal citations omitted).) Accordingly, the Court directed the Clerk of Court to "add Officer Spattula to the case caption as a defendant" and requested that Corporation Counsel notify the Court whether their office represented "Spattula" in this action. (*Id.*) By letter dated June 27, 2022, the City Defendants' attorneys identified "Spattula" as DOC Officer Robert Spatarella and confirmed their representation of him in this matter. (Dkt. 181, at ECF 1.) On November 7, 2022, Spatarella filed the instant motion to dismiss Plaintiff's excessive force claim against him "pursuant to Fed. R. Civ. P. 12(b)(6) ... both because Plaintiff failed to serve him pursuant to Fed. R. Civ. P. 4(m) and because the claim is time-barred." (Dkt. 190, at ECF 6, 9–11.) Plaintiff opposes the motion. (Dkt. 195.)

## LEGAL STANDARDS

While Spatarella's motion cites only Federal Rule of Civil Procedure ("Rule") 12(b)(6) as the basis of its motion, the Court construes it as, in part, being made under Rule 12(b)(5) for insufficient service of process and, in part, raising a statute of limitations affirmative defense to be considered under Rule 12(b)(6). *See Weisz v. Sarma Collections, Inc.*, No. 21-CV-6230 (PMH), 2022 WL 1173822, at *1 n.1 (S.D.N.Y. Apr. 20, 2022) (noting that because the defendant failed to identify the grounds for dismissal, the court "construe[d] the motion as one made under Rule 12(b)(1) because the arguments in the moving memorandum of law make clear that the motion seeks to dismiss ... for lack of subject matter jurisdiction"); *Matter of Trs. Established Under the Pooling & Servicing Agreements Relating to the Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 446 (S.D.N.Y. 2019) ("[T]he Court has an independent obligation to apply the correct legal standard[.]").[7]

[7]    Furthermore, as discussed, the Court has already ruled that "Plaintiff has adequately stated excessive force and deliberate indifference claims against Officer Spattula" (Dkt. 175, at ECF 2 n.3), which is therefore the law of the case. *See United*

*States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." (citations and internal quotation marks omitted)).

**I. Motion to Dismiss under Rule 12(b)(5)**

 **\*3**  "For a federal court to exercise personal jurisdiction over a defendant, 'the plaintiff's service of process upon the defendant must have been procedurally proper.' " *Westchase Residential Assets II, LLC v. Gupta*, No. 14-CV-1435 (ADS) (GRB), 2016 WL 3688437, at *2 (E.D.N.Y. July 7, 2016) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012)); *see also Sartor v. Toussaint*, 70 F. App'x 11, 13 (2d Cir. 2002) (summary order) ("A judgment is void for lack of personal jurisdiction over the defendant where service of process was not properly effected.") (citation omitted). To survive a motion to dismiss for insufficient service of process under Rule 12(b)(5), "the plaintiff bears the burden of establishing that service was sufficient." *Allstate Ins. Co. v. Rosenberg*, 771 F. Supp. 2d 254, 260 (E.D.N.Y. 2011) (quoting *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order)).

"In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010). Under Rule 4, a plaintiff must serve the summons and complaint on a defendant within 90 days[8] of filing the complaint. Fed. R. Civ. P. 4(c)(1); 4(m). If a plaintiff fails to effect service on a defendant, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). Furthermore, "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.*; *see also Canady v. Correct Care Sols.*, No. 15-CV-4893 (KMK), 2017 WL 4280552, at *9 (S.D.N.Y. Sept. 25, 2017) (noting that when a plaintiff has demonstrated good cause, the extension to serve is mandatory) (citing *Blessinger v. United States*, 174 F.R.D. 29, 31 (E.D.N.Y. 1997)).

[8]    At the time Plaintiff filed the original Complaint on September 17, 2014, the period prescribed by Rule 4(m) was 120 days. Rule 4(m) has subsequently been amended to shorten that period to 90 days, which took effect on December 1, 2015. *See*

Fed. R. Civ. P. 4(m), Comm. Notes 2015 Am. ("The presumptive time for serving a defendant is reduced from 120 days to 90 days."). Because Plaintiff initiated this action before December 1, 2015, he gets the benefit of the longer service period. *See, e.g., Soos v. Niagara Cnty.*, 195 F. Supp. 3d 458, 464 (W.D.N.Y. 2016) (applying the 120-day time period where complaint was filed before amendment to Rule 4(m)); *Kitsis v. Home Attendant Vendor Agency, Inc.*, No. 15-CV-6654 (FB), 2016 WL 8234676, at *2 n.1 (E.D.N.Y. Dec. 12, 2016) (same).

## II. Motion to Dismiss for Failure to Comply with Statute of Limitations

"A motion to dismiss on statute of limitations grounds generally is treated as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on such grounds, because expiration of the statute of limitations presents an affirmative defense." *La Russo v. St. George's Univ. Sch. of Medicine*, 936 F. Supp. 2d 288, 296–97 (S.D.N.Y. 2013) (internal citations omitted); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."). "The standards and procedures under Rule 12(b)(6) thus aptly apply to motions to dismiss upon the affirmative defense of statute of limitations." *Adams v. Crystal City Marriott Hotel*, No. 02-CV-10258 (PKL), 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004).

**\*4** To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (quoting *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The plausibility standard under Rule 12(b)(6) requires "more than a sheer possibility that a defendant has acted unlawfully," and determining whether a complaint meets this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 678–79). For purposes of this analysis, the Court

"accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020)). "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted). *Pro se* complaints "need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* at 93 (internal quotation marks omitted).

## III. Statute of Limitations for Section 1983 Claims

Because there is no federal statute of limitations governing actions brought pursuant to Section 1983 actions, courts apply the forum state's general personal injury statute of limitations. *Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994). In an action arising in New York pursuant to Section 1983, New York's general statute of limitations for personal injury actions, which is three years, supplies the applicable statute of limitations. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing N.Y. C.P.L.R § 214(5)).

While the applicable limitations period is determined by state law, the accrual date "is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *see also Pearl*, 296 F.3d at 80 ("Federal law determines when a section 1983 cause of action accrues."). "A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks and citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980).

## DISCUSSION

As discussed, the Court construes Spatarella as moving to dismiss Plaintiff's excessive force claim: (1) pursuant to Rule 12(b)(5) on the basis that "Plaintiff failed to serve him," and (2) pursuant to Rule 12(b)(6) on the basis that Plaintiff's Section 1983 "claim is time-barred." (Dkt. 190, at ECF 6.)

2023 WL 6450398

For the reasons set forth below, the Court denies Spatarella's motion in its entirety.

## I. Personal Service

Spatarella argues, in sum, that he should be dismissed from this case because the SAC was not timely served on him, that Plaintiff cannot show "colorable excuse" for the untimely service, and that Spatarella will be prejudiced in defending himself because it has been eight years since the alleged incident occurred. (*See* Dkt. 190, at ECF 10.) The Court addresses each of these arguments and finds none availing.

### A. Untimely Service Does Not Warrant Dismissal Where Good Cause is Shown.

Spatarella contends that he was named as a defendant at the earliest "at the time of the filing of [Plaintiff's SAC]" on April 20, 2021, and at the latest when "the Court instructed the Clerk of Court to include him in the caption on or about March 25, 2022." (Dkt. 190, at ECF 10.) Accordingly, Spatarella argues that because 90 days have passed since the latest possible date (i.e., March 25, 2022), and he still has not been served by Plaintiff, the SAC should be dismissed as to him. (*Id.*) The Court disagrees.

 **\*5**  Although Spatarella is correct that he has not been served with the SAC, he has not demonstrated that this failure requires the dismissal of Plaintiff's SAC. When a plaintiff fails to serve a defendant "within [the period for service provided by Rule 4(m)] after the complaint is filed," the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). "But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.* When a court grants a *pro se* plaintiff leave to proceed *in forma pauperis*, it "shift[s] the responsibility for serving the complaint from [the plaintiff] to the court" and thus "the Marshal's Office —not the plaintiff—is primarily responsible for effecting service." *Wright v. Lewis*, 76 F.3d 57, 59 (2d Cir. 1996); *Kavazanjian v. Rice*, No. 03-CV-1923 (FB) (SMG), 2005 WL 1377946, at *2 (citing 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process, and perform all duties in [*in forma pauperis*] ... cases.")). Thus, a *pro se* plaintiff may avoid dismissal under Rule 4(m) if he "indicated to the court his reliance on service by the Marshals[.]" *Romandette v. Weetabix Co.*, 807 F.2d 309, 311 (2d Cir. 1986). As long as a *pro se* litigant proceeding *in forma pauperis* "provides the information necessary to identify the

defendant, courts have uniformly held that the Marshals' failure to effect service automatically constitutes good cause within the meaning of Rule 4(m)." *Ruddock v. Reno*, 104 F. App'x 204, 206–07 (2d Cir. 2004) (collecting cases from several other circuits). "[T]he Court has an obligation to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training[,]" *Canady*, 2017 WL 4280552, at *10 (internal quotation marks and citations omitted), as well as their lack of resources, *Valentin*, 121 F.3d at 75 ("From [Plaintiff's] place of incarceration, it is hard to see what investigative tools would be at his disposal to obtain further information on [Defendants'] identit[ies].").

Here, as a *pro se* litigant proceeding *in forma pauperis*, Plaintiff is entitled to rely on the U.S. Marshals Service to effect service. *Meilleur v. Strong*, 682 F.3d 56, 62 (2d Cir. 2012) (" '[A]n incarcerated *pro se* litigant proceeding *in forma pauperis* ... [is] entitled to rely on service by the U.S. Marshals.' ") (quoting *Romandette*, 807 F.2d at 311). After granting Plaintiff's request to proceed *in forma pauperis*, the Court directed the U.S. Marshals Service to effect service on Plaintiff's behalf. (Dkt. 6.) Noting that "the U. S. Marshals will not be able to effect service of the summons and complaint on the unnamed defendants without more information," the Court subsequently issued a *Valentin* Order, requesting the City Defendants' counsel, Corporation Counsel, to "ascertain the full names of individuals *alleged to have interacted with the plaintiff* on ... April 25, 2014" (emphasis added), and provide "address(es) where each defendant can be served" (Dkt. 7, at ECF 1–2). Under *Valentin v. Dinkins*, a *pro se* litigant is entitled to assistance from the district court in identifying a defendant. 121 F.3d 72, 76 (2d Cir. 1997).

### B. Plaintiff Has Demonstrated Good Cause.

Spatarella also contends that "even if ... the initial *Valentin* Order survived the first round of motion practice with City [D]efendants," Plaintiff failed to "alert the Court to the purportedly outstanding response over the many years that this matter has been litigated" due to his "complete lack of diligence." (Dkt. 197, at ECF 4.) Not only does this argument improperly shift the burden to Plaintiff—it ignores the facts.

1. Corporation Counsel Failed to Comply with the *Valentin* Order.

Spatarella argues that Corporation Counsel was relieved of its *Valentin* obligations by a court order dated June 2, 2016 (*see* Dkt. 190, at ECF 7), and the *Valentin* Order was subsequently extinguished at the conclusion of the City Defendants' first round of motion practice (*see* Dkt. 197, at ECF 3). The record in this case, however, suggests the contrary—the *Valentin* Order remained in effect after the Court decided on the City Defendants' first round of motions on March 29, 2017. (Dkt. 103.) Although the Court stayed this action during the period when resolution of Plaintiff's parallel state criminal proceeding was pending (Dkts. 20, 35) and temporarily relieved Corporation Counsel of its *Valentin* obligations "[i]n light of the potentially dispositive nature of the [City Defendants'] motion [to dismiss]," the Court specifically ordered that Corporation Counsel's *Valentin* obligations were only stayed "*until the motion is resolved.*" (Dkt. 62 (emphasis added).) In addition, given the fact that the Court partially denied the City Defendants' motion dismissing Plaintiff's claims—including his excessive force claim—and that there were at least two City defendants who remained unidentified [9] at the time of the Court's decision (*see* Dkt. 103, at ECF 1–2, 5), it can hardly be said that Corporation Counsel's *Valentin* obligations were extinguished at the conclusion of their motion. Therefore, the *Valentin* Order survived the conclusion of the City Defendants' first round of the motion practice and resumed on March 29, 2017.

[9]     The two unidentified City defendants were a New York City Police Department officer and an Assistant District Attorney in the Queen's County District Attorney's Office. (Dkt. 103, at ECF 1.)

**\*6**  After their motion was resolved, however, Corporation Counsel failed to comply with its *Valentin* obligations to identify the remaining unidentified defendants—including Spatarella—even after Plaintiff twice amended his complaint and referred to Spatarella throughout both the pleadings. (Dkts. 108, 170.) It was not until 2022 when the Court directed the Clerk of Court to add Spatarella to the case caption as a defendant and directed Corporation Counsel to notify the Court whether their office represented Spatarella—almost eight years after the Court issued the *Valentin* Order and five years after Corporation Counsel's *Valentin* obligations resumed—that Corporation Counsel finally complied with the Order in seeking to discover Spatarella's identity. (Dkt. 181.) Thus, it was Corporation Counsel's failure to fully or timely comply with the *Valentin* Order that resulted in

Spatarella not being properly named in the complaint in this case.

### 2. Plaintiff Provided the Necessary Information to Identify Spatarella.

Spatarella also argues that it was not until the FAC that Plaintiff "for the first time ... referenced 'C.O Spatula' or 'Spattula' as an individual who may have used excessive force against Plaintiff" and that it was not until the SAC that Plaintiff "provided details of the alleged excessive force attributed to 'Officer Spattula.' " (Dkt. 190, at ECF 7–8.) Again, the Court disagrees.

A review of the record reveals that from the very beginning of this litigation, Plaintiff furnished all of the particulars about Spatarella's identity that Plaintiff had in his possession numerous times throughout his filings: Spatarella's surname (spelled as "Spattla" or "Spattula"), the correctional facility and the unit to which Spatarella was assigned, and the date of the incident in which Spatarella was allegedly involved. Specifically, it is clear from Plaintiff's original Complaint that he already identified "Spattla" as "N.Y.C. Dept. of Corrections [s]taff" and specified in detail that "Spattla" had used excessive force against him. (Compl., Dkt. 1, at ECF 4.) Indeed, Plaintiff alleged that "[his] arms [were] handcuffed behind [his] back and [were] lifted way above [his] head by ... Spattla," which caused him "excessive pain," and that Plaintiff "requested medical treatment," but was not treated until after he was "booked and fingerprinted." (*Id.*) In addition, in his FAC, Plaintiff requested leave to add defendants, including specifically "New York City Department of Corrections C.O. Spatula," a "Correction Officer employed at (E.M.T.C. C-76)," and made allegations against "Spattula" in the body of the FAC. (FAC, Dkt. 108, at ECF 1–3, 6.) Once more, in his SAC, Plaintiff listed Spatarella as "C/O Spattula" in the case caption as a defendant and provided details of his excessive force claim against "C/O Spattula" throughout the pleading. (SAC, Dkt. 170, at ECF 1–4.) "In the face of this data, at least some inquiry should have been made as to whether such an officer exists and could readily be located." *Valentin*, 121 F.3d at 75.

It is unclear why Spatarella was not identified by Corporation Counsel during the eight years of this litigation until after the Court directed the Clerk of Court to add Spatarella to the case caption as a defendant, and directed Corporation Counsel to advise the Court whether they represented him. (Dkt.

175, at ECF 2 n.3; 3/25/2022 Docket Order; *see* Dkt. 181 (6/27/22 Corporation Counsel Letter identifying Spatarella and confirming representation of him).) [10] But it was not because Plaintiff failed to supply sufficient information in his repeated filings to permit Corporation Counsel to identify Spatarella. *See Toliver v. Dept. of Corrections*, No. 10-CV-5806 (SHS), 2011 WL 3368472, at 3* (S.D.N.Y. July 26, 2011) (finding that the plaintiff who "specified that [defendant] is a male security captain who works in G.R.V.C. at Riker's Island" is deemed to have provided "information necessary" to identify defendant to constitute good cause under Rule 4(m)).

[10]        The Court surmises that because of the 2-1/2 year stay of the *Valentin* order—first while Plaintiff's underlying criminal case was pending and then while the City Defendants' motions were pending—that Corporation Counsel simply forgot about the *Valentin* order after the motions were decided. (*See* 12/17/2014 Order, Dkt. 20 (granting stay on responding to *Valentin* order pending criminal matter); 6/9/2015 Order, Dkt. 35 (extending stay until 30 days after criminal matter concluded); 6/2/2016 Order, Dkt. 62 (ordering that "defendants need not comply with the *Valentin* Order until [Defendants' motion to dismiss] is resolved"); 3/29/2017 Mem. & Order, Dkt. 103 (resolving Defendants' motion).) Contrary to Spatarella's argument, however, it was not Plaintiff's responsibility to remind Corporation Counsel about it.

*7 Thus, Plaintiff has demonstrated good cause for failing to complete service according to the requirements of Rule 4(m).

### C. Spatarella Has Actual Notice of the Instant Litigation.

In addition to the "special solicitude afforded to *pro se* civil litigants," *Canady*, 2017 WL 4280552, at *10, "[t]he Second Circuit has held that [Rule] 4 is to be construed liberally to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice." *McNulty v. Yaneka*, No. 11-CV-08320 (ER), 2013 WL 684448, at *4 (S.D.N.Y. Feb. 25, 2013) (internal citations and quotation marks omitted). Here, Defense Counsel Richard Bahrenburg, Esq. [11] and Luc C. Pierre-Louis, Esq. entered notices of appearance on behalf of Spatarella on June 27, 2022 (Dkt. 181) and July 25, 2022 (Dkt. 183), respectively, and litigated

this case on his behalf through the instant motion. [12] The Court therefore infers that Spatarella has actual notice of the instant litigation. *See Sidney v. Wilson*, 228 F.R.D. 517, 524 (S.D.N.Y. 2005) (finding that a defendant who had retained private counsel clearly had received actual notice of the complaint).

[11]        At the time when Richard Bahrenburg, Esq. entered the notice of appearance on behalf of Spatarella on June 27, 2022, he noted that "[t]his matter is assigned to Assistant Corporation Counsel Luc C. Pierre-Louis who is awaiting admission to the Eastern District of New York and is handling the case under [Richard Bahrenburg's] supervision." (Dkt. 181, at ECF 1 n.1.)

[12]        By an order dated January 31, 2023, the Court granted a motion to substitute Luc C. Pierre-Louis, Esq. with Nicolette Pellegrino, Esq. as defense counsel for Spatarella, who has been representing Spatarella since then. (*See* 1/31/2023 Docket Order.) In the Motion to Substitute, Nicolette Pellegrino noted that "[t]his case is being handled, under [Nicolette Pellegrino's] supervision, by Assistant Corporation Counsel Mary Jane Anderson, who is not yet admitted to the New York State Bar." (Dkt. 199, at ECF 1 n.1.)

### D. Spatarella Fails to Demonstrate Any Prejudicial Effect Against Him.

Finally, while Spatarella asserts that "requiring [him] to defend[ ] against Plaintiff's claims more than eight years after the alleged underlying incident occurred would be highly prejudicial to [him]" (Dkt. 190, at ECF 10), he fails to "make any specific allegations to demonstrate that prejudice occurred" or "offer[ ] ... facts to substantiate that assertion"—for example, "the loss or destruction of relevant evidence, or the inability to locate key witnesses" by allowing the suit to continue—"except a conclusory argument to that effect." *Husowitz v. Am. Postal Workers Union*, 190 F.R.D. 53, 58 (E.D.N.Y. 1999). Indeed, given that Spatarella's co-defendants, all of whom are facing the same claims for the same incident and some of whom are represented by Spatarella's counsel, have been litigating this matter since it was filed, substantially mitigates, if not eliminates, any prejudice Spatarella faces in defending himself in this case. [13]

13      The Court notes that discovery closed in November 2020. (*See* 11/19/2020 Defense Letter, Dkt. 165; 11/23/2020 Docket Order ("All discovery is closed.").) Should Spatarella need additional time to conduct discovery in light of the Court's ruling in this Memorandum & Order, he may request leave to do so.

\* \* \*

**\*8**  In sum, given the Second Circuit's "clearly expressed preference that litigation be resolved on the merits," *Canady, 2017 WL 4280552, at \*10* (internal quotation marks and citations omitted) and its guidance that " 'incomplete or improper service will lead the court to dismiss the action *unless it appears that proper service may still be obtained*[,]' " *Romandette, 807 F.2d at 311* (emphasis added)—as well as the facts showing good cause for Plaintiff's failure to effect timely service on Spatarella and that Spatarella has actual notice of the instant action—the Court denies Spatarella's motion under *Rule 12(b)(5)* to dismiss this case for failure to serve process.

## II. Statute of Limitations Affirmative Defense

Spatarella also maintains that Plaintiff's excessive force claim against him must be dismissed because it is time-barred under the applicable statute of limitations and does not relate back to the original filing. (Dkt. 190, at ECF 11.)

### A. Plaintiff's Claim Against Spatarella is Not Time-Barred.

Spatarella asserts that given the three-year statute of limitations in this case, Plaintiff's claim for excessive force against him "would have accrued on April 25, 2014 and expired on or about April 25, 2017." (*Id.* at ECF 12.) Spatarella further contends that "[e]ven accounting for the stay in this matter from December 17, 2014 until May 3, 2018 ..., Plaintiff would have had to name [him] by September 11, 2020 in order for [Plaintiff's] claim to be considered timely." (*Id.*) Thus, Spatarella argues, because Plaintiff "did not allege any specific claims against [him] until the filing of the [SAC] on or about April 20, 2021—well after the statute of limitations had expired[,]" his "excessive force claim is time-barred and should be dismissed." (*Id.*)

Contrary to Spatarella's arguments, read fairly and liberally, Plaintiff's first two complaints—both of which were filed before April 25, 2017—already named Spatarella (albeit

spelled incorrectly), as a defendant and raised specific claims against Spatarella. (*See* Dkts. 1, 108.) As noted above, Plaintiff's original Complaint specified in detail that "[his] arms [were] handcuffed behind [his] back and [were] lifted way above [his] head by ... Spattla, with the help of Nassau County detectives" and that the "alteration was ignited by C.O. Spattla[.]" (Compl., Dkt. 1, at ECF 4.) Plaintiff alleged that as a result of "Spatta's" and the other officers' conduct, Plaintiff was "in excessive pain and requested medical treatment," that he was not treated until after he was "booked and fingerprinted[,]" and that he later "had to return [to the medical facility] a second time" for treatment. (*Id.*) Plaintiff also alleges that his "back brace" was lost during the incident. (*Id.*) Again, in the FAC, Plaintiff alleges that on "April 25, 2014 ... [he] was [a]ssaulted by way of [e]xcessive [f]orce" by "C.O. Spatula," and as a result of the excessive force, "[he] suffered from substan[tial] pain in his back, head and wrist[,] and [n]umbness [in his] fingers [ ] and wrist." (Dkt. 108, at ECF 1, 5). Plaintiff further alleges that "[t]he actions of Defendant[ ] SPATTULA ... in using excessive Force against the Plaintiff without need or provocation ... were done Maliciously and Sadistically and Constituted Cruel and Unusal [sic] Punishment[.]" (*Id.* at ECF 3.) Therefore, both the original Complaint and FAC provided specific details identifying Spatarella as one of the perpetrators of the alleged unconstitutional conduct and describing that conduct.

While not raised by either party on this issue, the Court notes that neither the caption nor the list of defendants in the original Complaint included Spatarella as a defendant (Compl., Dkt. 1), and the FAC's caption also did not name Spatarella (Dkt. 108). Rule 10(a) provides that "[e]very pleading must have a caption" and that the "title of the complaint must name all parties" to a lawsuit. *Fed. R. Civ. P. 10(a)*. However, "Rule 10 is, of course, subject to the command 'never to exalt form over substance.' " *Shariff v. United States, 689 F. App'x 18, 19 (2d Cir. 2017)* (summary order) (quoting *Phillips v. Girdich, 408 F.3d 124, 128 (2d Cir. 2005)*). "Although captions provide helpful guidance to the court, they are not determinative as to the parties to the action or the court's jurisdiction." *Goldman v. C.I.R., 112 F.3d 503, 1997 WL 196677, at \*3 (2d Cir. 1997)* (citations omitted); *E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Loc. 580, 139 F. Supp. 2d 512, 525 (S.D.N.Y. 2001)* ("[T]he caption itself is normally not determinative of the identity of the parties or of the pleader's statement of claim.") (internal quotation marks omitted); *Curran v. Lee, 484 F.2d 1348, 1349 n.2 (2d Cir. 1973)* (quoting *Fed. R. Civ. P. 25(d)* ("Any misnomer in the caption of this action is treated

2023 WL 6450398

as one 'not affecting substantial rights of the parties.' ")). Rather, in assessing who is a proper party to a lawsuit, courts consider " '[t]he caption, pleadings, service of process and other indications of the intent of the pleader.' " *E.E.O.C.*, 139 F. Supp. 2d at 525 (quoting *Nationwide Mut. Ins. Co. v. Kaufman*, 896 F. Supp. 104, 109 (E.D.N.Y. 1995)). Courts in this Circuit " 'excuse technical pleading irregularities as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party.' " *Id.* (quoting *Phillips*, 408 F.3d at 128). In particular, "[*p*]*ro se* pleadings ... warrant especially liberal construction and should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations.' " *Shariff*, 689 F.App'x at 19 (quoting *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997)). "[I]t is 'entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of ... mere technicalities[.]' " *Id.* (internal citations omitted).

**\*9** Indeed, courts in this Circuit have found *pro se* complaints to sufficiently plead claims against defendants who are not even named in the caption or the list of defendants when there are adequate factual allegations in the body of the complaints to establish that the plaintiff intended them as defendants. *See, e.g.*, *Brown v. New York City Dept. of Corrs.*, No. 16-CV-6077 (CBA) (LB), 2018 WL 2389718, at \*1 n.1 (E.D.N.Y. May 23, 2018) (construing the *pro se* plaintiff's complaint liberally as naming the individuals who were not named in the caption or included in the list of defendants as parties when plaintiff made allegations against them); *Brazley v. ACS*, No. 16-CV-07138 (LDH) (PK), 2017 WL 4621951, at \*1 n.1 (E.D.N.Y. Oct. 13, 2017) (liberally construing the complaint as against all of the defendants that plaintiff named whose names did not appear in the caption of the complaint but the defendants' names and a short description of their conduct were included in the body of the complaint); *Gibson v. Brown*, No. 12-CV-622 (KAM) (RLM), 2012 WL 1744845, at \*1 (E.D.N.Y. May 16, 2012) (deeming caption amended to include defendants listed in body of complaint but not named in original caption); *Ocasio v. Riverbay Corp.*, No. 06-CV-6455 (PAC) (KNF), 2007 WL 1771770, at \*7 (S.D.N.Y. June 19, 2007) (finding that the text of the complaint established individual as intended defendant despite lack of specificity in the caption); *O'Neal v. Cnty. of Nassau*, 992 F. Supp. 524, 531 (E.D.N.Y. 1997) (finding plaintiff sufficiently alleged personal involvement of certain individuals even though he failed to name them as defendants in the caption or body of the complaint).

In the instant case, although Plaintiff did not list Spatarella as a defendant in the case captions of his original Complaint and FAC, it is abundantly clear that Plaintiff intended to bring claims against Spatarella because, as described above, Plaintiff made specific allegations against Spatarella in the body of his pleadings. (Compl., Dkt. 1, at ECF 4; Dkt. 108, at ECF 2–3, 6.) Therefore, "[c]asting a 'lenient eye' on *pro se* pleadings," *Shariff*, 689 F. App'x at 19, and avoiding "exalt[ing] form over substance," *id.*, the Court construes Plaintiff's complaints as having asserted claims against [Spatarella], despite the failure to list [him] in the caption." *See JCG v. Ercole*, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815, at \*16 (Apr. 24, 2014), *report and recommendation adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

## B. Plaintiff's SAC Relates Back to the Original Complaint.

Even assuming, *arguendo*, that the description of Spatarella is insufficient to consider him to have been named as an original defendant in the original Complaint, the Court nonetheless finds that Plaintiff's SAC relates back to his original Complaint under Rule 15(c)(1)(C) to overcome the statute of limitations hurdle.

The relation back doctrine allows claims that are otherwise untimely to relate back to the claims in the original complaint. *See* Fed. R. Civ. P. 15(c); *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996). Under Rule 15(c)(1), a plaintiff may amend a complaint in a federal action after the expiration of the limitations period when:

> (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such

notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1). Because the statute of limitations period in this case derives from state law, Rule 15(c)(1)(A) directs the Court to consider both federal and state law and employ whichever affords a "more forgiving" principle of relation back. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013); *see also* Fed. R. Civ. P. 15(c)(1), Advisory Comm. Notes 1991 Am. ("Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim.").

**\*10** Spatarella argues that Plaintiff's SAC does not relate back to the original filing under either federal or state law. (Dkt. 190, at ECF 12–17.) The Court disagrees.

### 1. Relation Back Under Federal Law Rule 15(c)(1)(C)

Rule 15(c)(1)(C) provides the standards for the relation back doctrine under federal law, which allows an amended complaint adding a new party to relate back to the date of the original pleading if four requirements are satisfied:

(1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party [knew or] should have known that, but for a mistake of identity, the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within [the period provided by Rule 4(m) for serving the summons and complaint], and ... the original complaint [was] filed within the limitations period."

*Hogan*, 738 F.3d at 517 (quoting *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 468–69 (2d Cir. 1995)). Regarding the first requirement, there is no dispute here that the "new claim" that Plaintiff seeks to assert in the SAC against Spatarella clearly arises out of the same occurrence set forth in his original Complaint and that the original Complaint was filed within the limitations period. However, Spatarella maintains that Plaintiff fails to satisfy the second and third requirements set forth above, asserting that he received no actual or constructive notice of Plaintiff's claim against him before the statute of limitations had run, and Plaintiff's failure to name him in the initial pleading cannot constitute a mistake under Rule 15(c)(1)(C). (Dkt. 190, at ECF 13–16.)

### a. Rule 15(c)(1)(C)(i): Notice

To relate back under Rule 15(c)(1)(C), the party to be added must have received notice of the action within the time period proscribed by Rule 4(m). *See* Fed. R. Civ. P. 15(c)(1)(C); Fed. R. Civ. P. 4(m). "The newly named party's actual or constructive notice of the suit satisfies the notice requirement." *Edwards v. City of New York*, No. 14-CV-10058 (KBF), 2015 WL 5052637, at \*5 (S.D.N.Y. Aug. 27, 2015) (citing *Scott v. Vill. of Spring Valley*, 577 F. App'x 81, 82 (2d Cir. 2014) (summary order)). When actual notice is absent, "[t]he court can impute [constructive notice] of a lawsuit to a new defendant government official through his attorney, when the attorney also represents the official(s) originally sued so long as there is some showing that the attorney knew that the additional defendants would be added to the existing suit." *Velez v. Fogarty*, No. 06-CV-13186(LAK) (HBP), 2008 WL 5062601, at \*5 (S.D.N.Y. Nov. 20, 2008); *Mosley v. Jablonsky*, 209 F.R.D. 48, 53 (E.D.N.Y. 2002); *Ramos v. Police Officer Maureen Engels*, No. 15-CV-1081 (ARR) (LB), 2016 WL 3619534, at \*4 (E.D.N.Y. June 3, 2016), *report and recommendation adopted*, 2016 WL 3640684 (E.D.N.Y. June 29, 2016) ("Constructive notice has specifically arisen in the context of a plaintiff seeking to add a new government official as a defendant when plaintiff has already named government officials as defendants.") "Constructive notice is derived from the presumed knowledge of the attorney who represents the original defendant(s) and who would represent the prospective defendant(s) if leave to amend were granted." *Feliciano v. Cnty. of Suffolk*, No. 04-CV-5321(JS) (AKT), 2013 WL 1310399, at \*8 (E.D.N.Y. Mar. 28, 2013) (quoting *Smith v. Westchester Cnty. Dep't of Corr.*, No. 07-CV-1803(SAS), 2012 WL 527222,

at *4 (S.D.N.Y. Feb. 15, 2012)). "In deciding whether the government attorney possessed the requisite knowledge, the question is whether the attorney 'knew or should have known that the defendants ... would be named' within the limitations period." *Blaskiewicz v. Cnty. of Suffolk*, 29 F. Supp. 2d 134, 139 (E.D.N.Y. 1998) (quoting *Gleason v. McBride*, 869 F.2d 688, 693 (2d Cir. 1989)).

**\*11** In the instant case, Spatarella argues that he "never received actual notice of the claims against him prior to the running of the statute of limitations since he was never named as a defendant or served with process." (Dkt. 190, at ECF 14.) In addition, Spatarella contends that constructive notice should not be imputed to him through his defense counsel either, "because (1) he was not represented by [Corporation Counsel] prior to June 2022; (2) there was no 'John Doe Correction Officer' placeholder in the caption of the original Complaint suggesting to [Corporation Counsel] that [P]laintiff intended to sue an unnamed DOC officer; (3) there were no specific allegations of the alleged force that would have placed [Corporation Counsel] on notice of a viable claim against [him]; (4) [Corporation Counsel] has not appeared in this action since [ ] 2018 [when] ... all claims against any City [defendants] were dismissed ...; and (5) Plaintiff took no steps to litigate any purported claims against [him] over the past eight years of this litigation." (*Id.*) Spatarella concludes that requiring him to defend the action at this late stage "would be highly prejudicial." (*Id.*) The Court disagrees with each of Spatarella's contentions.

To begin with, as noted above, at the time Plaintiff filed his original Complaint on September 17, 2014, the service time period prescribed by Rule 4(m) was 120 days. *See supra* footnote 7. Therefore, Spatarella must have received notice of the action by January 15, 2015—120 days from the date Plaintiff filed his original Complaint. While there is no indication in the record that Spatarella received actual notice of this action within the Rule 4(m) period, the Court finds that he received constructive notice of this suit within that period. During the 120-day service period, Corporation Counsel, who represented the City Defendants named in the original Complaint—and would later represent Spatarella after he was added as a defendant—were fully on notice of Plaintiff's original Complaint and its contents on December 8, 2014.[14] (Dkt. 21.) Furthermore, contrary to what Spatarella argues, Plaintiff clearly identified Spatarella in the original Complaint as "Spattla," an "N.Y.C. Dept. of Correction[ ] [s]taff" and made specific allegations of the excessive force against him. (Compl., Dkt. 1, at ECF 4.) Because of Corporation Counsel's

anticipated representation of all of the City Defendants, and its knowledge of the allegations in the original pleading, Corporation Counsel "should have known that, given the deficiencies of the original [C]omplaint, [Spatarella] should have been named, and would, when the mispleading became evident, be added" as a defendant. *Mosley*, 209 F.R.D. at 53; *see also Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-CV-8828 (KMK), 2009 WL 3151200, at *13 (S.D.N.Y. Sept. 29, 2009) ("The inquiry is not ... whether defense counsel had actual knowledge but whether he 'knew or should have known' that the additional defendant[ ] would be added within the statute of limitations period." (internal citations omitted)). As such, Spatarella received constructive notice of this suit when Corporation Counsel became "aware of Plaintiff's lawsuit, ... responded to the [o]riginal Complaint on behalf of the initial [City] [D]efendants, and was also aware that Plaintiff sought to add [ ] new defendants, given the Court's *Valentin* Order." *JCG*, 2014 WL 1630815, at *17; (*see* Dkt. 7.)

14    In the Summons Returned Executed by Plaintiff, Corporation Counsel acknowledged the receipt of summons and complaint served upon the New York City Police. (Dkt. 21, at ECF 2.)

Furthermore, even if Plaintiff did not specifically create a "John Doe Correction Officer placeholder" in the caption of his original Complaint, "there are a number of ways notice may be imputed to defendants not yet named through the Office of the Corporation Counsel, especially when the Court liberally construes a *pro se* plaintiff's pleadings[,]" and inclusion of "John Doe" defendants in the complaint is only one of them. *Ramos*, 2016 WL 3619534, at *4–5. Thus, the Court may impute notice where a plaintiff describes a prospective defendant in the complaint in any manner that suggests claims may eventually be brought against that defendant. *See, e.g.*, *Mosley*, 209 F.R.D. at 53 (holding that because plaintiff only named the city and a supervising officer as defendants, but the body of complaint clearly alleged unnamed officers assaulted plaintiff, corporation counsel knew or should have known that these officers would eventually be named); *Almeda v. City of New York*, No. 00-CV-1407, 2001 WL 868286, at *3 (E.D.N.Y. July 26, 2001) (noting that while plaintiff named only the city, "John Doe," and "Ronald Roe" as defendants, the complaint emphasized the role of Sergeant Robert Barnes as plaintiff's "chief assailant" and therefore counsel had notice Barnes would be named). As noted above, when Plaintiff filed his original Complaint, he specifically named Spatarella as "N.Y.C. Dept. of Correction[ ] [s]taff," specified the time of

the alleged incident, and provided sufficient details about the alleged force used against him. (Compl., Dkt. 1, at ECF 4.)

**\*12** Moreover, Spatarella's assertion that Corporation Counsel has not appeared in this action since 2018 after all claims against the City Defendants were dismissed is simply inaccurate. As discussed earlier, the Court's March 29, 2017 Order on the City Defendants' motion to dismiss allowed Plaintiff's excessive force claim against the City Defendants to proceed. (*See* Dkt. 103, at ECF 5.) Thus, not all claims against the City Defendants were dismissed in 2018, and given that there remains an active excessive force claim, the Court presumes Corporation Counsel continued appearance on behalf of the City Defendants in this matter.

Thus, in light of the facts, the Court deems Spatarella as having received constructive notice of this action within 120 days of the filing of the original Complaint, such that he will "not be prejudiced in defending on the merits." *See* Fed. R. Civ. P. 15(c)(1)(C)(i).

    b. Rule 15(c)(1)(C)(ii): Mistake

Regarding the third relation-back requirement, Spatarella contends that Plaintiff's "failure to include him in the initial pleading [was not due to] a mistake for the purposes of Rule 15(c)," but "rather due to a lack of diligence." (Dkt. 190, at ECF 15–16.) Specifically, Spatarella argues that he "was never named in the case caption even though Plaintiff apparently knew that [Plaintiff] intended to sue him" and that "[a]t the time that [Plaintiff] filed the Complaint, Plaintiff presumably knew that a male officer was involved in [Plaintiff]'s transfer to Nassau County custody and allegedly subjected [Plaintiff] to excessive force." (*Id.* at ECF 15.) Spatarella further asserts that "Plaintiff did not seek to identify [him] ... until after the limitations period had run ... [and] to the extent that Plaintiff did not know the correct spelling of [his] name, [Plaintiff] made no attempt to have the Court assist with properly identifying [him]." (*Id.* at ECF 15–16.) This argument borders on specious.

Here, Plaintiff's mistakes with respect to naming Spatarella as a defendant were that he failed to list Spatarella in the caption and misspelled Spatarella's last name in the original Complaint. "This is not the same as a plaintiff who does not name [a] certain [d]efendant[ ] because he is unsure of [the] identity" of the proper defendant at the outset of the litigation. *JCG*, 2014 WL 1630815, at \*18; *see also Ceara*

*v. Deacon*, 916 F.3d 208, 212 (2d Cir. 2019) (" 'Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.' ") (quoting *Barrow*, 66 F.3d at 470). "Rather, Plaintiff did know who [Spatarella was], as evidenced by his description of [Spatarella] by name [and] position in the text of the [o]riginal Complaint." *JCG*, 2014 WL 1630815, at \*18; (*see* Compl., Dkt. 1, at ECF 4.). "Where a plaintiff fails to list a party in the caption, mislabels the proper defendant, or incorrectly spells his name [but includes allegations of misconduct], courts generally will grant leave to correct the mistake under Rule 15." *JCG*, 2014 WL 1630815, at \*18; *see also Ingram v. Kumar*, 585 F.2d 566, 571 (2d Cir. 1978) (holding that relation back was proper when there was a "minor misspelling of defendant's name" as "Vijaya N. Kumar" in the original complaint rather than "Vijay S. Kumar"); *Mosley*, 209 F.R.D. at 52–53 (finding *pro se* plaintiff's failure to name individual defendants in the case caption is a mistake under Rule 15(c) where complaint sets forth allegations of defendants' conduct); *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 399 (E.D.N.Y. 1998) ("Where a plaintiff mislabels the proper defendant and/or incorrectly spells its name, courts generally grant the plaintiff leave to correct the mistake.") (citing *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1302 (2d Cir. 1990)). As such, Plaintiff's errors with respect to the spelling of Spatarella's name and not listing him in the caption "fall squarely within the ambit of Rule 15." *Ceara*, 916 F.3d at 214 (citing *Barrow*, 66 F.3d at 469 (noting the Rule's purpose as allowing amendments "to correct an error, such as a misnomer or misidentification")).

**\*13** In *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548, 552 (2010), the Supreme Court explained that the focus of the Rule 15(c)(1)(C)(ii) inquiry is on "what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Krupski*, 560 U.S. at 541. Here, as discussed above, Spatarella received constructive notice within the period prescribed by Rule 4(m) that an action had been brought against him. It should have been clear to Corporation Counsel from the allegations in the Complaint that Spatarella was one of the defendants identified by Plaintiff, and Corporation Counsel should have informed Spatarella at the inception about this lawsuit against him. Indeed, contrary to Spatarella's argument, the failure to properly identify Spatarella as "Spattla," the "N.Y.C. Dept. of Corrections [s]taff" who allegedly used excessive force against Plaintiff during his arrest on April 25, 2014, was not

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 74 of 217

due to Plaintiff "[making] no attempt to have the Court assist with properly identifying [him]" (Dkt. 190, at 15–16), but was instead Corporation Counsel's failure to comply with the Court's *Valentin* order. Accordingly, Plaintiff satisfies the third relation-back requirement.

\* \* \*

Therefore, Plaintiff's SAC relates back to his original timely-filed complaint under Rule 15(c)(1)(C).

## 2. Relation Back under Rule 15(c)(1)(A)

Although not necessary to its decision, the Court also considers whether the SAC relates back to the original Complaint under New York state law, as made applicable through Rule 15(c)(1)(A). As noted *supra*, Rule 15(c)(1)(A) directs courts to consider both federal and state law and apply whichever affords a "more forgiving" principle of relation back. *See Wilson v. City of New York*, No. 03-CV-2495, 2006 WL 2528468, at \*2 (S.D.N.Y. Aug. 31, 2006). "Rule 15(c)(1) (A) permits an amended pleading to relate back to the date of the original complaint if 'the law that provides the applicable statute of limitations allows relation back.' " *Hogan*, 738 F.3d at 509 (internal quotation marks omitted); Fed. R. Civ. P. 15(c) (1)(A). As the applicable statute of limitations is provided by New York law in this action, the Court must therefore look to the "entire body of limitations law" in New York to ascertain whether it would allow relation back. *Hogan*, 738 F.3d at 518 (emphasis omitted). Under New York law, a party seeking relation back for a newly added defendant may utilize New York Civil Practice Law and Rules ("C.P.L.R.") § 1024 (New York's special procedure for claims against "John Doe" defendants) or C.P.L.R. § 203 (New York's general relation back statute). *See Strada v. City of New York*, No. 11-CV-5735 (MKB), 2014 WL 3490306, at \*6–8 (E.D.N.Y. July 11, 2014).

### a. New York C.P.L.R. Section 1024

Section 1024 of the C.P.L.R, which pertains to claims against "John Doe" defendants as "unknown parties," states:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person

as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. C.P.L.R. § 1024. New York courts have interpreted this section to allow substitution of a named party for a John Doe party *nunc pro tunc* if a plaintiff meets two conditions. *Hogan*, 738 F.3d at 518–19 (collecting cases). First, the plaintiff "must 'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name.' " *Id.* at 519 (quoting *Bumpus v. N.Y.C. Transit Auth.*, 883 N.Y.S.2d 99, 104 (2d Dep't 2009)). Second, the plaintiff "must describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.' " *Id.* (quoting *Bumpus*, 883 N.Y.S.2d at 104). "Due diligence in this context requires that a plaintiff 'show that he or she made timely efforts to identify the correct party before the statute of limitations expired.' " *Perrien v. City of New York*, No. 21-CV-4443 (MKB), 2022 WL 4134367, at \*4 (E.D.N.Y. Sept. 12, 2022) (quoting *Doe v. New York*, 97 F. Supp. 3d 5, 19 (E.D.N.Y. 2015)).

**\*14** Here, Plaintiff's original Complaint is not a "John Doe" complaint subject to the relation-back rule under C.P.L.R. Section 1024. Spatarella's identity was not unknown to Plaintiff when he filed the original Complaint, and Plaintiff did not create a "John Doe" placeholder in his original Complaint. Rather, Plaintiff knew who Spatarella was when he commenced this action and identified Spatarella by name, though misspelled, in his original pleading. Because Plaintiff is not a "John Doe" litigant as to Spatarella, the relation-back rule pursuant to C.P.L.R. Section 1024 is not applicable here. [15]

[15]

> With respect to C.P.L.R. Section 1024, courts have distinguished between two groups of defendants and have applied different relation-back analyses to them, i.e., defendants "who were named as 'John Does' in the caption of the [o]riginal Complaint (and were described as unknown individuals in the body of the document)" and those "who were not 'named' as Defendants in the caption, but were specifically identified and had claims

2023 WL 6450398

asserted against them in the [o]riginal Complaint").
*See JCG*, 2014 WL 1630815, at *12–15, 17–19.
However, because Spatarella was neither named
as a "John Doe" or unknown party, or entirely
unnamed, in the original Complaint, C.P.L.R.
Section 1024 simply does not apply to this action.

### b. New York C.P.L.R. Section 203

A plaintiff may also seek to relate back claims against a
new defendant to timely-filed pleadings under Section 203 of
the C.P.L.R., New York's more general relation-back statute,
when:

> (1) the new claim arose out of the same
> conduct, transaction or occurrence as
> the original allegations; (2) the new
> party is united in interest with the
> original defendant, and by reason of
> that relationship can be charged with
> such notice of the institution of the
> action that he will not be prejudiced in
> maintaining his defense on the merits;
> and (3) the new party knew or should
> have known that, but for a mistake as
> to the identity of the proper parties,
> the action would have been brought
> against him as well.

*JCG*, 2014 WL 1630815, at *15 (quoting *Fisher v. Cnty. of
Nassau*, No. 10-CV-0677 (JS) (ETB), 2011 WL 4899920, at
*5 (E.D.N.Y. Oct. 13, 2011)). As already discussed, the first
and the third requirements are met here. The "new claim"
against Spatarella arises out of the same alleged conduct
as Plaintiff's timely-filed claims in his original Complaint,
and Spatarella knew or should have known that, but for a
mistake, the action would have been brought against him.
*See Vasconcellos v. City of New York et al.*, No. 12-CV-8445
(CM), 2014 WL 4961441, at *8 (S.D.N.Y. Oct. 2, 2014)
(noting that the third requirement of C.P.L.R. § 203 "closely
tracks the federal relation-back requirement of Rule 15(c)(1)
(C)").

Regarding the second requirement, however, there is no such
unity of interest between Spatarella and the originally-named
defendants. " 'The question of unity of interest is to be

determined from an examination of (1) the jural relationship
of the parties whose interests are said to be united and (2) the
nature of the claim asserted against them by the plaintiff.' "
*Ramos*, 2016 WL 3619534, at *7 (quoting *Amaya v. Garden
City Irrigation, Inc.*, 645 F. Supp. 2d 116, 122 (E.D.N.Y.
2009)). "A jural relationship means that 'because of some
legal relationship between the defendants they necessarily
have the same defenses to the plaintiff's claim,' and will
therefore 'stand or fall together.' " *Hunter v. Deutsche
Lufthansa AG*, No. 09-CV-3166 (RJD) (JMA), 2013 WL
752193, at *5 (citing *Amaya*, 645 F. Supp. 2d at 122). In
addition to inquiring whether there exists a jural relationship,
some courts have also considered whether a newly-added
defendant is represented by the same counsel as any of the
originally-named defendants in assessing unity of interest.
*See Simmons v. Mason*, No. 17-CV-8886 (KMK), 2019 WL
4525613, at *9 (S.D.N.Y. Sept. 18, 2019) (finding that no
unity of interest existed between the newly-named defendant
and the original defendants partly because they were not
represented by the same counsel); *Harris v. Viau*, No. 17-
CV-9746 (KMK), 2019 WL 1978596, at *6 (S.D.N.Y. May
3, 2019) (holding that the parties "who were represented
by separate counsel and raised different defenses" were not
united in interest under Section 203(c)).

 *15 Here, no such legal relationship exists between
Spatarella and the originally-named defendants. Spatarella
is a corrections officer at the New York City Department
of Correction, a branch of the municipal government of
New York City. The other defendants named in the original
Complaint are the Nassau County District Attorney, the
Queens County District Attorney, various governmental
entities, including the Nassau County Police Department, the
Hempstead Police Department, and the New York City Police
Department, as well as individual officials from these entities.
(Compl., Dkt. 1.)

In addition, while Spatarella and the originally-named City
Defendants are both represented by Corporation Counsel,
the claims that Plaintiff alleges against them are different
—Spatarella is sued for excessive force while the original
City Defendants are sued for false arrest, unlawful search,
and malicious prosecution. (Compl., Dkt. 1, at ECF 4, 6–
8.) Therefore, it can hardly be said that they share the
same defenses to Plaintiff's claims. Furthermore, Plaintiff
asserts excessive force claims against both Spatarella and
the originally-named Nassau County Defendants. (*Id.* at ECF
4.) However, they are represented by separate counsel, and
their defenses "would not necessarily stand or fall together"—

2023 WL 6450398

one may be held liable while the other is not because
"each individual defendant's liability will be determined
with regard to that defendant's particular acts or omissions."
*Maccharulo v. Gould*, 643 F. Supp. 2d 587, 597 (S.D.N.Y.
2009). Therefore, the unity of interest requirement cannot
be met, and relation back is unavailable to Plaintiff under
C.P.L.R. Section 203.

As such, Plaintiff's claim against Spatarella in the SAC relates
back to his original pleading under Rule 15(c)(1)(C), and not
under New York law. Therefore, the Court denies Spatarella's
motion to dismiss on statute of limitations grounds.

## CONCLUSION

For the reasons set forth herein, Spatarella's motion to dismiss
Plaintiff's SAC is denied.

**All Citations**

Slip Copy, 2023 WL 6450398

---

**End of Document** 

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

2016 WL 4275727
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James E. BROWN, Plaintiff,
v.
ONEIDA COUNTY, et al., Defendants.

6:15-CV-0849 (LEK/ATB)
|
Signed 08/12/2016

**Attorneys and Law Firms**

Karen H. Charrington, The Charrington Firm, PC, Rosedale, NY, for Plaintiff.

David H. Walsh, IV, Barth, Sullivan Law Firm, Syracuse, NY, for Defendants.

<u>**MEMORANDUM-DECISION AND ORDER**</u>

Lawrence L. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1 On July 10, 2015, Plaintiff James E. Brown commenced this action against Defendants Oneida County, the Oneida County District Attorney's Office, the Oneida County Police Department, the Oneida County Sheriff's Department, Oneida County Correctional Facility, the Town of Marcy, the Town of Marcy Police Department, Assistant District Attorney Robert A. Bauer, Investigator Nicholas Loconte, Correctional Officers Chapman and John Does 1–6, Sergeant John Doe, and Police Officer John Doe. Dkt. No. 1 ("Complaint"). Plaintiff alleges the following claims against Defendants pursuant to 42 U.S.C. § 1983 or New York state law: (1) malicious prosecution; (2) false arrest and false imprisonment; (3) malicious abuse of process; (4) liability of town and county for constitutional violations; (5) failure to train and supervise; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) unlawful strip search; (9) negligence; (10) negligence in hiring, screening, retention, supervision, and training; (11) respondeat superior liability; (12) supervisory liability; (13) trespass; and (14) attorney fees. Compl. ¶¶ 71–144. Plaintiff seeks two million dollars in compensatory damages and three million dollars in punitive damages for each individual claim.

Id. ¶¶ 80, 83, 89, 101, 109, 113, 116, 119, 122, 127, 130, 133, 139, 142.

Currently before the Court is a Motion to Dismiss, brought by all remaining Defendants [1] pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 10 ("Motion to Dismiss"); Dkt. No. 10-1 ("Memorandum"). Plaintiff has requested;leave to amend his Complaint, Dkt. Nos. 19 ("Motion to Amend"); 19-1 ("Proposed Amended Complaint"), and also opposes the Motion to Dismiss, Dkt. No. 20 ("Response"). Defendants filed a Reply. Dkt. No. 22 ("Reply"). For the following reasons, Plaintiff's Motion to Amend is granted, and Defendants' Motion to Dismiss is granted in part and denied in part.

[1]   Counsel for the Town of Marcy advised Plaintiff via communications extrinsic to court filings that the Town of Marcy does not maintain a police force and therefore cannot be responsible for Plaintiff's claims arising out of his arrest. Dkt. No. 24. Plaintiff and the Town of Marcy filed a stipulation of dismissal on January 26, 2016, and the Court terminated the Town of Marcy as a defendant on January 27, 2016. Dkt. Nos. 26, 28.

**II. BACKGROUND**

**A. Plaintiff's Original Complaint** [2]

[2]   Consistent with the Court's duty to construe a plaintiff's factual allegations in the light most favorable to the plaintiff in addressing a motion to dismiss, the allegations of the Complaint are accepted as true and form the basis for this section. See Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011).

On April 7, 2013, Plaintiff was pulled over under suspicion of speeding and was issued a ticket for disobeying a traffic device. Compl. ¶ 34. When Plaintiff appeared in Marcy Town Court on May 2, 2013, he met with Bauer to discuss a resolution of the ticket, as is customary in town court. Id. ¶ 38. Plaintiff informed Bauer that he was not speeding and that there were no traffic devices in the area that he could have disobeyed. Id. ¶ 39. Then Plaintiff made a statement to the effect of "there's a lot of fraud going on," believing that the officers had fabricated the ticket. Id. ¶ 40. Plaintiff thought Bauer was infuriated by his statement. Id. ¶ 41. Over Plaintiff's objections, Bauer put Plaintiff's case on for trial. Id. ¶¶ 42–43. On May 9, 2013, Plaintiff returned to Marcy

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 78 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

Town Court without an appointment intending to resolve the ticket and avoid a trial. Id. ¶¶ 45–46. After he was told by a court officer that Bauer did not want to speak with him, Plaintiff was advised that he could sit in the courtroom. Id. ¶ 47. The presiding judge gave Plaintiff a card with Bauer's contact information and instructions that Plaintiff could call Bauer but that he would be unable to speak with Bauer that day. Id. ¶ 48.

*2 A conversation then occurred between Plaintiff and Bauer in the parking lot, which was initiated by Bauer when he pulled his car next to Plaintiff's vehicle. Id. ¶ 50. Bauer asked Plaintiff if he still wished to resolve the ticket, and when Plaintiff responded affirmatively, Bauer gave him a new court date for May 14, 2013. Id. ¶ 50–51. On or about May 9, 2013, Plaintiff was called to appear at the State University of New York Police Department, where he was given new tickets. Id. ¶ 53. Plaintiff was informed that his original tickets for disobeying a traffic device were increased to speeding tickets and that Bauer wanted Plaintiff to have the new tickets. Id. ¶¶ 53–54. The next day, Plaintiff was arrested at work and escorted to the Oneida County Jail on charges of stalking in the third degree, harassment in the first degree, menacing in the second degree, and obstructing governmental administration in the second degree. Id. ¶¶ 55, 57, 72. All of these charges were apparently related to Plaintiff's interactions with Bauer.

On arrival at Oneida County Jail, Correctional Officers Chapman and John Does 1–6 pointed an object at Plaintiff and instructed Plaintiff to remove his clothing. Id. ¶ 58. During the strip search, Plaintiff was laughed at and mocked. Id. ¶ 60. Once he was naked, Plaintiff was strapped to a "wheeled chair" and covered with a clear gown. Id. ¶ 61. He was then wheeled to the lowest floor of the jail and left to sit there, where he began to suffer an anxiety attack and was given no treatment. Id. ¶¶ 61–62. Plaintiff claims that he was given no food for approximately twenty-four hours. Id. ¶ 63.

Plaintiff's Complaint stated that the tickets were dismissed and terminated in his favor on September 17, 2015. Id. ¶ 74. [3]

[3]      Considering that Plaintiff's Complaint was filed on July 10, 2015, the Court assumes that the year was a typographical error.

### B. Plaintiff's Amended Complaint

Plaintiff's Proposed Amended Complaint is largely similar to his original Complaint. Plaintiff omits the Town of Marcy

and its police department from the list of defendants and removes all of the state law tort claims that were originally brought against Defendants. In addition, Plaintiff adds two new claims of excessive force and failure to intervene under § 1983. Plaintiff also alleges that either Loconte or police officer John Doe effectuated his arrest and that Bauer ordered police officers to follow Plaintiff in his car. Proposed Am. Compl. ¶¶ 52–53.

## III. LEGAL STANDARD

### A. Motion to Dismiss

For pleadings, the Federal Rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss, a plaintiff must offer more than conclusions or a formulaic recitation of the elements of the claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The plaintiff does not need to set out "detailed factual allegations," but must assert more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). A complaint is insufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (alteration in original). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Motion to Amend

Generally, a party may amend his or her pleading once as a matter of course. Fed. R. Civ. P. 15(a)(1). When the time to amend as a matter of course has elapsed, the plaintiff may amend his complaint with the written consent of the opposing party or the court's leave. Fed. R. Civ. P. 15(a)(2). Where there exists no apparent reason for a court to deny a plaintiff's motion to amend, leave to amend should be "freely given." Price v. Gizzi, No. 11-CV-976, 2012 WL 2120028, at *3 (N.D.N.Y. June 11, 2012) (Kahn, J.) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). Potential reasons to deny a motion to amend include undue delay, bad faith, failure to cure deficiencies by previously granted amendments, undue prejudice to opposing party, or futility of amendment. Id.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 79 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

"Where 'futility is an appropriate basis for denying leave to amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to [Rule 12(b)(6)].' " Id. at *4 (alteration in original) (quoting Gorham-DiMaggio v. Countrywide Home Loans, Inc., No. 08-CV-19, 2009 WL 1748743, at *3 (N.D.N.Y. June 19, 2009)).

## IV. DISCUSSION

### A. Plaintiff's § 1983 Claims

**\*3** 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. There are no substantive rights created by § 1983; rather, it provides the means for "vindicating federal rights elsewhere conferred." Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 261 (N.D.N.Y. 2008) (quoting Patterson v. County of Oneida, 375 F.3d 206, 255 (2d Cir. 2004)). A claim pursuant to § 1983 requires an allegation "(1) that some person has deprived [the plaintiff] of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." Id. (quoting Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005)).

### 1. Claims Against County Agencies

Defendants contend that Plaintiff has named incorrect parties as Defendants in his Complaint. Mem. at 2. Specifically, Defendants state that since Oneida County has already been named as a defendant, claims against its departments are redundant. Id. "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." Macaluso v. Nassau Cty. Corr. Ctr., No. 13-CV-6206, 2014 WL 1401429, at *4 (E.D.N.Y. Apr. 8, 2014) (alteration in original) (quoting Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)); accord Moffet v. Town of Poughkeepsie, No. 11-CV-6243, 2012 WL 3740724, at *1 n.1 (S.D.N.Y. Aug. 29, 2012). The district attorney's office, police departments, sheriff's department, and correctional facility are all administrative arms of Oneida County. As such, Oneida

County is the proper defendant in this case. Therefore, all claims against the Oneida County District Attorney's Office, Oneida County Police Department, Oneida County Sheriff's Department, and Oneida County Correctional Facility are dismissed.

### 2. Monell Claims Against Oneida County

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). The Supreme Court has stated that "governments should be held responsible [in § 1983 claims] when, and only when, their official policies cause their employees to violate another person's constitutional rights." City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988). Therefore, in order for a municipality to be liable under § 1983 for acts of a public official, the plaintiff must plausibly allege that an official policy of the municipality caused the constitutional injury. Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell, 436 U.S. at 690–91). To plead the existence of a municipal policy, Plaintiff must allege one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010). In addition to pleading the plausible existence of a municipal policy, a plaintiff must allege an "affirmative link" between the municipal policy and the

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

constitutional violation at issue. Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985).

**\*4** Plaintiff brings the following claims against Oneida County pursuant to § 1983: malicious prosecution, false arrest, malicious abuse of process, liability of the county for constitutional violations, failure to train and supervise, unlawful strip search, intentional infliction of emotional distress, and supervisory liability. Defendants have moved to dismiss Plaintiff's Monell claims due to Plaintiff's failure to plead facts regarding the existence of a municipal custom that would make Oneida County liable under a Monell claim. Mem. at 10.

Plaintiff's Complaint contains many conclusory statements regarding municipal policies. Plaintiff states that Defendants "had in effect de facto policies, practices, customs, and usages that were a direct and proximate cause of the unconstitutional conduct of the Defendant police officers, investigators, prosecutors, their agents, servants and employees." Compl. ¶ 91. The policies that Plaintiff refers to are "arresting persons without probable cause, providing false information to prosecutors, falsifying police reports and affidavits, working and conspiring with others under a wall of silence, unlawfully utilizing law enforcement and testifying and/or swearing falsely under oath." Id. ¶ 92. Plaintiff fails to substantiate these conclusory allegations with facts that would meet the required plausibility standard. Plaintiff's claims amount to "boilerplate statements" that Oneida County employees were acting according to a municipal policy with no facts that support those statements. Rifenburg v. Hughes, No. 15-CV-978, 2016 WL 866344, at *3 (N.D.N.Y. Mar. 3, 2016); accord Duncan v. City of New York, No. 11-CV-3826, 2012 WL 1672929, at *2–3 (E.D.N.Y. May 14, 2012). "[T]o survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but 'must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.' " Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting Santos v. City of New York, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)). Plaintiff's Complaint at most alleges unconstitutional actions taken by employees of a municipality, which is insufficient to establish municipal liability. Monell, 436 U.S. at 691. Plaintiff has failed to meet the plausibility requirements to survive a motion to dismiss.

Plaintiff attempts to bolster his Monell claims in his Proposed Amended Complaint by adding more conclusory statements. Plaintiff adds that the Oneida County District Attorney's office has a policy and custom "of allowing the prosecutors whom cover town court jurisdictions to hold an unreasonable amount of power [and the] ability to [single handedly] file charges against individual[s] without having to obtain authorization from a supervisor or seek authorization from a hierarchical chain of command." Proposed Am. Compl. ¶ 85. Additionally, Plaintiff alleges a policy within the Oneida County Correctional Facility that "authorizes corrections officers to strip search inmates without a reasonable basis or for a purpose related solely to the safety of the facility and allows misdemeanor inmates to be strip searched in front of other corrections officers then strap him down to a wheelchair while depriving him of food and medical treatment." Id. ¶ 88. The only facts that are in accord with these pleaded policies are those that are specific to Plaintiff's case. "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." Newton v. City of New York, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008). Plaintiff states no facts at all that would support the inference that others besides Plaintiff have been affected by these alleged "policies." In order for municipal liability to attach to a single decision, that decision must have been made by a final policymaker that had sufficient power to act on behalf of the municipality. Pembaur v. Cincinnati, 475 U.S. 469, 479–80 (1986). Plaintiff does not allege actions on behalf of any final policymaker in his original or proposed amended complaints.

**\*5** In consideration of the lack of plausible allegations concerning a municipal policy, all claims against Oneida County are dismissed. As a result, Plaintiff's claims of "Liability of Town and County for Constitutional Violations" and "Failure to Train and Supervise" are dismissed entirely, as they were alleged solely against the municipality and its departments.

### 3. *Section 1983* Claims Against Individual Defendants

#### a. False Arrest

The elements for a claim of false arrest under § 1983 are substantially the same as those under New York law. Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007). The elements are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement,

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 81 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

(3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). If the arrest was conducted without "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," the plaintiff has a claim for false arrest. Jenkins, 478 F.3d at 84 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

Plaintiff has plausibly pleaded the first three Savino factors. Plaintiff's arrest itself satisfies intent to confine, and Plaintiff was aware that he was being arrested and confined. Compl. ¶ 55. Additionally, Plaintiff did not consent to the confinement. Id. ¶ 82. Lack of privilege, however, requires a deeper inquiry into probable cause.

The burden of proving that probable cause existed at the time of Plaintiff's arrest lies with Defendants. See Caidor v. M & T Bank, No. 05-CV-297, 2006 WL 839547, at *5 (N.D.N.Y. Mar. 27, 2006) (denying a motion to dismiss since it was not discernible from the plaintiff's complaint whether probable cause existed); see also Hernandez v. City of Rochester, 260 F. Supp. 2d 599, 606 n.6 (W.D.N.Y. 2003) (collecting cases); Mason v. Town of New Paltz Police Dep't, 103 F. Supp. 2d 562, 565 (N.D.N.Y. 2000) (observing that federal and New York cases state that where "an arrest or imprisonment is extrajudicial, that is, without legal process, the burden is on the defendant to prove justification"). Plaintiff states in his Complaint that the actions in dispute were initiated "without reasonable or probable cause or any legal justification." Compl. ¶ 72. Plaintiff also stated that Bauer had initiated contact with him in the courthouse parking lot. Id. ¶ 50. Taken as a whole, Plaintiff's Complaint describes subsequent encounters with Bauer after May 2, 2013, as being lawful. Plaintiff has demonstrated that he had done no acts that would warrant the charges he was given. "[A]n arrest is justified and a claim for false arrest must be dismissed pursuant to Rule 12(b)(6), if the undisputed facts in plaintiff's complaint demonstrate that the arresting officers had probable cause to believe that the suspect had committed a crime." Brewster v. Nassau County, 349 F. Supp. 2d 540, 551 (E.D.N.Y. 2004). It is unclear from Plaintiff's Complaint whether Defendants had probable cause for the arrest. Therefore, since the Complaint does not allow the Court to determine whether or not probable cause existed at the time of arrest, and since it is the Defendants' burden to prove probable cause, Plaintiff's claim

of false arrest against Police Officer John Doe is allowed to proceed.

*6 Defendants state that based upon Plaintiff's Complaint, it is reasonable to assume that it was the Town of Marcy that arrested Plaintiff. Mem. at 8. In their Motion to Dismiss, Defendants reason that since Plaintiff did not specifically allege which law enforcement department arrested him, the logical conclusion is that it was the Town of Marcy Police Department based on the fact that he appeared in Marcy Town Court. Id. Defendants then go on to state that while Plaintiff may have a claim against the Town of Marcy for false arrest, any claim against Oneida County and its officers must be dismissed. Id. The Town of Marcy has been dismissed as a defendant on the grounds that they do not have a police department. Dkt. No. 24. Therefore, it clearly was not the Town of Marcy who arrested Plaintiff and Defendants' argument must fail. The Court will allow the action of false arrest to proceed against Bauer and Police Officer John Doe so that Plaintiff has the opportunity to ascertain the identity of the arresting officers through discovery.

Plaintiff had also brought his false arrest claim against Loconte. In his original Complaint, Plaintiff failed to state any facts indicating that Loconte had any involvement at all in the arrest. However, in his Proposed Amended Complaint, Plaintiff asserts that it was either Loconte or Police Officer John Doe who arrested him. Proposed Am. Compl. ¶ 53. In light of Plaintiff's amended pleadings, the Court will allow Plaintiff's false arrest claim to continue against Loconte as well as Police Officer John Doe.

Bauer was also listed as a Defendant for Plaintiff's false arrest claim in both his original and Proposed Amended Complaint. Compl. ¶ 82; Proposed Am. Compl. ¶ 82. Since Plaintiff makes no mention in his amended pleadings of Bauer aiding in or effectuating the arrest, the false arrest claim against Bauer is dismissed.

b. Malicious Prosecution Under Color of State Law

In order to state a claim for malicious prosecution, the plaintiff must allege: (1) the commencement or continuation of a proceeding against him (2) with malice and without probable cause (3) that was terminated in his favor. Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002). Probable cause has been defined as "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 82 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (quoting Williams v. Town of Greenburgh, 535 F.3d 71, 79 (2d Cir. 2008)).

In support of their Motion to Dismiss, Defendants state three deficiencies with Plaintiff's pleading of malicious prosecution. First, Defendants argue that Plaintiff has failed to allege a particular individual who has commenced a criminal proceeding against him. Mem. at 6–7. Second, Defendants state that Plaintiff has failed to plead facts demonstrating that the arrest was conducted without probable cause. Id. at 6. Finally, Defendants claim that no facts have been pleaded that would support a finding of malice. Id.

Plaintiff's Complaint, taken in light most favorable to Plaintiff, states that he was served with tickets for stalking, harassment, menacing, and obstructing governmental administration that required his appearance in court in the County of Oneida. Compl. ¶ 72. Plaintiff pleads that the proceeding was instituted by Oneida County "officers"—although only Police Officer John Doe is listed as a defendant police officer—as well as Bauer, and Loconte. Compl. ¶ 76. Plaintiff has sufficiently pleaded the commencement of an action against him by Police Officer John Doe, Loconte, and Bauer.

Defendants state that Plaintiff has not pleaded a lack of probable cause. Mem. at 6. In order to establish probable cause in a malicious prosecution action, it must be shown that probable cause existed "to charge [the suspect] with *each* of the crimes." Cannistraci v. Kirsopp, No. 10-CV-980, 2012 WL 1801733, at *10 (N.D.N.Y. May 16, 2012) (alteration in original) (quoting Kavazanjian v. Rice, No. 03-CV-1923, 2005 WL 1377946, at *4 (E.D.N.Y. June 7, 2005)). "Malicious prosecution asks whether the facts objectively support a reasonable belief that a criminal prosecution should be initiated or continued because that prosecution could succeed." McClellan v. Smith, No. 02-CV-1141, 2009 WL 3587431, at *6 (N.D.N.Y. Oct. 26, 2009). Where, as it seems to be in this case, the arrest was not pursuant to a warrant, the Court must evaluate whether there was "probable cause to file the complaints that commenced the criminal proceeding against Plaintiff." Lenhard v. Dinallo, No. 08-CV-165, 2011 WL 4592804, at *7 (N.D.N.Y. Sept. 30, 2011). "The probable cause to prosecute inquiry focuses solely on those facts available to the officer leading up to, and at the time of, the arraignment." Simons v. New York, 472 F. Supp. 2d 253,

264 (N.D.N.Y. 2007). If an officer has "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of," then probable cause for the prosecution exists. Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (quoting Pandolfo v. U.A. Cable Sys. of Watertown, 568 N.Y.S.2d 981, 982 (App. Div. 1991)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Lenhard, 2011 WL 4592804, at *7 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

*7 In his Complaint, Plaintiff states that Bauer and Loconte caused the criminal charges to be instituted against him. Compl. ¶ 76. After his arrest, Plaintiff was taken to court and was seen by the presiding judge without an attorney present. Id. ¶ 56. The presiding judge told Plaintiff "you're going to jail," denied bail, and ordered a mental examination to be performed. Id. The criminal charges brought against Plaintiff were stalking, harassment, menacing, and obstructing governmental administration. Id. ¶ 72. As described previously, these charges were instituted on the basis of interactions with Bauer that appear to be lawful and benign. Plaintiff's Complaint pleads a lack of probable cause for his arrest, and it does not seem that any facts came to light between the time of Plaintiff's arrest and arraignment that would give the prosecutor probable cause for the charges brought against him.

Additionally, Plaintiff satisfactorily pleaded a favorable termination. Plaintiff stated that the charges against him "were dismissed and withdrawn with prejudice upon decision or motion (Order) before Honorable Justice William M. Virkler." Compl. ¶ 32.

As to malice, Rule 8 requires that where state of mind is an element of a claim, that state of mind must be "plausibly pleaded and supported by factual allegations." Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015). However, "a lack of probable cause generally creates an inference of malice." Pizarro v. City of New York, No. 14-CV-507, 2015 WL 5719678, at *4 (E.D.N.Y. Sept. 29, 2015) (quoting Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003)). As stated previously, Plaintiff has pleaded a lack of probable cause. In addition, "[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts." Connolly v. Wood-Smith, No. 11-CV-8801, 2012 WL 7809099, at *9 (S.D.N.Y. May 14,

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 83 of 217
Brown v. Oneida County, Not Reported in Fed. Supp. (2016)
2016 WL 4275727

2012) (quoting Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 183 (2d Cir. 2000)), adopted as modified, 2013 WL 1285168 (S.D.N.Y. Mar. 28, 2013); see also Rentas v. Ruffin, 816 F.3d 214, 221–22 (2d Cir. 2016) (finding actual malice inferred based on objective facts and lack of probable cause). Plaintiff stated that he believed Bauer to be "infuriated" by a statement made by Plaintiff during their first encounter. Compl. ¶ 41. Plaintiff's Complaint describes that all subsequent interactions with Bauer were cordial. After Plaintiff was told he could not see Bauer on May 9, 2013, since Plaintiff was not on the docket, Bauer approached Plaintiff in his vehicle in the parking lot. Compl. ¶ 50. During that conversation, Bauer inquired as to whether Plaintiff wanted to have his traffic ticket reduced, and Plaintiff responded affirmatively. Id. Bauer gave Plaintiff a new court date for resolving the ticket, and then Plaintiff left the parking lot and proceeded home. Id. ¶ 52. Plaintiff was then subsequently accused of stalking, harassment, menacing, and obstruction of governmental administration. Id. ¶ 72. The fact that Plaintiff was charged with these crimes, without probable cause, after supposedly benign interactions with Bauer is sufficient to suggest that the charges were maliciously commenced.

Accordingly, Plaintiff's claim of malicious prosecution survives Defendants' Motion to Dismiss.

### c. Unlawful Strip Search

The Supreme Court has held that strip searches conducted on detainees who would be admitted to the general population of a jail could be constitutional. Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1522–23 (2012). The Court articulated that "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " Id. at 1515 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Florence "was not a license for prison staff to conduct strip searches anytime, anywhere, or in any manner." George v. City of New York, No. 12-CV-6365, 2013 WL 5943206, at *7 (S.D.N.Y. Nov. 6, 2013). The decision in Florence was limited in its scope and refrained from discussing the constitutionality of strip searches involving "intentional humiliation and other abusive practices." Florence, 132 S. Ct. at 1523.

*8 Defendants claim that the Supreme Court's decision in Florence is a barrier to Plaintiff's claim of unlawful strip search and that Plaintiff has failed to plead facts that

suggest that the strip search was unreasonable or unrelated to legitimate penological interests. Mem. at 15–16. The Court disagrees. Plaintiff's Complaint alleged that he was forced to strip while corrections officers laughed and pointed an object at Plaintiff. Compl. ¶¶ 58–59. Additionally, the facts indicate that Plaintiff was strapped to a chair wearing a clear gown and wheeled "to the lowest floor of the jail, and he was left to sit in the chair, causing Plaintiff to begin to suffer from an anxiety attack and trouble breathing." Id. ¶ 61. On its face, the method of strip searching described by Plaintiff appears to be wholly unrelated to legitimate penological goals. See Jean-Laurent v. Wilkinson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (holding that a strip search violates the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish"); see also George, 2013 WL 5943206, at *8 (denying defendants' motion to dismiss where the complaint plausibly alleged that the purpose of the strip search was to make a spectacle and publicly humiliate prisoner plaintiffs). Therefore, Plaintiff has pleaded facts sufficient to indicate that the manner and circumstances of the strip search were unreasonable. The Court denies Defendants' Motion to Dismiss Plaintiff's claim of unlawful strip search against the individual correctional officers.

### d. Supervisory Liability

42 U.S.C. § 1983 does not allow for supervisory liability based upon a respondeat superior theory. The plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. "Each government official is only liable for his or her own misconduct." Id. at 677. Personal involvement may be shown by alleging

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 84 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)
2016 WL 4275727

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [4]

[4] The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal may have affected the standards articulated in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the Warden's personal involvement even under Colon"); see also Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [Iqbal] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations") (citing Grullon, 720 F.3d at 139). The Court assumes here that Colon remains good law.

*9 Plaintiff's Complaint fails to state exactly which supervisors violated his constitutional rights and the nature of their involvement. [5] Plaintiff makes statements such as "supervisory Defendants were personally involved in failing to take preventative and remedial measures to guard against such constitutional deprivations, such that Plaintiff would not have been injured." Compl. ¶ 137. Additionally, the Complaint states without further elaboration that the "supervisory Defendants were personally involved in additional deprivation of Plaintiff's rights." Id. ¶ 138. " 'Conclusory statements and formulaic recitations of the Colon factors [that are] wholly unsupported by facts,' present no factual support for a supervisory liability claim." Gray-Davis v. New York, No. 14-CV-1490, 2015 WL 2120518, at *8 (N.D.N.Y. May 5, 2015) (alteration in original) (quoting Eldridge v. Kenney, No. 11-CV-6459, 2014 WL 2717982, at *3 (W.D.N.Y. June 16, 2014)). Because Plaintiff has failed to plead facts that meet the plausibility standard, his claim for supervisory liability is dismissed.

[5] Plaintiff names Sergeant John Doe as a defendant but fails to mention Sergeant John Doe anywhere else in his Complaint. As Plaintiff has alleged no personal involvement of Sergeant John Doe in any deprivation of Plaintiff's constitutional rights, Sergeant John Doe is terminated as a Defendant.

e. Malicious Abuse of Process

To state a claim for malicious abuse of process, a plaintiff must allege that a defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Hoffman v. Town of Southampton, 523 Fed.Appx. 770, 771 (2d Cir. 2013) (summary order) (alterations in original) (quoting Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003)).

"The crux of a malicious abuse of process claim is the collateral objective element." McHenry v. Bell, No. 13-CV-657, 2015 WL 2354438, at *9 (N.D.N.Y. May 15, 2015). The Court agrees with Defendants' statement that Plaintiff has failed to adequately plead the element of a collateral objective. Mem. at 9. In pleading malicious abuse of process, Plaintiff recites the elements and states that Defendants "arrested Plaintiff and/or caused the arrest, of Plaintiff in order to obtain a collateral objective outside the legitimate ends of legal process." Compl. ¶ 86. A generous reading of the Complaint suggests that Plaintiff believes the charges were brought in retaliation for Plaintiff's insinuation to Bauer that there was a lot of fraud in the county.

"[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77. "The gist of the action for abuse of process lies in the improper use of process after it is issued." Sullivan v. Laplante, No. 03-CV-359, 2005 WL 1972555, at *8 (N.D.N.Y. Aug. 16, 2005) (quoting Dean v. Kochendorfer, 143 N.E. 229, 231 (N.Y. 1924)). The most that can be inferred from Plaintiff's Complaint is that Bauer had improper motives in initiating legal process. There are no pleaded facts indicating improper use of process after it was issued. There are no facts indicating a collateral objective. Plaintiff properly pleaded a claim for malicious prosecution, but is unable to do the same for malicious abuse

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 85 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)
2016 WL 4275727

of process. However, while Plaintiff's malicious abuse of process claim was pleaded insufficiently, Plaintiff omits the claim in his Proposed Amendment Complaint. Therefore, Defendants' Motion to Dismiss the claim of malicious abuse of process is denied as moot.

### f. Attorney Fees

Plaintiff asserts a cause of action for attorney's fees. Compl. ¶ 143–44. As Defendants correctly observe, attorney fees are a remedy, not a cause of action. See Carvel v. Franchise Stores Realty Corp., 08-CV-8938, 2009 WL 4333652, at *9 (S.D.N.Y. Dec. 1, 2009) ("Section 1988 only grants attorneys' fees to a prevailing party under §§ 1981–83, it does not create an independent cause of action."). Therefore, without addressing the possibility of attorney's fees as a remedy, Plaintiff's standalone cause of action for attorney's fees is dismissed.

### g. Prosecutorial Immunity for Defendant Bauer

*10 A prosecutor enjoys absolute immunity for the "initiation and pursuit of a criminal prosecution, including presentation of the state's case at trial." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993). "The doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that 'prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and in presenting the State's case," insofar as that conduct is "intimately associated with the judicial phase of the criminal process." ' " Pinaud v. County of Suffolk, 52 F.3d 1139, 1147 (2d Cir. 1995) (quoting Burns v. Reed, 500 U.S. 478, 486 (1991)). So long as the actions of a district attorney are clearly within the "judicial phase of the criminal process," he is absolutely immune to civil suits to damages. Day v. Morgenthau, 909 F.2d 75, 77 (2d Cir. 1990) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). However, absolute immunity does not cover all conduct by a prosecutor. "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to qualified immunity, which requires a showing that his acts were objectively reasonable." Day, 909 F.2d at 77. "A prosecutor is functioning in an investigatory capacity in a criminal case up and until he or she has gathered sufficient evidence to demonstrate probable cause and effect an arrest." Tellier v. Petrillo, No. 95-CV-211, 1996 WL 734885, at *2 (S.D.N.Y. Dec. 23, 1996). "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " Buckley, 509 U.S. at 273 (quoting Hampton v. Chicago, 484 F.2d 602, 608 (7th Cir. 1973)).

At this stage in litigation, the Court is unable to determine whether Bauer is entitled to prosecutorial immunity. While Plaintiff's Complaint and subsequent materials do not specify in detail the precise actions taken by Bauer, Plaintiff does accuse Bauer of actions that are outside of the judicial process. Plaintiff asserts that Bauer ordered the state police or Oneida County police to follow Plaintiff in a car. Proposed Am. Compl. ¶ 52. No arrest was effectuated at that time, which suggests that this event was prior to any potential probable cause that may have arisen later. If Bauer ordered officers to follow Plaintiff before probable cause existed for an arrest, Bauer was acting as an investigator and not as an advocate. "[W]hen a prosecutor manufactures evidence for the purpose of obtaining probable cause to arrest a suspect," the actions are deemed to be investigatory in nature and cannot be "transformed into advocacy simply by being characterized as work in preparation for trial." Hill v. City of New York, 45 F.3d 653, 662–63 (2d Cir. 1995). "[A] prosecutor is not entitled to absolute immunity in situations such as those where he 'supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest ....' " Morris v. Martin, No. 16-CV-601, 2016 WL 4059209, at *6 (N.D.N.Y. June 21, 2016) (quoting Richards v. City of New York, No. 97-CV-7990, 1998 WL 567842, at *2 (S.D.N.Y. Sept. 3, 1998)), adopted, 2016 U.S. Dist. LEXIS 98404 (N.D.N.Y. July 28, 2016). The Court therefore finds that Bauer is not currently entitled to absolute prosecutorial immunity. [6]

[6]    Neither party has presented arguments as to whether individual Defendants are entitled to qualified immunity. However, it has been noted that, "[g]iven the factual nature of the qualified immunity inquiry, it is an issue 'often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed.' " Rubeor v. Town of Wright, No. 13-CV-612, 2016 WL 3199510, at *3 (N.D.N.Y. June 8, 2016) (Kahn, J.) (quoting Walker v. Schult, 717 F.3d 119, 129 (2d Cir. 2013)). Therefore, the Court declines to address qualified immunity at this point.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 86 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

**B. New York State Tort Claims**
Plaintiff alleged the following state claims against Defendants: (1) false imprisonment; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) negligence; (5) negligence in hiring, screening, retention, supervision, and training; (6) respondeat superior liability; and (7) trespass under color of state law.

 **\*11**  Defendants observe that Plaintiff has failed to comply with General Municipal Law section 50-e, which requires that notice of a claim be given within ninety days after the claim arises. N.Y. Gen.Mun. Law § 50-e; Mem. at 5. "As a 'condition precedent' to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law § 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." Olsen v. County of Nassau, No. 05-CV-3623, 2008 WL 4838705, at \*1 (E.D.N.Y. Nov. 5, 2008) (citing Chesney v. Valley Stream Union Free Sch. Dist., No. 05-CV-5106, 2006 WL 2713934, at \*8 (E.D.N.Y. Sept. 22, 2006)). "Notice of claim requirements are generally strictly construed, and failure to comply with the requirements typically results in dismissal due to failure to state a cause of action." Chesney, 2006 WL 27139345, at \*9 (citing Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 793–94 (2d Cir. 1999)); see also Dzwonczyk, 710 F. Supp. 2d at 271–72 (dismissing state law tort claims due to failure to comply with section 50-e). Plaintiff has withdrawn his state tort claims in his Proposed Amended Complaint. As a result, Defendants' Motion to dismiss the state claims is denied as moot.

**C. Plaintiff's Motion to Amend**
Plaintiff's Proposed Amended Complaint specifies that it was either Loconte or Police Officer John Doe who arrested Plaintiff. Proposed Am. Compl. ¶ 53. Specifically, Plaintiff adds facts alleging the personal involvement of Bauer that would vitiate Bauer's entitlement to prosecutorial immunity. Proposed Am. Compl. ¶ 52. Plaintiff's Proposed Amended Complaint is still sparse, and barely passes the threshold of plausibility in regard to the claims that do manage to survive Defendants' Motion to Dismiss. However, based upon the standard for amendments stated in Foman, Plaintiff is entitled to amend his Complaint. Discovery may result in Plaintiff being able to add to the narrative of the circumstances surrounding his claim. Plaintiff is also permitted to amend his Complaint by adding his claims of excessive force and failure to intervene for the following reasons.

*1. Claim of Excessive Force*

There appears to be some general confusion between the parties as to what constitutional amendment applies to Plaintiff's claim of excessive force. Plaintiff has pleaded that excessive force during his strip search was in violation of his Fourth Amendment right to be free from unreasonable searches, seizures, and excessive force by officers. Proposed Am. Compl. ¶ 110. Defendants address the constitutionality of the strip search under the Eighth Amendment as well as the Fourth, implying that his alleged strip search might be a violation of the Eighth Amendment. Reply at 6.

The correct authority for Plaintiff's excessive force claim is the Due Process Clause of the Fourteenth Amendment. The Eighth Amendment would not apply in this matter, as "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977). According to the Complaint, Plaintiff at no point was adjudged guilty, and certainly not at the point at which the strip search allegedly occurred. Instead, courts have evaluated excessive force claims by pretrial detainees under the Due Process Clause of the Fourteenth Amendment. Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). However, the standards for a claim of excessive force under the Fourteenth Amendment are substantively the same as those brought under the Eighth Amendment. Bellatto v. County of Orange, 248 Fed.Appx. 232, 235 (2d Cir. 2007).

To prevail in an Eighth Amendment claim of excessive force, "the use of force 'must be, objectively, sufficiently serious,' and 'the prison official involved must have a sufficiently culpable state of mind.' " Id. (quoting Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997)). The objective component is "contextual and responsive to 'contemporary standards of decency.' " Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). While there is generally some degree of injury required, "the injury need not be 'serious' or 'significant' 'as long as the amount of force used is not *de minimis*.' " Bellotto, 248 Fed.Appx. at 235 (quoting United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). For strip searches it is required that a plaintiff "allege that the defendants engaged in egregious conduct." Holland v. City of New York, No. 14-CV-5517, 2016 WL 3636249, at \*9 (S.D.N.Y. June 24, 2016). "Even where inmates allege aggressive or inappropriate behavior during strip searches,

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 87 of 217

Brown v. Oneida County, Not Reported in Fed. Supp. (2016)

2016 WL 4275727

courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation." Vaughn v. Strickland, No. 12-CV-2696, 2013 WL 3481413, at *3 (S.D.N.Y. July 11, 2013). The subjective element is based upon "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.

**\*12** Plaintiff's Complaint contended that the strip search occurred "for the purpose of harassing and intimidating Plaintiff [by] forcing him to remove his clothing with other officers present as they laughed and mocked him then forcibly pointing an object in Plaintiff's face and forcibly strapping him down to a wheeled chair and wheeling him to the basement of the facility without any food or drink for 24 hours." Proposed Am. Compl. ¶ 111. The actions alleged by Plaintiff do not rise to the level of a constitutional violation. Plaintiff does not assert any actual physical contact between his person and whatever object was pointed in his face. Physical contact may not be necessary for an excessive force claim to succeed. See, e.g., Cortez v. McCauley, 478 F.3d 1108, 1131 (10th Cir. 2007) ("Physical contact is not required for an excessive force claim—patently unreasonable conduct is."); Snoussi v. Bivona, No. 05-CV-3133, 2008 WL 3992157, at *5–6 (E.D.N.Y. Aug. 21, 2008) (acknowledging that the law is unsettled as to whether physical contact is necessary); Duggan v. City of League City, 975 F. Supp. 968, 971 (S.D. Tex. 1997) ("[T]he law is uncertain regarding whether an excessive force claim can arise without physical injury to the Plaintiff."). However, Plaintiff has not pleaded sufficiently egregious conduct flowing solely from the strip search to rise to the level of a Fourteenth Amendment excessive force claim.

Courts have routinely declined Eighth Amendment claims arising from strip searches, even where the strip search was determined to be for the sole purpose of humiliation. George v. City of New York, No. 12-CV-6365, 2013 WL 5943206, at *9 (S.D.N.Y. Nov. 6, 2013). Furthermore, in George, the court noted that "the law of this Circuit indicates that a strip search without elements of sexual harassment, excessive force, or indeed any physical contact at all is not 'sufficiently serious' under the objective prong to support a claim ... under the Eighth Amendment." Id. at *10. Plaintiff has not plausibly alleged facts suggesting sexual harassment or any physical contact. As written, Plaintiff's Complaint suggests that Plaintiff stripped under the threat of whatever object the correctional officers were holding, but there does not appear to have been any physical contact between Plaintiff and either

the object or the correctional officers. Proposed Am. Compl. ¶ 56. On its own, the strip search would not be "objectively, sufficiently serious" as to rise to the level of an Eighth—and therefore Fourteenth—Amendment excessive force claim.

However, Plaintiff also alleged that his constitutional rights were violated by correctional officers "forcibly strapping him down to a wheeled chair and wheeling him to the basement of the facility without any food or drink for 24 hours." Proposed Am. Compl. ¶ 111. "While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596–97 (W.D.N.Y. 1978)). Although neither the strip search, nor the deprivation of food by itself would generally constitute a claim of excessive force, in the aggregate the events of Plaintiff's pretrial detention are sufficient to plead a claim of excessive force. See Ziemba v. Armstrong, 343 F. Supp. 2d 173, 185 ("A twenty-two hour restraint with no penal justification, no food or water, and no access to the bathroom would constitute excessive force."). The Court therefore allows Plaintiff to amend his Complaint to add a claim of excessive force.

### 2. Failure to Intervene

Correctional officers can be held responsible for failing to intervene when they witness a fellow officer violating the constitutional rights of an inmate. Philips v. Lecuyer, No. 08-CV-878, 2013 U.S. Dist. LEXIS 36452, *14 (N.D.N.Y. Feb. 19, 2013). An officer has failed to intervene when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

**\*13** Plaintiff's failure to intervene claim appears to be based upon the excessive force claim. Proposed Am. Compl. ¶ 117. Plaintiff's Proposed Amended Complaint stated that "Defendants Correction's Officer Chapman and Corrections Officers John Doe 1–6 were present at said times and places." Id. Plaintiff's Proposed Amended Complaint is sparse in pleading this claim. However, if, as Plaintiff alleged, other correctional officers were present during the events giving

2016 WL 4275727

rise to Plaintiff's excessive force claim, then Plaintiff may also have a claim for failure to intercede. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Plaintiff claimed that he was strapped to a chair for twenty-four hours and was denied meals during that time. Proposed Am. Compl. ¶ 61–62. There are sufficient facts to indicate that a jury could find that other correctional officers had sufficient time to intercede. Therefore, Plaintiff is allowed to amend his Complaint to include a claim of failure to intervene.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 10) is **GRANTED in part** as to claims against Oneida County and its departments, claims of supervisory liability, and attorney fees, and **DENIED in part**, as to Plaintiff's claims of malicious prosecution, false arrest, and unlawful strip search against the individual Defendants in their individual capacities; and it is further

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 10) is **DENIED as moot in part** as to all New York state law

tort claims and claims of malicious abuse of process; and it is further

**ORDERED**, that Oneida County, Oneida County District Attorney's Office, Oneida County Police Department, Oneida County Sheriff's Department, Oneida County Correctional Facility, and Sergeant John Doe are terminated as Defendants; and it is further

**ORDERED**, that Plaintiff's Motion to Amend (Dkt. No. 19) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff file an amended complaint within **thirty (30) days** consistent with this Memorandum-Decision and Order that will be deemed the operative pleading in this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4275727

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 89 of 217

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

2022 WL 428247

2022 WL 428247
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Daniel CRUZ, Plaintiff,
v.
VILLAGE OF SPRING VALLEY et al., Defendants.

No. 21-CV-2073 (KMK)
|
Signed 02/11/2022

**Attorneys and Law Firms**

John V. Decolator, Esq., Garden City, NY, Counsel for Plaintiff.

Vernee Ciara Pelage, Esq., Brian S. Sokoloff, Esq., Sokoloff Stern LLP, Counsel for Defendants Village of Spring Valley, Spring Valley Police Department, and Police Officer Timothy Ward.

Robert Benjamin Weissman, Esq., Saretsky Katz & Dranoff, LLP, Elmsford, NY, Counsel for Defendant County of Rockland and County of Rockland District Attorney.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Daniel Cruz ("Cruz" or "Plaintiff") brings this Action under 42 U.S.C. § 1983 and state law against the Village of Spring Valley ("Spring Valley"), the Spring Valley Police Department, Police Officer Timothy Ward ("Ward"), Police Officer John Doe (together, the "Spring Valley Defendants"), the County of Rockland ("Rockland County"), and the Rockland County District Attorney, (together, the "Rockland County Defendants" and collectively, "Defendants") alleging false arrest and imprisonment, malicious prosecution, negligence, intentional infliction of emotional distress, and violation of Plaintiff's Fifth, Sixth, and Fourteenth Amendment rights. (See generally Am. Compl. (Dkt. No. 15).) Before the Court is the Rockland County Defendants' Motion To Dismiss the Amended Complaint as against the Rockland County Defendants (the "Motion"), filed pursuant to Federal Rule of Civil Procedure 12(b)(6). (Not. of Mot. (Dkt. No. 21).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background

Unless otherwise stated, the following facts are drawn from Plaintiff's Amended Complaint and are assumed true for the purpose of resolving the instant Motion.[1] See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ., 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

[1]     "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." Arce v. Walker, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977)).

On October 23, 2013, Plaintiff was panhandling outside a store in Spring Valley, New York. (Am. Compl. ¶ 17.) Ward, an undercover Spring Valley police officer, approached Plaintiff and asked where he could obtain drugs. (Id. ¶ 18.) Plaintiff told Ward he could obtain marijuana and crack cocaine for him and used Ward's phone to make a call. (Id. ¶ 19.) Plaintiff and Ward then bicycled to an apartment complex, where Plaintiff took $40 from Ward, left for approximately five to ten minutes, and returned with two bags of marijuana and a bag of crack cocaine, which he gave to Ward. (Id. ¶ 20.) Plaintiff also purchased a small bag of crack cocaine for himself, which he immediately started smoking with a crack pipe. (Id. ¶ 20–21.) Plaintiff also asked Ward for a small amount of the crack cocaine Ward had purchased. (Id. ¶ 22.) Ward gave Plaintiff a small amount of crack cocaine from his bag, and Plaintiff smoked that piece of crack in front of Ward. (Id.)

On October 29, 2013, Plaintiff was panhandling in front of the same store when he was again approached by Ward, who asked Plaintiff for the "same thing" as last time. (Id. ¶ 23.) Plaintiff again used Ward's phone to make a phone call, bicycled with Ward to a location near Lake Street in Spring Valley, took $40 from Ward, left for approximately five or ten minutes, and returned with a quantity of marijuana and crack cocaine. (Id. ¶ 24.) Plaintiff again asked Ward for some of the crack cocaine, and after Ward gave him some, Plaintiff smoked that portion in front of Ward. (Id. ¶ 25.)

**\*2** On May 14, 2014, Plaintiff was arrested and detained by an unknown police officer. (Id. ¶ 26.) Plaintiff alleges that the officer placed Plaintiff in handcuffs that were too tight.

(*Id.* ¶ 28.) Plaintiff was arraigned and charged with criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree. (*Id.* ¶ 33.) Plaintiff was indicted by a grand jury, but the indictment was dismissed "because the prosecution had failed to instruct the grand jury on the defense of agency." (*Id.* ¶ 52.) However, on appeal the appellate court reinstated the indictment. (*Id.* ¶ 53.)

After a jury trial in 2017, Plaintiff was convicted of criminal sale of a controlled substance in the third degree. (*Id.* ¶ 54.) Plaintiff was found not guilty of criminal possession of a controlled substance in the third degree, but he was convicted of the lesser included offense of criminal possession of a controlled substance in the seventh degree. (*Id.*)

Plaintiff appealed, and the appellate court vacated his conviction for criminal sale of a controlled substance in the third degree. (*Id.* ¶ 55.) According to Plaintiff, the appellate court found that "the prosecution had failed to satisfy any of the nine (9) criteria or factors that must be considered when evaluating an agency defense." (*Id.* ¶ 56.) On November 21, 2019, after having been incarcerated for five and a half years "with exceptions," Plaintiff was released from prison. (*Id.* ¶¶ 34, 57.) [2]

[2]    The Court notes that it is unclear what Plaintiff means when he alleges that he was incarcerated for five and a half years "with exceptions." (*See id.* ¶ 34.)

The Amended Complaint brings five causes of action: (1) false arrest claims under New York State common law and 42 U.S.C. § 1983 against the Spring Valley Defendants, (*id.* ¶¶ 58–76); (2) malicious prosecution claims under New York State common law and 42 U.S.C. § 1983 against the Rockland County Defendants, (*id.* ¶¶ 77–86); (3) a claim of negligent hiring, training, supervision and retention in connection with the conduct of Officers Ward and Doe against the Spring Valley Defendants, (*id.* ¶¶ 87–96); (4) a § 1983 *Monell* policy claim against the Spring Valley Defendants, (*id.* ¶¶ 97–111); and (5) a claim for punitive damages against all Defendants, (*id.* ¶¶ 112–114.) On May 27, 2021, Plaintiff withdrew the fifth cause of action for punitive damages and the state law malicious prosecution claims against the Rockland County Defendants. (Pl.'s Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") at 3 (Dkt. No. 28).)

B. Procedural History

Plaintiff originally filed his Complaint in the Supreme Court of the State of New York for Rockland County on February 18, 2021. (Dkt. No. 1-1.) On March 10, 2021, the Rockland County Defendants filed a Notice of Removal to remove the case to the United States District Court for the Southern District of New York. (Dkt. No. 1.) On March 12, 2021, the Rockland County Defendants filed a letter outlining the grounds for their anticipated motion to dismiss. (Dkt. No. 3.) On March 17, 2021, the Spring Valley Defendants also filed a letter outlining the grounds for their anticipated motion to dismiss. (Dkt. No. 6.) On April 28, 2021, after seeking permission from the Court, (*see* Dkt. No. 12), Plaintiff filed an Amended Complaint, (Dkt. No. 15). On May 27, 2021, the Spring Valley Defendants filed an Answer to the Amended Complaint. (Dkt. No. 17.) On June 3, 2021, the Rockland County Defendants filed another pre-motion letter outlining the grounds for their anticipated motion to dismiss, (Dkt. No. 19), and the same day, the Court set a briefing schedule, (Dkt. No. 20). Also on June 3, 2021, the Rockland County Defendants filed their Motion to Dismiss and accompanying papers. (Dkt. Nos. 21–23.) On August 12, 2021, Plaintiff filed an Opposition, (Dkt. No. 28), and the Rockland County Defendants replied on August 25, 2021, (Dkt. No. 29.)

II. Discussion

A. Standard of Review
 **3   The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 91 of 217

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

2022 WL 428247

line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

## B. Analysis

### 1. Eleventh Amendment

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alteration and quotation marks omitted). "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983." *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)).

"The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F.3d at 366 (alteration omitted). This includes prosecutors. *See Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) ("To the extent [the plaintiff] seeks damages from [former and current prosecutors] in their official capacities, the Eleventh Amendment bars his claims."); *see also D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, [he or] she is an agent of the State, and therefore immune from suit in [his or] her official capacity."); *Dejesus-Vasquez v. Bethencourt*, No. 19-CV-967, 2020 WL 1047909, at *5 (S.D.N.Y. Mar. 4, 2020) (dismissing claims against district attorney and assistant district attorney as barred by the Eleventh Amendment).

Thus, to the extent that Plaintiff asserts claims against the Rockland County District Attorney in his official capacity, those claims are dismissed.

### 2. Prosecutorial Immunity

"Absolute immunity protects a prosecutor not only from liability but also from suit." *Ogunkoya v. Monaghan*, 913 F.3d 64, 67 (2d Cir. 2019) (citation and quotation marks omitted); *see also Barnett v. City of Yonkers*, No. 15-CV-4013, 2020 WL 2539005, at *4 (S.D.N.Y. May 19, 2020) (same). Prosecutors are entitled to absolute immunity from civil suits for damages under § 1983 when "function[ing] as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (citation and quotation marks omitted); *see also Kroemer v. Tantillo*, 758 F. App'x 84, 86–87 (2d Cir. 2018) ("Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." (alterations and quotation marks omitted) (*quoting Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995))). However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts apply "a functional approach, which looks to the nature of the function performed [by the prosecutor], not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations and quotation marks omitted); *see also Van de Kamp v.*

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 92 of 217

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

2022 WL 428247

*Goldstein*, 555 U.S. 335, 342 (2009) (noting that courts "must take account of ... 'functional' considerations" in deciding "whether absolute immunity attaches to a particular kind of prosecutorial activity" (citations omitted)).

**\*4** It is clear that "the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions" covered by absolute immunity. *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (*citing Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Hill*, 45 F.3d at 661 (noting that absolute immunity covers such acts as "initiating a prosecution and presenting the case" in court proceedings (citations omitted)). Also covered is prosecutors' "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273. Absolute immunity even protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard*, 356 F.3d at 506 (citation omitted); *see also Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)). Furthermore, a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant for purposes of absolute immunity. *See Shmueli*, 424 F.3d at 237–38 (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused" (citation omitted)).

By contrast, "[w]hen a [prosecutor] functions outside his or her role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill*, 45 F.3d at 661. Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (citation and quotation marks omitted); *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("[W]hen a prosecutor ... performs the investigative functions normally performed by a detective or police officer, he is

eligible only for qualified immunity." (citations and quotation marks omitted)). In determining whether a prosecutor is functioning within a prosecutorial or an investigative role, courts must look to the prosecutor's general "role and function in an ongoing proceeding," and will reach a determination based "chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Ogunkoya*, 913 F.3d at 70 (citation and quotation marks omitted).

Here, Plaintiff makes no allegations suggesting that the prosecution engaged in investigatory functions. Nor does Plaintiff claim that any allegedly investigatory acts by the prosecution were done prior to or independent from the "judicial phase of the criminal process." *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at 430); *see also Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858955, at \*10 (S.D.N.Y. Feb. 29, 2016) ("The [a]mended [c]omplaint's generalized allegations fail to adequately allege that either [of the defendant prosecutors] functioned in any way that would prevent immunity from attaching."); *Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at \*18 (S.D.N.Y. Sept. 30, 2010) ("Even construed liberally, [the] [p]laintiff does not allege any particular acts of investigative misconduct by [the defendant prosecutors.]").

Accordingly, Plaintiff's claims against the Rockland County District Attorney in his official capacity, as well as any claims against the Rockland County District Attorney's Office, are dismissed due to prosecutorial immunity. *See Valentin v. City of Rochester*, 783 F. App'x 97, 100 (2d Cir. 2019) (dismissing district attorney's office and its current and former district attorneys from suit because they were entitled to prosecutorial immunity); *Maldonado v. New York City*, No. 16-CV-4191, 2016 WL 7494861, at \*3 (E.D.N.Y. Dec. 29, 2016) (dismissing claim where the plaintiff "alleged no conduct by the Queens County District Attorney's Office that falls outside the scope of prosecutorial immunity as defined by federal law."); *Arum v. Miller*, 331 F. Supp. 2d 99, 112 (E.D.N.Y. 2004) ("[D]ue to prosecutorial immunity, [the plaintiff's] claim against the Nassau County District Attorney's Office also must be dismissed.").

### 3. *Monell* Liability

**\*5** "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475

U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). That is, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). [3]

[3]     Counties are municipal entities for purposes of *Monell* liability. *See Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (holding that a county could be held liable for a county district attorney's long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing).

Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009); *see also Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *report and recommendation adopted sub nom.*, *Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton*, 566 F. Supp. 2d at 270 ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur*, 475 U.S. at 478 (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong") (italics in original). Instead, there must be a "direct causal link between

a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

**\*6**  A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 94 of 217

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

2022 WL 428247

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Roe*, 542 F.3d at 36–37 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

The Rockland County Defendants argue that Plaintiff fails to satisfy the fifth element because he has not alleged the existence of a policy that "supposedly contributed to his prosecution, [nor has he] provide[d] detailed factual pleading concerning such policy." (Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem") at 9 (Dkt. No. 22.) The Court agrees.

Plaintiff fails to cite or describe any policies officially promulgated by Rockland County or the Rockland County District Attorney's Office that allegedly led to his prosecution. To survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)). "Conclusory allegations that there was such a policy or custom, without

identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York*, No. 13-CV-3412, 2013 WL 6667681, at *4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or custom would be insufficient if wholly conclusory"); *Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *20 (S.D.N.Y. Mar. 29, 2018) (dismissing a *Monell* claim where the plaintiff failed "to cite or describe a policy officially promulgated [the county] or a specific act taken by a final policymaker of [the county]" relevant the plaintiff's claims) (collecting cases); *Guerrero v. City of New York*, No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("At the pleading stage, the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (quotation marks omitted)); *Santos*, 847 F. Supp. 2d at 577 ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed." (citation omitted)); *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 n. 3 (S.D.N.Y. Sept. 28, 2011) ("Since [*Iqbal* and *Twombly*], courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability....") (collecting cases), *aff'd*, 480 Fed. App'x 627 (2d Cir. 2012); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise —that violates the Federal Constitution"); *cf. Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *Simms*, 480 Fed. App'x at 631 n.4 ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's [policy] prior to discovery ... this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." (citation omitted)).

*7 Accordingly, Plaintiff cannot maintain a claim against Rockland County or the Rockland County District Attorney, and those claims are therefore dismissed. And, because the Court has dismissed all of the Rockland County Defendants, the Court need not reach the merits of Plaintiff's claims against them.

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

2022 WL 428247

### III. Conclusion

For the reasons stated above, the Court grants the Rockland County Defendants' Motion To Dismiss. Because this is the first adjudication of Plaintiff's claims on the merits, Plaintiff's claims are dismissed without prejudice. If Plaintiff wishes to file a second amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 428247

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 96 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2016 WL 6902478
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frank VASSALLO, Plaintiff,
v.
CITY OF NEW YORK, Corizon Health, Inc.,
Corizon, Inc., New York City Health and Hospitals
Corporation, New York City Department of
Correction Commissioner Joseph Ponte, Chief of
Department Martin Murphy, Deputy Commissioner
of Operations Dr. Errol Toulon, Jr., Manhattan
Detention Complex Warden Raleem Moses, Bellevue
Hospital Prison Ward Deputy Warden in Command
Daniel O'Connell, John/jane Does 1-50, Defendants.

15 Civ. 7125 (KPF)
|
Signed 11/22/2016

**Attorneys and Law Firms**

Philip Michael Hines, Held & Hines, LLP, Brooklyn, NY, for Plaintiff.

Omar Hani Tuffaha, New York City Law Department, David Rosen, Nicole Teresa Attia, Heidell, Pittoni, Murphy & Bach, LLP, New York, NY, Daniel Gerard May, Heidell, Pittoni, Murphy & Bach, LLP, White Plains, NY, for Defendants.

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

**\*1**  Plaintiff Frank Vassallo, a diabetic former inmate at the Manhattan Detention Center ("MDC") and Bellevue Hospital Center's Prison Ward ("BPW"), brings this action under 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs in violation of the Eighth and Fourteenth Amendments. Various defendants employed by the City of New York (the "City Defendants") and the New York City Health and Hospitals Corporation ("HHC") have filed two motions to dismiss Plaintiff's Amended Complaint (the "FAC") under Federal Rule of Civil Procedure 12(b)(6). For the reasons that

follow, the City Defendants' motion is granted in part and denied in part, and HHC's motion is granted.

BACKGROUND [1]

[1]   This Opinion draws on facts from the Amended Complaint ("FAC", Dkt. #42), which facts are taken as true for purposes of this motion. See Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). For convenience, the City Defendants' moving brief is referred to as "City Br." (Dkt. #50); HHC's moving brief as "HHC Br." (Dkt. #48); Plaintiff's brief in joint opposition as "Pl. Opp." (Dkt. #56); the City Defendants' reply as "City Reply" (Dkt. #58); and HHC's reply as "HHC Reply" (Dkt. #57).

**A. Factual Background**

**1. Plaintiff's Incarceration at MDC**

The FAC alleges the following facts for the period from December 19, 2014, to December 21, 2014, during which Plaintiff was incarcerated at MDC (the "MDC Period"): On December 19, 2014, Plaintiff was taken into Department of Correction ("DOC") custody for failure to pay child support by Order of Commitment of the Richmond County Family Court. (FAC ¶ 64). The Order directed DOC "to [e]nsure that [Plaintiff] receive all appropriate medical attention and be given all prescribed medications." (Id. at ¶ 65). At the time Plaintiff was taken into custody, he was "a well-cared for diabetic, receiving regular insulin via his insulin pump, receiving boluses as required, and not suffering from any foot ulcerations, cellulitis, or infection." (Id. at ¶ 67). DOC designated Plaintiff for housing at MDC. (Id. at ¶ 66).

In the early morning hours of December 20, 2014, Plaintiff was interviewed by medical intake personnel at MDC about his social, mental health, and medical histories. (FAC ¶ 68). As part of his medical history interview, Plaintiff informed personnel that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, which he was wearing at that time, and which automatically monitors his blood sugar and provides insulin throughout the day; (iii) he had run out of his insulin after being taken into custody but prior to the intake; (iv) he

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 97 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

requires a special diabetic diet; (v) he was experiencing swelling in his lower extremities and burning pain at a level of 9 out of 10; and (vi) he was starting to feel sluggish and experiencing other effects of high blood sugar (collectively referred to herein as the "Health Disclosure"). (*Id.*).

**\*2** At this time, Plaintiff requested an insulin refill for his pump, but was informed that DOC policy would not permit him to continue using the pump while in custody. (FAC ¶ 69). He was also told that MDC clinic medical staff would give him insulin shots instead. (*Id.*). Plaintiff was not given any insulin or food at the time of his intake. (*Id.*). He submitted to a urine drug screen and was then returned to the intake cell to await his housing assignment. (*Id.*). Several hours later, Plaintiff was taken from the intake cell to the MDC clinic, where he repeated the Health Disclosure that he had provided at intake; he also requested insulin. (*Id.* at ¶ 70). A finger stick test was taken and revealed that Plaintiff's blood sugar was 189 mg/dl. [2] (*Id.*). Plaintiff was still not given any insulin or food at that time. (*Id.*).

[2]    In an effort to be comprehensive, Plaintiff includes considerable detail in the FAC regarding his blood chemistry during the period of his confinement, including, for example, his hemoglobin A1C levels and milligrams of glucose per deciliter of blood (mg/dl). (*See, e.g.,* FAC ¶¶ 70, 72, 87-88). Plaintiff also alleges the appropriate blood sugar levels for a "well-managed" diabetic. (*See id.* at ¶ 85 (alleging that diabetic's blood sugar before meals should be between 70 and 130 mg/dl; two hours after meals, should be less than 180 mg/dl; and at bedtime, should be between 90 to 130 mg/dl)). This level of medical detail is usually presented and considered at the summary judgment stage, not on the pleadings. This Court's review of other courts' treatment of such medical details at the pleadings stage has not revealed perfect consistency in that treatment. The Court has considered Plaintiff's blood chemistry details, but does not believe that, in light of the FAC's overall allegations, the inclusion or exclusion of such details would impact the deliberate indifference analysis in this Opinion.

Plaintiff was next questioned by an individual whom he believed to be a physician, and repeated his Health Disclosure to this individual. (FAC ¶ 71). Plaintiff also showed the individual a letter from his treating physician, which confirmed Plaintiff's diabetic condition and his need for an

insulin pump. (*Id.*). Plaintiff again requested insulin, but was provided no insulin either through a pump refill or a shot. (*Id.*). He was also not given any food at this time. (*Id.*).

At approximately 12:36 p.m. on December 20, 2014, nearly 24 hours after Plaintiff was received into custody, MDC medical personnel performed a physical examination, including a blood test, on Plaintiff. (FAC ¶ 72). MDC medical personnel—including Charles Appiah, RPA, Curt Walker, PA, and Jeanne Israel, RN—tested Plaintiff's hemoglobin A1C, which was found to be 12.6%. (*Id.*). The FAC alleges that such a level is "nearly double the goal for fasting diabetics," and indicates that Plaintiff was "at a significantly heightened risk for developing diabetes-related complications such as kidney failure, blindness and neuropathy." (*Id.*). Plaintiff's blood sugar at that time was 150 mg/dl. (*Id.*). Plaintiff was given four medications (omeprazole, lisinopril, hydrochlorothiazide, and simvastatin) to treat his cholesterol, high blood pressure, and gastric reflux conditions; however, Plaintiff was provided no insulin or medication to manage his diabetes. (*Id.*).

Mr. Appiah contacted Dr. Tahmina Sikder and requested Plaintiff's transfer to the medical dorm at DOC's North Infirmary Command ("NIC"), which the FAC alleges "houses and is better equipped to treat detainees with similar medical conditions, for insulin pump management." (FAC ¶ 73). Although Plaintiff was initially accepted into the NIC medical dorm, his admission was later rescinded because DOC policy allegedly did not permit Plaintiff to be housed at NIC due to his status as a civilly confined prisoner. (*Id.*). Because Plaintiff's medical needs could not be met at MDC, the FAC alleges, Plaintiff was slated for transfer to BPW. (*Id.* at ¶ 74).

**\*3** On December 21, 2014, DOC officers were tasked with transporting Plaintiff from MDC to BPW and commenced the transport; however, upon reaching BPW, the officers were informed by medical staff that "more was required of them than their anticipated '3 hour hospital run.' " (FAC ¶ 76). The FAC alleges that because it was near the end of the officers' shift, rather than wait and admit Plaintiff into BPW, the officers returned Plaintiff to MDC in order for officers from the following shift to transport Plaintiff back to BPW. (*Id.*). Plaintiff was not examined or treated by any medical personnel at BPW before officers returned him to MDC for the next shift's transport. (*Id.*).

Several hours later, Plaintiff was returned to BPW, where he was admitted through the emergency department and

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 98 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

transferred to the prison ward. (FAC ¶ 77). At the emergency room, Plaintiff was found to be "hypoglycemic with his blood sugar below 40 mg/dl." (*Id.*) The FAC notes that, prior to that day, Plaintiff had never been hospitalized for his diabetes. (*Id.* at ¶ 78).

In short, Plaintiff received no insulin, food, or diabetes medication from the time of his admission to MDC on December 19, 2014, through the time of his transfer to BPW on the evening of December 21, 2014. (FAC ¶¶ 72, 75, 106-07).

### 2. Plaintiff's Incarceration at BPW

The FAC alleges the following facts for the period from December 21, 2014, to January 14, 2015, during which Plaintiff was in custody at BPW (the "BPW Period"):

#### a. Plaintiff's Admission to BPW and Initial Care

Upon Plaintiff's December 21, 2014 admission to BPW, staff conducted a medical and social history intake, during which Plaintiff conveyed the name and contact number for his treating physician, as well as the facts that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, but ran out and the MDC medical staff had refused to refill it; (iii) he had not received any insulin while at MDC; (iv) he had not had a meal since December 19, 2014; and (v) during the intake he was feeling sweaty and experiencing swelling in his lower extremities with burning pain. (FAC ¶ 79). These symptoms are alleged to be well-known complications from elevated blood sugar levels. (*Id.*). Plaintiff was told that DOC policy forbids BPW from refilling his insulin pump and that he would be given insulin shots instead. (*Id.* at ¶ 80). Plaintiff was not given any insulin or food at that time. (*Id.*).

About four hours after his admission to BPW, at approximately 10:13 p.m. on December 21, 2014, Plaintiff was provided juice and his first meal since his December 19, 2014 admission into MDC; this "made him feel better for the moment." (FAC ¶ 82). About an hour later, Plaintiff reported to his nurse that he was experiencing bilateral foot and leg pain at an 8 out of 10 intensity; upon examination, Plaintiff was confirmed to have bilateral leg swelling, which was worse in his left leg. (*Id.* at ¶ 83). Plaintiff again reported severe throbbing pain about 40 minutes later. (*Id.*).

At 10:40 p.m. on December 22, 2014, Plaintiff's blood sugar was tested and found to be 311 mg/dl. (FAC ¶ 87). In response, BPW medical personnel gave Plaintiff long-acting insulin, but failed to give him any short-acting insulin to bring his sugar down quickly; consequently, by 11:19 p.m. on the same evening, Plaintiff's blood sugar rose to 588 mg/dl, but personnel took no action. (*Id.*). Nearly nine hours later, at 7:45 a.m. on December 23, 2014, BPW medical personnel re-checked Plaintiff's blood sugar, which was found still to be over 450 mg/dl. (*Id.* at ¶ 88). At that point, personnel provided Plaintiff with short-term insulin instead of a sliding scale. (*Id.*). However, as of 9:41 a.m., Plaintiff's blood sugar was still over 450 mg/dl and, by 10:04 a.m., it reached 626 mg/dl. (*Id.*).

**\*4** On December 29, 2014, Plaintiff was examined and found to have an "open laceration under [his] right foot" and dry crust under his left foot, indicative of an underlying ulcer. (FAC ¶ 91). Plaintiff had not been receiving treatment for this ailment despite its progressive worsening. (*Id.*). Following this exam, Plaintiff was ordered to be provided with special foot appliances for his right foot to offload right foot erosion (and to be worn whenever walking); BPW medical personnel were also directed to advise Plaintiff to remain off his feet; and personnel were to dress Plaintiff's right foot to keep it dry in the shower and to apply lotion topically to his feet. (FAC ¶ 92). However, Plaintiff was not provided with these foot appliances or dressings, nor was he advised to stay off his feet. (*Id.*). An x-ray of Plaintiff's right foot was performed, which ruled out osteomyelitis, i.e., a bone infection; however, follow-up studies were not ordered or performed during Plaintiff's admission. (*Id.*).

#### b. Plaintiff's Consultations with Specialists

On January 3, 2015, endocrinologist Nidhi Agrawal, M.D., consulted with Plaintiff regarding the ulcers and swelling of his feet. (FAC ¶ 93). Dr. Agrawal reviewed Plaintiff's medication history, blood sugar levels since admission, and lab results, but did not physically examine Plaintiff. (*Id.*). Dr. Agrawal advised medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers"; however, no such consultation was requested. (*Id.*).

Two days later, Dr. Agrawal returned due to increased swelling of Plaintiff's legs and for evaluation of a plantar ulcer on Plaintiff's right foot, along with two smaller ulcers on the heel and ball of the foot. (FAC ¶ 94). Erythematous

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 99 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

areas were found over both legs with pitting edema, which the FAC alleges are indicative of infection. (*Id.*). Again, Dr. Agrawal advised medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers"; however, no such consultation was requested. (*Id.*). Despite several endocrinal consultations, Plaintiff's hyperglycemia was never controlled and "would range from the 40s to 600s." (*Id.* at ¶ 95).

On January 9, 2015, Plaintiff was examined by podiatrist Eric Nelson, M.D., who found plantar ulcerations and fissures on Plaintiff's feet. (FAC ¶¶ 96-97). Plaintiff reported that he felt no sensation in his feet and was worried about infection. (*Id.* at ¶ 97). Dr. Nelson determined that the ulcerations on both feet were not infected and that the right foot "ulceration is secondary to uncontrolled diabetes w/ peripheral neuropathy." (*Id.* at ¶ 97). Dr. Nelson directed that Plaintiff's right foot be kept elevated and that his dressings be changed daily with an antiseptic, but Plaintiff's right foot was not kept elevated by BPW medical personnel, nor were his dressings changed daily. (*Id.*).

On January 14, 2015, Plaintiff was examined by dermatologist Shields Callahan, M.D., who found Plaintiff with a two-to-three-centimeter ulcer at the base of his right second toe, with granulation tissue at the base and without an active infection. (FAC ¶ 98). Plaintiff's left foot had linear deep fissures on plantar surfaces, also without an active infection. (*Id.*).

Later the same day, podiatrist Mariola Morell, M.D., examined Plaintiff and made further recommendations regarding foot care for Plaintiff; however, Plaintiff was discharged from BPW later that evening. (FAC ¶ 99).

### 3. Plaintiff's Discharge from BPW and Subsequent Medical Care

On January 14, 2015, Plaintiff was discharged from BPW and released from DOC custody, after having petitioned the Family Court for compassionate release due to inadequate medical care and complications arising from diabetes. (FAC ¶ 100).

The next day, Plaintiff was examined by his own doctor, who diagnosed Plaintiff with an infection, started him on a course of antibiotics, and scheduled him for an MRI to determine whether the infection had reached the bone. (FAC ¶ 103). While the infection did not reach the bone and Plaintiff's foot did not require amputation, "the infection was so prevalent" that, approximately five weeks later, on February 24, 2015,

"Plaintiff underwent surgery to excise the infection and skin graft the wound." (*Id.*).

**\*5** On February 24, 2015, prior to the surgery, a tissue sample was taken of the infected area. (FAC ¶ 104). Plaintiff was later advised that he had "contracted a hospital-borne infection—methicillin-resistant staphylococcus aureus (MRSA)—at BPW." (*Id.*). Tissue samples were never taken during Plaintiff's detention at BPW and he was never treated there for MRSA. (*Id.*).

### B. Procedural Background

On March 10, 2015, Plaintiff filed a Notice of Claim with the City of New York, and on March 11, 2015, Plaintiff filed a Notice of Claim with HHC. (FAC ¶¶ 112-13). HHC held its statutory hearing on May 14, 2015, and the City its statutory hearing on July 6, 2015. (*Id.* at ¶¶ 115-16).

Plaintiff filed the Complaint in this action on September 10, 2015. (Dkt. #1). HHC filed a pre-motion letter on October 29, 2015 (Dkt. #35), to which Plaintiff responded on November 3, 2015 (Dkt. #36). The Court held a joint Initial Pretrial Conference and Pre-Motion Conference on November 17, 2015 (*see* Dkt. #40), at which the City Defendants appeared and also sought leave to move to dismiss (*see* Tr. of Nov. 17, 2015 Pre-Motion Conf., Dkt. #40, at 17:7-23). The Court issued an Order on the same day that, *inter alia*, directed Defendants to produce Plaintiff's medical records, and set a scheduling for amending the Complaint and for motion practice. (*See* Dkt. #39).

Plaintiff filed the FAC on January 29, 2016 (Dkt. #42), naming: (i) the City of New York (the "City"); Corizon Health, Inc. and Corizon, Inc. (together, "Corizon"); Joseph Ponte; Martin Murphy; Errol Toulon; Raleem Moses; Daniel O'Connell; John and Jane Doe healthcare workers and medical staff at MDC, and John and Jane Doe DOC officials (collectively, with the City and Corizon, the "City Defendants"); and (ii) the New York City Health and Hospitals Corporation, and certain John and Jane Doe healthcare workers and medical staff at BPW (collectively, "HHC").

On March 8, 2016, HHC filed a motion to dismiss and memorandum in support thereof, and the City Defendants did the same on the following day. (Dkt. #46-50). On April 6, 2016, Plaintiff filed a memorandum opposing Defendants' motions to dismiss. (Dkt. #55-56). Defendants filed their reply memoranda on April 19, 2016. (Dkt. #57-58).

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 100 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

#### 2. Materials That May Be Considered in Resolving a Motion Under Rule 12(b)(6)

**\*6** "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am.*

*Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss).

HHC argues for the first time in its Reply Brief that "Plaintiff has made his medical records an integral part of his Complaint," and urges the Court to consider those records, an electronic copy of which HHC has submitted, in connection with resolving the present motions or, alternatively, in converting the present motions practice into one for summary judgment. (*See* HHC Reply 2-3). The Court declines to consider Plaintiff's medical records in resolving the instant motions. For starters, HHC's medical records argument is raised for the first time in reply, despite the fact that it could and should have been made in its opening brief. Although the Court has discretion to consider arguments raised for the first time in reply, it is also "free to disregard" them. *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.").

Moreover, the medical records here are neither "attached to the complaint as exhibits," nor "incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111. Although the Court "*may* nevertheless consider [the medical records] where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *Chambers*, 282 F.3d at 153 (emphasis added) (internal quotation marks omitted), upon reviewing the FAC, the Court finds this not to be the case and, in any event, declines to consider the records at this stage. *See Goel*, 820 F.3d at 559 ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." (internal quotation marks and alterations omitted)).

#### 3. Section 1983 Claims Generally

Section 1983 establishes liability for deprivation, under color of state law, "of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). As such, § 1983 claim "has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 101 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

As a prerequisite to an award of damages under § 1983, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (citing *Twombly*, 550 U.S. at 555).

### 4. Section 1983 Claims for Deliberate Indifference

**\*7** To plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege facts that satisfy (i) an objective requirement that the alleged deprivation results in a serious medical condition and (ii) a subjective requirement that the defendant, in depriving the plaintiff of medical treatment, acted with deliberate indifference. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *id.* (holding that deliberate indifference to medical need claims "of a person in custody should be analyzed under the same standard irrespective of whether they are brought" under the Eighth Amendment (for convicted detainees) or Fourteenth Amendment (for pretrial detainees)). [3]

[3]    The Second Circuit has not indicated post-*Caiozzo* whether a different standard applies in the civil detention setting presented here. *Cf. Calhoun v. Umeasor*, No. 12 Civ. 7238 (AJN), 2014 WL 1229742, at \*3 (S.D.N.Y. Mar. 21, 2014) (finding that *Caiozzo* obviated the need, when conducting a deliberate indifference to medical needs analysis, to resolve the factual issue of whether the plaintiff was criminally or civilly confined); *accord James v. Kaskiw*, No. 13 Civ. 526 (DNH), 2014 WL 3845086, at \*3 (N.D.N.Y. Aug. 5, 2014). Nor does Plaintiff argue for a different standard based on his civil detention. (*See* FAC ¶¶ 9, 127, 152; Pl. Opp. 12-20). In light of *Caiozzo*'s holding, and for ease of reference, this Opinion refers only to the Eighth Amendment deliberate indifference framework, while recognizing that Plaintiff raises

his deliberate indifference claim under both the Eighth and Fourteenth Amendments. (*See id.*).

With respect to the subjective element, a plaintiff must allege that the defendant acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citation omitted). Such a state of mind "entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)) (internal quotation marks omitted).

Mere allegations of negligence will generally be insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, a plaintiff must allege that "the charged official ... act[ed] or fail[ed] to act while *actually aware* of a substantial risk that serious inmate harm will result." *Bell v. Jendell*, 980 F. Supp. 2d 555, 561 (S.D.N.Y. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks omitted) (emphasis in *Bell*)); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Accordingly, "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference. *See Ross v. Correct Care Sols. LLC*, No. 11 Civ. 8542 (DLC), 2013 WL 5018838, at \*4 (S.D.N.Y. Sept. 13, 2013).

### B. Analysis

### 1. Plaintiff Adequately Pleads a Claim of Deliberate Indifference as to the MDC Period, But Not as to the BPW Period

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

### a. The Objective Element Is Satisfied as to Both the MDC and the BPW Periods

**\*8** The City Defendants argue that Plaintiff's claim, properly construed, is not for the total deprivation of medical care, but rather for delayed or inadequate medical care. (*See* City Br. 9). Therefore, the City Defendants maintain, the seriousness inquiry under the objective element should be focused only on the unreasonableness of the delay or inadequacy rather than on the severity of Plaintiff's underlying condition. (*Id.* at 9-10). HHC argues that, as to the BPW period, Plaintiff was neither deprived of medical care nor provided delayed or inadequate care and, accordingly, Plaintiff's claims fail to satisfy the objective element. (*See* HHC Br. 9-12).

The Second Circuit advises district courts that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin*, 467 F.3d at 279-80. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). Where, however, the inadequacy is in the medical treatment given, "the seriousness inquiry is narrower." *Id.* at 280. For example, if the offending conduct is an unreasonable delay or interruption in treatment, "the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith*, 316 F.3d at 185) (alterations omitted). In such scenarios, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical

condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.

The City Defendants are incorrect that Plaintiff fails to raise a claim for the total deprivation of medical care as to the MDC Period. The FAC makes clear that despite Plaintiff's repeated declarations to MDC personnel that he suffers from diabetes and was experiencing its painful symptoms, he was deprived of food, insulin, and diabetes medication during the entirety of the MDC Period. (*See* FAC ¶¶ 68, 70-72, 75, 106-07). Provision of medicine for Plaintiff's unrelated medical needs, such as cholesterol, blood pressure, and gastric reflux (*see id.* at ¶ 72), does nothing to negate Plaintiff's allegations about a complete lack of care for his diabetes, the medical condition on which his claims are based. *See Smith*, 316 F.3d at 185-86 ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition."). As to the BPW Period, however, the FAC may be construed as raising claims based on delayed or inadequate care. (*See, e.g.,* FAC ¶ 84 (alleging that at BPW, Plaintiff's "blood sugar was not tested with regular frequency nor was insulin regularly provided."); *id.* at ¶ 87 ("Plaintiff should have been receiving long-acting insulin rather than by sliding scale, as BPW personnel administered."); *id.* at ¶ 90 (alleging delayed podiatry consultation and surgical evaluation of Plaintiff's foot)).

**\*9** The Court finds that Plaintiff's allegations concerning both the MDC Period and the BPW Period state claims that satisfy the objective element of the deliberate indifference analysis. Plaintiff's diabetes is a sufficiently serious medical condition: a reasonable doctor or patient would find it "important and worthy of comment"; the condition "significantly affects an individual's daily activities"; and it can cause "chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotation marks omitted); *see also Beatty v. Davidson*, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010) ("This Court need not linger on this point: diabetes is a sufficiently serious medical condition to meet the objective prong.") (collecting cases); *Colon v. County of Nassau*, No. 12 Civ. 4466 (JS), 2014 WL 4904692, at \*6 (E.D.N.Y. Sept. 26, 2014) (recognizing that "[c]ourts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong of a deliberate indifference claim" (internal quotation marks omitted)).

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

Even under a narrower seriousness inquiry that focuses on "the particular risk of harm" faced by Plaintiff due to delayed or inadequate treatment during the BPW Period, *see Smith, 316 F.3d at 186*, the objective element is met. The FAC alleges infrequent blood sugar monitoring and insulin provision (*see, e.g.,* FAC ¶¶ 84, 88), inadequate insulin treatments (*see, e.g., id.* at ¶ 88), and delayed or inadequate treatment by specialists (*see, e.g., id.* at ¶¶ 90, 93-94, 96), allegedly resulting in consistently and abnormally elevated blood sugar levels (*see id.* at ¶¶ 86-88), and other diabetes-related complications (*see id.* at ¶¶ 92-93). (*See also* Pl. Opp. 17 ("Plaintiff is not alleging that there were short-term delays and inadequacies of treatment surrounded by otherwise acceptable care, but rather that there were short-term provisions of inadequate care surrounded by otherwise non-existent and/or cursory care.")). These allegations of harm are sufficiently serious, not "minor and inconsequential." *Smith* at 186; *see id* ("For example, the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment."); *see also Roberts v. C-73 Med. Dir.*, No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *5 (S.D.N.Y. July 13, 2015) (finding that allegations of delayed diabetes treatment and resulting pain satisfied objective element of deliberate indifference analysis); *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (recognizing that "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness").

In sum, Plaintiff has plausibly pled that his underlying medical condition and the risk of (and actual) harm incurred due to delayed or inadequate care were sufficiently serious to satisfy the Eighth Amendment's objective element for both the MDC and the BPW Periods.

### b. The Subjective Element Is Satisfied as to the MDC Period But Not as to the BPW Period

### i. The MDC Period

Satisfaction of the objective element is, of course, only half of the inquiry. The City Defendants further argue that the FAC's allegations fail to satisfy the subjective element of the Eighth Amendment analysis. (*See* City Br. 10). Specifically,

they contend that Plaintiff pleads no facts from which it can be inferred that "any of the MDC staff he encountered knew of and disregarded an excessive risk to his health or safety." (*Id.* at 11). In support of this argument, the City Defendants point out that, "[i]n the short time he was at MDC, Plaintiff was seen and evaluated by multiple medical staff members, had his blood sugar level tested, was prescribed several medications, and was promptly directed to be transferred to [BPW] for the very purpose of ensuring ... that Plaintiff receive 'continual medical care.' " (*Id.* at 11 (quoting FAC ¶ 74)). Furthermore, Plaintiff's allegations about the aborted initial transfer to BPW "raise no inference that the officers delayed with actual knowledge that the delay would result in serious harm" (*id.*), while his allegations about being deprived of food are vague and not sufficiently injurious (*id.* at 12).

**\*10**  These arguments are unpersuasive. Plaintiff has pled sufficient facts to claim plausibly that at least certain of the City Defendants acted with culpable recklessness; specifically, that MDC personnel knew of and disregarded an excessive risk to Plaintiff's health. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (the official must " 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " (quoting *Farmer*, 511 U.S. at 837)).

In *Washington v. Westchester County Department of Correction*, this Court found allegations supporting an analogous deliberate indifference claim to be insufficient because that complaint lacked details regarding "(i) whether [the plaintiff] was in pain or exhibited symptoms [when he was first detained]; (ii) whether Defendants were aware that Plaintiff ... had symptoms of [his medical condition] at the time of his incarceration; and (iii) whether Defendants ignored such symptoms or deliberately withheld medication." No. 13 Civ. 5322 (KPF), 2015 WL 408941, at *8 (S.D.N.Y. Jan. 30, 2015) (internal quotation marks omitted). Here, by contrast, Plaintiff informed MDC personnel both at his initial intake, and repeatedly thereafter, that he suffers from diabetes; that he was experiencing swelling in his legs and severe burning pain; and that he requires insulin. (*See, e.g.,* FAC ¶¶ 68-71; *see also id.* at ¶ 71 (alleging that Plaintiff presented letter from his treating physician confirming his diabetic condition and need for insulin)). Plaintiff's physical examination approximately 24 hours into his MDC custody confirmed, according to the FAC, that his diabetes was not being properly treated and that he was "at a significantly

2016 WL 6902478

heightened risk for developing complications such as kidney failure, blindness and neuropathy." (*Id.* at ¶ 72). This led to efforts to transfer Plaintiff to a facility equipped to treat him, but an initial attempt to transfer him to NIC failed due to an alleged DOC policy and the first attempt to transfer him to BPW failed due to DOC officers' alleged malfeasance. (*Id.* at ¶¶ 73-74, 76).

Despite all of this, during the entirety of Plaintiff's MDC detention—an approximately two-day period concluding with Plaintiff's transfer to BPW—Plaintiff was provided no food, insulin, or diabetes medication. (*See* FAC ¶¶ 69-72, 75, 106-07). *See also Washington*, 2015 WL 408941, at \*8 ("[C]ertain medical conditions may be so life-threatening that advising prison personnel of a diagnosis of that condition and providing corroborative prescriptions may, particularly at the pleading stage, be sufficient to state a claim of culpable recklessness if prison officials later fail to act on that knowledge.").

The City Defendants' arguments listed above do not alter this conclusion. First, the mere fact that Plaintiff was "seen and evaluated by multiple medical staff members" and "had his blood sugar level tested" (City Br. 11), but nevertheless received no food, insulin, or diabetes medication over a two-day period, lends no support to (and, indeed, may affirmatively undermine) the City Defendants' position that MDC personnel were not deliberately indifferent to Plaintiff's condition. Next, the City Defendants' argument that Plaintiff "was prescribed several medications" while at MDC (*id.* at 11), is a non-starter: Plaintiff was prescribed medication for cholesterol, blood pressure, and gastric reflux (*see* FAC ¶ 72); none of these medications was intended to treat Plaintiff's diabetes (*see id.*), the medical condition upon which Plaintiff's deliberate indifference claim is based. Finally, the City Defendants' reliance on *Inesti v. Hogan* for the proposition that the "deprivation of one to two isolated meals does not amount to a constitutional violation" is misplaced in this context. (City Br. 12 citing *Inesti v. Hogan*, No. 11 Civ. 2596 (PAC) (AJP), 2013 WL 791540, at \*24-25 (S.D.N.Y. Mar. 5, 2013), *report and recommendation adopted*, No. 11 Civ. 2596 (PAC), 2013 WL 5677046, at \*1 (S.D.N.Y. Sept. 30, 2013))). Plaintiff's lack of food over an approximately two-day period (*see* FAC ¶ 75), amounts to significantly more than "one or two isolated meals." And, more importantly, the *Inesti* inmate was not a diabetic, nor did he claim to suffer from a condition so directly and delicately tied to food intake and blood sugar regulation. *See Inesti*, 2013 WL 791540, at \*1-4, \*22-25; *Inesti*, 2013 WL 5677046, at \*1 (describing the plaintiff's

mental health disorder). The City Defendants' comparison of denying food to a diabetic versus a non-diabetic is self-evidently flawed.

**\*11** In sum, the FAC details how MDC personnel were aware of Plaintiff's serious and deteriorating condition, but failed, over approximately two days, to provide any care by means of food, insulin, or diabetes medication. (FAC ¶¶ 69-72, 75, 106-07). Taken as a whole, these allegations are sufficient to state a plausible claim that certain of the City Defendants consciously disregarded a substantial risk of serious harm to Plaintiff. *See Hill*, 657 F.3d at 122; *Chance*, 143 F.3d at 703.

### ii. The BPW Period

Plaintiff claims that BPW personnel also failed to manage properly his diabetes in multiple respects, including by infrequently monitoring his blood sugar, providing him with the incorrect insulin regimen and untimely specialist care, and neglecting to maintain sanitary conditions, all of which led to numerous diabetes-related complications. (*See, e.g.,* FAC ¶¶ 83-84, 87, 89, 102). Plaintiff argues that such inadequate care rises to a constitutional violation because, given the condition in which he arrived at BPW and examinations thereafter, HHC personnel knew that a serious risk of harm to Plaintiff existed, but consciously disregarded that risk by providing only "perfunctory treatment and cursory examinations." (Pl. Opp. 19).

The City Defendants argue that Plaintiff fails to state a claim against them as to the BPW Period, because BPW is owned and operated by co-Defendant HHC, a municipal corporation distinct from the City and Corizon. (*See* City Br. 12). In the alternative, the City Defendants argue that Plaintiff's claim fails on the merits because he received "frequent and consistent medical care," and any criticism to the contrary amounts merely to "disagreements with the care provided" and "at worst, negligence amounting to medical malpractice," but nothing approaching Eighth Amendment deliberate indifference. (City Br. 13-14). HHC echoes the latter argument. After cataloguing the treatment Plaintiff received at BPW (*see* HHC Br. 9-12, 15-16), HHC argues that Plaintiff's allegations "merely describe a situation in which [Plaintiff] disagrees with the course of treatment provided," which, "[a]t most ... state[s] a claim for medical malpractice," but which "fall[s] well short of alleging that [HHC] acted with the requisite culpable state of mind" (HHC Br. 14, 16-17).

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 105 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

While Plaintiff's allegations as to the BPW Period may support a claim for negligence or medical malpractice, something Defendants acknowledge, the allegations do not support an inference of culpable recklessness in satisfaction of the subjective element of a deliberate indifference analysis. *See Santana v. Watson*, No. 13 Civ. 1549 (SAS), 2014 WL 1803308, at *5 (S.D.N.Y. May 6, 2014) ("[D]eliberate indifference is more substantial than mere disagreement over a course of treatment, negligence[,] or even medical malpractice."); *cf. Brown v. McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (holding that "the fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim").

Unlike the allegations concerning the MDC Period, as to which Plaintiff alleges a total deprivation of medical care for his diabetes, the FAC describes the extensive medical care that Plaintiff received at BPW, including blood sugar level monitoring (FAC ¶ 87); insulin treatment (*id.* at ¶¶ 87-88); examinations of his foot condition (*id.* at ¶¶ 91-92); and treatment by multiple specialists, including two podiatrists, an endocrinologist, and a dermatologist (*id.* at ¶¶ 93-98). At bottom, the FAC alleges that this care was inadequate because it was characterized by delay, irregularity, misdiagnoses, and suboptimal treatment options, but these allegations do not rise to the level of a constitutional violation. *See Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." (internal citations omitted)); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."); *Williams v. Williams*, No. 13 Civ. 3154 (RA), 2015 WL 568842, at *7 (S.D.N.Y. Feb. 11, 2015) ("[A]llegations of a negligent misdiagnosis do not satisfy the subjective requirement of the deliberate indifference analysis because they do not suggest that the defendant acted with a conscious disregard to inmate health or safety.").

**\*12** For example, in *Roberts v. C-73 Medical Director*, the diabetic inmate's claim for deliberate indifference was

principally based on a treating physician's failure to stabilize his blood sugar levels with appropriate care and her denial of specialist care until his condition worsened and, even then, only on an infrequent basis. *See* No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *5-6 (S.D.N.Y. July 13, 2015). The Court held that while the inmate's poor physical condition at intake supported "an inference that a serious risk of harm existed," the allegations did not show that the physician "drew that inference and then consciously disregarded it." *Id.* "In fact, plaintiff acknowledges that when his condition worsened, [the physician] referred him to a specialist, which does not support a contention that she acted with deliberate indifference." *Id.*; *see also Roberts v. City of N.Y.*, No. 14 Civ. 5198 (GHW), 2016 WL 4146135, at *5 (S.D.N.Y. Aug. 2, 2016) (reaffirming reasoning and holding as to treating physician upon amended complaint).

By contrast, the court in *Colon v. County of Nassau*, found plausible claims of deliberate indifference where two diabetic inmates alleged that a physician denied them necessary, specified medical care because of budgetary constraints. *See* No. 12 Civ. 4466 (JS), 2014 WL 4904692, at *6 (E.D.N.Y. Sept. 26, 2014). "If this is true and if the treatments at issue were medically necessary, this allegation could support a conclusion that [the named physician] was deliberately indifferent to [plaintiffs'] medical needs." *Id.* (citing *Liner v. Fischer*, No. 11 Civ. 6711 (PAC), 2013 WL 4405539, at *21 (S.D.N.Y. Aug. 7, 2013) (denying motion to dismiss deliberate indifference claim because "if, as plaintiff alleges, he was denied necessary medication for almost two years due to 'budget cuts,' this delay could potentially be a factor in support of a finding of deliberate indifference") (alterations omitted)).

Here, although Plaintiff's treatment during the BPW Period, based on the facts alleged, should have been more consistent, timely, and thorough, there is no indication that any of the treatment deficiencies were a result of "a conscious disregard of a substantial risk of serious harm" to Plaintiff. *See Estelle*, 429 U.S. at 105-06 (recognizing that "an inadvertent failure to provide adequate medical care," such as "a complaint that a physician has been negligent in diagnosing or treating a medical condition[,] does not state a valid claim of medical mistreatment under the Eighth Amendment").

### 2. Plaintiff Has Failed to Plead Municipal Liability

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 106 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

#### a. Applicable Law

Municipal entities may be sued directly for constitutional violations pursuant to § 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). In other words, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original) (citing *Monell*, 436 U.S. at 694).

A plaintiff may establish municipal liability under *Monell* in several ways, including by presenting evidence of "[i] an express policy or custom, [ii] an authorization of a policymaker of the unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a 'deliberate indifference' to the rights of its citizens, or [iv] a practice of the municipal employees that is 'so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials.' " *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)).

#### b. Plaintiff Allegations of Municipal Liability Are Inadequate

**\*13** Plaintiff raises *Monell* claims against the City, Corizon, and HHC. (*See* FAC ¶¶ 119-23). HHC is a municipal corporation subject to municipal liability. *See Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (addressing HHC); *Sussman v. N.Y. City Health & Hosps. Corp.*, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at *7 n.3 (S.D.N.Y. June 16, 1997) (same). Corizon, although a private entity, is here treated as a municipal actor for purposes of *Monell*. *See Bess v. City of N.Y.*, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("Corizon enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit. In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality." (collecting cases)); *Law v. Corizon Med.*

*Servs.*, No. 13 Civ. 5286 (KBF), 2014 WL 2111675, at *5 (S.D.N.Y. May 12, 2014) (same).

Plaintiff's claim against HHC presupposes the existence of an independent constitutional violation arising during the BPW Period; because this Court has found that none has been identified, Plaintiff's *Monell* claim is dismissed as to HHC. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that municipal liability requires that an individual municipal agent committed an underlying constitutional deprivation); *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12, 2012) ("Because the Court has concluded that [the plaintiff's] constitutional rights have not been violated, his claim of municipal liability pursuant to *Monell* is, *a fortiori*, also meritless.").

As to the MDC Period, and the municipal City Defendants, Plaintiff seeks to establish *Monell* liability principally on the basis of (i) the City Defendants' alleged official policies, including of prohibiting diabetic prisoners' insulin pumps to be used or refilled while in custody and of prohibiting civilly committed individuals to be admitted to the NIC infirmary (*see* Pl. Opp. 23; FAC ¶¶ 125-26); (ii) the City Defendants' widespread practice and customs, including of "failing to employ obvious measures to reduce the risk of abuses alleged," failing to supervise adequately and train properly medical staff and corrections officers, and failing to ensure prompt and adequate medical services to inmates in compliance with the City's Minimal Standards for Health Care (*see* Pl. Opp. 24-25; *see generally* FAC ¶¶ 131-48); and (iii) the City Defendants' failure to train and supervise personnel, including "to ensure that they perform" duties related to inmate medical care "in strict accordance with [inmates'] civil rights and doctors' medical orders" and on how to handle difficult circumstances that are often presented (*see* Pl. Opp. 26-27; *see generally* FAC ¶¶ 119-48).

None of these allegations as pled is sufficient to state a claim for *Monell* liability against the municipal City Defendants. Plaintiff's allegations concerning the two official policies principally targeted—barring use of an insulin pump and precluding civilly confined inmates from receiving treatment at NIC—suffer from at least two defects. First, the FAC fails to plead facts showing that these policies caused the constitutional violation. *See Monell*, 436 U.S. at 693-94 (holding that municipal liability claim must allege that officially adopted policy or custom caused the constitutional violation); *see also Bd. of County Comm'r of Bryan County*

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 107 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

*v. Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). Here, given the alternate medical treatments available, such as insulin shots or care at a different facility, the FAC fails to allege sufficient facts to plead a "direct causal link" between the alleged insulin pump or civil custody policies and the constitutional violation here recognized, i.e., the total deprivation of medical care for Plaintiff's diabetes during the MDC Period.

**\*14** Second, the "official policy" allegations lack sufficient factual detail. The FAC offers little beyond, "[Plaintiff] was told that he would not be allowed to continue using his insulin pump while in custody due to DOC policy" (FAC ¶ 69; *see id.* at ¶¶ 3, 125), and "DOC policy did not permit Plaintiff to be housed at [NIC]" because "Plaintiff was civilly confined" (*id.* at ¶ 73). "To state there is a policy does not make it so. And while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery," *Betts v. Shearman*, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at \*16 (S.D.N.Y. Jan. 24, 2013), additional facts for Plaintiff's "official policy" *Monell* allegations are required. *Cf. Colon*, 2014 WL 4904692, at \*10 (finding municipal liability adequately pled where complaint alleged that contract between municipality and medical provided subjected provider to a fixed budget that caused it to cut costs and that provider's policy "limit[ed] medication dispensing and prescribing to the facility formulary within the budget for the contract ... notwithstanding medical need").

Relatedly, Plaintiff's allegations concerning the City's (i) training and supervision failures, and (ii) widespread custom and practice of failing to ensure prompt and adequate medical services, a reduced risk of abuse, and the like, are inadequately pled. "[C]onclusory allegations that a municipality failed to train and supervise its employees [are] insufficient to state a *Monell* claim." *Davis v. City of N.Y.*, No. 07 Civ. 1395 (RPP), 2008 WL 2511734, at \*5-6 (S.D.N.Y. June 19, 2008); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). Under the pleading requirements imposed by *Twombly* and *Iqbal,* Plaintiff must give a factual description of the injurious policy or custom, "not just bald allegations that such a thing existed." *Bess,* 2013 WL 1164919, at \*2.

Here, Plaintiff's allegations consist essentially of a recitation of the inadequate medical treatment received and generic claims that such inadequacies were a product of harmful customs and practices or failures to train or supervise. (*See generally* FAC ¶¶ 124-48; Pl. Opp. 23-27). Such boilerplate allegations are insufficient to state a *Monell* claim. *See Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535-37 (S.D.N.Y. 2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details"); *Plair v. City of N.Y.,* 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (rejecting as inadequately pled the plaintiff's "conclusory" allegations that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality ... which constituted a municipal policy, practice or custom and led to plaintiff's assault" (alterations omitted)); *cf. Anderson v. City of N.Y.,* 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Plaintiff's claim for failure to train (*see* Pl. Opp. 26-27), suffers from the additional pleading defect of nowhere identifying "[a] pattern of similar constitutional violations by untrained employees," which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). Plaintiff identifies two examples of diabetic inmates dying due to DOC negligence in recent years (*see* Pl. Opp. 27), but nowhere details which deficient training program or manners of supervision caused the violations suffered by both Plaintiff and these other inmates. Consequently, Plaintiff fails to plead adequately that the municipal City Defendants were aware that their training would fail to prevent the violations here suffered by Plaintiff. *See Connick,* 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). For all of these reasons, Plaintiff's *Monell* claims against the City, Corizon, and HHC are dismissed.

### 3. The Court Dismisses Certain of the Claims Against Certain of the Individual Defendants

**\*15** The FAC names John and Jane Does 1-25, "site directors, physicians, nurses, physician assistants, clinicians, therapists, and other medical staff ... employed by the City, Corizon and/or HHC who were assigned to MDC and BPW on the subject dates and were responsible for the provision of appropriate medical care to patients at MDC and BPW, including Plaintiff, on said dates" (FAC ¶ 55); as well as John and Jane Does 26-50, "DOC officers, including but not

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 108 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

limited to assistant deputy wardens, captains, and correction officers, between December 19, 2014[,] and January 14, 2015, who participated in and/or had knowledge of and failed to protect Plaintiff from and/or intervene in the denial of timely and adequate medical care on those dates" (*id.* at ¶ 58). As established above, the FAC plausibly pleads a deliberate indifference claim as to the MDC Period, but not as to the BPW Period. Accordingly, Plaintiff's § 1983 claims are upheld as to the John and Jane Doe individual defendants responsible for Plaintiff's care at MDC and dismissed as to those responsible for Plaintiff's care at BPW.

The FAC also names five "senior officials" in their individual and official capacities: (i) DOC Commissioner Ponte; (ii) DOC Chief of Department, Martin Murphy; (iii) DOC Deputy Commissioner of Operations Dr. Errol Toulon, Jr.; (iv) MDC Warden Raleem Moses; and (v) BPW Deputy Warden Daniel O'Connell. (*See* FAC ¶¶ 44, 50-53). Plaintiff's allegations regarding these senior officials boil down to the claim that "[t]hese supervisory officials knew or should have known that the pattern of abuse set forth in the [FAC] existed in their jails and hospital prison wards. Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of their subordinates." (Pl. Opp. 22).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required."), *abrogated on other grounds by Graham v. Connor,* 490 U.S. 386, 393 (1989). A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional

acts. *See Grullon,* 720 F.3d at 139 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).

Plaintiff's deliberate indifference claims have been dismissed as to the BPW Period; accordingly, there can be no supervisory liability for those claims. *Cf. Farid,* 593 F.3d at 249 (recognizing that a defendant's personal involvement in a constitutional deprivation is a prerequisite to a damages award under § 1983); *see Houston v. Schriro,* No. 11 Civ. 7374 (LAP), 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) (holding that there can be no supervisory liability for § 1983 claims that have been dismissed).

Turning to the MDC Period, the FAC fails to allege sufficient facts to plausibly demonstrate the personal involvement of the named supervisory officials. The FAC merely recites the duties that inhere in each of the supervisor's positions and attempts to bootstrap these responsibilities into generic claims of personal involvement. *See Colon,* 58 F.3d at 874 (dismissing claim against DOCS Commissioner because "[t]he bare fact that [he] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim"); *Walker v. Schriro,* No. 11 Civ. 9299 (JPO), 2013 WL 1234930, at *15 (S.D.N.Y. Mar. 26, 2013) ("A defendant's status as warden or commissioner of a prison, standing alone, is ... insufficient to establish personal involvement under section 1983."); *id.* ("[P]roof of 'linkage in the prison chain of command' is insufficient." (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985))); *see generally Ramrattan v. Fischer,* No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *9-10 (S.D.N.Y. June 9, 2015).

*16 As discussed, the FAC fails to plead adequately any official policy, custom or practice, or deficient training or supervision, that led to the constitutional violation here recognized. Likewise, the FAC fails to allege sufficient facts concerning which of these officials were responsible for creating which particular policies or customs, how they were grossly negligent in supervision, or in what specific manner they failed to act to prevent Plaintiff's injury. Generic allegations that these officials "exercised policymaking, supervisory, and disciplinary authority on behalf of DOC," are insufficient to support a finding of supervisory liability. *See Collins v. Goord,* 438 F. Supp. 2d 399, 420 (S.D.N.Y. 2006) (rejecting claims of supervisory liability against DOC Commissioner and prison superintendent because "entirely conclusory allegations" claimed that officials "were aware of and acquiesced to the

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 109 of 217

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 6902478

unlawful practices"). Accordingly, Plaintiff's claims against the named "senior official" defendants are dismissed.

### 4. The Court Dismisses Certain of Plaintiff's State Law Claims

Plaintiff raises nine pendent state law claims in connection with his medical care during the MDC and BPW Periods. (*See generally* FAC ¶¶ 164-232). The City Defendants and HHC make no merits argument in favor of dismissing these claims. (*See* City Br. 20-21; HHC Br. 17). Rather, they presuppose the absence of a viable federal claim and argue exclusively that the Court should decline to exercise its supplemental jurisdiction. (*Id.*).

Having upheld Plaintiff's federal claim as to the MDC Period, the Court presently declines to dismiss the state law claims arising from the MDC Period. By contrast, having dismissed Plaintiff's federal claim as to the BPW Period, the Court exercises its discretion under 28 U.S.C. § 1367 to decline jurisdiction over Plaintiff's state-law claims for care received during the BPW Period. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013).

### 5. Plaintiff Is Granted Leave to Amend in Part

Plaintiff requests leave to amend the FAC if the Court finds it deficient. (*See* Pl. Opp. 29). This request is granted in part and denied in part.

The Court has found that the FAC's allegations concerning the BPW Period fail to demonstrate "a conscious disregard of a substantial risk of serious harm," *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703), and thereby fail, as a matter of law, to state a valid claim for deliberate indifference under the Eighth and Fourteenth Amendments. In light of the Court's reasoning, set forth *supra*, the Court finds that any effort to replead would be futile and, thus, denies Plaintiff leave to amend the FAC with regard to the BPW Period. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that leave to amend should be "freely given," but not if amendment would be futile); *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile."). Accordingly, all of Plaintiff's federal claims as to the BPW Period are dismissed with prejudice. *See Ferguson*, 2012 WL 2865474, at *6 (finding municipal liability claim *a fortiori* meritless where no constitutional violation found); *Houston*, 2014 WL 6694468, at *14 (applying same reasoning

for supervisory liability claim). Plaintiff's state law claims based on the BPW Period are dismissed without prejudice to their potential refiling in state court.

With regard to the MDC Period, the Court has found that the FAC plausibly pleads a claim for deliberate indifference in violation of the Eighth and Fourteenth Amendments, but not for *Monell* or supervisory liability based on that violation. As currently pled, both of these theories of liability are supported by insufficient facts and also suffer from serious defects related to causation, e.g., that the deprivation of care here recognized to be a constitutional violation was due to a specific policy, widespread practice or custom, or training or supervision failures, *see Monell*, 436 U.S. at 693-94 (holding that municipal liability claim must allege that officially adopted policy or custom caused the constitutional violation); *see also Bryan County*, 520 U.S. at 403 (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). Nonetheless, because Plaintiff did not have the benefit of a pre-motion submission from the City Defendants before amending his original complaint (*see* Tr. of Nov. 17, 2016 Pre-Motion Conf., Dkt. #40, at 17:14-19; *see also* Dkt. #42), the Court grants Plaintiff leave to amend the FAC as to the MDC Period only. In so doing, the Court expects that Plaintiff will take seriously the pleading deficiencies discussed in this Opinion, and will refrain from repleading these claims if those deficiencies cannot credibly be remedied.

**\*17** Accordingly, Plaintiff's claims for the MDC Period against the municipal City Defendants (City, Corizon) and the named "senior official" Defendants (Ponte, Murphy, Toulon, and Moses) are dismissed without prejudice to replead; Plaintiff's claims against BPW Deputy Warden O'Connell are dismissed with prejudice. Plaintiff's § 1983 claims are upheld as to the John and Jane Doe healthcare workers and DOC officers assigned to and responsible for Plaintiff's care at MDC. (*See* FAC ¶¶ 55, 58). Finally, as the City Defendants did not move to dismiss Plaintiff's state law claims based on the merits, those claims endure insofar as they arise from the MDC Period.

### CONCLUSION

For the foregoing reasons, the City Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, and HHC's motion to dismiss is GRANTED. Plaintiff is permitted to file an amended complaint in accordance with this Opinion,

2016 WL 6902478

if he wishes to, on or before December 22, 2016. The City Defendants can file an answer or other response within 21 days of the filing of the amended complaint. Thereafter, the Court will schedule a pretrial conference in the matter.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6902478

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5146629
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Aixamary RUIZ and Richard John, Plaintiffs,
v.
CITY OF NEW YORK, Deputy Inspector Kevin
A. Williams, Lieutenant Wise, Sergeant Youssef,
Lieutenant Jimilian, Police Officer Armond, and
Police Officer Kevin Lopez, all being sued in their
individual and professional capacities, Defendants.

No. 14–CV–5231 (VEC).
|
Signed Sept. 2, 2015.

*MEMORANDUM OPINION & ORDER*

VALERIE CAPRONI, District Judge.

**\*1** Plaintiffs Aixamary Ruiz ("Ruiz") and Richard John
("John") bring this action against the City of New
York ("City") and Individual Defendants Deputy Inspector
Kevin A. Williams ("Williams"), Lieutenant Lavonda Wise
("Wise"), Sergeant Maro Youssef, Lieutenant Sigifried
Jiminian (s/h/a Lieutenant Jimilian), Police Officer Armond,
and Police Officer Kevin Lopez (collectively, "Defendants").
The Plaintiffs and the Individual Defendants are all
employees of the New York City Police Department
("NYPD"). Plaintiffs assert claims for race, gender, and color
discrimination, retaliation and hostile work environment
pursuant to Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Civil Rights Act
of 1871, 42 U.S.C. § 1983 ("Section 1983"); the Civil
Rights Act of 1866, 41 U.S.C. § 1981 ("Section 1981"); the New
York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*
("NYSHRL"); and the New York City Human Rights Law,
N.Y. City Admin. Code §§ 8–101 *et seq.* ("NYCHRL").

On December 5, 2014, Plaintiffs filed an Amended
Complaint. On January 16, 2015, Defendants submitted a
Notice of their intention to rely on their previously filed
Motion to Dismiss the original Complaint pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.[1] For
the reasons stated below, Defendants' Motion to Dismiss is
GRANTED IN PART and DENIED IN PART.

1    The proceeding pursuant to Fed.R.Civ.P. 12(b)
(2), Defs.' Mem. at 1, but Defendants make
no argument whatsoever based on personal
jurisdiction. Accordingly, Defendants' Motion to
Dismiss based on lack of personal jurisdiction is
denied.

**BACKGROUND**

Plaintiffs Ruiz and John are minority members of the NYPD
(Hispanic and African–American, respectively) who are
assigned to the 28th Precinct in Manhattan. Am. Compl. ¶¶
2024. At all relevant times, they were romantically involved
with each other, a relationship of which all Defendants were
aware. *Id.* ¶ 27.

Beginning as early as February 20, 2012, Plaintiffs were
subjected to a variety of official and non-official acts that
they assert were discriminatory and retaliatory. In general
terms, Plaintiffs were subjected to a lewd text message
sent by Defendant Lopez and to multiple instances of
anonymous sexually-explicit graffiti, allegedly as a result
of their respective genders or as retaliation for registering
complaints about prior discrimination. *Id.* ¶¶ 49–55. In
addition, Ruiz alleges that she was singled out for discipline
because of her minority status and was prohibited from
speaking Spanish on the job. *Id.* ¶¶ 46, 64. Ruiz further
alleges that she was subjected to a variety of adverse actions,
including: being forced to work with Defendant Armond, a
colleague with whom she did not get along, *id.* ¶ 35; being
assigned to a "day tour" that interferes with her childcare
schedule, *id.* ¶ 46; being harshly interrogated based on the
late submission of a robbery report, *id.* ¶¶ 45–46, receiving
a Command Discipline ("CD") for filing the late report, *id.* ¶
70; being required to work despite an order from the District
Surgeon that she be out on sick leave, *id.* ¶¶ 57–58; being
reprimanded in a threatening and hostile manner, given a CD
and denied overtime pay by after arriving late to the precinct
while three non-minority officers who arrived around the
same time were not disciplined, *id.* ¶¶ 60–65; being placed on
"foot duty" shortly after John complained about graffiti that
mentioned Ruiz's name, *id.* ¶¶ 67, 69; and being consistently
ridiculed and shunned such that her co-workers refuse to back
her up on duty, *id* . ¶¶ 48, 73–74. Ruiz alleges that, as a result
of the retaliatory discipline she received after complaining
about discrimination, her prospects of promotion and transfer
have been severely limited. *Id.* ¶ 72.

**\*2** Plaintiffs complained to their supervisors and to the NYPD's Office of Equal Employment Opportunity ("OEEO") about each of the alleged instances of discrimination and retaliation. *Id.* ¶ 68. In particular, Ruiz filed complaints with her supervisors or the OEEO on October 18, 2012, *id.* ¶ 47; November 29, 2012, *id.* ¶ 55 and November 25, 2012, *id.* ¶¶ 41, 43. John filed complaints with his superiors or the OEEO on or around February 20, 2012, *id.* ¶ 31; November 9, 2012, *id.* ¶ 49; November 29, 2012, *id.* ¶ 50 and April 4, 2013, *id.* ¶ 67. John's OEEO complaint regarding Lopez's text message was ultimately substantiated by the NYPD on March 8, 2013. *Id.* ¶ 66. On or about August 9, 2013, both Plaintiffs complained to the Equal Employment Opportunity Commission, *id.* ¶¶ 16, 18; they each received a Right to Sue letter dated April 14, 2014, *id.* ¶¶ 17, 19. On July 14, 2014, Plaintiffs filed the Complaint in this action.

### DISCUSSION

#### I. Legal Standard

In reviewing a motion to dismiss under Rule 12(b)(6), courts " 'accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.' " *Meyer v. JinkoSolar Holdings Co., Ltd.,* 761 F.3d 245, 249 (2d Cir.2014) (quoting N.J. *Carpenters Health Fund v. Royal Bank of Scotland Grp ., PLC,* 709 F.3d 109, 119 (2d Cir.2013) (alterations omitted)). To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). "At this stage, dismissal is appropriate only where [Plaintiff] can prove no set of facts consistent with the complaint that would entitle [him] to relief." *Meyer,* 761 F.3d at 249.

#### II. Discrimination Claims

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under the *McDonnell Douglas*

burden-shifting framework, to establish a prima facie case of Title VII employment discrimination "the plaintiff must demonstrate that: (1) she fell within a protected class under [the statute]; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Robinson v. Concentra Health Services, Inc.,* 781 F.3d 42, 45 (2d Cir.2015) (citation omitted); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). [2] Employment discrimination claims brought under Title VII, Section 1983, the NYSHRL, and the NYCHRL are all treated under the same *McDonnell Douglas* framework. *See Bermudez v. City of New York,* 783 F.Supp.2d 560, 576–77 (S.D.N.Y.2011) (citing *Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir.2010); *Pilgrim v. McGraw–Hill Cos.,* 599 F.Supp.2d 462, 468 (S.D.N.Y.2009)).

> [2]
>
> Under the *McDonnell Douglas* framework, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate reason for its action. The burden then shifts back to the plaintiff to show that the defendant's explanation is a pretext for discrimination. *United States v. Brennan,* 650 F.3d 65, 93 (2d Cir.2011) (citations omitted).

**\*3** Because the prima facie case requirement is an evidentiary standard, "a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss." *EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 254 (2d Cir.2014) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002)). Nonetheless, "the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim." *Barbosa v. Continuum Health Partners, Inc.,* 716 F.Supp.2d 210, 215 (S.D.N.Y.2010) (citation and quotation omitted). In *Littlejohn v. City of New York,* the Second Circuit recently clarified that *"Iqbal's* requirement applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs" of the *McDonnell Douglas* framework. No. 14–1395–CV, 2015 WL 4604250, at *8 (2d Cir. Aug. 3, 2015):

> The facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation. The facts required by

*Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation.

Under the relevant standard, therefore, Plaintiffs' claims will survive to the extent Plaintiffs have plausibly asserted facts supporting an inference of discrimination under the *McDonnell Douglas* framework.

### A. Plaintiffs' 1981 Race Discrimination Claims Are Encompassed by Section 1983

The Supreme Court has clarified that, with respect to Defendants who are state actors, Section 1983 is the exclusive remedy for violations of rights guaranteed under Section 1981. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 731–34 (1989); see also Bermudez, 783 F.Supp.2d at 576. Plaintiff's race discrimination claims under Section 1981 are therefore dismissed as against all Defendants. *See Roddini v. City Univ. of N.Y.,* No. 02 Civ. 4640, 2003 WL 435981(LAP), at *5 (S.D.N.Y. Feb. 21, 2003) (holding that, under Jett, individuals sued in their individual capacities who are state actors must be sued under Section 1983 for violations of the rights guaranteed by Section 1981 (citations omitted)).

### B. Ruiz Has Adequately Pled Title VII, Section 1983 and NYSHRL Race Discrimination

Defendants do not deny that Ruiz belongs to a protected class or that she was qualified for her position as a police officer. Rather, Defendants argue that Ruiz fails to allege facts that could plausibly establish an "adverse employment action" or give rise to an "inference of discriminatory intent." Defs.' Mem. at 9–13.

An adverse employment action in the context of the anti-discrimination laws is a "materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir.2008) (quoting *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004)). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.2006) (citation omitted); *see also Mathirampuzha,* 548 F.3d at 78 ("Examples

of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (quoting *Sanders,* 361 F.3d at 755)).

**\*4** Ruiz argues that she was subject to several forms of adverse actions because of her race and gender, including: being disciplined without cause, being prevented from transferring or being promoted, being assigned to a "day tour" that conflicts with her childcare schedule, being assigned to a "foot post," being assigned to work long hours while she was sick, being yelled at, being required to work with an officer with whom she does not get along, being denied overtime pay, and not receiving "back up" from other officers when she is on duty. While some of these actions standing alone do not meet the relevant standard, *see, e.g., Jackson v. N.Y. Dep't of Labor,* 709 F.Supp.2d 218, 228 (S.D.N.Y.2010) (disciplinary notices alone do not amount to an adverse employment action (citation omitted)); *Barounis v. N.Y.C. Police Dep't,* No. 10 CIV. 2631(SAS), 2012 WL 6194190, at *6 (S.D.N.Y. Dec. 12, 2012) (being yelled at or unfairly criticized does not amount to an adverse employment action), others plausibly state a claim, and as a group they collectively state a claim. *See, e.g., Pimentel v. City of New York,* 74 Fed. App'x 146, 148 (2d Cir.2003) (denial of a transfer may constitute an adverse employment action if it involves "more cumbersome job responsibilities or lower compensation" (citation omitted)); *Edwards v. Huntington Union Free Sch. Dist.,* 957 F.Supp.2d 203, 211 (E.D.N.Y.2013) (reassignment that constitutes a career setback may constitute an adverse employment action (citation omitted)); *Wright v. N.Y.C. Off–Track Betting Corp.,* No. 05 CIV. 9790(WHP), 2008 WL 762196, at *4 (S.D.N.Y. Mar. 24, 2008) ("Comparatively poor assignments can constitute adverse employment actions." (citations omitted)); *Edwards v. Metro–North Commuter R.R. Co.,* No. 04–cv–430(JBA), 2006 WL 2790402, at *5 (D.Conn. Sept. 27, 2006) (actions exposing employee to "potentially unreasonably dangerous working conditions" could constitute adverse employment action (citations omitted)).

Ruiz has pled facts that could plausibly give rise to a minimal inference of discrimination based on her race. An inference of discrimination may be discerned from a variety of circumstances, including, "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group."

*Dellaporte v. City Univ. of N.Y.,* 998 F.Supp.2d 214, 227 (S.D. N.Y.2014) (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (internal citations omitted)). Ruiz alleges that Defendant Wise singled her out, reprimanded and punished her for tardiness (including by withholding her overtime pay) while three other non-minority officers who returned to the stationhouse at approximately the same time were not disciplined in any way. She further alleges that she was prohibited from speaking Spanish or punished for speaking Spanish on the job in a manner than could suggest racial animus. [3] Although her allegations on this point are thin, the Court cannot, at this stage, weigh Ruiz's evidence in deciding Defendants' Motion to Dismiss.

[3]     "[M]any courts, including the Second Circuit, have recognized that Title VII does not expressly identify language as a protected class," but in some circumstances a prohibition on speaking one's native language in the workplace can be an indication of unlawful race or national origin discrimination. *Pacheco v. N.Y. Presbyterian Hosp.,* 593 F.Supp.2d 599, 612 (S.D.N.Y.2009) (citing cases).

 **\*5** Ruiz does not, however, allege any connection between her gender and the adverse employment actions she allegedly suffered. In particular, she does not argue that she was targeted for any adverse employment action because she is a woman, or that Lopez's text message and the vulgar writing on the bathroom walls (her only allegations relating to gender) constituted adverse employment actions. [4] Indeed, in responding to Defendants' Motion to Dismiss, Plaintiffs' brief focuses solely on Ruiz's allegations of racial discrimination. Pls.' Opp. at 9–10. Ruiz's claims for gender discrimination pursuant to Title VII, Section 1983 and the NYSHRL are therefore dismissed.

[4]     Ruiz's hostile work environment claims, on the other hand, based on many of those facts, are sufficiently pled. *See* Section 4(A), *infra.*

### C. Ruiz Has Adequately Pled NYCHRL Race and Gender Discrimination

In 2005, the New York City Council broadened the protection of the NYCHRL, such that " 'courts must analyze NYCHRL claims separately and independently from any federal and state law claims.' " *Velazco v. Columbus Citizens Found.,* 778 F.3d 409, 411 (2d Cir.2015) (*per curiam*) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715

F.3d 102, 109 (2d Cir.2013)). The scope of the NYCHRL is broader than the federal and state anti-discrimination laws because the NYCHRL does not require a "materially adverse employment action[ ]." *Mihalik,* 715 F.3d at 114 (citation omitted). The relevant standard is instead whether a plaintiff was "treated less well at least in part because of her [membership in a protected class]." *Mihalik,* 715 F.3d at 110 (alteration and internal quotation marks omitted). NYCHRL claims are construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York,* 16 N.Y.3d 472, 477–78 (N.Y.2011). Having met the higher standard in pleading a race-based adverse employment action, Ruiz also meets the more liberal pleading standard under the NYCHRL with respect to her race discrimination claims. Ruiz has also pled sufficient facts to show that she was "treated less well" because of her gender: apart from the text message and sexually-explicit graffiti, Plaintiffs' allegations suggest that Ruiz may have been disciplined and harassed more severely than John following their reporting of the same incidents. Am. Compl. ¶¶ 69, 71–74.

### D. John Has Not Stated a Claim of Discrimination

In contrast to Ruiz, John does not allege that he suffered any adverse employment action or that he was "treated less well" because of his race, color or gender. John did complain that Lopez's text "would not have been tolerated if [John] and Ruiz were not minorities," Am. Compl. ¶ 31, but there is no allegation suggesting that Lopez's text was racially motivated or that it constituted an adverse employment action. Defendants clearly flagged this shortcoming in their Motion to Dismiss, and Plaintiffs failed to respond, focusing their entire Opposition argument on Ruiz's discrimination claims. Pls.' Opp. at 9–10. Because John has effectively abandoned his race, gender and color discrimination claims, those claims are dismissed. *See Lipton v. Cnty. of Orange, NY,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) (Courts "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (citation omitted)).

### III. Retaliation Claims

 **\*6** "To [allege] a prima facie case of retaliation [under Title VII], a plaintiff must [allege] that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action.' " *Kelly v. Howard I. Shapiro*

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 115 of 217
Ruiz v. City of New York, Not Reported in F.Supp.3d (2015)
2015 WL 5146629

& Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir.2013) (per curiam) (quoting Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir.2012)). As with discrimination claims, "allegations in [support of a retaliation claim] need only give plausible support to the reduced prima facie requirements that arise under McDonnell Douglas in the initial phase of a Title VII litigation." Littlejohn, 2015 WL 4604250, at *11. The same pleading standard applies to retaliation claims brought under Section 1983 and the NYSHRL. Bermudez, 783 F.Supp.2d at 575; Conklin v. Cnty. of Suffolk, 859 F.Supp.2d 415, 424 (E.D.N.Y.2012).

A protected activity includes any action that "protests or opposes statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir.2000). "Informal complaints to supervisors, instituting litigation, or filing a formal complaint are protected activities under Title VII." Giscombe v. N.Y.C. Dep't of Educ., 39 F.Supp3d 396, 401 (S.D.N.Y.2014) (citations and internal quotations omitted). The standard for a "materially adverse action" in the retaliation context is broader than the standard for an "adverse employment action" in the discrimination context. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). The relevant query is whether the employer's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (citations and internal quotations omitted).

Plaintiffs may establish a causal connection for purposes of a retaliation claim either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir.2000) (citation omitted).

### A. Ruiz Has Adequately Alleged Title VII, Section 1983 and the NYSHRL Retaliation

Defendants appear to concede that Ruiz engaged in protected activity by, inter alia, complaining to her supervisors about Armond's behavior[5] and other allegedly discriminatory treatment, Am. Compl. ¶¶ 41, 68; filing a complaint with the OEEO on October 18, 2012, id. ¶ 47; filing this action on July 14, 2014, Dkt. 1, and complaining to a supervisor regarding retaliatory treatment following her complaints, Am. Compl. ¶ 74. Defendants also appear to concede that at least some

Defendants were aware that Ruiz had engaged in protected activity.

[5]    Ruiz alleges that, while working on patrol with Armond, Armond became "very confrontational," refused to allow Ruiz to interview a robbery victim in Spanish, and later refused to accompany Ruiz to the hospital to complete the victim interview. Id. ¶¶ 36–40. The same day, Ruiz reported the incident to three supervisors, including Defendant Youssef. Id. ¶¶ 41, 43. After the incident, Ruiz was subjected to a "hostile" interrogation, given a CD, and permanently assigned to a "day tour" that interferes with her childcare schedule, while Armond was not disciplined. Id. ¶¶ 46, 70.

*7 Defendants argue that Ruiz cannot establish that she suffered any materially adverse action, nor can she establish a "causal connection" between the protected activity and any materially adverse action. Defs.' Mem. at 14–19. The Court disagrees. Ruiz's allegations that she was, inter alia, disciplined without cause, assigned to shifts that conflict with her childcare schedule, required to work on "foot post," and shunned to the point of being denied "back-up" by her co-workers are sufficient to allege a materially adverse action for her retaliation claims; these actions "well might have dissuaded a reasonable worker" from complaining about discrimination. See, e.g., Burlington N., 548 U.S. at 67; see also id. at 69 (noting that "[c]ontext matters" in determining whether an adverse action is material or trivial, such that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."); Monclova v. City of New York, No. 05 Civ. 3164, 2008 WL 822117, at *7 (E.D.N.Y. Mar. 26, 2008) (disciplinary charges may constitute an adverse action for purposes of establishing a prima facie case of retaliation).

Furthermore, Ruiz has plausibly pled that the adverse actions she suffered were causally connected to her engagement in protected activity. For example, the Amended Complaint states that, after she filed her OEEO complaint on October 18, 2012, Ruiz's co-workers stopped backing her up, Am. Compl. ¶ 48, and several weeks later, graffiti directed at her and John was written on the bathroom and locker room walls, id. ¶ 54. After Ruiz complained about Armond's treatment, including her refusal to permit Ruiz to interview a crime victim in Spanish and to accompany Ruiz to the hospital to interview the victim, id. ¶¶ 41, 43, Ruiz was assigned to a shift that interfered with her childcare schedule, id. ¶ 46. Ruiz

further alleges that, at least part of the reason she received a CD and was assigned to foot patrol was that 12 days earlier John had reported sexually-explicit graffiti regarding her and John. *Id.* ¶¶ 67, 69; Pls.' Opp. at 15. Finally Ruiz alleges that she was subject to retaliatory harassment by co-workers after filing the Complaint in this case. Am. Compl. ¶¶ 73–75. The context and timing of these incidents plausibly supports a causal connection between the protected activity and the adverse action. *See Nagle v. Marron,* 663 F.3d 100, 111 (2d Cir.2011) ("While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw." (citation omitted)).

### B. John Has Adequately Alleged Title VII, Section 1983 and NYSHRL Retaliation

As with Ruiz, Defendants do not dispute that John engaged in protected activity, of which at least some Defendants were aware. Instead, they argue that John fails to allege that he suffered any materially adverse action as a result of engaging in protected activity. Defs.' Mem. at 15, 17–18. Although John's allegations are less robust than Ruiz's, he does allege that he was subject to a "retaliatory hostile work environment" as a result of his complaining to his supervisors and the OEEO about Lopez's text message. Pls.' Opp. at 14 (citing *Thomas v. Istar Financial Inc.,* 438 F.Supp.2d 348, 365 (S.D.N.Y.2006)). The Second Circuit has held that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [third] prong of the retaliation prima facie case." *Rivera v. Rochester Genesee regional Transp. Authority,* 743 F.3d 11, 26–27 (2d Cir.2012) (quoting *Richardson v. N.Y. State Dep ' t of Corr. Ser.,* 180 F.3d 426, 446 (2d Cir.1999) (abrogated on other grounds by *Burlington v.,* 548 U.S. 53)). Whether John can ultimately prove that the vulgar graffiti was "sufficiently severe" to constitute a materially adverse action, he has alleged enough at the pleading stage.

### C. Both Ruiz and John Have Adequately Alleged Retaliation Under the NYCHRL

**\*8** The requirements for a retaliation claim under the NYCHRL are substantially the same as under federal and state law. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination ... and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action ." *Mihalik,* 715 F.3d at 122 (internal citation omitted); *see also* N.Y.C. Admin.

Code § 8–107(7). For the reasons stated above, Ruiz and John have pled claims for retaliation under the NYCHRL.

### IV. Hostile Work Environment Claims

For a hostile work environment claim, a plaintiff must plead that the conduct "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007) (quoting *Gregory v. Daly,* 243 F.3d 687, 691–92 (2d Cir.2001) (quotations and internal alterations omitted)). [6] The same standard is used for evaluating hostile work environment claims under Section 1983 and the NYSHRL. *See Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2,* 798 F.Supp.2d 443, 451 (E.D.N.Y.2011); *Bermudez,* 783 F.Supp.2d at 578 (S.D.N.Y.2011). In evaluating hostile work environment claims, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.,* 510 U.S. 17, 23 (1993). While the Second Circuit has "often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe,' " *Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 176 (2d Cir.2012) (citing cases), in most cases, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," *Raspardo v. Carlone,* 770 F.3d 97, 114 (2d Cir.2014) (citation omitted).

6   Employers can be liable for a hostile work environment created either by the plaintiff's supervisors or her non-supervisory co-workers under federal and state law. "If the harassment is perpetrated by the plaintiff's 'non-supervisory coworkers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.' " *Wiercinski v. Mangia 57, Inc.,* 787 F.3d 106 (2d Cir.2015) (quoting *Petrosino v. Bell Atl.,* 385 F.3d 210, 225 (2d Cir.2004)); *see also Totem Taxi, Inc. v. New York State Human Rights Appeal Board,* 65 N.Y.2d 300, 304 (N.Y.1985) ("[I]n order to hold the employer responsible [under the NYSBRL] the [plaintiff] must demonstrate that

the employer approved of, or acquiesced in the
employee's conduct" (citations omitted)).

While Plaintiffs face a "high hurdle with respect to the level
and frequency of offensive conduct that must be present"
to prove their hostile work environment claims, *DelaPaz
v. N.Y.C. Police Dep't,* No. 01 CIV. 5416(CBM), 2003
WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003) "to avoid
dismissal under [Fed.R.Civ.P.] 12(b) (6), a plaintiff need
only plead facts sufficient to support the conclusion that she
was faced with 'harassment ... of such quality or quantity
that a reasonable employee would find the conditions of her
employment altered for the worse,' " *Patane,* 508 F.3d at 113
(quoting *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003)).
The Second Circuit has "repeatedly cautioned against setting
the bar too high" in this context. *Patane,* 508 F.3d at 113
(quotation marks omitted).

**A. Both Ruiz and John Have Adequately Alleged
Hostile Work Environment Claims Under Title VII,
Section 1983 and the NYSHRL**

 *9  Ruiz and John have plausibly alleged that they suffered
"harassment ... of such quality or quantity that a reasonable
employee would find the conditions of her employment
altered for the worse.' " *Id.* The question is whether they
have sufficiently pled that such conduct is connected to their
membership in a protected class. Plaintiffs' allegations related
to race are relatively sparse. Ruiz alleges that both Armond
and Wise refused to let her speak Spanish and that Wise
singled her out for discipline while turning a blind eye to
similar conduct by her non-minority colleagues. John alleges
that Lopez's offensive text was seen by others as acceptable
because he and Ruiz are minorities. Plaintiffs also allege that
they were subject to a hostile work environment as a result of
their respective genders.

In terms of factual allegations, Plaintiffs allege that Lopez
circulated a text, depicting an image of Ruiz's face
"photoshopped" onto a naked woman's body, to John and
others, and then "approached and threatened" Ruiz. Am.
Compl. ¶¶ 28, 30, 34. Later, the Plaintiffs were the subject
of multiple instances of sexually-explicit graffiti using their
names. *Id.* ¶¶ 49–50, 54, 67. This is sufficient to state a
hostile work environment claim. *See, e.g., Howley v. Town of
Stratford,* 217 F.3d 141, 156 (2d Cir.2000) (reversing grant
of summary judgment on female firefighter's hostile work
environment claims based on a single instance in which a co-
worker publicly subjected her to gender-based ridicule in such

a way as to question her competence and impair her ability to
lead in life-threatening situations).

Defendants argue that because Plaintiffs are "of different
races and different genders" they cannot plausibly complain
about the same allegedly offensive conduct. Defs.' Mem. at
23. This, however, is not an issue that the Court can resolve at
the pleading stage. "[T]here is no per se bar to maintaining a
claim of sex discrimination where a person of another sex has
been similarly treated." *Brown v. Henderson,* 257 F.3d 246,
256 (2d Cir.2001). For example, "it may be the case that a co-
worker or supervisor treats both men and women badly, but
women worse." *Id.* (citation omitted). In *Brown,* the Second
Circuit further noted:

> [T]here might even be circumstances
> that are actionable under Title
> VII when both men and women
> suffer sexually discriminatory harms
> in the same workplace, but for
> different reasons. This could occur, for
> example, if an employer discriminated
> against women, but not men, who
> were overweight, *see, e.g., Laffey v.
> Northwest Airlines, Inc.,* 567 F.2d 429,
> 454 (D.C.Cir.1976); *Gerdom,* 692 F.2d
> at 606–08, and against men, but not
> women, who dated overweight people.
> *See Parr v. Woodmen of the World
> Life Ins. Co.,* 791 F.2d 888, 891–
> 92 (11th Cir.1986) (holding that an
> employer had discriminated against a
> white employee, based on his race,
> when it refused to hire him because
> of his interracial marriage, and finding
> that such discrimination against the
> white employee was consistent with
> the possibility that the employer
> also discriminated against African–
> Americans generally).

 *10  *Id.* at 254–55 (citation omitted); *see also Holcomb v.
Iona College,* 521 F.3d 130, 139 (2d Cir.2008) ("[W]here an
employee is subjected to adverse action because an employer
disapproves of interracial association, the employee suffers
discrimination because of the employee's own race."). Thus,
the fact that Ruiz and John were both targeted in Lopez's text

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 118 of 217
Ruiz v. City of New York, Not Reported in F.Supp.3d (2015)
2015 WL 5146629

message and in the sexually-explicit graffiti, albeit in different ways, does not preclude the viability of both Plaintiffs' hostile work environment claims. Defendants' Motion to Dismiss such claims is therefore denied.

### B. Plaintiffs' Title VII Hostile Work Environment Claims Are Not Time–Barred

Defendant argue that any employment discrimination claims brought under Title VII based on the text message incident, which occurred on February 20, 2012, are time-barred. Title VII claims must be filed with the EEOC or a qualified state or local fair employment practice agency within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e)(1). Plaintiffs filed their Charge of Discrimination with the EEOC on August 9, 2013, Am. Compl. ¶¶ 16, 18; any claims that accrued before October 13, 2012, including any claim based solely on the February 12, 2012 text incident, are time-barred. Defs.' Mem. at 25.

An exception to this rule is the "continuing-violation doctrine," pursuant to which, "[i]f a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996) (citation omitted). In *Nat'l R.R. Pas senger Corp. v. Morgan,* the Supreme Court clarified that discrete and easily identifiable acts "such as termination, failure to promote, denial of transfer, or refusal to hire" are only actionable to the extent they occurred during the statutory time period. 536 U.S. 101, 114 (2002). A hostile work environment claim, in contrast, by its very nature "involves repeated conduct" that "may not be actionable on its own." *Id.* at 115 (citations omitted). Therefore, so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. *But see Bowen–Hooks v. City of New York,* 13 F.Supp.3d 179, 206 (E.D.N.Y.2014) (two separate instances of alleged harassment separated by more than three years are not subject to the continuing-violation doctrine).

Lopez's text message incident is only relevant to Plaintiffs' gender discrimination and hostile work environment claims. The Court has dismissed both Plaintiffs' gender discrimination claims, so it need not determine whether the continuing-violation doctrine applies to those claims. Based on the continuing-violation doctrine, as elucidated in *Nat'l R.R. Passenger Corp. v. Morgan,* the Court finds

that Lopez's text message may be considered for purposes of determining liability relative to Plaintiffs' hostile work environment claims.

### C. Both Ruiz and John Have Adequately Alleged Hostile Work Environment Claims Under the NYCHRL

**\*11** The pleading standard for hostile work environment claims under the NYCHRL is more liberal than the federal and state standard, because under the NYCHRL conduct need not qualify as "severe or pervasive" to be actionable. *Bermudez,* 783 F.Supp.2d at 579 (citing *Williams v. New York City Housing Authority,* 61 A.D.3d 62, 76–77 (1st Dep't 2009)). Thus, any conduct, apart from "petty slights and trivial inconveniences," establishing that a plaintiff is treated "less well than other employees" because of his or her protected status is actionable. *Williams,* 61 A.D.3d at 78. For the reasons discussed above, Defendants' Motion to Dismiss Plaintiffs' hostile work environment claims under the NYCHRL is denied. [7]

[7]    As under federal and state law, to succeed on their NYCHRL claims against the City, Plaintiffs must establish that their supervisors knew or should have known of the actionable conduct and failed to take appropriate steps to stop it. *See Zakrzewska v. New Sch.,* 598 F.Supp.2d 426, 434 (S.D.N.Y.2009) (under the NYCHRL, an employer will be liable for the discriminatory act of a co-workers only if "a managerial or supervisory employee knew of and acquiesced in such conduct or should have known of what was going on an failed to take reasonable preventive measures.").

### V. Plaintiffs Fail to State a *Monell* Claim Against The City

Under the Supreme Court's ruling in *Monell v. Dep't of Soc. Servs. of City of New York,* a municipal entity may only be held liable under Section 1983 if the plaintiff demonstrates that the alleged constitutional violation was caused by a municipal "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. 658, 694 (1978). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (citing *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992)). Policy or custom, as used in *Monell,* includes "the decisions of a government's lawmakers,

the acts of its policymaking officials," *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011), and "persistent and widespread" practices that have become "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. at 691.

Plaintiffs' only allegations in support of their *Monell* claims are the conclusory statements that Defendants engaged in a "pattern and practice" evidencing discrimination, hostile work environment and retaliation against the Plaintiffs, and that Defendants similarly engaged in a "pattern and practice" of discrimination against other minority officers and women. Am. Compl. ¶¶ 25–26. Plaintiffs do not complain of any formal law, regulation or policy implemented by the City. Nor do they allege that any Defendant made any decision or took any action as a policy maker for the City that resulted in a constitutional violation. *See Vives v. City of New York,* 524 F.3d 346, 350 (2d Cir.2008) ("Policy, in the *Monell* sense, may of course be made by the municipality's legislative body ... but it also may be made by a municipal official 'possess[ing] final authority to establish municipal policy with respect to the action ordered.' " (citations omitted)); *see also Littlejohn,* 2015 WL 4604250, at *11 (dismissing *Monell* claims where supervisor who fired plaintiff "was not a final municipal policymaker such that her isolated personnel decision ... could be said to represent official City policy.").

**\*12** In their Opposition brief, Plaintiffs merely argue that the alleged misconduct was "repetitive, continuous and systematic" and that it "extend[ed] up the chain of command to Defendant Williams, a Deputy Inspector and Commanding Officer." Pls.' Opp. at 23. While a particular custom or usage could become so permanent and well-settled so as to carry the "force of law," Plaintiff's vague and conclusory statement that the misconduct "extend[ed] up the chain of command to Defendant Williams" is simply insufficient to state a plausible *Monell* claim. This is particularly true inasmuch as certain of Plaintiffs' complaints were investigated and acted upon, as evidenced by the fact that Lopez was disciplined following Plaintiffs' complaints regarding his text message and threatening behavior. Am. Compl. ¶ 34. Plaintiffs' *Monell* claims are therefore dismissed.

### VI. Plaintiffs Fail to State a Claim Against Defendant Jiminian

None of Plaintiffs' allegations against the Individual Defendants is particularly detailed, [8] but their allegations

against Defendant Jiminian are clearly insufficient to state a claim. Plaintiffs' sole allegation regarding Defendant Jiminian is that Ruiz "was assigned to patrol with Defendant Armond" after having informed Jiminian "that she and Armond did not get along." Am. Compl. ¶ 35. Based on this allegation, there is no plausible set of facts under which Plaintiffs would be entitled to relief from Jiminian. *Meyer,* 761 F.3d at 249. Plaintiffs' claims against Defendant Jiminian are therefore dismissed.

[8]    Plaintiffs are reminded that under Section 1983, an individual may only be held liable if that individual is "personally involved in the alleged deprivation." *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004).

### VII. Plaintiffs' Title VII Claims Against the Individual Defendants are Not Cognizable

Plaintiffs' Title VII claims against the Individual Defendants are dismissed because "individuals are not subject to liability under Title VII." *Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995)).

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The following claims are DISMISSED: (1) Plaintiffs' race discrimination claim under Section 1981; (2) Ruiz's claims for gender discrimination under Title VII, Section 1983 and NYSHRL; (3) John's claims for race, gender and color discrimination under Title VII, Section 1983, NYSHRL and NYCHRL; (4) Plaintiffs' *Monell* claims against the City; (5) all of Plaintiffs' claims against Defendant Jiminian and (6) Plaintiffs' Title VII claims against the Individual Defendants. Defendants' Motion to Dismiss other aspects of the Amended Complaint is denied. The Clerk is respectfully requested to close the open motion at docket entry number 22.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5146629

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 121 of 217

2018 WL 1633563

2018 WL 1633563
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ediberto SANTANA, Plaintiff,
v.
CITY OF NEW YORK, Commissioner
Joseph Ponte, Warden Kenneth Stukes, and
Deputy Warden Robert Kelly, Defendants.

15 Civ. 6715 (ER)
|
Signed 03/29/2018

**Attorneys and Law Firms**

Ediberto Santana, New York, NY, pro se.

Elizabeth Edmonds, Lesley Berson Mbaye, New York City
Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

 *1 Ediberto Santana ("Plaintiff"), acting *pro se* and *in
forma pauperis*, brings this action against the City of New
York ("City"), Commissioner Joseph Ponte, Warden Kenneth
Stukes, and Deputy Warden Robert Kelly (collectively
"Defendants"), pursuant to 42 U.S.C. § 1983. Plaintiff alleges
that the conditions of his confinement at the Otis Bantum
Correctional Center ("Bantum") violated his constitutional
rights and that he was housed in punitive segregation without
due process. Defendants bring the instant motion to dismiss
the Complaint pursuant to Federal Rule of Civil Procedure
12(c). For the reasons set forth below, the Defendants' motion
to dismiss is GRANTED.

**I. FACTUAL BACKGROUND** [1]

[1]    The following facts, accepted as true for purposes
of the instant motion, are based on Plaintiff's
allegations in his Complaint (Doc. 2), and
Plaintiff's Opposition Memorandum to Defendant's
Motion to Dismiss ("Opp. Mem.") (Doc. 37). *See
Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145
(2d Cir. 2012); *Walker v. Schult*, 717 F.3d 119, 122
n. 1 (2d. Cir. 2013) ("[a] district court deciding a

motion to dismiss may consider factual allegations
made by a *pro se* party in his papers opposing the
motion.").

Liberally construed, Plaintiff principally alleges that he was
subject to unconstitutional conditions of confinement at
Bantum's Enhanced Supervision Housing ("ESH") on Rikers
Island from April 15, 2015 to December 15, 2015. Plaintiff's
Opposition Memorandum to Defendants' Motion to Dismiss
("Opp. Mem.") (Doc. 37), at 4. Specifically, Plaintiff claims
that he was placed in ESH where detainees are locked up
in continuous cycles of 24 hours in their cells followed by
7 hours outside of their cells. During the 24-hour lock-up
period, detainees are not afforded time to shower or an hour
for recreation. Plaintiff's Complaint ("Compl.") (Doc. 2) at
3. He alleges that no one ever cleaned his cell even though
his cell was searched every week. Opp. Mem. at 6. Plaintiff
also claims that detainees were subjected to excessive and
unjust beatings and were denied prompt medical attention.
Compl. Ex. A. Specifically, he describes an incident during
which he was severely beaten by several correction officers
and thereafter denied medical attention for the injuries he
suffered. [2] Opp. Mem. at 7–8. He further alleges that he ate
two out of three meals in his cell and that the food was
not served at the prescribed temperature as mandated by the
health code. *Id.* at 3. Plaintiff also claims that there were
prolonged delays in delivering inmates in ESH to the visiting
area, and that they were kept in their cells even when the
temperature exceeded 90 degrees. *Id.* Ex. A. Plaintiff claims
that these conditions, as well as the fact that detainees housed
in ESH are not allowed to have a representative on the Inmate
Council, demonstrate that detainees in ESH were actually
subjected to punitive segregation in violation of the Eight
Amendment. *Id.* at 3; Ex. A. Punitive segregation is intended
as a response to an offense committed by an inmate while he
is incarcerated. *See* 40 R.C.N.Y. § 1-17(a).

[2]    As discussed below, although Plaintiff describes
an incident involving force in his opposition, this
incident was not included in the Complaint. While
he does make reference to "unjust beatings," the
Complaint speaks generally of the conditions to
which all ESH inmates are subjected (e.g., "We
are being treated as inmates who are in Punitive
Segregation"). Compl. Ex. A. Nowhere does he say
that he himself was beaten, nor does he allege any
physical injuries.

 *2 As a result of these conditions, Plaintiff states he suffers
from "[d]epression, [i]solation, despair, disorientation,

2018 WL 1633563

hal[l]ucinations, depr[i]vation of senses, hearing, sight, smell" and is "unable to think and put things in perspective [and] seeing ghost[s] at night." Compl. At 3. He also alleges that he did not receive any medical care for these issues while in confinement. *Id.* Plaintiff is seeking $8 million in damages for treatment and care of these afflictions, all of which were allegedly caused by the unconstitutional conditions of his confinement. *Id.* at 5.

Additionally, Plaintiff alleges a violation of his constitutional right to due process stemming from his transfer to ESH on April 15, 2015, without any prior notification or administrative hearing. Opp. Mem. at 3-4. Plaintiff claims that there was no pre-transfer event that could have justified the transfer. *Id.* at 3. Although he concedes that during his pretrial detention he had three previous altercations with other inmates which caused his security classification to increase from 20 to 30, these altercations were remote in time, having taken place between March 2014 and September 2014. *Id.* Plaintiff further alleges that he had no more altercations between September 2014 and the date of his transfer to ESH seven months later, received no more citations, and had his security classification level decreased from 30 to 17 in the seven months preceding his transfer to ESH. *Id.* Plaintiff asserts that the only reason given for his placement in ESH was his criminal history. Compl. at 5.

It was only after being confined in ESH for two weeks that Plaintiff was afforded a hearing to oppose his transfer. Opp. Mem. at 4. At that hearing, Plaintiff claims that he was not provided any assistance and was not allowed to call any witnesses to testify on his behalf. Thereafter, Plaintiff alleges that hearings would take place every forty-five days to determine whether to continue his placement in ESH. His placement was extended after every subsequent hearing despite the fact that his only disciplinary citation during this period was for a violation of the smoking ban. *Id.* at 5. Plaintiff alleges that he tried to file a grievance regarding his placement in ESH by writing directly to Warden Kenneth Stukes, Deputy Warden Robert Kelly, and the New York City Board of Correction, but was informed that his placement at ESH was not a grievable issue. Compl. at 4.

In addition to monetary damages, Plaintiff is seeking injunctive relief ordering the Department of Corrections to change its practices concerning the operation of ESH, Plaintiff's removal from ESH, and treatment for Plaintiff's afflictions mentioned above. *Id.* at 5.

## II. PROCEDURAL BACKGROUND

Plaintiff filed the instant action on August 24, 2015. *See* Compl. The Complaint did not include an allegation that Plaintiff had been beaten by correction officers. Defendants filed their answer on April 22, 2016. Doc. 15. Defendants filed an amended answer on August 18, 2016. Doc. 25. On April 4, 2017, this Court granted Defendants' order to show cause why this action should not be dismissed for want of prosecution pursuant to Federal Rule of Civil Procedure 41(b) based on Plaintiff's failure to keep the Court and Defendants apprised of his current residence. Doc. 28. That same day, Plaintiff filed a letter providing his current mailing address and explaining that while he was incarcerated, the documents pertaining to the case were lost. Doc. 29.

On June 8, 2017, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(c). Doc. 30. Plaintiff filed an opposition to Defendants' motion on August 14, 2017. *See* Opp. Mem. Defendants' reply memorandum in support of the motion to dismiss was filed on September 15, 2017. Doc. 43.

## III. LEGAL STANDARD

### A. Rule 12(c) Motion to Dismiss Standard

**\*3** Rule 12(c) provides that "[a]fter the pleadings are closed —but early enough not to delay trial—a party may move for judgment on the pleadings." The Court applies the same standard of review to a Rule 12(c) motion as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Grp. Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)). On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Id.* at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 123 of 217

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 680, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

**B. *Pro Se* Plaintiff**

The same standard applies to motions to dismiss for *pro se* plaintiffs. *See Zapolski v. Fed. Repub. of Germany*, 425 Fed.Appx. 5, 6 (2d Cir. 2011). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as "rais[ing] the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006) (citing *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F.Supp.2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 566 U.S. at 678, 132 S.Ct. 2073. A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

**C. 42 U.S.C. § 1983**

Plaintiff seeks to impose liability on the City pursuant to Section 1983. Compl. at 1. Although a municipality cannot be held liable under Section 1983 solely on a theory of respondeat superior, a Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of City of N. Y.*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action, and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for the deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (internal citation omitted). Accordingly, a civil rights action brought under Section 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

**IV. DISCUSSION**

**\*4** Liberally construing the Complaint, Plaintiff alleges that he suffered unconstitutional conditions of confinement and a violation of his due process rights in connection with his placement in ESH. Compl. at 3. In Plaintiff's opposition to Defendants' motion, he alleges new facts that were not included in his Complaint. Opp. Mem. at 2–8. Most notably, he alleges that he was beaten by several correction officers. *Id.* at 7–8. In addition, Plaintiff seeks to add 27 new defendants and raises a number of new causes of action, namely: excessive force, deliberate indifference to a serious medical need, failure to protect, and disability-based discrimination under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. *Id.* at 1, 7–8, 9, 17–19. Plaintiff, however, has not sought leave to amend his Complaint.

"Ordinarily, plaintiffs may not amend their complaints through their motion papers." *Anderson v. Davis Polk & Wardwell LLP*, 850 F.Supp.2d 392, 402 (S.D.N.Y. 2012); *see also Soules v. Connecticut Dep't of Emergency Servs. and Pub. Prot.*, 882 F.3d 52, 56 (2d Cir. 2018) ("[A] party is not entitled to amend its complaint through statements made in motion papers....") (quoting *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)). Despite this restriction, "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations in the plaintiff's complaint." *Cusamano v. Sobek*, 604 F.Supp.2d 416, 461 (N.D.N.Y. 2009); *see also Aponte v. Buono*, No. 11 Civ. 1077 (CBA) (MDG), 2011 WL 6812924, at \*3 (E.D.N.Y. Dec. 28, 2011)

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 124 of 217

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

("[T]o the extent [Plaintiff's opposition to Defendant's motion to dismiss] contains new facts relevant to [Plaintiff's] claim against [Defendant], the Court liberally construes the factual allegations in the original ... complaint as effectively amended by this submission.").

Plaintiff cannot amend his Complaint to add new causes of actions in his opposition papers. *See Wright*, 152 F.3d at 178 (declining to read in Plaintiff's amended complaint a new cause of action asserted in opposition papers to a motion to dismiss); *see also Mathie v. Goord*, 267 Fed.Appx. 13, 14 (2d Cir. 2008) (holding that claim asserted in a *pro se* plaintiff's opposition papers to a motion to dismiss was not encompassed in the plaintiff's amended complaint); *Williams v. Rosenblatt Sec. Inc.*, 136 F.Supp.3d 593, 609 (S.D.N.Y. 2015) ("A [*pro se*] plaintiff cannot amend his complaint [by adding new or different claims] in response to a motion to dismiss."); *Bernstein v. City of New York*, No. 06 Civ. 895 (RMB), 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (holding that "[n]ew claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss" a *pro se* case) (quoting *Lerner v. Forster*, 240 F.Supp.2d 233, 241 (E.D.N.Y. 2003)). As such, the Court confines its analysis to the conditions of confinement and due process claims under the Fourteenth Amendment and municipal liability pursuant to *Monell*.

However, Plaintiff's opposition papers also allege new facts that are consistent with the allegations contained in his Complaint. Since a *pro se* litigant's papers must be read generously, the Court will consider the additional facts contained in Plaintiff's opposition to the extent that they are consistent with the allegations in the Complaint.

## A. Personal Involvement

Plaintiff's papers offer little insight into how the individual Defendants Commissioner Ponte, Deputy Warden Kelly, and Warden Stukes participated in depriving Plaintiff of his constitutional rights. "[V]icarious liability is inapplicable to ...Section 1983 suits," therefore "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937. A prerequisite to a damage award under 42 U.S.C. § 1983 is the "personal involvement of defendants in alleged constitutional deprivations...." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A

defendant holding a supervisory position may be found to have been personally involved in depriving a plaintiff of his or her constitutionally protected liberty interest in several ways:

> **\*5** The defendant may have directly participated in the infraction.... A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event[.]

*Id.* at 501 (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)). "Supervisory officials may not be held liable merely because they held positions of authority." *O'dell v. Bill*, No. 13 Civ. 1275 (FJS) (TWD), 2015 WL 710544, at *4 (N.D.N.Y. Feb. 18, 2015).

Plaintiff alleges that he was placed in ESH by Warden Stukes and Deputy Warden Kelly, but he does not provide any additional factual allegations to support this conclusion. Opp. Mem., at 4. He also alleges that he wrote to Warden Stukes and Deputy Warden Kelly to complain about his transfer to ESH. Compl. at 4–5; Opp. Mem. at 5. The Second Circuit has held that:

> [a]t the pleading stage, even if [the plaintiff] had no knowledge or information as to what became of his [l]etter [complaining of prison conditions] after he sent it [to the Warden], he would be entitled to have the court draw the reasonable inference—if his ... complaint contained factual allegations indicating that the [l]etter was sent to the Warden at an appropriate address and by appropriate

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 125 of 217
Santana v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1633563

means—that the Warden in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained.

*Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). Here, Plaintiff does not mention the address where he mailed these letters and also does not allege that they were sent through the appropriate means. Therefore, Plaintiff is not entitled to have the Court draw the inference that Warden Stukes and Deputy Warden Kelly received his letters, read them, and thereby became aware of the alleged conditions of which Plaintiff is complaining. *See Barrow v. Buren*, No. 12 Civ. 1268 (MAD) (CFH), 2015 WL 417084, at *10 (N.D.N.Y. Jan. 30, 2015) (finding that plaintiff's failure to "allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them" fails to "provide sufficient factual detail to support his claim that the letters establish personal involvement"). Plaintiff also does not mention in his papers what details of his confinement he included in his letters to alert both Warden Stukes and Deputy Warden Kelly of the alleged unconstitutional conditions in ESH. He states that the only response he received was that placement in ESH was not a grievable issue and that he was placed there due to his criminal history, but does not specify the method by which he received this information. *See* Compl. at 5; Opp. Mem. at 5. Moreover, Plaintiff fails to allege any facts as to Commissioner Ponte's alleged involvement in the deprivation of his constitutional rights. Plaintiff also does not allege in his papers facts that would support a conclusion that any of the Defendants were grossly negligent in managing subordinates who were causing the alleged unlawful conditions. Consequently, Plaintiff's Complaint must be dismissed for failure to allege any personal involvement by any of the named Defendants. *See O'dell*, 2015 WL 710544, at *4 (stating that "[i]n order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant") (internal quotation marks omitted). Because there is no individual liability, there can also be no municipal liability. *See Escalera v. Lunn*, 361 F.3d 737, 749 (2d Cir. 2004). Accordingly, the Complaint must be dismissed in its entirety.

## B. The Prison Litigation Reform Act

**\*6** Even if Plaintiff had sufficiently asserted individual liability, the conditions of confinement claim would still be dismissed. Plaintiff seeks $8 million in compensatory damages for the injuries allegedly sustained while confined in ESH. Compl. at 5. According to the Complaint, all of the injuries he sustained while confined in ESH were mental or emotional in nature. *Id.* at 3 ("Depression, [i]solation, despair, disorientation, hal[l]ucinations, depr[i]vation of senses, hearing, sight, smell, [inability] to think and put things in perspective [and] seeing ghost[s] at night."). The Prison Litigation Reform Act states that "no Federal civil action may be brought by a prisoner confined in ... a correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury...." 42 U.S.C. § 1997e(e). This includes "claims alleging constitutional violations." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002).

Nowhere in the Complaint does Plaintiff allege that he was subjected to excessive force or that he sustained any physical injuries as a result of his confinement in ESH. Because of Plaintiff's failure to allege that he sustained any physical injuries as a result of the conditions of his confinement at ESH, his claim must be dismissed. *Toliver v. City of New York*, 530 Fed.Appx. 90, 93 n.2 (2d Cir. 2013) (stating that "[t]he district court correctly noted that ... a prisoner may not recover for mental or emotional injury suffered while in custody without a prior showing of physical injury") (internal quotations omitted); *see also Brown v. Cunningham*, No. 15 Civ. 5093 (VB), 2017 WL 627463, at *6 (S.D.N.Y. Feb. 14, 2017) (dismissing "any claims for damages associated with mental or emotional injury" where "plaintiff does not allege physical or sexual abuse"); *see also Dillon v. City of New York*, No. 12 Civ. 7113 (LAP), 2013 WL 6978959, at *2 (S.D.N.Y. Nov. 18, 2013) (dismissing Plaintiff's claims "because he does not meet the PLRA's physical injury requirement and he does not seek nominal or punitive damages"). As indicated below, however, he will be allowed to amend his Complaint to include the excessive force claim.[3]

3       Because Plaintiff will be given an opportunity to amend his Complaint, the Court will assess the weight of that claim to provide appropriate guidance.

Moreover, the PLRA does not require dismissal of Plaintiff's due process violation claims. As relevant to his due process claim, "even absent physical injury, [Plaintiff] may still recover compensatory damages for the loss of a constitutional

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 126 of 217

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

liberty interest." *Holland v. City of New York*, 197 F.Supp.3d 529, 537 (S.D.N.Y. 2016) (quoting *Rosado v. Herard*, No. 12 Civ. 8943 (PGG) (FM), 2014 WL 1303513, at *13 (S.D.N.Y. Mar. 25, 2014)).

## C. Conditions of Confinement

Even if the Complaint were not dismissed for failure to allege physical injury or personal involvement of the individual Defendants, it would still be dismissed for failure to state a claim. Plaintiff alleges that he was locked in his cell for 24 hours at a time, deprived of one hour of recreation and time to shower, served food that was lukewarm, and kept in his cell "even when temperatures exceeded ninety degrees." Compl. at 3; Opp. Mem. at 6–7. Although the Constitution does not mandate comfortable prison settings, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Accordingly, prison officials are required to take "reasonable measure[s] to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). While claims of unconstitutional confinement by pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause, "a detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)). These claims may be established "by showing that the officers acted with deliberate indifference to the challenged conditions." *Id.* Two prongs must be satisfied: an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' ... showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.*

## 1. Objective Element

**\*7** To establish the objective element of an unconstitutional conditions of confinement claim, a plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35–36, 113

S.Ct. 2475). More specifically, a plaintiff must show that the conditions of confinement, "either alone or in combination, pose an unreasonable risk of serious damage" to a plaintiff's health or safety. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "[T]o determine whether a deprivation is sufficiently serious ... the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (internal quotations omitted) (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually reinforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise." *Walker*, 171 F.3d at 125 (internal quotations omitted) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Here, none of the conditions Plaintiff was allegedly subjected to rise to the level of a constitutional violation either alone or in combination.

### i. Exercise

Prisoners must be afforded "some opportunity for exercise." *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Gradner v. Murphy*, 613 Fed.Appx. 40, 42 (2d Cir. 2015) (requiring "that prison inmates be allowed some out-of-cell exercise.") (quoting *Williams v. Greifinger*, 97 F.3d 699, 704 n.5 (2d Cir. 1996)). But not every deprivation of the opportunity for exercise violates a plaintiff's constitutional rights. *Williams v. Goord*, 142 F.Supp.2d 416, 425 (S.D.N.Y. 2001). To satisfy the objective element, "a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Id.* To determine if there was a violation, factors to consider are: "(1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation." *Id.* A deprivation of "all meaningful opportunity [to] exercise" for three-and-a-half years runs "afoul of the Eighth Amendment." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).

Here, Plaintiff alleges that he was allowed out of his cell every other day—clearly a stark contrast to the three-and-a-half year deprivation of all opportunity to exercise in *Jolly*. Even assuming that Plaintiff was not afforded any meaningful opportunity to exercise in his cell, Plaintiff fails to allege that he was deprived of the opportunity to exercise while he was

2018 WL 1633563

outside of his cell during the alternate 7 hour periods. "Courts have held that deprivation of exercise for periods as long as fourteen days do not violate" the inmate's rights. *Dillon v. City of New York*, 12 Civ. 3872 (LAP), 2013 U.S. Dist. LEXIS 101692, at *7 (S.D.N.Y. June 24, 2013). Therefore, even assuming that Plaintiff was not afforded the opportunity to exercise within the 24 hour period he was locked inside of his cell, Plaintiff was not denied all meaningful exercise for a *substantial* period of time.

### ii. Showers

Denial of shower access for up to two weeks has been held not to be a violation of the Eighth Amendment. *Banks v. Argo*, No. 11 Civ. 4222 (LAP), 2012 WL 4471585, at *4, 2012 U.S. Dist. LEXIS 141853, at *10 (S.D.N.Y. Sept. 25, 2012) ("[E]ven assuming prison officials denied Plaintiff shower access for the entire time alleged in his complaint—thirteen days—his claim still fails as a matter of law."); *see also McCoy v. Goord*, 255 F.Supp.2d 233, 260 (S.D.N.Y. 2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' ") (quoting *Cruz v. Jackson*, No. 94 Civ. 2600 (RWS), 1997 WL 45348, at *7, 1997 U.S. Dist. LEXIS 1093, at * 20 (S.D.N.Y. Feb. 5, 1997)). It is clear that limiting Plaintiff's access to shower and recreation facilities to every other day does not "violate contemporary standards of decency" or "pose an unreasonable risk of serious damage" to his health or safety.

### iii. Food Temperature

**\*8** Plaintiff's allegation that his "food was prepared far too long in advance and always arrived cold" fails to state a violation of his constitutional rights. Opp. Mem. at 7. The Eighth Amendment requires that "prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.' " *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). Here, Plaintiff does not allege that the food he was provided with was nutritionally deficient. Courts have consistently rejected Eighth Amendment claims based on cold food. *See Huggins v. Schriro*, No. 14 Civ. 6468 (GBD) (JLC), 2015 WL 7345750, at *7, 2015 U.S. Dist. LEXIS 156848, at *18 (S.D.N.Y. Nov. 19, 2015) (holding that allegations of being served cold or lukewarm food did not amount to a constitutional violation);

*see also Cruz v. Jackson*, No. 94 Civ. 2600 (RWS), 1997 WL 45348, at *6, 1997 U.S. Dist. LEXIS 1093, at * 18 (S.D.N.Y. Feb. 5, 1997) ("While warm meals may be preferable to cold, the denial of warm food did not deprive him of the minimal civilized measure of nutrition.") (internal quotations omitted); *Fisher v. Dep't of Corr.*, No. 92 Civ. 6037 (LAP), 1995 WL 608379, at *5, 1995 U.S. Dist. LEXIS 15206, at *13–14 (S.D.N.Y. Oct. 16, 1995) (holding that food being served cold sixty-five percent of the time did not amount to a constitutional violation).

### iv. Ambient Temperature

Although Plaintiff further alleges that he was confined in his cell when "temperatures exceeded ninety degrees," he fails to specify the length of his confinement while under these conditions, the adverse effect this type of confinement had on his health, and the number of times this occurred. *See* Opp. Mem. at 7. Plaintiff also claims that another inmate died due to the excessive heat in his cell, but again does not provide any additional details about this event other than it took place in a facility other than Bantum. *Id.* The Second Circuit has held that "excessively hot or cold conditions may be a constitutional violation." *Wingate v. Robert N. Davoren Ctr.*, No. 12 Civ. 5521 (ALC), 2013 WL 4856573, at *3 (S.D.N.Y. Sept. 10, 2013); *see also Hathaway v. U.S. Att'y Gen.*, 491 Fed.Appx. 207, 208 (2d Cir. 2012) (holding that an Eighth Amendment claim could be established by allegations of imprisonment in a small cell "in which the temperature exceeded 110 degrees" for a significant amount of time); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (holding that an Eighth Amendment claim could be established by proof that an "inmate was subjected for a prolonged period to bitter cold"). But "district courts in this [Second] Circuit have also found allegations of exposure to extreme temperatures for short periods of time are insufficient to state an Eighth or Fourteenth Amendment claim." *Id.* Without offering any details to substantiate the extent of the alleged confinement in extreme temperatures, Plaintiff's bare allegations do not sufficiently demonstrate that the conditions he was exposed to constitute the substantial risk of serious harm necessary to satisfy the objective element of an Eighth Amendment violation. *Pack v. Artuz*, 348 F.Supp.2d 63, 73 (S.D.N.Y. 2004); *see also Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Because Plaintiff has failed to satisfy the objective component of an Eighth Amendment claim with respect to each of

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 128 of 217

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

his grievances, the Court declines to pass judgment on the subjective component. *See Martinez v. Schriro*, No. 14 Civ. 3965 (KMW), 2017 WL 87049, at *5 (S.D.N.Y. Jan. 9, 2017) (dismissing plaintiff's Eighth Amendment claim solely based on the plaintiff's failure to plead the objective element in his pleadings without analyzing the subjective element).

### D. Due Process Claim

Plaintiff alleges that he was not afforded due process when he was placed in ESH without prior notification or hearing. Because Plaintiff has failed to adequately claim that the City deprived him of a constitutionally protected interest, his Due Process Claim fails. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property.... A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). In evaluating a procedural due process claim, the court must determine (1) whether a plaintiff was deprived of a constitutionally protected interest by government action, and, only after finding the deprivation of a protected interest, (2) whether the State's procedures in depriving that interest comported with due process. *See Wilkinson*, 545 U.S. at 221, 125 S.Ct. 2384 ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest[.]"); *see also Vogelfang v. Capra*, 889 F.Supp.2d 489, 510 (S.D.N.Y. 2012) ("In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution.") (quoting *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001)). Here, Defendants contend that Plaintiff's constitutionally protected interests were not violated and, alternatively, even if they were, Plaintiff failed to allege that he was denied any of the process afforded by Rules of the City of New York ("R.C.N.Y."), Board of Correction title 40, § 1-16. Reply Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs.' Reply") (Doc. 43), at 9.

**\*9** The New York City Board of Correction adopted rules creating Enhanced Supervision Housing and the procedure under which an inmate may be transferred to ESH. *See* 40 R.C.N.Y. § 1-16. The objective of ESH "is to protect the safety and security of inmates and facilities ... ESH is designed to

separate from the general population those inmates who pose the greatest threat to the safety and security of staff and other inmates." *Id.* § 1-16(a). An inmate is eligible for ESH only upon a finding that:

> (1) the inmate has been identified as a leader of a gang and has demonstrated active involvement in the organization or perpetration of violent or dangerous gang-related activity; (2) the inmate has demonstrated active involvement as an organizer or perpetrator of a gang-related assault; (3) the inmate has committed a slashing or stabbing, has committed repeated assaults, has seriously injured another inmate, visitor, or employee, or has rioted or actively participated in inmate disturbances while in Department custody or otherwise incarcerated; (4) the inmate has been found in possession of a scalpel or a weapon that poses a level of danger similar to or greater than that of a scalpel while in Department custody or otherwise incarcerated; (5) the inmate has engaged in serious or persistent violence; or (6) the inmate, while in Department custody or otherwise incarcerated, has engaged in repeated activity or behavior of a gravity and degree of danger similar to the acts described in paragraphs (1) through (5) of this subdivision, and such activity or behavior has a direct, identifiable and adverse impact on the safety and security of the facility, such as repeated acts of arson....

*Id.* § 1-16(b)(1)–(6). The regulation also provides that "to the extent the Department imposes restrictions on an ESH inmate that deviate from those imposed on inmates in the general population, such restraints must be limited to those required to address the specific safety and security threat posed by that individual inmate." *Id.* § 1-16(d)(1).

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

Procedurally, once an inmate is determined to be eligible for ESH, that inmate must be given written notice of that determination within 24 hours of placement in ESH. *Id.* § 1-16(f)(1). The notice shall contain, *inter alia*, the grounds relied on to support the inmate's placement in ESH and information on the inmate's right to review the evidence relied upon by the Department. *Id.* § 1-16(f)(1)(i)–(iv). An inmate has the right to appear in person at the initial hearing to adjudicate his placement in ESH where the inmate can "submit a written statement, call witnesses and present evidence." *Id.* § 1-16(f)(iv), (g)(1), (g)(4). The inmate's placement in ESH is also to be periodically reviewed every 45 days "to determine whether an inmate continues to present a significant threat to the safety and security of the facility." *Id.* § 1-16(h)(1).

To determine "[w]hether an inmate has a protected liberty interest in avoiding a particular kind of confinement depends on both 'the duration and conditions of confinement.'" *Hamilton v. Deputy Warden*, No. 15 Civ. 4031 (KBF), 2016 WL 6068196, at *6 (S.D.N.Y. Oct. 13, 2016). An alleged deprivation will not be enough to support a claim for violation of a plaintiff's due process rights "if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration." *Welch v. Bartlett*, 196 F.3d 389, 394 (2d Cir. 1999). "The appropriate comparison is between 'the actual conditions of the challenged confinement compared with ordinary prison conditions.'" *Hamilton*, 2016 WL 6068196, at *10 (quoting *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997)). "Especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). To establish a liberty interest, "a district court should consider the entire 'sustained period of confinement.'" *Fludd v. Fischer*, 568 Fed.Appx. 70, 73 (2d Cir. 2014) (quoting *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001)). For a plaintiff confined "for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

 **\*10**  Here, Plaintiff alleges that he spent approximately 8 months in ESH (or 243 days). Opp. Mem. at 5. While this amount is clearly a confinement of "intermediate duration," Plaintiff has failed to allege that similar deprivations are not typically endured by ordinary prisoners. Instead, Plaintiff

seeks to compare the conditions in ESH to the conditions in punitive segregation. Punitive segregation addresses offenses committed during an inmate's incarceration. 40 R.C.N.Y. § 1-17(a). Therefore, conditions in punitive segregation do not reflect typical conditions for ordinary prisoners. Other than allegations of 24 hour locked-in periods, Plaintiff has failed to provide additional facts that contrast the conditions of confinement in ESH and ordinary prison conditions. Absent additional facts highlighting the differences in conditions of confinement in ESH and ordinary prison conditions, the Court cannot conclude that placement in ESH creates a protectable state liberty interest.

### E. *Monell* Liability

Although a municipality cannot be held liable under Section 1983 solely on a theory of *respondeat superior*, a Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice or custom. *Monell*, 436 U.S. at 690–92, 98 S.Ct. 2018. The Second Circuit has established a two prong test for Section 1983 claims brought against a municipality. First, the plaintiff must prove "the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official]." *Johnson v. City of New York*, No. 06 Civ. 9426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

To satisfy the first prong of the municipal liability test, a plaintiff must allege the existence of at least one of the following elements: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation; (3) a practice so consistent and widespread that constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York*, 705 F.Supp.2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted).

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 130 of 217

Santana v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633563

While the Court has previously found that Plaintiff has failed to adequately plead a violation of his underlying constitutional rights, even if the Court had found a violation, the Court finds that Plaintiff has failed to meet any of the requisite elements to satisfy the first prong of a municipal liability claim. Plaintiff submits no allegations to indicate the existence of either a formally recognized policy or a consistent and widespread practice adopted by the City. Further, Plaintiff neither alleges that the Bantum prison officials have policymaking authority nor claims that the City failed to train and supervise its employees. Liberally construing the pleadings, Plaintiff seems to allege the existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Without offering any factual support for his conclusory allegations, this Court cannot "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Therefore, Plaintiff's claims against the City must be dismissed on this basis as well.

### F. Injunctive Relief

**\*11** Plaintiff seeks injunctive relief in the form of a transfer from ESH. Compl. at 5. But it appears that Plaintiff has been released from Bantum. Doc. 22. Since Plaintiff lacks "a legally cognizable interest in the outcome" of the case for injunctive relief, his claim is rendered moot. *Muhammad v. City of N. Y. Dep't of Corr.*, 126 F.3d 119, 122 (2d Cir. 1997); *see also Khalil v. Laird*, 353 Fed.Appx. 620, 621 (2d Cir. 2009) (holding a Plaintiff's injunctive relief claim moot because when "[Plaintiff] was released from prison [while the action was pending] he no longer had a continuing person stake in the outcome of this action") (internal quotations omitted) (quoting *Muhammad*, 126 F.3d at 122).

### G. Leave to Amend

Defendants request that the Court deny Plaintiff any leave to amend his Complaint. Defs.' Reply at 5. They argue that Plaintiff's request for leave to amend is made in bad faith, would be futile for failure to state a claim, and would be unduly prejudicial to them "due to Plaintiff's inexcusable two-

year delay in seeking such leave." *Id.* As a general rule, leave to amend a complaint should be freely granted. *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002). District courts have broad discretion in deciding whether to grant leave to amend. *Pasternack v. Laboratory Corp. of Am.*, 892 F.Supp.2d 540, 548–49 (S.D.N.Y. 2012). It is advisable that "when addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson*, 284 F.3d at 416 (quoting *Branum v. Clark*, 927 F.2d 689, 705 (2d Cir. 1991)) (internal quotation marks omitted). A court should allow leave to amend a pleading unless the non-moving party can establish prejudice or bad faith. *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Denying leave to amend is proper where the amendment would be futile, would result in undue prejudice to the opposing party, or would be made in bad faith. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. County of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999).

Defendants emphasize that the fact that Plaintiff is seeking leave to amend two years after filing of this suit but "mere delay ..., absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Block*, 988 F.2d at 350 (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)) (internal quotations omitted). Defendants' conclusory statement that granting Plaintiff leave to amend would be unduly prejudicial for them is not enough to sustain their "burden of establishing that an amendment would be prejudicial." *Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 589 (E.D.N.Y. 1994). Neither do Defendants' conclusory statements that Plaintiff's request for leave to amend is made in bad faith and would be futile for failure to state a claim.

Given that this would be Plaintiff's first time in amending and the possibility that this leave would allow Plaintiff to assert additional facts to fully state his claims, the Court cannot conclude that amendment would be futile. Therefore, Plaintiff's Complaint will be dismissed without prejudice. The Court directs Plaintiff to submit an amended complaint, if at all, by no later than April 27, 2018. If Plaintiff wishes to continue to assert claims against the individual Defendants named in the initial Complaint, he must add additional

2018 WL 1633563

facts that allege personal involvement of the Defendants in depriving him of his rights. Plaintiff may also seek to add an excessive force claim, and all facts relevant to that claim including, but not limited to, the date and location of the alleged assault, the individuals involved, the injuries sustained, and the officers of whom Plaintiff requested medical assistance. Plaintiff is instructed to only include additional Defendants that are alleged to have had personal involvement in these new claims.

## V. CONCLUSION

**\*12**  For the reasons set forth above, the City's motion to dismiss Plaintiff's Complaint is GRANTED. Plaintiff must file his Amended Complaint, if at all, by April 27, 2018. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 30, and mail a copy of this Opinion and Order to Plaintiff.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1633563

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

2017 WL 7048912
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

John William DOSIAK III, Bennett Dosiak, Bennett
A. Dosiak, Lisa Dosiak and Edda Dosiak, Plaintiffs,

v.

TOWN OF BROOKHAVEN, Defendant.

Civil Action No. 16-6658
|
Signed 11/27/2017

**Attorneys and Law Firms**

For Plaintiffs: Frederick P. Stern, PC, 2163 Sunrise Highway,
Islip, NY 11751, Frederick P. Stern, Esq., Richard I. Scheyer,
Esq.

For Defendant: Rosenberg Calica & Birney LLP, 100 Garden
City Plaza, Suite 408, Garden City, New York 11530, Robert
M. Calica, Esq., Judah Serfaty, Esq.

**MEMORANDUM & ORDER**

Denis R. Hurley, United States District Judge

***1** Plaintiffs John William Dosiak III ("JWD"), Bennett
Dosiak ("BD"), Bennett A. Dosiak ("BAD"), Lisa Dosiak
("LD") and Edda Dosiak ("ED") (collectively "Plaintiffs" or
"Dosiaks") commenced this action pursuant to 28 U.S.C. §
1983 alleging defendant Town of Brookhaven ("Brookhaven"
or "Town") violated their constitutional rights. Presently
before the Court is Brookhaven's motion to dismiss pursuant
to Fed. R. Civ. P. 12(b)(1) and (6). For the reasons set forth
below, the motion is granted.

**BACKGROUND**

The following allegations are taken from the Complaint.

Plaintiffs own approximately 200 acres of farmland in
Manorville ("the Farm"). The Farm consists of, among other
lots, parcels identified as Lots 7 (owned by JWD, BD, and
BAD), 13.4 (owned by LD and JWD), 2 (owned by JWD and
ED), and 6 (owned by JWD and BD). Portions of the Farm are

leased to third parties, although a substantial part is cultivated
as farmland. (Comp. ¶¶ 9-14.)

In January 2016, lot 6 (which is vacant land) was leased to JD
Trucking Material, Inc. ("JD Material"); almost immediately
thereafter the Town began to harass JD Material by issuing
tickets and stop work orders based on allegation that JD
Material was operating a solid waste facility. In April 2016,
JD Materials relocated to Lot 7, which is zoned agricultural,
but the Town continued to harass JD Material. (Comp. ¶¶
15-18.)

In February 2016, the Dosiaks filed an application to build
two barns on Lot 13.4, which is part of the Farm used as
farmland; the plans were approved in February 2016 and a
building permit issued in March 2016. The barns were to be
constructed along an "earth road" which provides access to
Lot 13.4 from Wading River Road, located approximately
750 feet away. In April 2016 prefabricated materials for the
barns were delivered to Lot 13.4 along with "enough recycled
concrete aggregate ('RCA') to pave a portion of the 'earth
road' and put a base down for the foundation on which the two
barn structures were to be constructed." (Comp. ¶¶ 19-22.)

Code Violations

On April 19, 2016 "a representative of the Town, Sr.
Investigator Brian Tohill," issued two appearance tickets
alleging violations of sections 45-10F (prohibiting private
disposal areas) and 85-405A (Residence 2 District permitted
uses) of the Town Code. "[N]o supplemental information
has been provided by the Town to any of the Plaintiffs to
explain the allegations upon which these alleged violations
are based." (Compl. ¶¶ 23-25.) "Of the five [ 1 ] violations
which have been issued against Plaintiffs, none of them has
resulted in a conviction nor has either [sic] the Town been
ready to proceed to prosecute on any of these charges." (*Id.*
¶ 38.)

1        The Court notes that paragraph 23 of the Complaint
         references the issuance of only two code violation
         while paragraph 38 refers to 5.

The Supreme Court Action

On April 26, 2016 the Town commenced an action in
the Supreme Court, Suffolk County ("the Supreme Court
Action"), "alleging violations of [the above referenced] and
other Code sections all based upon the erroneous claims that
these portions of the Dosiak Farm are being used as a 'solid

2017 WL 7048912

waste management facility.' " It is alleged that the operations being conducted by JD Material do not rise to the level of a "solid waste management facility under either the Code" or "the Environmental Code Law § 27-0704(4)." (Compl. ¶¶ 26-27.) "As part of its scheme to further harass JD Material," [2] an Order to Show Cause was filed by the Town seeking a preliminary injunction enjoining and restraining JWD, BD and JD Material, their agents, and persons acting in concert with them from:

**\*2** a. Importing, dumping and spreading any further fill material, recycled concrete aggregate ("RCA"), construction and demolition debris ("C&D"), and any other imported earth, dirt, fill, gravel, and material to the additional farm property owned by B. Dosiak, and operated by J. Dosiak and B. Dosiak located at the Northeast and Northwest corners of Wading River Road and the Long Island Expressway known as "Dosiak Gardens", and as more fully described in the attached submissions (the "North Dosiak Farm") which is located in the Pine Barrens Core Preservation Area;

b. Maintaining a non-permitted and illegal Solid Waste facility on the North Dosiak Farm and from further "dumping" and spreading of solid waste at such properties; and

c. Granting a mandatory injunction requiring defendants to remove thousands of cubic yards of unidentified imported solid waste, RCA, C&D material, imported dirt, earth and other imported materials from such North Dosiak Farm" and other relief.

(*Id.* ¶ 28.) The Supreme Court, "without a hearing," granted a temporary restraining order " 'pending the hearing of this motion and further Order of this Court' enjoining and restraining 'any further importation to, or spreading on the aforesaid properties any further fill material, RCA, earth, dirt and other material.' " (*Id.* ¶ 29.) The temporary restraining order prevents the construction of the barns for which the Town had issued the permit referenced above as the spreading of RCA for substrate is required for the concrete base of the barns, which barns are necessary for the continued operation of the Farm. (Id. ¶¶ 30, 31.)

[2]     Plaintiffs have disavowed bringing any cause of action on behalf of JD Material. (*See* Pls.' Mem. in Opp. at 14.)

The Town brought an application by Order to Show Cause on May 5, 2016 to modify/enlarge the temporary restraining order to include Lot 7. On the return date, "Plaintiffs" appeared and requested a hearing on the request for a preliminary injunction and the continued imposition of the temporary restraining order. They were advised to provide notice to the Town that the hearing would be held the following day. When they appeared the following day, they were advised that no hearing would be held and that a decision would be rendered at some future date. As of the filing of the complaint, no decision has been rendered "despite the passage of more than seven months since the original temporary restraining order was issued." (Comp. ¶¶ 33-36.)

Causes of Action

Plaintiffs' first cause of action alleges a violation of the equal protection clause of the Fourteenth Amendment. The following additional allegations are asserted in support thereof. They are being treated differently from "residents of the Town who have been issued building permits and have not had their construction projects interfered with" and "the other property owners who operate on the neighboring lands." Further "none of the other residents of the Town have been subjected to repeated harassment by the Town and/or its agents" or "been issued Stop Work Orders while they are in full compliance with the lawfully issued building permits." Finally, the Town "singled the Plaintiffs out for enforcement proceedings which are pending and/or under investigation" as a result of "personal animus toward non party JD Material and the Plaintiffs herein" and "for the sole purpose of preventing Plaintiffs from acquiring any use in their property, causing extreme economic hardship to Plaintiff [sic]." (Compl. ¶¶ 42-46, 49-51.)

The second cause of action asserts a violation of the Fourteenth Amendment's Due Process Clause. According to the Complaint, Defendant "acting as a matter of official Town or State policy" deprived "Plaintiffs of their property without an opportunity to be heard" by unilaterally issuing the Stop Work Orders;" by "issu[ing] Stop Work Orders and criminal charges [although] there has never been a trial adjudicating any of the Plaintiffs," and by not setting forth "any credible or substantial evidence that any violations have been committed," and have "damaged Plaintiffs' reputations in the community where they live and conduct their business." (Compl. ¶¶ 62-67.)

**\*3** The third cause of action alleges a violation of "Plaintiff's [sic] Civil Rights Pursuant to Section 1983" with "[t]he

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 134 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

full composite of Defendant's conduct includ[ing] but ... not limited to issuing violations, issuing stop work orders, obtaining a temporary restraining order which prevents Plaintiffs from constructing the structures authorized by a validly issued building permit and, thereby, essentially confiscating Plaintiff's [sic] properties, all of which markedly treat Plaintiffs differently than other residents in the immediate area who conduct similar operations."(Compl. ¶ 78.)

The fifth [3] cause of action alleges that the "full composite of Defendant's conduct has so slandered, encumbered, and debilitated Plaintiffs' property rendering it a taking" violating the Fifth Amendment.

[3]        The fourth cause of action seeks attorneys' fees pursuant to 42 U.S.C. § 1988.

The sixth cause of action asserts a violation of substantive due process in that the Town "undermined the Plaintiffs use of the real property and prevented their lawful use all without a hearing or opportunity to be heard" and "has no evidence that the Plaintiffs were operating, or knew of the operation of, a 'solid waste management facility' in violation of any lawfully issued certificate of occupancy of the real properties which the Town has restrained." (Compl. ¶¶ 87-88.)

The seventh and final cause of action asserts a violation of Plaintiffs' right to petition the Courts for redress in that as a result of the state court action and restraining order the Town "has actually seized and confiscated their property" and are "punishing Plaintiffs for exercising their Constitutionally protected rights to obtain permits, to petition the Court, and to have Hearings on administrative Stop Work Orders," which actions have deprived Plaintiffs of the use of their property "before there has been any official determination or adjudication by any Court of law." (Compl. ¶¶ 91-93.)

Additional Materials Submitted by Defendant
Attached to the Town's motion are the following materials: (1) the (original) Order to Show Cause with temporary restraining order issued on April 26, 2016 in the Supreme Court Action and the papers on which it was based (Eaderesto Declar. at Ex. B); (2) the Order to Show Cause issued in May 2016 in the Supreme Court Action (seeking modification/ enlargement of the temporary restraining order issued on April 26, 2016) and the papers on which it was based (id. at Ex. C); (3) a transcript of hearing held on May 4, 2016 in the Supreme Court Action (id. at Ex. D); (4) an affidavit

of counsel for JWD, BD and JD Materials, dated June 9, 2016, submitted "in opposition to the Pending Orders to Show Cause" and "to request an immediate hearing regarding the granting of a permanent injunction to the Town" (id. at Ex. E); (5) a reply affirmation of counsel for the Town, dated June 13, 2016, submitted in further support of the "two pending motions for preliminary injunctions" in the Supreme Court Action (id. at Ex. F); (6) an order of the Appellate Division, Second Department, dated October 25, 2016, denying a motion by the defendants in the Supreme Court action for "leave to appeal from the two orders to show cause" issued in the Supreme Court Action and denying "as academic" that portion of their application to stay enforcement of the temporary restraining orders contained in the orders to show cause, pending hearing and determination of the appeals (id. at Ex. G); (7) a decision, dated December 22, 2016, issued in the Supreme Court Action granting the Town's application for a preliminary injunction (id. at Ex. H) [4]; (8) sections of the Brookhaven Town Code (id. at Ex. I). Reference to the contents of these documents will be made as appropriate.

[4]        The Court takes judicial notice of the fact that the Plaintiffs herein filed a notice of appeal from the preliminary injunction order entered in the Supreme Court Action. See https://iapps.courts.state.ny.us/ webcivil/FCASeFiledDocsDetail? county_code=8IyhIV_PLUS_9PSFtX87g2d6u9g %                                3D% 3D&txtIndexNo=zLfoWrwmKSNHzu6930SM6A %                                3D% 3D&showMenu=no&isPreRji=N&civilCase=sJ0Mi7c36cj1xUdrTy % 3D% 3D at Document 20.

## DISCUSSION

### I. Legal Standards

#### A. Rule 12(b)(1) Motion
**\*4**  A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.' " *MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp.

**Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)**

2017 WL 7048912

2d 133, 136 (E.D.N.Y. 2006) (quoting *Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F. App'x 61 (2d Cir. 2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010). "In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions." *Cunningham v. Bank of New York Mellon, N.A.*, 2015 WL 4101839, * 1 (E.D.N.Y. July 8, 2015) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

A motion to dismiss based on the *Rooker-Feldman* [5] doctrine addresses subject matter jurisdiction and therefore is considered pursuant to Fed. R. Civ. P. 12(b)(1). *See Redmond v. Bank of New York Mellon, Corp.*, 697 Fed. App'x 23, 24 (2d Cir. 2017) (citing *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 426 (2d Cir. 2014)); *MacPherson v. Town of Southampton*, 738 F. Supp.2d 353 (E.D.N.Y. 2010). Similarly, a motion to dismiss based the abstention doctrine is considered pursuant to Fed. R. Civ. P. 12(b)(1). *U.S. v. Blake*, 942 F. Supp.2d 285, 292 (E.D.N.Y. 2013); *City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp.2d 332 (E.D.N.Y. 2008).

[5]    The doctrine evolved from the Supreme Court decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

### B. Rule 12(b)(6) Motion

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

 **\*5**  In making its determination, the Court is confined to "the allegations contained within the four corners of [the] complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998). However, this has been interpreted to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily relies, and anything of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

## II. Summary of Defendant's Contentions

Defendant raises the following arguments in support of its motion to dismiss (1) "[b]ecause the entire complaint attempts to challenge and collaterally attack the TROs, it must be dismissed for lack of subject matter jurisdiction pursuant to the *Rooker/Feldman* doctrine;" (2) the Court should abstain from hearing this action pursuant to the *Younger* and/or *Colorado River* abstention doctrines; (3) the complaint fails to state a *Monell* claim; and (4) each of Plaintiffs' claims otherwise fail to state a claim.

## III. The *Rooker-Feldman* Doctrine

The Supreme Court decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court*

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

*of Appeals v. Feldman*, 460 U.S. 462 (1983), taken together, establish the principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments. *See Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). The Supreme Court has explained that *Rooker–Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting the district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).

In this Circuit, courts must make four determinations before applying the doctrine. *See Hoblock*, 422 F.3d at 84. First, the federal court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced." *Id.* at 85. The first and fourth requirements are procedural, whereas the second and third are substantive. *Id.* If all four requirements are met, federal subject matter jurisdiction is barred by *Rooker–Feldman*.

With respect to the first factor, Plaintiffs contend that *Rooker-Feldman* does not apply because "[w]hile the State Court orders were issued in favor of the Town and against some of the Plaintiffs herein, those Orders do not encompass Lot 13.4 ...." (Pls.' Mem. at 10.) Similarly, they argue that the fourth factor cannot be met as "there is no Order affecting Lot 13.4." (*Id.* at p. 11.) However, as Defendant aptly points out:

> The State Court Action specifically concerns illegal activities on Lot 13.4 and the other Lots "[u]nder the guise and pretext of constructing only lawful barn structures," of which Lot 13.4 is repeatedly and specifically identified in the Town's Complaint and simultaneously filed Order to Show Cause application therein as being the 24 acre lot whose mailing address is 191 South Street, Manorville, NY. *See* [Eaderesto Declar. at] Exhibit B, First Order to Show Cause and TRO, with Town's Complaint attached, PDF pp. 22, 28, 71, 36-37, 69, & Exhibit H, Preliminary Injunction Order, PDF pp. 261, 263. Moreover, Plaintiffs' own Complaint herein specifically admits that the Town's State Court Action concerns all four of the Lots, including specifically Lot 13.4 and that the first "temporary restraining order prevents the construction of the lawfully permitted barns"... and has "halted" that construction (Compl. ¶¶ 23-26, 30).

**\*6** Def.'s Reply at 4-5 (footnote omitted).

While the applicability of the Orders to Lot 13.4 appears satisfied, that some of the plaintiffs herein are not named as a party to the Supreme Court Action precludes satisfaction of the first prong as to those plaintiffs (i.e., BAD, LD, and ED). The Supreme Court has emphasized that the *Rooker-Feldman* is a "narrow" doctrine and has cautioned against "erroneously conflating [it with] preclusion law." *Lance v. Dennis*, 546 U.S. 459, 464, 466 (2006). It "does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Id.*; *accord Worthy-Pugh v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 2944535, * 6 (D. Conn. Jan. 29, 2016), *aff'd*, 664 Fed. App'x 20 (2d Cir. 2016) (*Rooker-Feldman* does not require dismissal of claims of federal plaintiff who was "married co-habitant" with the state court debtor and co-plaintiff, even though "their legal interest in the funds is identical and they are in privity.") While the *Lance* Court left open the possibility that there are limited circumstances in which the doctrine may be applied against a party not named in the state proceeding, this case does not appear to fall within the single example given of such a circumstance, i.e. "[w]here an estate takes a de facto appeal in a district court of an earlier state decision involving the decedent." *Id.* at n.2. As the first element has not been satisfied as to plaintiffs BAD, LD, and ED, the motion to dismiss pursuant to *Rooker-Feldman* is denied as to them. The Court will proceed to address the remaining elements as to plaintiffs JWD and BD.

Plaintiffs do not dispute that the second element has been met. *See* Pls.' Opp. Mem at 10 ("Here, while Plaintiffs complain of injuries caused by the State Court TRO ..."). Indeed, as the complaint specifically alleges that the Order issued in the Supreme Court Action "prevents the construction of the lawfully permitted barns ... effectively halting any further construction of the barns" (Compl. ¶ 30), the second element has been met.

Plaintiff maintains, however, that the third element has not been met citing the "Wherefore Clause" of their complaint in which they seek "ordering the Defendant to remove the administrative Stop Work Orders and allow Plaintiff [sic] to continue to construct the barns which are the validly issued building permit" and "enjoining Defendant from taking any action against the Plaintiffs without a determination by the Court as to guilt or innocence of any of the allegations made." (Pls.' Opp. Mem at 10.) The Court is underwhelmed

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)
Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 137 of 217
2017 WL 7048912

by this argument. Notwithstanding clever pleading, Plaintiffs seek to have this Court allow them to continue to construct the barns and thus are challenging the Orders of the court in the Supreme Court Action which they allege prevents that construction. Their complaint specifically claims that the "temporary restraining order prevents the construction of the lawfully permitted barns ... as the barns require a concrete base and without the spreading of the RCA on the property as a substrate, the concrete base cannot be installed, effectively halting any further construction of the barns." Further, the affidavit submitted by the Town in support of the first Order to Show Cause states that "[u]nder the guise and pretext of constructing only lawful barn structures ostensibly incidental to farming and for which only limited and incidental leveling is permitted, defendants have instead imported ten of thousands of cubic yards of fill, recycled concrete aggregate, and material containing currently unknown contaminants to create unlawful grades and roadways (without approved grading, drainage, or site plans) causing runoff of contaminants onto adjoining operating farms, and contaminating crops and groundwater, all in violation of applicable Town Codes and Environmental Conservation Law prohibitions." (Eaderesto Declar. Ex. B at ¶ 7 (DE 11-2 at p. 26).) The lifting of the stop work orders would not permit construction of the barns, because their construction would continue to be subject to the Orders in the Supreme Court Action. Thus, the relief sought invites review and rejection of the preliminary injunction Order entered in the Supreme Court Action. *See, e.g., Salten v. United States,* 2014 WL 5682804, *4 (E.D.N.Y. 2014) (citing cases).

**\*7** There is no dispute that the Orders in the Supreme Court Action were entered before the commencement of the instant action and therefore the fourth factor has been met.

Defendant's motion to dismiss on the basis of *Rooker-Feldman* is granted as to plaintiffs JWD and BD.

## IV. Abstention

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River,* 424 U.S. 800, 813 (1976). The Second Circuit has characterized the abstention doctrine as "compris[ing] a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction." *Woodford v. Community Action Agency of Green County, Inc.,* 239 F.3d 517, 522 (2d Cir. 2001) (internal quotation marks omitted).

### A. *Younger* Abstention

The Supreme Court has recognized that in certain instance "the prospect of undue interference with state proceedings counsels against federal relief." *Sprint Commc'ns, Inc. v. Jacobs,* ––– U.S. –––, 134 S. Ct. 584, 588 (2013). "*Younger* [*v. Harris,* 401 U.S. 37 (1971) ] exemplifies one class of cases in which federal-court abstention is required.... Circumstances fitting with the *Younger* doctrine ... include ... state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state court's ability to perform their judicial functions." *Id.* (internal quotation marks omitted).

To the extent Plaintiffs claims involve the ongoing criminal proceedings, *Younger* abstention is warranted. *Washington v. County of Rockland,* 373 F.3d 310, 318 (2d Cir. 2004) (Sotomayor, J.) ("Under *Younger*, federal courts, in the interest of comity, must abstain from enjoining pending state court criminal prosecutions and allow state courts to resolve pending matters within their jurisdiction.") Further, Plaintiffs' claim here clearly implicate both civil enforcement proceedings and New York State's interest in enforcing the orders and judgments of its courts. Nor does the bad faith exception to Younger apply. As the Second Circuit recently stated:

A court may refuse to abstain when "a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." *Cullen v. Fliegner,* 18 F.3d 96, 103–04 (2d Cir. 1994). But "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Diamond "D" [Constr. Corp. v. McGowan,]* 282 F.3d 191, 199 [ (2d Cir. 2002) ]. The plaintiff must therefore show subjective bad faith on the part of the defendants. *Id.* at 199–200. The plaintiff must demonstrate that the party bringing the state action has "no reasonable expectation of obtaining a favorable outcome." *Id.* at 199 (quoting *Cullen,* 18 F.3d at 103.)

*Schorr v. DoPico,* 686 Fed. App'x 34, 36 (2d Cir. 2017). Given that Defendant was able to successfully obtain a Temporary Restraining Order and Preliminary Injunction, Plaintiffs cannot demonstrate that the Town has no reasonable expectation of obtaining a favorable outcome.

2017 WL 7048912

**\*8** *Younger* abstention is therefore appropriate. To the extent Plaintiffs seek injunctive relief, their claims are dismissed; the claims for monetary relief are stayed. *See Quackenbush v. Allstate Ins.*, 517 U.S. 706, 730-31 (1996.)

**B. *Colorado River* Abstention** [6]

[6]    The Court notes that Plaintiffs' Memorandum in Opposition does not address whether *Colorado River* abstention is appropriate.

Alternatively, for the following reason, *Colorado River* abstention is also appropriate. In *Colorado River* the Supreme Court announced that "while the [general] rule is that the pendency of an action in the state court is no bar to proceedings concerning the matter in the Federal court having jurisdiction" a court may abstain in order to conserve federal judicial resources where resolution of the state matter may result in "comprehensive disposition of the litigation." *Colorado River*, 424 U.S. at 817; *see Woodford*, 239 F.3d at 522.

The *Colorado River* abstention analysis begins with a determination of whether the concurrent proceedings are parallel; parallelism is a "necessary prerequisite." *Smulley v. Mutual of Omaha Bank*, 634 Fed. App'x 335, 337 (2d Cir. 2016) (citing *Dittmer v. County of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998)). If the proceeding are parallel, then the following six factors should be considered:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less convenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Woodford*, 239 F.3d at 522 (internal citations omitted). "No one factor is necessarily determinative.... Only the clearest of justifications will warrant dismissal." *Moses H. Cone*

*Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 15–16 (1983) (quoting *Colorado River*, 424 U.S. at 818-19) (emphasis in *Moses H. Cone* omitted). "Where a *Colorado River* factor is facially neutral, that is a basis for retaining jurisdiction, not for yielding it." *Niagara Mohawk Power Corp v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 101 (2d Cir. 2012) (internal quotation marks omitted).

"Actions are 'parallel when substantially the same parties are contemporaneously litigating the same issue in another forum.' " *Smulley*, 634 Fed. App'x 335, 337 (2d Cir. 2016) (quoting *Niagara Mohawk*, 673 F.3d at 100); *see Dittmer v. County of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998) ("Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum") (internal quotation marks omitted); *Blake*, 942 F. Supp.2d at 293 ("Cases are considered parallel when the main issue in the case is the subject of already pending litigation.") (internal quotation marks omitted). "Perfect symmetry of parties and issues is not required." *United States v. Blake*, 942 F. Supp.2d 285, 297 (E.D.N.Y. 2013) (citations omitted). Abstention may be appropriate "notwithstanding the nonidentity of the parties" in cases where interests are "congruent." *Canaday v. Koch*, 608 F. Supp. 1460, 1475 (S.D.N.Y.), *aff'd*, 768 F.2d 501 (2d Cir. 1985).

**\*9** This action is parallel with the State Court Action and the code enforcement proceedings as all revolve around the same core issues and involve "substantially" the same parties. That some of the plaintiffs herein are not a named party to the matters pending in the state courts does not preclude the actions being parallel given the congruency of their interests with those plaintiffs named in those proceedings.

Having determined that the two actions are parallel, the Court will address the six-part balancing test.

Jurisdiction over the res may be "dispositive" in a *Colorado River* analysis. *See FDIC v. Four Star Holding Co.*, 178 F.3d 97, 102 (2d Cir. 1999) (citing *40235 Washington St. Corp. v. Lusardi*, 976 F.2d 587, 589 (9th Cir. 1992) (per curiam) (holding that in an action concerning the disposition of property, "the first prong of the Colorado River abstention test is dispositive ... [and] the forum first assuming custody of the property at issue has exclusive jurisdiction to proceed")). Although neither the various state court proceedings or this action are proceedings "in rem" they do all involve the use of the same property—the Dosiak Farm and therefore the first factor favors abstention.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 139 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

The state court proceedings are pending in Suffolk County, which is just as convenient to the parties as this Court. Thus, this factor is neutral and favors retention of federal jurisdiction. *See Village of Westfield, NY. v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999).

Avoidance of piecemeal litigation is of paramount importance in a *Colorado River* analysis. *See Moses H. Cone*, 460 U.S. at 16 (stating that "the most important factor in our decision to approve the dismissal [in *Colorado River*] was the clear federal policy ... of avoidance of piecemeal adjudication.") (internal quotation marks and brackets omitted); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 211 (2d Cir. 1985) (noting that in the case before it, "the danger of piecemeal litigation is the paramount consideration"). This factor strongly favors abstention inasmuch as the state proceeding and this action revolve around the core issue of whether illegal materials are being stored and/or processed on the Farm.

The Supreme Court Action was commenced prior to the filing of the instant action. The relative commencement dates are not determinative; rather, the relative progress of the cases each in forum are to be considered. *Arkwright-Boston*, 762 F.2d at 211 (citing *Moses Cone*, 460 U.S. at 21-22). As the Supreme Court Action had already resulted in the issuance of a temporary restraining order and a preliminary injunction, its progress favors abstention.

The Complaint contains only federal law claims. The presence of federal claims normally weighs against abstention but only slightly where the claims are not within the exclusive jurisdiction of the federal courts. *See generally Niagara Mohawk*, 673 F.3d at 99 ("[T]he presence of a federal basis of jurisdiction may raise the level of justification needed for abstention....") (internal quotation marks omitted). Here, however, the federal claims will require the Court to apply and interpret Brookhaven Code provisions and DEC environmental regulations. Thus abstention is favored. *See General Reins. Corp. v. Ciba-Geigy Corp.*, 853 F.2d 78, 82 (2d Cir. 1988) (abstention favored "where the bulk of the litigation would necessarily revolve around the state-law ... rights of ... parties." (internal quotation marks omitted)).

**\*10** The last factor is whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone*, 460 U.S. at 28. To the extent Plaintiffs successfully defeat the State Court Action and the enforcement proceedings, they will have received relief that parallels the injunctive relief sought in this action. To the extent Plaintiffs seek damages, they may assert counterclaims in the State Court action for their recovery. Thus, this factor supports abstention.

Upon consideration of the *Colorado River* factors, the Court concludes that this case falls within the "exceptional circumstances" warranting abstention and thus a stay of any claims which may remain after resolution of Defendant's Rule 12(b)(6) motion. It is to that portion of Defendant's motion that the Court now turns.

## V. Failure to State a Claim

### A. *Monell*
In order to bring a § 1983 claim against a municipal defendant, a plaintiff must establish both a violation of his constitutional rights and that the violation was motivated by a municipal custom or policy. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *see Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir 2005) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (noting that "the mere invocation of the 'pattern' or 'plan' will not suffice") (citations omitted); *Middleton v. City of New York,* 2006 U.S. Dist. Lexis 44320 (E.D.N.Y. 2006) (allegations of a isolated incident of police misconduct will not suffice). A municipality cannot be held liable under Section 1983 on a respondeat superior theory. *Monell,* 436 U.S. at 691.

"To show a policy, custom, or practice, a plaintiff need not identify an express rule or regulation." *Patterson*, 375 F.3d at 226. "Rather, the existence of a municipal policy or custom may be plead in any of four ways. A plaintiff may allege "(1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials; or (4) a failure by policy makers to properly train or supervise their subordinates,

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 140 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

amounting to deliberate indifference to the rights of those who come in contact with municipal employees." *Calicchio v. Sachem Central Sch. Dist.*, 2015 WL 5944269, *10 (E.D.N.Y. Oct. 13, 2015) (citing *Giscombe v. New York City Dept. of Educ.*, 2013 WL 829127, * 7 (S.D.N.Y. Feb. 28, 2013); *accord Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 430 (S.D.N.Y. 2012); *Zambrano–Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011).

The Supreme Court has long recognized that "[i]f the decision to adopt [a] particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered.... Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 481–83 (citations and footnotes omitted). In other words, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (" 'policy' generally implies a course of action consciously chosen from among various alternatives.")).

**\*11** The complaint does not include any allegations to plausibly suggest *Monell* liability based on the existence of a formal policy or a widespread practice. *See, e.g., Vail v. City of New York*, 68 F. Supp.3d 412, 431 (S.D.N.Y. 2014). ("A municipal policy may be pronounced or tacit and reflected in either action or inaction, but either way Plaintiff must allege it with factual specificity, rather than by bare and conclusory statements.") (internal quotation marks omitted). Indeed, the complaint contains only a detailed account of plaintiffs' own experiences. *Cf. Schnauder v. Gibens*, 679 Fed. App'x 8 (2d Cir. 2017) (no de facto policy alleged where "apart from a detailed recounting of his own experiences, [plaintiff's] complaint contains only general conclusory allegations that there was a policy....") (internal quotation marks omitted); *Iacovangelo v. Correctional Med. Care, Inc.*, 624 Fed. App'x 10, 14 (2d Cir. 2015) (widespread practice not pled where

other than the plaintiff, the pleading provides only one additional example of a similar incident).

With respect to the code violations and stop work orders, the complaint is devoid of any reference to a failure by the Town to properly train or supervise the members of either the Building or Code Department, no less contain allegations suggesting that the lack of training or supervision amounted to deliberate indifference to the rights of those who come in contact with municipal employees. Similarly absent are allegations in the Complaint of actions taken or decisions made by municipal officials with final decision making authority over policy which caused the alleged violation of Plaintiffs' civil rights stemming from the issuance of appearance tickets for code violations and stop work orders. Indeed, Plaintiffs seem to concede as much in their opposition memorandum where they concede that they "are unable to determine what officials at the Town made the decision to deprive them of their constitutional rights...." Pls.' Opp. Mem. at 17.

The assertion in their Memorandum that "senior officials in the Building Department were not only aware of, but were personally involved in, carrying out the dictates of the Town" *id.*, does not cure this defect. Even if a statement in a memorandum of law could cure a defective pleading, which it does not, *see Taormina v. Thrifty Car Rental*, 2016 WL 7392214, *8 (S.D.N.Y. Dec. 21, 2016)*, this does not plausibly suggest that senior officials in the Building Department were the final municipal policy makers with regard to the matters alleged. *See Boonmalert v. City of New York*, 2017 WL 1378274, * 7 (S.D.N.Y. Apr. 12, 2017) (citing *Hurdle v. Bd. of Educ. of City of N.Y.*, 13 Fed. App'x 423, 427 (2d Cir. 2004)). In fact, it suggests just the opposite.

However, given the allegations in the complaint with respect to the Supreme Court Action, a *Monell* claim has been sufficiently pled. The Supreme Court Action was instituted in the name of the Town, with the Town Attorney herself submitting an affidavit in support of the application for relief, and thus it may reasonably be inferred that the Town Board authorized its initiation. Defendant's argument that no *Monell* claim is stated because it was not the driving force behind the alleged injury is premature at this juncture.

The motion to dismiss on the ground that a *Monell* claim has not been stated is denied.

**B. The Equal Protection Claim**

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 141 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

The mandate of the Fourteenth Amendment's Equal
Protection Clause is essentially to prohibit the government
from treating similarly situated individuals differently. *See
City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439
(1985). The Equal Protection Clause is typically invoked to
bring law suits claiming discrimination based on membership
in a protected class. Where, as here, there is no inherently
suspect class is at issue a plaintiff may assert an equal
protection claim under a class-of-one theory or a selective
enforcement theory. *Bizzarro v. Miranda*, 394 F.3d 82, 86, 89
(2d Cir. 2005).

 **\*12** A class-of-one claim arises when a plaintiff claims that
he was "intentionally treated differently from others similarly
situated and that there is no rational basis for the difference
in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562,
564 (2000).

> [T]o succeed on a class-of-one claim,
> a plaintiff must establish that: (i)
> no rational person could regard the
> circumstances of the plaintiff to
> differ from those of a comparator
> to a degree that would justify the
> differential treatment on the basis of
> a legitimate government policy; and
> (ii) the similarity in circumstances and
> difference in treatment are sufficient
> to exclude the possibility that the
> defendants acted on the basis of a
> mistake.

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140
(2d Cir. 2010) (internal quotations omitted).

A class-of-one plaintiff is "required to identify comparators
that are 'prima facie identical' in order to 'provide an
inference that the plaintiff was intentionally singled out for
reasons that so lack any reasonable nexus with a legitimate
governmental policy that an improper purpose ... is all but
certain.' " *Renato Pistolesi, Alltow, Inc. v. Calabrese*, 666 Fed.
App'x 55, 58, n.2 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*,
409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds
by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)); *cf. Ruston*,
610 F.3d at 59 (Class of one claims require "an extremely high
degree of similarity between [plaintiffs] and the persons to
whom they compare themselves.").

A selective enforcement claim requires that a plaintiff plead
that "(1) [he was] 'treated differently from other similarly
situated' [entities] and (2) this 'differential treatment was
based on impermissible considerations such as race, religion,
intent to inhibit or punish the exercise of constitutional rights,
or malicious or bad faith intent to injure a person.' " *Butler
v. City of Batavia*, 323 Fed. App'x 21, 22 (2d Cir. 2009)
(quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778,
790 (2d Cir. 2007)). Like a class of one claim, a selective
enforcement claim must allege the existence of similarly
situated comparators. *See id.*

Here, the complaint fails in that it does not identify
comparators that are prima facie identical and thus the Court
cannot say that it is "all but certain" that the Town's actions
were based on an improper purpose. The complaint only
generally refers to other property owners or tenants that were
issued building permits. As defendants succinctly state:

> It identifies no other property owners who themselves
> or their tenant maintained a stockpile of alleged "clean
> fill" or RCA and were treated differently. It identifies
> no comparators whose tenants was charged with illegally
> "operation a 'solid waste management facility.' " It
> identifies no other property owner who constructed or were
> allegedly preparing to construct a "road" without permits
> or who maintained a stockpile of used concrete based
> materials (the claimed RCA) for that alleged purpose at the
> same time their tenant was being prosecuted for operating
> a solid waste management facility by stockpiling used
> concrete and other unpermitted materials.

Def.'s Reply Mem. at 17-18 (citing Compl. ¶¶ 15, 16, 22). The
failure to identify even one comparator is fatal to the Equal
Protection claim. *See Clark v. Kitt*, 2014 WL 4054284, \*14
(S.D.N.Y. Aug. 15, 2014). Further, the conclusory allegation
that "the sole reason for Plaintiffs being singled out for
punishment is personal animus toward non party JD Material
and the Plaintiffs herein" (*see* Compl. ¶ 49) does not save the
selective enforcement claim as conclusory allegations are not
entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678.

 **\*13** The motion to dismiss the equal protection claim is
granted. [7]

[7]
> The dismissal includes not only the first cause of
> action, which is labeled as a violation of equal
> protection, but the third cause of action as well.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 142 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

The third cause of action is labeled "violation of Plaintiff's [sic] rights pursuant to Section 1983 of Title 42 of the U.S. Code" but does not specify the constitutional rights that was allegedly violated. Section 1983 is the enforcement mechanism for violations of constitutional rights by persons acting under color of state law and does not itself establish any rights. Given the allegations contained with respect to this "claim" it appears that Plaintiffs are reasserting an equal protection claim. *See, e.g.*, ¶ 78 (Alleging that the "full composite of Defendant's conduct" "markedly treat Plaintiffs differently than other residents in the immediate area who conduct similar operations.")

### C. Procedural Due Process

The Due Process Clause does not protect against all deprivations of constitutionally protected interests, rather it protects "only against deprivations without due process of law." *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S. Ct. 1908 (1981) (internal quotation marks omitted), *overruled in part on other grounds* by *Daniels v. Williams*, 474 U.S. 327, 330-331, 106 S. Ct. 662 (1986). "[I]t is necessary to ask what process the State has provided, and whether it was constitutionally adequate" in determining whether a constitutional violation has occurred. *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975 (1990).

"[I]n evaluating what process satisfies the Due Process Clause the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458 (2d Cir. 2006) (internal quotation marks omitted). A state will satisfy procedural due process requirements if it provides a meaningful post-deprivation remedy when the state conduct in question is "random and unauthorized." *Hellenic American Neighborhood Action Committee v. City of New York* ("*HANAC*"), 101 F.3d 877, 880 (2d Cir. 1996); *see Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194 (1984). If, however, "the deprivation is pursuant to established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing," *Rivera-Powell*, 470 F.3d at 465 (citing *HANAC*, 101 F.3d at 880; *Parratt*, 451 U.S. at 541) and therefore " 'the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process.' " *Id.* (quoting *HANAC*, 101 F.3d at 880).

In support of their procedural due process claim Plaintiffs argue:

> The Town was granted the TROs and the preliminary injunction in violation of CPLR § 6301 which requires that "a temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss, or damage will result unless the defendant is restrained before the hearing can be had. Here, in contrast, Plaintiffs received no hearing before the Town essentially revoked their building permit.

 **\*14**  (Pls.' Mem. in Opp. at 25.) Firstly, Plaintiffs do not cite to any authority that the "hearing" requirement in the CPLR requires a full blown evidentiary hearing, as opposed to an opportunity to be heard. But assuming such a requirement does exist, given the allegations that the TRO precludes Plaintiffs from constructing the barns, it was the court, not the Town, that failed to provide such a hearing and a remedy for such an omission exists in the form of an Article 78 proceeding which provides relief in the form previously obtained by, inter alia, a writ of mandamus. *See* N.Y. CPLR § 7801.[8] As the Town notes there is no claim that it "did not give Plaintiffs notice of its civil enforcement lawsuit or of its Order to Show Cause applications, or that Plaintiffs did not receive actual complaint and application papers.... [T]he Plaintiffs appeared and submitted opposition to both applications, as the State Court observed in its Order granting both Preliminary Injunction Motions." (Def.'s Mem. at 20.)

[8]     The Second Circuit has held that the availably of a post-deprivation hearing under Article 78 of the C.P.L.R. satisfies the requirements of due process. *See Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001) ("An Article 78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes."); *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) ("Where a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter.... Where, as here, Article 78 gave the employee a meaningful opportunity to challenge the voluntariness of his resignation, he was not deprived of due process simply because he failed to avail himself of the opportunity.").

It is unclear whether Plaintiffs are asserting a procedural due process claim with respect to the alleged delays in the criminal proceeding and/or the

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 143 of 217

Dosiak v. Town of Brookhaven, Not Reported in Fed. Supp. (2017)

2017 WL 7048912

initial issuance of the stop work order. In any event, the availability of an Article 78 proceeding satisfies the dictates of procedural due process in both cases.

The motion to dismiss the procedural due process claim for failure to state a claim is granted.

### D. Substantive Due Process

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York,* 680 F.3d 127, 151 (2d Cir. 2011). To state a claim for violation of this right, allegations must plausibly allege that the plaintiff "was deprived of a fundamental constitutional right," *Walker v. City of Waterbury,* 361 Fed. App'x 163, 165 (2d Cir. 2010) (citing *Local 342 v. Town Bd. of Huntington,* 31 F.3d 1191, 1196 (2d Cir. 1994)), by government conduct so egregious it as " to shock the contemporary conscience," *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8 (1998); *accord Rochon v. California,* 342 U.S. 165, 172 (1952); *Reston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 58 n.2 (2d Cir. 2010). Conduct that is merely "incorrect or ill-advised" does not meet this standard. *See Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994). It must be "conscience shocking." *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 275 (2d Cir. 2011) (internal quotation marks omitted). Substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit." *Corbley v. County of Suffolk,* 45 F. Supp. 3d 276, 282 (E.D.N.Y. 2014) (citing *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir. 1999)).

Here, the action of the Town in issuing the stop work order, commencing criminal and civil enforcement proceeding and bringing the State Court Action and seeking preliminary relief cannot be viewed as an "exercise of power without any reasonable justification in the service of a legitimate governmental objective" given the assertions in those proceedings of the potential damage to the environment. Additionally, that the Town is pursuing relief through the judicial process, both civil and criminal, even if its motivation is arbitrary and capricious, is not conscience shocking. Moreover, unlike the cases upon which Plaintiffs rely, *e.g., Soundview Assocs. v. Town of Riverhead,* 725 F. Supp. 2d 320, 338 (E.D.N.Y. 2010) (substantive due process claim stated where plaintiff alleged that defendant arbitrarily extinguished its right to build a health spa in order to approve the

application of another); *Garlasco v. Stuart,* 602 F. Supp.2d 396 (D. Conn. 2009) (substantive due process claim stated by allegations that the defendant blocked plaintiff's property access with boulders, stones, dirt, and snow in an attempt to compel him to sell the property); *Collier v. Town of Harvard,* 1997 WL 33781338, at 5 (D. Mass. Mar. 28, 1997) (substantive due process claim premised on assertion that the defendants attempted to extort an easement for the personal benefit of a member of the town's planning board), here there are no specific factual allegations to support an improper motive.

**\*15** The motion to dismiss the substantive due process claim is granted.

### E. First Amendment Right to Petition Claim

Plaintiffs' claim that Defendant "violated the Plaintiffs right to petition the government when they refused to schedule a hearing on the preliminary injunction in the State Court as required by N.Y.C.P.L.R. § 6301. By doing so, the Plaintiffs were unable to assert their rights affectively [sic] in that action prior to the issuance of the preliminary injunction in violation of the First Amendment." (Pls.' Mem. in Opp. at 31.) As the Court has previously stated, they cite no authority for the proposition that a full blown evidentiary hearing is required as opposed to an opportunity to be heard (which they received when they submitted their opposition papers) and even if such a hearing is required, the scheduling of such a hearing is an obligation of the court, not the Town.

The First Amendment Right to Petition claim is dismissed.

### F. The Fifth Amendment Taking Claim

A Fifth Amendment taking claim is subject to the two-step ripeness test announced in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186-97 (1985). That test requires a plaintiff (1) to have received a final decision regarding the application of an ordinance or regulation to its property and (2) to have sought just compensation for the alleged taking before proceeding to federal court. *Id.; see Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342 (2d Cir. 2005). Given the on-going nature of the proceedings in the New York courts, the first prong has not been met. Accordingly, the taking claim is not ripe and therefore dismissed.

2017 WL 7048912

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted.[9] The Clerk of Court is directed to enter judgment accordingly and to close this case.

[9]    Plaintiffs' request for leave to amend their complaint in the concluding paragraph of their memoranda is denied as they do not provide the Court with any elucidation of the proposed amendment. *See* Pls.' Opp. Mem. at 32. Moreover, to the extent that the Court has determined that this action is subject to *Rooker-Feldman* and that abstention is appropriate, such an amendment would be futile.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 7048912

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD  Document 43  Filed 02/01/24  Page 145 of 217

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1378274

2017 WL 1378274
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Boonsakdi BOONMALERT, Plaintiff,

v.

CITY OF NEW YORK; Andrew Schwartz; Social
Services Union, Local 371; and John and Jane Doe
(said names being fictitious, the persons intended
being those who aided and abetted the unlawful
conduct of the named Defendants), Defendants.

16 Civ. 4171 (KMW) (KNF)
|
Signed 04/12/2017

**Attorneys and Law Firms**

Special Hagan, Law Offices of Special Hagan, Saint Albans,
NY, for Plaintiff.

Sean Robert Renaghan, Shira M. Blank, New York City Law
Department, New York, NY, for Defendants.

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge

*\*1*  On June 3, 2016, Boonsakdi Boonmalert filed this
action pursuant to the Age Discrimination in Employment
Act of 1967 ("ADEA"), 42 U.S.C. §§ 1983 and 1985, the
New York State Human Rights Law ("NYSHRL"), and the
New York City Human Rights Law ("NYCHRL"), claiming
discrimination, retaliation, and a hostile work environment
on the basis of his age. The City of New York and
Andrew Schwartz (the "City Defendants") move to dismiss
Plaintiff's amended complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6). For the reasons stated below, the
City Defendants' motion to dismiss is GRANTED.

**I. BACKGROUND** [1]

[1]  The following facts are taken from the amended
complaint and are assumed to be true for purposes
of City Defendants' motion to dismiss. *See Tellabs,
Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.

308, 322 (2007); *Shipping Fin. Servs Corp. v.
Drakos,* 140 F.3d 129, 131 (2d Cir. 1998) ("When
considering a motion to dismiss ... for failure to
state a cause of action, a court must accept as true
all material factual allegations in the complaint.").

Plaintiff, who was 69 years old at the time the amended
complaint was filed, Am. Compl. ¶ 9, ECF No. 21, has been
employed by the City of New York since April 2001, *id.*
¶ 10. Since 2003, he has worked as an associate contract
specialist in the New York City Department of Small Business
Services ("SBS"). *Id.* ¶ 12. Plaintiff has always received at
least satisfactory job evaluations, *id.* ¶ 24, and has never
been formally disciplined, *id.* ¶ 25. During the relevant time
periods, Schwartz was either the First Deputy Commissioner,
Acting Commissioner, or Deputy Commissioner for Legal
Affairs of SBS, and was accordingly an indirect supervisor of
Plaintiff. *Id.* ¶ 20.

Plaintiff alleges that there are three other associate
contract specialists—whose names, ages, civil service levels,
education levels, and lengths of employment are not included
in the amended complaint—who work under the same
supervisors as Plaintiff, have less experience and are younger
than Plaintiff, and yet were paid more money than he was. *Id.*
¶¶ 26-27.

In 2012, Plaintiff turned 65, at which point City Defendants
began to ask him about retirement, reminded him that he
could retire, and encouraged him to retire. *Id.* ¶ 28, 35-37.
In one instance, Schwartz directed the Executive Director
of Human Resources, Myrna Mateo, to submit Plaintiff's
paperwork to the New York City Employee Retirement
System ("NYCERS"). *Id.* ¶¶ 38-39. Mateo submitted the
paperwork to Schwartz for review, but Plaintiff went to
Mateo's office to stop the process. *Id.* ¶¶ 40-41.

In September 2012, City Defendants moved Plaintiff from the
Budget Review Unit ("BRU") to the Workforce Development
Division Unit ("WDDU"). *Id.* ¶ 29. The WDDU position was
in a more remote and less prestigious part of SBS, and the
work was "out of his civil service title." *Id.* ¶ 30. In addition,
Plaintiff continued to work on BRU matters, resulting in
his being "required to simultaneously perform the functions
of two separate full time staff persons" without additional
compensation. *Id.* These additional tasks, without additional
support or resources, were designed to set Plaintiff up to fail,
and he experienced stress, insomnia, and panic attacks. *Id.* ¶¶
31-32.

2017 WL 1378274

**\*2** In June and July 2013, Plaintiff and a colleague, Kevin Ying, filed grievances against SBS with the Office of Collective Bargaining. *Id.* ¶ 48. The two grievances were consolidated, and the Social Services Union, Local 371 ("Local 371") represented both individuals through attorney Gary Maitland. *Id.* ¶¶ 50, 52. Ying has the same civil service and office title as Plaintiff, *id.* ¶ 69, and has less education and professional experience than Plaintiff, *id.* ¶ 70, but was in his 40s, *id.* ¶ 67. Throughout the grievance process, Schwartz would suggest that Plaintiff retire, and suggested that Plaintiff's refusal would deprive Ying of the raise that he needed to support his family. *Id.* ¶ 55. Schwartz also conveyed to Maitland that Plaintiff intended to retire, *id.* ¶ 56, and Maitland began to insist that Plaintiff retire as a condition of resolving his grievances against SBS, *id.* ¶ 57.

Hearings on these grievances were held on November 12, 2014, and February 12, 2015. *Id.* ¶ 49. On March 12, 2015, Plaintiff was presented with a proposed settlement agreement, which was drafted by Local 371 and Schwartz. *Id.* ¶¶ 58-59. The proposed settlement agreement stated that Plaintiff would receive an eight percent higher rate of pay until December 31, 2015, at which point Plaintiff's pay would revert to the original, lower amount if he did not retire. *Id.* ¶¶ 60, 62.

In June 2015, Maitland received an offer from SBS in which Boonmalert and Ying would each receive a "one-time lump sum payment that represents the 12% raise for the period 7/9/13 (date the grievance was filed) to 12/31/15 to resolve the grievance for this period." Renaghan Decl. Ex. C, ECF No. 28. [2] The offer stated that "SBS is still calculating the lump sum, but indicated it would probably come out to around $17,000. After 12/31/15, they are, of course, free to refile their grievance." *Id.* Ying appears to have accepted this offer. His signed settlement agreement states that Ying would receive a lump sum of $18,383 to resolve the grievance for the period of July 9, 2013 through December 31, 2015, and does not include a prospective salary increase. *Id.* ¶ 82; *see* Renaghan Decl. Ex. D. [3] Plaintiff did not settle his grievance. Am. Compl. ¶ 82.

[2]    Although the Court is generally constrained to the pleadings on a Rule 12(b)(6) motion, *see Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006), the Court may consider external documents that are incorporated by reference or "where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint," *Nicosia v.*

*Amazon.com, Inc.,* 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010)). Because Plaintiff's and Ying's settlement agreements and the negotiation processes thereto are integral to the discrimination allegations, the Court shall consider them.

[3]    An earlier, undated, and unsigned draft of Ying's settlement provided that he would receive a twelve percent pay increase "from July 9, 2013 to thereafter." Hagan Decl. Ex. 2, ECF No. 35.

Finally, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") on May 20, 2015 and June 8, 2015. *Id.* ¶¶ 7, 80. In the June 8, 2015 complaint, Plaintiff alleges that the City Defendants were "pushing me to retire when I am not ready to do so. In addition, I am being penalized by forcing me to sign the agreement agreeing to retire by December 30, 2015 otherwise I will forfeit the 8% increase." Renaghan Decl. Ex. A. The EEOC issued right-to-sue notices on March 2 and March 31, 2016. Am. Compl. ¶ 7; *see* Renaghan Decl. Ex. B. [4]

[4]    As with the settlement agreement, the Court finds that the EEOC charge of discrimination and right-to-sue notice are integral to the amended complaint and considers them. *See, e.g., Holowecki v. Fed. Express Corp,* 440 F.3d 558, 565 (2d Cir. 2006) ("In reviewing the Rule 12(b)(6) ruling, it is proper for this court to consider the plaintiff['s] relevant filings with the EEOC ..., none of which were attached to the complaint, because the ... plaintiff[ ] rel[ies] on these documents to satisfy the ADEA's time limit requirements."). Only the June 8 EEOC charge, and not the May 20 one, were provided to the Court.

**\*3** The amended complaint states seven claims for relief: (1) age discrimination in violation of the ADEA, § 1983, NYSHRL, and NYCHRL; (2) retaliation in violation of the ADEA, § 1983, NYSHRL, and NYCHRL; (3) hostile work environment in violation of the ADEA, § 1983, NYSHRL, and NYCHRL; (4) conspiracy in violation of § 1985; (5) *Monell* liability under § 1983; (6) breach of duty of fair representation in violation of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and (7) aiding, abetting, and inciting in violation of NYSHRL and NYCHRL. Am. Compl. ¶¶ 86-122. Plaintiff has withdrawn his conspiracy claim. Pl. Opp. 19-20, ECF No. 34. Plaintiff's LMRA claim is against only Local 371, which has not

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 147 of 217

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1378274

appeared in this action. Accordingly, the Court addresses neither the fourth nor sixth causes of action in this opinion.

## II. LEGAL STANDARD

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

## III. DISCUSSION

### A. Count I: Age Discrimination

Plaintiff's discrimination claims can be categorized as follows: (1) three unnamed, younger associate contract specialists were paid more than Plaintiff despite having less work experience, Am. Compl. ¶¶ 26-27; (2) Schwartz urged Plaintiff to retire, *id.* ¶¶ 28, 35-37, 55; (3) Mateo prepared the NYCERS papers against Plaintiff's wishes, *id.* ¶¶ 38-41; (4) Plaintiff received less favorable settlement terms through the grievance process than his younger colleague, Ying, *id.* ¶¶ 58-62; and (5) Plaintiff was assigned work from the WDDU in addition to continuing to work on BRU matters without additional compensation, *id.* ¶¶ 29-32. Plaintiff does not satisfy his burden under federal, state, and city law as to any of these five claims.

### i. ADEA and NYSHRL

ADEA and NYSHRL claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). To survive a motion to dismiss, the facts as alleged in the complaint must plausibly support that "the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). The parties do not dispute the first two elements. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). Materially adverse changes include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (alteration in original) (quoting *Galabya*, 202 F.3d at 640). Finally, a complaint "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311; *see Johnson v. Andy Frain Servs., Inc.*, 638 Fed.Appx. 68, 70 (2d Cir. 2016).

**\*4** As to the first allegation regarding Plaintiff's comparators, the amended complaint fails to plead sufficient facts about the comparators to state a claim for disparate impact discrimination. The amended complaint is "entirely devoid of any details regarding the purported comparators, e.g., who they are, what their positions or responsibilities were at [the company], how their conduct compared to plaintiff['s] or how they were treated differently by defendants." *Haggood v. Rubin & Rothman, LLC*, No. 14 Civ. 34, 2014 WL 6473527, at \*12 (E.D.N.Y. Nov. 17, 2014); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) ("[Plaintiff's] allegations of gender-based disparate treatment are conclusory.... [T]he Amended Complaint does not allege that any similarly situated male employee received more favorable treatment than [plaintiff] —the Amended Complaint fails to identify, let alone describe, any purported comparator."). Without more, these conclusory allegations fail to state a claim. [5]

[5]    The original complaint names the three comparators: Georgette Barnes, Joan White, and Kevin Ying. Compl. ¶ 24, ECF No. 4. Neither complaint describes Barnes. White is alleged to be of retirement age, *see* Am. Compl. ¶¶ 45-47, and therefore is not an appropriate comparator. *See, e.g., Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("[T]he plaintiff [must] show that the employer treated him or her 'less favorably than a similarly situated employee' *outside of the protected group*.") (emphasis added) (quoting

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 148 of 217

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1378274

*Graham v. Long Island R R.,* 230 F.3d 34, 39 (2d Cir. 2000)).

Plaintiff's second, third, and fourth allegations—regarding retirement discussions, preparing NYCERS papers, and the grievance settlement offers—do not amount to adverse employment actions. "[D]iscussion of retirement is common in offices, even between supervisors and employees, and is typically unrelated to age discrimination." *Hamilton v. Mount Sinai Hosp.,* 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007), *aff'd,* 331 Fed.Appx. 874 (2d Cir. 2009); *see also Katz v. Beth Israel Med. Ctr.,* No. 95 Civ. 7183, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) ("Being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments, and being told to retire or work part time if she did not like the schedule also do not rise to the level of adverse employment actions; they do not affect any ultimate employment decisions."). Discussions of retirement and preparing the NYCERS papers did not materially change Plaintiff's working conditions sufficient to state a cause of action for discrimination. And the settlement that Ying ultimately signed was also offered to Plaintiff: in both, the grievant was entitled to a pay increase only until December 31, 2015. *See* Renaghan Decl. Exs. C, D; Hagan Decl. Ex. 2. Plaintiff's contention that the settlement agreement conditioned Plaintiff's salary increase on his retirement by December 31, 2015 misreads that document. *See* Pl. Opp. 8 ("Mr. Boonmalert was offered: a lump sum payment for the time he performed tasks that were outside of his civil service title; and an 8% increase in salary *that was conditioned on his retirement by December 31, 2015.*" (emphasis added)). On the contrary, according to the amended complaint, if Plaintiff did not retire by December 31, 2015, his salary merely would revert to his original salary going forward, rather than the salary with an eight percent increase. Am. Compl. ¶ 60. The settlement agreement did not incentive or encourage his retirement, and the settlement offer and grievance process neither materially altered Plaintiff's terms of employment nor, for that matter, suggested discriminatory animus.

Turning to Plaintiff's fifth allegation, although being assigned additional work from WDDU may amount to an adverse employment action, this claim fails to plausibly allege facts that support the requisite minimal inference of discriminatory motivation. Plaintiff points to repeated discussions about retirement and pressure to retire as raising an inference of discriminatory motivation. Am. Compl. ¶¶ 28-47. However, a person's eligibility for retirement is "analytically distinct" from age. *Dressler v. City Sch. Dist. of the City of N.Y.,* No. 15 Civ. 3696, 2016 WL 4367967, at *4 (S.D.N.Y. Aug.

15, 2016) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611-13 (1993)); *see also id.* ("An attempt to force [plaintiff] to retire ... unless it is motivated by age-based discrimination ... is not within the ambit of the ADEA."). On the contrary, "cases that have found references to retirement to be significant involved other indicia of an improper animus." *Hamilton,* 528 F. Supp. 2d at 447. The amended complaint does not allege any statements made by Schwartz or others that suggest improper animus. Because Plaintiff fails to allege facts that support any inference of discriminatory motivation, this claim, too, fails. [6]

[6]    Plaintiff's claim also may be barred because he did not exhaust administrative remedies regarding this claim. An EEOC complaint must be filed within 300 days of the act of discrimination, 29 U.S.C. § 626(d)(1), and Plaintiff's complaints were filed in May and June 2015, Am. Compl. ¶ 7. His reassignment to WDDU in September 2012 is well outside of this period. Additionally, the June 2015 EEOC complaint states that the discrimination took place only from July 9, 2013 to March 12, 2015, in which case the September 2012 reassignment may not have been presented to the EEOC. Renaghan Decl. Ex. A.

### ii. Section 1983

**\*5** The Court assumes that Defendant asserts his § 1983 claim as a violation of the Equal Protection Clause. To state a § 1983 claim, a plaintiff must plead that he "has been treated differently from others similarly situated." *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (quoting *Sweeney v. City of New York,* No. 03 Civ. 4410, 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004)). "Conclusory allegations of selective treatment are insufficient to state an equal protection claim." *Id.* (quoting *Jarrach v. Sanger,* No. 08 Civ. 2807, 2010 WL 2400110, at *8 (E.D.N.Y. June 9, 2010)). For the reasons that Plaintiff fails to allege facts sufficient to suggest discriminatory motivation under his ADEA claim, Plaintiff's § 1983 claim fails. *See, e.g., Kearney v. Cnty. of Rockland ex rel. Vanderhoef,* 185 Fed.Appx. 68, 70 (2d Cir. 2006); *Bishop,* 2010 WL 4159566, at *12; *cf. Davidson v. Lagrange Fire Dist.,* No. 08 Civ. 3036, 2012 WL 2866248, at *21 (S.D.N.Y. June 19, 2012) (dismissing § 1983 claim that "is based wholly on the facts underlying" the ADEA claim as duplicative (citing *Jones v. N.Y.C. Health & Hosps. Corp.,* 102

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1378274

Fed.Appx. 223, 226 n.3 (2d Cir. 2004))), *aff'd,* 523 Fed.Appx. 838 (2d Cir. 2013).

### iii. NYCHRL

Finally, even under the broader standards of the NYCHRL, Plaintiff has failed to state a claim for retaliation. "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Gorokhovsky v. N.Y.C. Hous. Auth.,* 552 Fed.Appx. 100, 102 (2d Cir. 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 114 (2d Cir. 2013)). Plaintiff has failed to plausibly allege that the City Defendants acted with discriminatory motive, nor has he pleaded facts that permit an inference that younger similarly situated individuals received preferential treatment. *See, e.g., Eng v. City of New York,* No. 15 Civ. 1282, 2016 WL 750251, at *3 (S.D.N.Y. Feb. 19, 2016).

\* \* \*

Accordingly, Count I of Plaintiff's amended complaint is dismissed.

### B. Count II: Retaliation

Plaintiff alleges that the City Defendants retaliated against him after he orally complained to Schwartz about the discrimination he experienced, filed a grievance with Local 371, and filed complaints with the EEOC. Am. Compl. ¶¶ 73-83. On a motion to dismiss a retaliation claim, a plaintiff must plausibly allege that: "(1) defendants discriminated —or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega,* 801 F.3d at 90 (Title VII); *see also Moore v. Verizon,* No. 13 Civ. 6467, 2016 WL 825001, at *14 (S.D.N.Y. Feb. 5, 2016). As with discrimination claims, "the allegations in the complaint need only give plausible support to the reduced *prima facie* requirements." *Littlejohn,* 795 F.3d at 316. The elements of a retaliation claim under NYCHRL and § 1983 are the same as for federal and state claims. *Mohamed v. NYU,* No. 14 Civ. 8373, 2015 WL 5307391, at *5 (S.D.N.Y. Sept. 10, 2015) (NYCHRL); *Vega,* 801 F.3d at 91 (§ 1983).

The only adverse action that Plaintiff alleges occurred as retaliation relates to the settlements of Plaintiff's and Ying's grievances. *See* Am. Compl. ¶ 82. As discussed above, Plaintiff and Ying received nearly identical settlement offers: Ying received a lump sum payment that covered July 9, 2013 through December 31, 2015, Renaghan Decl. Ex. D, and Plaintiff was offered an 8% raise that covered those same dates, Hagan Decl. Ex. 2. Plaintiff's settlement offer included a salary raise through December 31, 2015, after which his salary would revert to its base level. Am. Compl. ¶ 60. Plaintiff never received a pay increase or lump-sum payment because he never entered into a settlement. *Id.* ¶¶ 82-83.

**\*6** Even drawing all inferences in Plaintiff's favor, the facts, as alleged in the amended complaint and as presented in the documents integral thereto, do not state a retaliation claim under federal, state, or city law. First, Plaintiff has not alleged an adverse employment action. For retaliation claims, a plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cty. Dep't of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). The closest Plaintiff gets to alleging an adverse employment action is stating that he received a less favorable settlement offer than Ying; because Ying's and Plaintiff's settlement offers were comparable, there is no plausible allegation of unfavorable treatment. Moreover, there is no plausible allegation of a causal connection between Plaintiff's EEOC complaint and the grievance settlement offers for the simple reason that Plaintiff has not shown any adverse actions taken against him subsequent to his taking protected actions. In particular, the EEOC complaint describes the settlement offer, and thus the settlement offer cannot be retaliation for the EEOC complaint: "[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Chung v. City Univ. of N.Y.,* 605 Fed.Appx. 20, 23 (2d Cir. 2015) (quoting *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)). Plaintiff's retaliation claims is dismissed.

### C. Count III: Hostile Work Environment

A hostile work environment claim under ADEA, § 1983, and the NYSHRL requires "conduct (1) that is objectively severe or pervasive—that is, if it creates an environment that a reasonable person would find hostile or abusive ...,

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 150 of 217

2017 WL 1378274

(2) that the plaintiff subjectively perceives as hostile or abusive ..., and (3) that creates such an environment because of plaintiff's [age]." *Gregory v. Daly,* 243 F.3d 687, 691-92 (2d Cir. 2001) (citations, quotation marks, and alterations omitted); *see also Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 n.2 (2d Cir. 2010); *Kassner,* 496 F.3d at 240-41. "In determining whether the conduct was sufficiently severe or pervasive, courts look at '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Sotomayor v. City of New York,* 862 F. Supp. 2d 226, 260-61 (E.D.N.Y. 2012) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.,* 580 F.3d 73, 82 (2d Cir. 2009)).

Plaintiff's hostile work environment claim fails: he does not plausibly allege that the adverse conduct occurred because of his age and he does not allege facts suggesting severe and pervasive conduct. First, it is "axiomatic" that a hostile work environment claim must allege that the conduct occurred because of the protected characteristic. *See Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002). As discussed above, Plaintiff has failed to allege discriminatory animus regarding his reassignment, his salary, or his grievance settlement offer. Further, the amended complaint is devoid of allegations that plausibly suggest that discrimination was so severe and pervasive such that the work environment was "permeated with discriminatory intimidation, ridicule, and insult ... sufficient[ ] ... to alter the conditions of [Plaintiff's] employment." *Kassner,* 496 F.3d at 240 (quoting *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999)); *see also, e.g., Fleming v. MaxMara USA, Inc.,* 371 Fed.Appx. 115, 119 (2d Cir. 2010) (allegations that "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" were insufficient to show pervasive and severe conduct to support hostile work environment claim); *Moore,* 2016 WL 825001, at *13 (allegations that supervisor "persistently questioned [plaintiff] about retiring" were insufficient to support hostile work environment claim); *Wu v. Metro-N. Commuter R.R. Co.,* No. 14 Civ. 7015, 2015 WL 5793971, at *17 (S.D.N.Y. Aug. 4, 2016) ("[C]omments or questions about retirement, without more, do not create a hostile work environment." (quoting *Mazur v. N.Y.C. Dep't of Educ.,* 53 F. Supp. 3d 618, 635 (S.D.N.Y. 2014))).

*7 Hostile work environment claims under the NYCHRL are analyzed under the same code provision as discrimination claims. *Sotomayor,* 862 F. Supp. at 261 (citing *Williams v. N.Y.C. Hous. Auth.,* 61 A.D.3d 62, 74 (N.Y. 2009)). Unlike the ADEA and the NYSHRL, the NYCHRL does not require that discriminatory conduct be severe or pervasive. *Id.* Even under the broader provisions of the NYCHRL, the lack of plausible allegations regarding discriminatory animus, as described above, is fatal to Plaintiff's NYCHRL hostile work environment claim. *See, e.g., Moore,* 2015 WL 825001, at *14 (finding "persistent" questioning about plaintiff's retirement plans and only two comments about plaintiff's age insufficient to state a hostile work environment claim under the NYCHRL).

For these reasons, Plaintiff's hostile work environment claim is dismissed.

## D. Count V: *Monell* Liability

Plaintiff asserts a § 1983 *Monell* claim against the City of New York. Am. Compl. ¶¶ 108-14. To prevail on such a claim, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2010) (quoting *Connick v. Thompson*, 561 U.S. 51, 61 (2011)); *see also Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690-92 (1978). Plaintiff's claim fails. Having failed to plausibly allege his § 1983 discrimination, retaliation, and hostile work environment claims, Plaintiff's *Monell* claim "necessarily fails as well." *Kajoshaj v. N.Y.C. Dep't of Educ.,* 543 Fed.Appx. 11, 16-17 (2d Cir. 2013).

Moreover, Plaintiff has not alleged that his rights were violated pursuant to an official policy, practice, or custom. *See, e.g., Corbett v. City of New York,* No. 15 Civ. 9214, 2016 WL 7429447, at *3 (S.D.N.Y. Dec. 22, 2016) ("A plaintiff may satisfy the 'policy or custom' prong in one of four ways: by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to 'deliberate indifference to the rights of those with whom municipal employees will come into contact.'" (citations omitted)). Plaintiff argues that Schwartz was a "final *decision maker* for personnel actions as well as internal and external complaints and grievances,"

Boonmalert v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1378274

and that Schwartz's actions violated Plaintiff's rights. Pl. Opp. 20 (emphasis added). However, Plaintiff does not allege or suggest that Schwartz was a final municipal *policymaker* with regard to the City's equal employment practices. *See, e.g., Hurdle v. Bd. of Educ. of City of N.Y.*, 113 Fed.Appx. 423, 427 (2d Cir. 2004). Plaintiff's *Monell* claim is dismissed.

E. Count VII: Aiding, Abetting, and Inciting

Plaintiff alleges that the City Defendants, along with "Jane and John Doe named individually and in their official capacities," have aided, abetted, and incited discriminatory practices in violation of NYSHRL and NYCHRL. Am. Compl. ¶ 120; *see id.* ¶¶ 120-22. Plaintiff fails to state a claim. First, because Plaintiff has failed to state a claim for discrimination, retaliation, or hostile work environment, there can be no cause of action for aiding, abetting, and inciting. *See White v. Pacifica Found.,* 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013). Second, to the extent the amended complaint asserted claims against unnamed defendants, Plaintiff appears to have abandoned those arguments. *See* Pl. Opp. 19 (failing to address "Jane and John Doe" defendants and concluding only that "Plaintiff respectfully asserts that his aiding and abetting claims should not be dismissed against individually named defendant Schwartz"). Count VII is dismissed.

F. Leave to Amend

**\*8** Plaintiff requests, in his opposition, leave to amend his complaint. "[I]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (quoting *In re WorldCom, Inc. Sec. Litig.,* 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004)). Plaintiff provided no such identification. Further, Plaintiff already has amended his complaint in response to the City Defendants' first motion to dismiss, which raised many of the same issues discussed here. Accordingly, the request is denied as futile.

**IV. CONCLUSION**

For the reasons set forth above, the City Defendants' motion to dismiss is GRANTED. As all claims against the City of New York and Schwartz have been dismissed, both are terminated from this action. By **April 19, 2017,** Plaintiff shall file a letter about the status of his claims against Local 371. The Clerk of Court is directed to terminate the motion at ECF No. 27.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1378274

---

**End of Document**                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Boggs v. Town of Riverhead, Not Reported in Fed. Supp. (2018)

2018 WL 5830824

2018 WL 5830824
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elendell BOGGS and Randy Mouzon, Plaintiff,
v.
TOWN OF RIVERHEAD, Riverhead Town Police
Officers "John Does" 1-10 and "Jane Does" 1-10, in
Their Official and Individual Capacities; Riverhead
Village Preservation LLP; City of New York; New
York City Law Enforcement Agents "John Does" 1-10
and "Jane Does" 1-10, in Their Official and Individual
Capacities and; New York State Law Enforcement
Agents "John Does" 1-10 and "Jane Does" 1-10, in
Their Official and Individual Capacities, Defendants.

2:17-cv-05411 (ADS) (SIL)
|
Signed 11/07/2018

**Attorneys and Law Firms**

Law Office of Harriet A. Gilliam, Attorney for the Plaintiff,
21 W Second St, Po Box 1485, Riverhead, NY 11901, By:
Harriet A. Gilliam, Esq., Of Counsel.

Campolo, Middleton & McCormick, LLP, Attorneys for
Defendants Town of Riverhead and Riverhead Town Police
Officers Joh Does 1-10 and Jane Does 1-10, 4175 Veterans
Memorial Hwy, Ronkonkoma, NY 11779, By: William
McDonald, Esq., Meghan McGuire Dolan, Esq., Of Counsel.

London Fischer LLP, Attorneys for Defendant Riverhead
Village Preservation LLP, 59 Maiden Lane, 39th Floor, New
York, NY 10038, By: Brian Patrick McLaughlin, Esq., Of
Counsel.

NYC Law Department, Attorneys for Defendant City of
New York, 100 Church Street, New York, NY 10007,
By: Jacqueline C. Chavez, Senior Corporation Counsel, Of
Counsel.

**MEMORANDUM OF DECISION & ORDER**

ARTHUR D. SPATT, United States District Judge

**\*1**  The plaintiffs Elendell Boggs ("Boggs") and Randy
Mouzon ("Mouzon") (collectively, the "Plaintiffs") brought

this action pursuant to 42 U.S.C. § 1983 ("Section 1983")
alleging violations of their federal and state constitutional
rights by the Town of Riverhead (the "Town"), Riverhead
Village Preservation LLP, the City of New York (the "City"),
and various law enforcement officers named as John and Jane
Does.

Presently before the Court is a motion to dismiss by the City,
pursuant to Federal Rule of Civil Procedure ("FED. R. CIV.
P." or "Rule") 12(b)(6), seeking to dismiss the claims against
the City for failure to state a claim upon which relief may be
granted. ECF 12. For the following reasons, the Court grants
the motion to dismiss by the City in its entirety.

**I. BACKGROUND**

This action arises from an incident that allegedly took place on
November 6, 2014 at the Plaintiffs' apartment in Riverhead,
Suffolk County, New York. ECF 1 ¶ 16. According to the
Plaintiffs, law enforcement officers from the Town, the City,
and the State of New York entered the Plaintiffs' apartment
without requesting permission, showing a search warrant,
identifying themselves, or explaining the reason for their
presence. *Id.* ¶ 19–21. Upon entering the apartment, they
handcuffed all the individuals present, including Mouzon, but
not Boggs, who they told to sit on the couch. *Id.* ¶¶ 23–24.
The officers then proceeded to search the remainder of the
apartment. *Id.* ¶ 31.

The Complaint alleges that the officers "mocked" and
"taunted" and threatened the Plaintiffs throughout the search.
*Id.* ¶ 38. At some point, one of the officers took Mouzon into
a different room and called Boggs into that room 20 minutes
later. *Id.* ¶¶ 33–34. Then, the officers told the Plaintiffs
that they were looking for Mouzon's son and threatened
to arrest the Plaintiffs if they did not assist. *Id.* ¶¶ 35–36.
The Plaintiffs further allege that the officers denied Mouzon
medical assistance in the form of his asthma inhaler, despite
his visible difficulty breathing. *Id.* ¶ 38.

Based on these events, the Plaintiffs allege that the Town,
the City, and the State of New York (the "State") conspired
to violate their rights under the United States and New York
State Constitutions. *Id.* ¶¶ 56–59. The Plaintiffs assert that the
Town, the City, and the State engaged the Village, which is the
management company of the Plaintiffs' apartment building,
in the conspiracy. *Id.* ¶ 17, 27, 57. Accordingly, the Plaintiffs
brought this action against the Town, the City, and the Village,

as well as Riverhead Town Police Officers, "John Does" 1-10 and "Jane Does 1-10"; New York City Law Enforcement Agents "John Does" 1-10 and "Jane Does 1-10" (the "City John and Jane Does"); and New York State Law Enforcement Agents "John Does" 1-10 and "Jane Does 1-10."

On March 5, 2018, the City brought the present motion seeking dismissal of the action against itself. ECF 12.

## II. DISCUSSION

### A. THE LEGAL STANDARD ON A MOTION TO DISMISS PURSUANT TO RULE 12(B)(6).

**\*2** In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.,* 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L.Ed. 2d 868 (2009) ).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 556 U.S. at 679.

### B. THE CITY'S SECTION 1983 MUNICIPAL LIABILITY.

Under Section 1983, a municipality cannot be held liable solely on a theory of *respondeat superior. Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). "Rather, in order to sustain a claim for relief pursuant to § 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right." *Norton v. Town of Brookhaven,* 33 F. Supp. 3d 215, 244 (E.D.N.Y. 2014) (Spatt, J.).

A plaintiff can establish the existence of a municipal policy or custom by showing:

> the existence of[ ] (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence \*16 can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

2018 WL 5830824

*Boston v. Suffolk Cty., New York*, 326 F. Supp. 3d 1, 15–16 (E.D.N.Y. 2018) (Spatt, J.); *Norton*, 33 F. Supp. 3d at 244; *see also Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (explaining that municipal liability attaches if acts "were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses.").

 **\*3**  The Plaintiffs assert *Monell* liability under a failure to train theory. ECF 16 at 2, 4. They claim that "the municipal Defendants (collectively and individually) were negligent in training, hiring and supervising its officers and agents, employees and representatives in carrying out searches and arrests, thereby resulting in a denial of Plaintiffs' constitutional rights under the Fourth Amendment." *Id.* at 4. The Court finds that the Complaint fails to state a claim in this regard.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L.Ed. 2d 417 (2011). Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under Section 1983 be established. *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996); *see also Connick*, 563 U.S. at 61–62, 131 S.Ct. 1350; *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

While plaintiffs need not prove their allegations at the pleading stage, a complaint will only survive a motion to dismiss if it "contain[s] specific factual allegations tending to support the inference that the municipality failed to train its employees." *Aguilera v. Cty. of Nassau*, 425 F. Supp. 2d 320, 324 (E.D.N.Y. 2006) (Spatt, J.). Generally, allegations of a single, isolated incident of police misconduct will not suffice. *See City of Canton*, 489 U.S. at 387, 109 S.Ct. 1197; *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy."); *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (A municipality "may not be held liable

under § 1983 simply for the isolated unconstitutional acts of its employees.").

Here, the Complaint is devoid of specific factual allegations that, even when viewed in the light most favorable to the Plaintiffs, would support a claim under *Monell*. The only allegations in the Complaint relate to the search of the Plaintiffs' apartment itself, and shed no light on the City's customs, policies, or training. The remaining allegations in the Complaint consist of bare conclusory assertions that the City failed to properly train its officers.

Courts routinely reject claims such as these as bases for attaching municipal liability. *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("[T]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."); *Neighbour v. Covert*, 68 F.3d 1508, 1512 (2d Cir. 1995) ("The mere allegation that the municipality failed to train its employees properly is insufficient to establish a municipal custom or policy."); *Burbar v. Inc. Vill. of Garden City*, 961 F. Supp. 2d 462, 472 (E.D.N.Y. 2013) (Spatt, J.) ("[T]he mere assertion that there exists such a policy or custom, absent specific allegations of fact tending to support such an inference, is insufficient.") (quoting *Batista v. City of New York*, No. 05-CV-8444, 2007 WL 2822211, at *4 (S.D.N.Y. Sept. 24, 2007) ); *Aguilera*, 425 F. Supp. 2d at 24 (dismissing complaint where "[t]he only factual allegations in the complaint describe the isolated events that occurred on August 26, 2004" and the remainder "consist[ed] of bare, conclusory statements").

 **\*4**  Further, even assuming the Complaint contained more factual color, it is nonetheless legally deficient because the Plaintiffs only allege mere negligence by the City. ECF 1 ¶¶ 4 ("Plaintiffs further allege that the municipal Defendants (collectively and individually) were negligent in training, hiring and supervising its officers, agents, employees and Representatives"), 63 (claiming the constitutional violations occurred "[a]s a result of the municipal defendants' negligence"), 64 (claiming their injuries occurred "as a result of said municipal negligence"). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81 (citing *Cash v.*

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 155 of 217

Boggs v. Town of Riverhead, Not Reported in Fed. Supp. (2018)
2018 WL 5830824

*Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) ). It is thus apparent from the face of the Complaint that the Plaintiffs cannot state a claim for *Monell* liability against the City.

Therefore, the Court grants the City's motion to dismiss the Section 1983 action against it in its entirety.

## C. THE CLAIMS AGAINST JOHN AND JANE DOE NEW YORK CITY LAW ENFORCEMENT AGENTS.

The Court further dismisses the claims by the Plaintiff against the City John and Jane Does due to the expiration of the statute of limitations, and denies the Plaintiffs leave to amend the Complaint to add the names of the individual defendants.

### 1. The Statute of Limitations.

The limitations period for Section 1983 claims in New York is three years. *See Owens v. Okure*, 488 U.S. 235, 250 (1999); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). The statute of limitations for any of the Plaintiffs' pendant state law claims is one year and 90 days. *See Santiago v. City of New York*, No. 15-cv-00517, 2016 WL 11447843, at *4 (E.D.N.Y. Sept. 6, 2016) ("While federal civil rights claims are governed by a state's general statute of limitations, where a complaint also alleges violations of state law, the state claims must meet their specific statutory requirements."), *report and recommendation adopted*, 2016 WL 5395837 (E.D.N.Y. Sept. 27, 2016); N.Y. Gen. Mun. Law § 50-i(c) (providing statute of limitations for intentional tort claims against municipalities). The federal claims accrue at the time a plaintiff knows or has reason to know of the injury that is the basis of his or her action, *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980), whereas the claims under New York law accrue at the time of the incident. N.Y. Gen. Mun. Law § 50-i(c).

All of the Plaintiffs' claims accrued on November 6, 2014, the date of the purported unlawful search and detention. ECF 1 ¶¶ 45, 47–49, 53–55. Any state law claims against the City John and Jane Does expired prior to the filing of the Complaint on November 6, 2017. As for the federal claims, the filing of the Complaint on September 15, 2017 would normally render them timely, because the Plaintiffs brought their action before the expiration of the limitations period on November 6, 2017. However, the Plaintiffs only named the New York City Law Enforcement Agent defendants as John and Jane Does, and the Plaintiffs failed amend the Complaint to include the identities of these individual defendants before the November 6, 2017 cutoff. For this reason, the claims against the City John and Jane Does fall outside the applicable statutes of

limitations. The Plaintiffs agree and seek leave to amend the Complaint pursuant to Rule 15(a).

### 2. Leave to Amend the Complaint

"It is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Tapia-Ortiz v. Doe, et al.*, 171 F.3d 150, 152 (2d Cir. 1999) (quoting *Aslanidis v. United State Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993) ). "Thus, in order to amend a pleading to replace a John Doe Defendant with a named Defendant where the statute of limitations has run, the claims must relate back as provided by Rule 15(c)." *Morales v. Cty. of Suffolk*, 952 F. Supp. 2d 433, 436 (E.D.N.Y. 2013) (Spatt, J.). The Court finds that the circumstances do not warrant relation back under Rule 15(c), and accordingly denies the Plaintiffs leave to amend the Complaint.

#### a. Rule 15(c)(1)(C)

*5 An amended complaint that adds a new party must meet the following criteria to relate back under Rule 15(c)(1)(C):

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and the original complaint was filed within the limitations period.

*Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (quoting *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468–69 (2d Cir. 1995) (internal alterations omitted, emphasis in original) ).

The Plaintiffs provide no explanation whatsoever for their failure to name the City John and Jane Does. In fact, they do

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 156 of 217

Boggs v. Town of Riverhead, Not Reported in Fed. Supp. (2018)

2018 WL 5830824

not even reference Rule 15(c), instead choosing to broadly seek leave to amend under Rule 15 "in the interest of justice". ECF 16 at 5. The Plaintiffs failed to mention the name the officers they intend to substitute for the John Does, let alone supply a proposed amended complaint. "This is an insufficient showing, and sufficient reason to summarily deny the Plaintiff[s'] motion to amend [their] complaint pursuant to Rule 15." *Boston*, 326 F. Supp. 3d at 11; *see also Martinez v. City of New York*, No. 12-cv-3806, 2012 WL 4447589, at *2 (E.D.N.Y. Sept. 25, 2012) (dismissing individual claims where "Plaintiff [had] not suggested that anything prevented him from naming individual defendants or otherwise amending his claim in a timely fashion"); *Urena v. Wolfson*, No. 09-cv-1107, 2011 WL 7439005, at *4 (E.D.N.Y. Aug. 24, 2011) (dismissing individual claims where plaintiff did "not claim that he made a mistake concerning the identities of these defendants" and "simply chose to wait until [after the expiration of the limitations period] to add ... individuals as defendants"), *report and recommendation adopted*, 2012 WL 669059 (E.D.N.Y. Feb. 29, 2012).

Even assuming that the reason for their failure to name the City John and Jane Does stemmed from a lack of knowledge as to their identities, the law of this Circuit is that "Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow*, 66 F.3d at 470; *see also Hogan*, 738 F.3d at 518 ("This Court's interpretation of Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.' "); *Boston*, 326 F. Supp. at 11 (collecting cases and holding that *Barrow* is still good law, except in certain exceptional circumstances).; *Morales*, 952 F. Supp. 2d at 437–38 (same).

Therefore, the Court finds that the Plaintiffs cannot avail themselves of relation back under Rule 15(c)(1)(C).

### b. Rule 15(c)(1)(A)

However, "even if a plaintiff's claims are barred by Rule 15(c)(1)(C), the Second Circuit has held that an amended pleading asserting § 1983 claims against John Doe defendants may still relate back under Rule 15(c)(1)(A)." *JCG v. Ercole*, No. 11-cv-6844, 2014 WL 1630815, *13 (S.D.N.Y.) (citing *Hogan*, 738 F.3d at 518), *report and recommendation adopted* 2014 WL 2769120 (S.D.N.Y. 2014). Rule 15(c)(1)(A) establishes

that amendments to a pleading relate back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back."

**\*6** The statute of limitations provided in New York State law "provides a more forgiving principle of relation back in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)(1)(C)." *Hogan*, 738 F.3d at 518. Section 1024 of the New York CPLR, which creates a special procedure for claims brought against John Doe Defendants, states that:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. C.P.L.R. § 1024.

Under Section 1024 of the New York CPLR, a court may allow a plaintiff to substitute a named party for a John Doe party if the plaintiff meets two requirements: (1) " 'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name,' " and (2) "describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.' " *Hogan*, 738 F.3d at 518–19 (quoting *Bumpus v. N.Y.C. Transit Auth.*, 66 A.D.3d 26, 883 N.Y.S.2d 99, 104 (2009) ). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and ... serve process upon them, within 120 days from filing." *Bumpus*, 66 A.D.3d at 31, 883 N.Y.S.2d at 105; *see also JCG*, 2014 WL 1630815, at *13 ("If a plaintiff fulfills these conditions, he 'must then ascertain the identity of unknown [John] Doe parties, and ... serve process upon them, within 120 days from filing [the original complaint].' " (quoting *Williams v. United States*, No. 07-cv-3018, 2010 WL 963474, at *12 (S.D.N.Y. Feb. 25, 2010) ) ). The 120–day deadline imposed by CPLR 305–b may be extended "upon good cause shown or in the interest of justice." N.Y CPLR 305–b.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 157 of 217

Boggs v. Town of Riverhead, Not Reported in Fed. Supp. (2018)

2018 WL 5830824

Here, the Plaintiffs cannot avail themselves of Section 1024, because they neither exercised the necessary due diligence nor adequately described the City John and Jane Does. In fact, the Plaintiffs failed to even mention Section 1024 in support of their claim that an amendment to identify the proper individual defendants would relate back to the filing of the original complaint.

With regard to the Plaintiffs' diligence, the Plaintiffs provide no indication that they undertook even bare minimum efforts to discover the identity of the City John and Jane Does. Their opposition omits any mention of the steps they took, such as contacting the City's counsel, filing a Freedom of Information Act request, or anything of the like. Unsurprisingly, the City affirms that no such inquiries occurred. The Plaintiffs therefore cannot rely on Section 1024 to bring their claims within the applicable statute of limitations. *See Fahlund v. Nassau Cty.*, 265 F. Supp. 3d 247, 258 (E.D.N.Y. 2017) (Spatt, J.) (dismissing complaint where plaintiff had "not furnished any evidence to the Court that he attempted to discern the names of individual officers before the statute of limitations had run"); *Harris v. City of New York*, No. 16-cv-1214, 2018 WL 4471631, at *4 (E.D.N.Y. Sept. 18, 2018) (dismissing case where there was "no evidence that Plaintiff attempted to identify Defendant Gebbia before the expiration of the statute of limitations"); *Santiago*, 2016 WL 11447843, at *5 (dismissing complaint where "[n]othing in the record suggests that counsel ever sought the Officers' identities prior to the expiration of the limitations period or sought an extension of time to do so").

*7 Assuming the Plaintiffs took the minimal efforts necessary to discover the identity of the City John and Jane Does, the Complaint failed to adequately describe them. The events underlying the Complaint took place in the Town of Riverhead, Suffolk County, New York. ECF ¶¶ 7, 9,16. The Complaint totally lacks factual allegations or other details either linking those events to the City or otherwise describing the City John and Jane Does. It provides no description of the agents, their agency, or the basis for the belief that the agents were employed by the City. As a result, the Court finds that the City John and Jane Does could not apprise they are the intended defendants based on the allegations set forth in the Complaint. *See Harris*, 2018 WL 4471631, at *4 (dismissing case where the "initial complaint [was] utterly devoid of any description of the John Doe Defendants involved in her arrest"); *Escoffier v. City of New York*, No. 13-cv-03918, 2017 WL 9538603, at *4 (S.D.N.Y. Jan. 4, 2017) (dismissing John Doe complaint where complaint consisted

of "vaguely described incidents that took place in unspecified police precincts in 'about' April of 2013 or on 'about' April 12, 2013"), *report and recommendation adopted*, 2017 WL 3206337 (S.D.N.Y. July 27, 2017); *Santiago*, 2016 WL 11447843, at *6 ("The Complaint here ... only indicates that a group of twenty officers engaged in unspecified actions, somewhere in Brooklyn, at some time on February 8, 2012. No description of the Officers is provided, let alone a sufficient one, nor is any indication given of why Santiago was arrested. This is insufficient to impute knowledge to the Officers.").

Therefore, the Court denies the Plaintiffs leave to amend the Complaint to replace the City John and Jane Does with the actual identities of the New York City Law Enforcement Agents.

**D. THE STATE LAW CLAIMS AGAINST THE CITY**

While the Supreme Court has held that state law notice-of-claim requirements do not apply to actions under 42 U.S.C. § 1983, it carefully noted that "federal courts entertaining state-law claims against ... municipalities are obligated to apply the [state's] notice-of-claim provision." *Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). Under New York law, "service of a notice of claim within ninety days from the accrual of a cause of action founded in tort is a condition precedent to a lawsuit against the [City] or its employees," *Feliciano v. County of Suffolk*, 419 F. Supp. 2d 302, 315 (E.D.N.Y. 2005), and "[f]ederal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim," *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 216 (E.D.N.Y. 2013) (Spatt, J.) (quoting *Dingle v. City of New York*, 728 F. Supp. 2d 332, 348-49 (S.D.N.Y. 2010) ); *see also* N.Y. Gen. Mun. Law § 50-k(6) ("No action or proceeding ... shall be prosecuted or maintained against the city or any agency or an employee unless notice of claim shall have been made and served upon the city in compliance with section fifty-e of this chapter and within ninety days after the claim arises.").

Here, the Plaintiffs only filed a Notice of Claim with the Town, and not the City. ECF 1 at 8; ECF 13 ¶ 3. The Plaintiffs do not contest this point. As a result, the Court lacks jurisdiction to hear the Plaintiffs' state law claims. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 74–75 (E.D.N.Y. 2009) ("There is no dispute, however, that defendants Yoo and Viani never served a notice of claim on the City, much less within

90 days of those dates. Accordingly, even if their claims were timely, defendants Yoo's and Viani's § 50–k(2) claims would be dismissed for failure to comply with applicable notice-of-claim requirements."); *Bradshaw v. City of New York*, No. 15-cv-2166, 2017 WL 6387617, at *4 (E.D.N.Y. Aug. 22, 2017) (dismissing complaint against city where plaintiff had "not clearly alleged that he filed a notice of claim within ninety days of" incident); *Cooper v. City of New York*, No. 14CV3698ENVPK, 2016 WL 4491719, at *10 (E.D.N.Y. Aug. 25, 2016) (dismissing cause of action against city where plaintiff "[w]ith no explanation, ... missed the statutory deadline"); *Colson v. Haber*, No. 13-cv-5394, 2016 WL 236220, at *6 (E.D.N.Y. Jan. 20, 2016) (dismissing case where Plaintiffs had "not filed any notice of claim in connection with the" incident prior to motion to dismiss").

**\*8** Therefore, the Court finds that the City would be entitled to dismissal of the state law claims, regardless of their timeliness.

### III. CONCLUSION

For the foregoing reasons, the Court grants the City's motion to dismiss in its entirety. The Plaintiffs' claims against the City and the City John and Jane Does are dismissed. The Clerk of the Court is respectfully directed to amend the caption as follows:

——————————————X

ELENDELL BOGGS and RANDY MOUZON, Plaintiff,
-against-

TOWN OF RIVERHEAD, Riverhead Town Police Officers "JOHN DOES" 1-10 and "JANE DOES" 1-10, in their official and individual capacities; RIVERHEAD VILLAGE PRESERVATION LLP and; New York State Law Enforcement Agents "JOHN DOES" 1-10 and "JANE DOES" 1-10, in their official and individual capacities, Defendants.

——————————————X

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5830824

---

                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3946291

558 F.Supp.3d 66
United States District Court, W.D. New York.

Ronald E. ROWLES, Plaintiff,

v.

Nurse Jane DOE, Physician Assistant Dave
Parsons, and Niagara County, Defendants.

6:19-CV-06933 EAW

|

Signed 09/03/2021

**Synopsis**
**Background:** Federal inmate brought § 1983 action against
correctional facility nurse, physician assistant, and county,
alleging they violated his constitutional rights when they were
deliberately indifferent to his medical needs. County filed a
motion to dismiss inmate's municipal liability claim.

**Holdings:** The District Court, Elizabeth A. Wolford, Chief
Judge, held that:

[1] inmate failed to plausibly identify a municipal policy or
practice resulting in the denial of medical care to federal
inmates, as would support holding county liable on his § 1983
claim that county violated his constitutional rights by being
deliberately indifferent to his medical needs, and

[2] inmate failed to identify any actions taken by
policymaking individuals, any consistent or widespread
practice that constituted a custom, or a failure of policymakers
to provide adequate training or supervision to subordinates
that amounted to deliberate indifference, as would support
holding county liable on his § 1983 claim.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (12)

[1]     **Federal Civil Procedure**  ⚷  Insufficiency in
        general

To state a plausible claim to survive a motion to
dismiss, the pleading's factual allegations must
be enough to raise a right to relief above the
speculative level. Fed. R. Civ. P. 12(b)(6).

[2]     **Federal Civil Procedure**  ⚷  Pro Se or Lay
        Pleadings

While a court is obliged to construe pro se
pleadings liberally in considering a motion to
dismiss, particularly when they allege civil rights
violations, even pleadings submitted pro se must
satisfy the plausibility standard set forth in *Iqbal*
and *Twombly*. Fed. R. Civ. P. 12(b)(6).

[3]     **Sentencing and Punishment**  ⚷  Medical care
        and treatment

Contracting out prison medical care does not
relieve a State of its constitutional duty to
provide adequate medical treatment to those
in its custody, and it does not deprive a
State's prisoners of the means to vindicate their
constitutional rights. U.S. Const. Amend. 8.

[4]     **Civil Rights**  ⚷  Governmental Ordinance,
        Policy, Practice, or Custom

To establish municipal liability under § 1983,
a plaintiff must prove that action pursuant to
official municipal policy caused the alleged
constitutional injury. 42 U.S.C.A. § 1983.

[5]     **Civil Rights**  ⚷  Governmental Ordinance,
        Policy, Practice, or Custom

        **Civil Rights**  ⚷  Issues, proof, and variance

To hold a municipality liable under § 1983 for
the unconstitutional actions of its employees, a
plaintiff is required to plead and prove three
elements: (1) an official policy or custom that (2)
causes the plaintiff to be subjected to (3) a denial
of a constitutional right. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

2021 WL 3946291

**[6]**    **Civil Rights**    Governmental Ordinance, Policy, Practice, or Custom

For purposes of holding a municipality liable under § 1983 for the unconstitutional actions of its employees, official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[7]**    **Civil Rights**    Complaint in general

To survive a motion to dismiss on a § 1983 claim for municipal liability, the plaintiff cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[8]**    **Civil Rights**    Governmental Ordinance, Policy, Practice, or Custom

**Civil Rights**    Lack of Control, Training, or Supervision; Knowledge and Inaction

A plaintiff may satisfy the "policy or custom" requirement for municipal liability under § 1983 by alleging one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[9]**    **Civil Rights**    Prisons and jails; probation and parole

Federal inmate failed to plausibly identify a municipal policy or practice resulting in the denial of medical care to federal inmates, as would support holding county liable on his § 1983 claim that his constitutional rights were violated when county was deliberately indifferent to his medical needs, although inmate was told the jail did not provide medical care to federal inmates; inmate did not specify who informed him of alleged policy, inmate did not identify any other federal inmates denied medical care or any rule indicating that it was an official policy of county to deny medical care to federal inmates, and inmate received at least some medical treatment at the jail. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[10]**    **Civil Rights**    Complaint in general

While *Monell* claims under § 1983 are not subject to a heightened pleading standard beyond that defined in federal rules of pleading, such claims nevertheless must meet the plausibility requirements of *Twombly* and *Iqbal*. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 8(a)(2).

**[11]**    **Civil Rights**    Complaint in general

For the purposes of a § 1983 claim for municipal liability, mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details. 42 U.S.C.A. § 1983.

**[12]**    **Civil Rights**    Criminal law enforcement; prisons

**Civil Rights**    Criminal law enforcement; prisons

Federal inmate failed to identify any actions taken by policymaking individuals resulting in the denial of medical care to federal inmates,

any practice so consistent or widespread at the jail that it constituted a custom, or a failure of policymakers to provide adequate training or supervision to subordinates to such an extent that it amounted to deliberate indifference, as would support holding county liable on his § 1983 claim that his constitutional rights were violated when county was deliberately indifferent to his medical needs; inmate's claims were based on the medical treatment he received or did not receive from a nurse and physician assistant, neither of whom were policymaking individuals, and inmate did not identify any other federal inmates denied medical care. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**Attorneys and Law Firms**

*67 Ronald E. Rowles, Buffalo, NY, Pro Se.

Paul A. Sanders, Barclay Damon, LLP, Rochester, NY, for Defendant PA Dave Parsons.

Brian P. Crosby, Melissa M. Morton, Gibson, McAskill & Crosby, LLP, Buffalo, NY, for Defendant Niagara County.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, Chief Judge

**\*68 INTRODUCTION**

**\*\*1** Plaintiff Ronald E. Rowles ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Nurse Jane Doe, Physician Assistant Dave Parsons, and Niagara County (collectively "Defendants"), violated his constitutional rights when they were deliberately indifferent to his medical needs. (Dkt. 4). Presently before the Court is a motion filed by defendant Niagara County ("the County") to dismiss Plaintiff's claim for municipal liability against it, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. 10). For the reasons explained below, the County's motion is granted.

**BACKGROUND**

The following facts are taken from Plaintiff's amended complaint. (Dkt. 4). As required on a motion to dismiss, the Court treats Plaintiff's factual allegations as true.

Plaintiff alleges that, when he was being processed at Niagara County Correctional Facility on June 28, 2019, he verbally informed the nurse that he recently underwent an MRI after being involved in a car accident on February 16, 2019. (Id. at 5, 12). Plaintiff had sustained injuries to his back and neck, which included "herniations and bulges" at "T1, T2, T9, T10, C5-6, C6-7, L5 [and] S1." (Id.). "No further action was taken" by the medical staff and, on July 26, 2019, Plaintiff "filed a sick call for [his] pain [but] was never seen." (Id. at 5).

Plaintiff filed additional sick call requests in August through December 2019. (Id. at 12-13). On October 2, 2019, Plaintiff was informed that the "jail doesn't provide medical care for federal inmates." (Id. at 12). Plaintiff started receiving some pain medication on October 14, 2019, but it was insufficient to relieve his "major" pain. (Id. at 12, 14). On December 4, 2019, Plaintiff was seen by defendant Parsons, who advised Plaintiff that he "shouldn't have come to jail" and called him a "complainer." (Id. at 12). Plaintiff filed several grievances in December 2019, and was erroneously removed from the doctor's list on or about December 25, 2019. (Id. at 12-13). Plaintiff was seen by the doctor on December 27, 2019, and approved for physical therapy, which consisted of only two sessions conducted in January and February 2020. (Id. at 13). As of September 1, 2020, Plaintiff was still waiting for his physical therapy to resume, and he continues to suffer from severe neck and back pain. (Id. at 13-14). He alleges that his injuries "are far more serious than what the medical staff has medicated [him] for," and that he has "never had this much of a hassle receiving 'proper care' " for his medical problems than he has at the jail. (Id. at 14).

**PROCEDURAL HISTORY**

Plaintiff filed his complaint and a motion to proceed *in forma pauperis* on December 30, 2019. (Dkt. 1; Dkt. 2). The Court screened the complaint and directed Plaintiff to file an amended complaint. (Dkt. 3). Plaintiff filed his amended complaint on September 8, 2020, and named the "Niagara County Correctional Facility Medical" as a defendant. (Dkt. 4 at 1). On January 5, 2021, the Court issued a Decision

2021 WL 3946291

and Order, which permitted Plaintiff's claim **\*69** based on inadequate medical care to proceed to service. (Dkt. 5 at 5). The Court further found that although Plaintiff named "Niagara County Correctional Facility Medical" as a defendant, the real party in interest was Niagara County, and therefore the County was substituted as a defendant. (*Id.* at 6). The Court clarified that "[f]or purposes of initial review only" it would "generously construe[ ] the pleadings to assert the existence of a policy or practice to deny medical care to federal prisoners confined at the Jail." (*Id.* at 7).[1]

[1]    Plaintiff states in a grievance attached to his amended complaint that he was "a federal detainee inmate." (Dkt. 4 at 10). Assuming that Plaintiff was not a sentenced prisoner during the period alleged in the amended complaint, his deliberate indifference claim would be evaluated under the Fourteenth Amendment's Due Process Clause. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

**\*\*2** On February 19, 2021, the County filed its motion to dismiss.[2] (Dkt. 10). The Court set a scheduling order, requiring that Plaintiff file response papers no later than March 15, 2021 (Dkt. 13), and the docket reflects that a copy of the scheduling order was mailed to Plaintiff. To date, Plaintiff has not filed a response to the County's motion to dismiss.

[2]    Defendant Parsons filed an answer to the amended complaint on February 24, 2021. (Dkt. 15). To date, Plaintiff has failed to identify the individual presently named as Nurse Jane Doe. (*See* Dkt. 8; Dkt. 18; Dkt. 19).

## DISCUSSION

### I. Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the [claimant]." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a claimant must set forth "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

[1]  [2]  "While a [pleading] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [claimant]'s obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). "To state a plausible claim, the [pleading]'s '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). While the Court is "obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must satisfy the plausibility standard set forth in *Iqbal* and *Twombly, see* **\*70** *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("Even after *Twombly*, though, we remain obligated to construe a *pro se* complaint liberally.").

### II. Plaintiff has Failed to Plead a Claim for Municipal Liability Against the County

[3]  The County moves for dismissal on the basis that Plaintiff has failed to state a claim for municipal liability against it for deliberate indifference to medical care, because he has failed to allege: (1) the existence of a formal policy endorsed by the County; (2) a practice so persistent and widespread such that it constitutes a custom or usage of which supervisory authorities must have been aware; or (3) a municipal custom, policy, or usage which can be inferred from evidence of deliberate indifference of supervisory officials to such abuses. (Dkt. 10-1 at 4; Dkt. 10-4 at 9-16). The County contends that medical treatment at the jail is provided not by county employees, but rather by employees of an independent contractor, PrimeCare Medical of New York, Inc.—the employees of which do not hold supervisory roles in the county and are not involved in making policy decisions—and therefore municipal liability cannot exist as to the County, since the conduct complained of by Plaintiff

was not performed by county employees. [3] (Dkt. 10-4 at 10-11). Further, the County argues that even if the conduct complained of by Plaintiff was undertaken by a county employee, Plaintiff has not plausibly alleged a claim for municipal liability. (*Id.* at 11-17).

[3]    In support of its claim that medical care at the jail was performed not by county employees but by an independent contractor, the County submits the declaration of Darren W. Engert, an Administrative Captain with the Corrections Division of the Niagara County Sheriff's Office. (Dkt. 10-2 at ¶ 1). Mr. Engert states, in relevant part, that "any and all medical care and treatment received by inmates at the Niagara County Jail is exclusively provided by an independent contractor, PrimeCare Medical of New York, Inc. ... and its employees and/or subcontractors." (*Id.* at ¶ 12). Mr. Engert's statement that PrimeCare, and not county employees, provide medical care to inmates at the jail is supported by Plaintiff's amended complaint, which includes as an attachment a PrimeCare "Patient Follow-Up Sheet." (*See* Dkt. 4 at 9). The document is dated "8-22," and indicates that Plaintiff underwent an MRI of his cervical spine on June 14, 2019, the results of which were considered within normal ranges, with no further visits required. (*Id.*). "Herniations [at] C5-6 [and] C6-7 without stenosis" were noted. (*Id.*).

Given that the motion before the Court is a motion to dismiss—where the Court is required to accept all allegations as true and draw all reasonable inferences in favor of Plaintiff—the Court will not consider the declaration submitted by Mr. Engert in resolving the County's motion. Further, the Court notes that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their [constitutional] rights." *Carter v. Broome Cnty.*, 394 F. Supp. 3d 228, 241-42 (N.D.N.Y. 2019) (quoting *West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

**\*\*3** **[4]** **[5]** **[6]** **[7]** **[8]** "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). "[T]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking **\*71** officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. To survive a motion to dismiss, the plaintiff "cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quotation omitted). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

**[9]** Plaintiff's allegations are not sufficient to survive the County's motion to dismiss. The focus of Plaintiff's amended complaint is the treatment of his neck and back injuries at the jail, including that he was denied medical treatment and that when he did receive treatment, including both in the form of medications and physical therapy, it was not effective.

2021 WL 3946291

Plaintiff's factual allegations focus on treatment he received from a physician assistant and a nurse, rather than on a widespread policy to deny inmates medical treatment.

**[10]** Even construing Plaintiff's allegation that on October 2, 2019, he was informed that the "jail doesn't provide medical care for federal inmates" (*see* Dkt. 4 at 12) as identifying a policy or practice by the County, the amended complaint does not include supporting factual allegations regarding this alleged policy sufficient to survive a motion to dismiss. "While *Monell* claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of *Bell Atlantic Corp. v. Twombly* ... and *Ashcroft v. Iqbal*." *King v. City of Beacon Police Dep't*, No. 20 CV 5815 (VB), 2021 WL 1550073, at *2 (S.D.N.Y. Apr. 20, 2021) (citation omitted); *see also Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (where plaintiff complained that deputy acted pursuant to county policy of permitting deputies to publish false statements and to target perceived pedophiles for harassment, explaining that plaintiff "made no allegation that any official policymaker or policymaking body took any action to establish either of the policies he alleges," and "allegations that [the deputy] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient.").

**[11]** Here, Plaintiff does not specify who informed him of the alleged policy or the circumstances of his learning of the policy, nor does he identify other federal inmates denied medical care or any rule indicating that it is the official policy of the County to deny medical care to federal inmates. Plaintiff's allegations, which reveal that he did receive at least some medical treatment at the jail, also do not provide factual support for the existence of such a policy. In other words, even generously construing Plaintiff's amended complaint as alleging a policy of denying medical care to federal inmates, that allegation **\*72** is still too conclusory to plausibly allege a claim for municipal liability against the County. *Vassallo v. City of New York*, No. 15 Civ. 7125 (KPF), 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016) (dismissing plaintiff's inadequate medical care claim against municipal defendants, and explaining that "[t]o state there is a policy does not make it so," and "while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery ... additional facts for Plaintiff's 'official policy' *Monell* allegations are required" (internal citation omitted)); *see also Fleming v. City of New York*, No. 18 Civ. 4866

(GBD), 2019 WL 4392522, at *8 (S.D.N.Y. Aug. 27, 2019) ("Plaintiff's conclusory allegations are ... insufficient to allege that the *Monell* Defendants have a longstanding custom, pattern, or practice of ... being deliberately indifferent to inmates' medical needs or physical safety."); *Isaac v. City of New York*, No. 17 Civ. 1021 (PGG), 2018 WL 1322196, at *7 (S.D.N.Y. Mar. 13, 2018) ("Plaintiff's conclusory allegations regarding the alleged deprivation of adequate medical care that he suffered are ... not sufficient to establish a municipal custom or policy."). In other words, "mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom *unless supported by factual details*." *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (emphasis added); *see also Simms v. City of New York*, No. 10-CV-3420 (NGG)(RML), 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing plaintiff's claim against city, which made "a scant three factual assertions, which, when read together, d[id] not amount to a plausible claim that any City policy, practice, or custom contributed to [plaintiff's] injury"), *aff'd*, 480 F. App'x 627 (2d Cir. 2012).

**\*\*4** **[12]** Further, Plaintiff has not identified any actions taken by policymaking individuals resulting in the denial of medical care to federal inmates. Rather, Plaintiff's claims are based on medical treatment he received or did not receive from a nurse and physician assistant, neither of whom from the allegations contained in the amended complaint appear to be policymaking individuals. Nor has Plaintiff alleged that the failure to treat federal inmates was a practice so consistent or widespread at the jail that it constitutes a custom, such as by identifying other federal inmates who were denied medical care or other prison officials who denied federal inmates medical care. *See Walker v. City of New York*, No. 14-CV-808 (ER), 2015 WL 4254026, at *7 (S.D.N.Y. July 14, 2015) ("While Plaintiff provides general allegations that the City has adopted a widespread custom, the facts pled are insufficient to meet this prong's requirements."). Finally, the amended complaint does not contain allegations describing a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference. Rather, Plaintiff's amended complaint details his requests for medical care, his visits with medical staff at the jail, and grievances he filed relating to his care. Without further development by Plaintiff, allegations of this nature are not sufficient to impose liability on the County.

Rowles v. Doe, 558 F.Supp.3d 66 (2021)

2021 WL 3946291

Plaintiff has not responded to the County's motion to dismiss, and therefore he has failed to identify how any of the allegations contained in his amended complaint support imposing municipal liability on the County. Because Plaintiff has failed to plausibly allege municipal liability on the part of the County, his claims against it must be dismissed.

**\*73  CONCLUSION**

For the foregoing reasons, the County's motion to dismiss Plaintiff's municipal liability claim is granted. Plaintiff's amended complaint is dismissed as to defendant Niagara County only, and the Clerk of Court is directed to terminate Niagara County as a defendant to this action.

SO ORDERED.

**All Citations**

558 F.Supp.3d 66, 2021 WL 3946291

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 166 of 217

Isaac v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1322196

2018 WL 1322196
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Carlos ISAAC, Plaintiff,

v.

The CITY OF NEW YORK, Corizon Health Inc.,
Corizon Health Clinical Solutions, LLC, Corizon
Inc., Correctional Medical Associates of New York,
P.C., New York City Police Department Officer Juan
Cabrera (Shield No. 26123), P.O. John Does, and P.O.
John Roes, in their individual capacities, Defendants.

17 Civ. 1021 (PGG)
|
Signed 03/13/2018

**Attorneys and Law Firms**

David Bruce Rankin, Gillian Robin Cassell-Stiga, Beldock
Levine & Hoffman LLP, New York, NY, for Plaintiff.

Jeffrey Loperfido, Peter William Brocker, New York City
Law Department, New York, NY, for Defendants.

**OPINION**

Paul G. Gardephe, United States District Judge

**\*1** In this Section 1983 action, Plaintiff Carlos Isaac
brings claims against the City of New York ("the City");
Corizon, Inc., Corizon Health, Inc., Corizon Health Clinical
Solutions, LLC, and Correctional Medical Associates of
New York, P.C. (collectively, "Corizon" or the "Corizon
Defendants"); and New York City Police Department
("NYPD") Officer Juan Cabrera alleging false arrest and
false imprisonment, fabrication of evidence, abuse of process,
malicious prosecution, and failure to provide medical
treatment. (Am. Cmplt. (Dkt. No. 36) ¶¶ 8-16, 34-49) [1] The
Amended Complaint also asserts state law claims for medical
malpractice, and liability under the doctrine of respondeat
superior. (Id. ¶¶ 50-56)

[1]    The page numbers of documents referenced in this
       Order correspond to the page numbers designated
       by this District's Electronic Case Filing system.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants have moved
to dismiss Plaintiff's (1) deliberate indifference to serious
medical needs claim against Officer Cabrera; (2) Monell
claim against the City and the Corizon Defendants; and (3)
medical malpractice claim. (Def. Br. (Dkt. No. 48) at 12-21)

For the reasons stated below, Defendants' motion to dismiss
will be granted.

**BACKGROUND** [2]

[2]

        Unless otherwise noted, the following facts
        are drawn from the Amended Complaint and
        are presumed true for purposes of resolving
        Defendants' motion to dismiss. See Kassner v. 2nd
        Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir.
        2007).

**I. FACTS**
On January 22, 2015, Plaintiff was arrested by Police Officer
Cabrera and another, unidentified police officer at the corner
of 148th Street and Brook Avenue in the Bronx. (Am. Cmplt.
(Dkt. No. 36) ¶ 17) The officers brought Plaintiff to the 40th
Precinct, where they subjected him to an "invasive[ ]" search.
(Id. ¶ 21)

Plaintiff was charged with the sale and possession of a
controlled substance. (Id. ¶ 22) Plaintiff claims that he "was
unlawfully arrested" and that the charges against him "were
based upon the false statements of [Officer] Cabrera and
[Officer] Doe." (Id. ¶¶ 17, 23)

After his arraignment, Plaintiff was transferred to Rikers
Island. (See id. ¶ 22) The Corizon Defendants are under
contract with the City to provide health care services to
pretrial detainees in the City's custody, including at Rikers
Island. (Id. ¶ 10)

Shortly after his arrest, Plaintiff "informed City and Corizon
employees ... that he "needed his prescribed medication and
required medical attention." (Id. ¶ 25) Although Plaintiff
"displayed the physical signs of being in medical distress
during the period of his detention," he "did not receive
his prescribed medication ... for an extended period of
time." (Id. ¶¶ 26-27) According to Plaintiff, "Defendants
acted recklessly and with a deliberate indifference to
[Plaintiff's] medical needs." (Id. ¶ 28) Due to "medical

2018 WL 1322196

complications resulting from the defendants' failure to provide adequate medical care," Plaintiff was eventually transferred to Bellevue Hospital. (Id. ¶ 30)

**\*2** Plaintiff was released from custody on August 22, 2015, and the charges against him were dismissed on October 8, 2015. (Id. ¶¶ 31-32)

The Complaint was filed on February 10, 2017, and alleges (1) Section 1983 claims against Officer Cabrera for false arrest and false imprisonment, fabrication of evidence, abuse of process, malicious prosecution, and deliberate indifference to Plaintiff's medical needs; (2) a Monell claim against the City of New York and Corizon; (3) a medical malpractice claim against Corizon; and (4) respondeat superior liability as to Corizon concerning the medical malpractice claim. (Id. ¶¶ 34-56)

## DISCUSSION

### I. RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions, are not entitled to the assumption of truth," however. Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " id., 556 U.S. at 678, 129 S.Ct. 1937, offers " 'a formulaic recitation of the elements of a cause of action,' " id., or does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable

L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).

## II. DELIBERATE INDIFFERENCE CLAIM

Defendants contend that Plaintiff has not pled sufficient facts to make out a Section 1983 claim for deliberate indifference to Plaintiff's medical needs. (Def. Br. (Dkt. No. 48) at 12-16)

### A. Applicable Law

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). This is because—in contrast to a convicted prisoner—" '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.' " Id. (alteration in original) (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)). Thus, "[a] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' " Id.

**\*3** To establish a Section 1983 claim for deliberate indifference to serious medical need under the Due Process Clause, "a pretrial detainee must satisfy two prongs": (1) "an 'objective prong' showing that the [deprivation of medical care] w[as] sufficiently serious to constitute [an] objective deprivation[ ] of the right to due process," and (2) "a 'subjective prong'—perhaps better classified as a 'mens rea prong' or 'mental element prong'—showing that the [defendant official] acted with at least deliberate indifference" in denying medical care. Id. at 29, 33 n. 9; Lloyd v. City of New York, 246 F.Supp.3d 704, 717 (S.D.N.Y. 2017).

In order to satisfy the mens rea prong—a plaintiff need only prove that

> the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee, even though the defendant-official knew, or should

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 168 of 217

Isaac v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1322196

have known, that the condition posed
an excessive risk to health or safety.

Darnell, 849 F.3d at 35. "[R]ather than ask whether the
charged official 'kn[ew] of and disregard[ed] an excessive
risk to inmate health or safety,' courts are to instead determine
whether the official 'knew, or should have known' that his or
her conduct 'posed an excessive risk to health or safety.' "
Lloyd, 246 F.Supp.3d at 719 (alteration in original) (quoting
Darnell, 849 F.3d at 33, 35); see also Davis v. McCready, No.
14 Civ. 6405 (GHW), 2017 WL 4803918, at *4-5 (S.D.N.Y.
Oct. 23, 2017) (The court must determine "whether an
objectively reasonable person in Defendant's position would
have known, or should have known, that Defendant's actions
or omissions posed an excessive risk of harm to [plaintiff].").
"In other words, the 'subjective prong' (or 'mens rea prong')
of a deliberate indifference claim [brought by a pretrial
detainee] is [now] defined objectively." Darnell, 849 F.3d at
35.

## B. Analysis

### 1. Sufficiently Serious Deprivation

Determining whether an alleged deprivation of medical care
is "sufficiently serious" under the first prong of analysis
requires two separate inquiries. Salahuddin v. Goord, 467
F.3d 263, 279 (2d Cir. 2006). " 'The first inquiry is whether
the [pretrial detainee] was actually deprived of adequate
medical care,' keeping in mind that only 'reasonable care' is
required.' " Barnes v. Ross, 926 F.Supp.2d 499, 505 (S.D.N.Y.
2013) (quoting Salahuddin, 467 F.3d at 279 (citing Farmer
v. Brennan, 511 U.S. 825, 844-47, 114 S.Ct. 1970, 128
L.Ed.2d 811 (1994))). "The second inquiry 'asks whether
the inadequacy in medical care is sufficiently serious.' "
Feliciano v. Anderson, No. 15 Civ. 4106 (LTS) (JLC), 2017
WL 1189747, at *10 (S.D.N.Y. Mar. 30, 2017) (quoting
Salahuddin, 467 F.3d at 280). "There is no settled, precise
metric to guide a court in its estimation of the seriousness of
a prisoner's medical condition." Brock v. Wright, 315 F.3d
158, 162 (2d Cir. 2003). Instead, the determination "must be
tailored to the specific circumstances of each case." Smith v.
Carpenter, 316 F.3d 178, 185 (2d Cir. 2003).

" '[I]n cases of delayed or inadequate care, 'it's the particular
risk of harm faced by a prisoner due to the challenged
deprivation of care, rather than the severity of the prisoner's

underlying medical condition, considered in the abstract, that
is relevant....' " Id. (alteration in original) (quoting Sledge
v. Fein, No. 11 Civ. 7450 (PKC), 2013 WL 1288183, at *5
(S.D.N.Y. Mar. 28, 2013)); see also Bellotto v. Cty. of Orange,
248 Fed.Appx. 232, 236 (2d Cir. 2007) ("When a prisoner
alleges denial of adequate medical care, we evaluate the
seriousness of the prisoner's underlying medical condition....
When a prisoner alleges 'a temporary delay or interruption
in the provision of otherwise adequate medical treatment,'
we focus on the seriousness of the particular risk of harm
that resulted from 'the challenged delay or interruption
in treatment rather than the prisoner's underlying medical
condition alone." ' (quoting Smith, 316 F.3d at 184-86)). "A
claim of an unconstitutional delay or interruption in treatment
is only cognizable if it 'reflects deliberate indifference to
a serious risk of health or safety, to a life-threatening or
fast-degenerating condition[,] or to some other condition of
extreme pain that might be alleviated through reasonably
prompt treatment.' " Case v. Anderson, No. 16 Civ. 983
(NSR), 2017 WL 3701863, at *8, 2017 U.S. Dist. LEXIS
137118 at *23 (S.D.N.Y. Aug. 25, 2017) (quoting Amaker
v. Coombe, No. 96 Civ. 1622 (JGK), 2002 WL 523388, at
*8 (S.D.N.Y. Mar. 29, 2002))). "[I]n most cases, the actual
medical consequences that flow from the alleged denial of
care will be highly relevant to the question of whether the
denial of treatment subjected the prisoner to a significant risk
of serious harm." Smith, 316 F.3d at 187 (citations omitted).

*4 Here, Plaintiff has not set forth sufficient facts to
demonstrate that the alleged delay in care was "sufficiently
serious." While Plaintiff alleges that he displayed "physical
signs of being in medical distress," requested his "prescribed
medications," and did not receive timely or adequate medical
care, Plaintiff does not disclose what his medical condition
was or what illnesses he suffers from, what prescriptions
he was deprived of, or what signs of medical distress he
displayed. (See Am. Cmplt. (Dkt. No. 36) ¶¶ 25-29). Indeed,
Plaintiff does not even specify the length of the delay. (See
id. ¶ 27)

Plaintiff uses similarly inadequate, conclusory allegations
in discussing the consequences of the alleged deliberate
indifference: Plaintiff suffered "pain, mental anguish,
and physical injury," and "due to medical complications
resulting from the defendants' failure to provide adequate
medical care, ... was eventually transferred to Bellevue
hospital." (See id. ¶¶ 30, 33) Plaintiff does not disclose the
medical complications or physical injury he experienced,
the treatment he received at Bellevue Hospital, or how

Isaac v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1322196

Defendants' alleged deliberate indifference caused him to suffer "pain, mental anguish, and physical injury" and to suffer "medical complications."

The Amended Complaint's factual allegations are not sufficient to demonstrate that Plaintiff was deprived of medically necessary treatment or that the risk of harm posed by any delay in medical care was sufficiently serious. See, e.g., Feliciano, 2017 WL 1189747, at *11 ("There are ... no allegations that his conditions were life-threatening and fast-degenerating, or that they worsened because of the delay, or that the delay was punitive.... [T]he Court concludes that any alleged delay was not serious enough to violate [Plaintiff's] constitutional rights."); Gantt v. Horn, No. 09 Civ. 7310 (PAE), 2013 WL 865844, at *9 (S.D.N.Y. Mar. 8, 2013) ("[Plaintiff] has not alleged that any delays in his treatment caused any symptoms of his underlying illnesses to worsen.... Furthermore, [plaintiff] has not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy of such treatment, has put him at an 'unreasonable risk of future harm.' ... The facts at hand fall far short of those in cases in which courts have found an objectively serious injury." (quoting Smith, 316 F.3d at 188)); Fernandini v. United States, 15 Civ. 3843 (GHW), 2017 WL 3208587 at *9 (S.D.N.Y. July 26, 2017) ("The allegations in the [Complaint] do not suggest that the three-day delay in receiving medical treatment was 'needlessly prolonged.' While the Court accepts as true that Plaintiff felt pain from the bite, ... nothing in the [Complaint] suggests that the three-day wait time caused 'chronic and substantial pain' or worsened Plaintiff's condition.").

### 2. Excessive Risk to Health or Safety

The Amended Complaint's factual allegations are also insufficient as to the second prong of the Due Process analysis.

Under Darnell, a plaintiff seeking to satisfy the mens rea prong must demonstrate that the defendant behaved in an objectively reckless manner. See Darnell, 849 F.3d at 35. "[A] defendant possesses the requisite mens rea when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result." Feliciano, 2017 WL 1189747, at *13 (citing Darnell, 849 F.3d at 35 ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the

pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.")). A mere showing of negligence is insufficient, however. See Darnell, 849 F.3d at 36 ("A detainee must prove that an official acted intentionally or recklessly, and not merely negligently.").

**\*5** For the same reasons discussed above, the Amended Complaint's factual allegations do not demonstrate that any Defendant acted with "deliberate indifference" to Plaintiff's health. Absent factual allegations disclosing Plaintiff's medical condition and prescriptions, the length of the alleged delay in care, and the physical signs of medical distress Plaintiff exhibited, there is no basis to find that the Defendants "knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result [from the alleged delay in care]." See Feliciano, 2017 WL 1189747, at *14. Accordingly, Defendants' motion to dismiss Plaintiff's deliberate indifference claim will be granted.

### III. *MONELL* CLAIM

The City and the Corizon Defendants contend that Plaintiff's Monell claim must be dismissed because he has not identified a specific policy or practice that caused the alleged constitutional deprivation. [3] (Def. Br. (Dkt. No. 48) at 16)

[3]     "Corizon, although a private entity, is treated as a municipal actor for purposes of this lawsuit." Grimmett v. Corizon Med. Assocs. of New York, No. 15 Civ. 7351 (JPO) (SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017); see also Bess v. City of New York, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality." (citations omitted)).

### A. Applicable Law

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a government's

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 170 of 217

Isaac v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1322196

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694, 98 S.Ct. 2018. Accordingly, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)

A plaintiff can satisfy the "policy or custom" requirement in one of four ways. The plaintiff may allege:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Vasquez v. Rockland Cty., No. 15 Civ. 8912 (KMK), 2017 WL 456473, at *4 (S.D.N.Y. Feb. 1, 2017) (quoting Brandon v. City of New York, 705 F.Supp.2d 261, 276-77 (S.D.N.Y. 2010)).

" '[T]he word "policy" generally implies a course of action consciously chosen from among various alternatives.' " Vives v. City of New York, 524 F.3d 346, 350 (2d Cir. 2008) (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). "Policy, in the Monell sense, may of course be made by the municipality's legislative body, ... but it also may be made by a municipal official 'possess[ing] final authority to establish a municipal policy with respect to the action ordered.' " Id. (quoting

Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

*6 " 'A municipal "custom," on the other hand, need not receive formal approval by the appropriate decisionmaker....' " Triano v. Town of Harrison, New York, 895 F.Supp.2d at 531 (S.D.N.Y. 2012) (quoting Newton v. City of New York, 566 F.Supp.2d 256, 271 (S.D.N.Y. 2008)). "Instead, 'an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.' " Id. (quoting Bd. Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

"[M]ere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." Id. at 535 (citing Moore v. City of New York, No. 08 Civ. 8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010)). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Santos v. New York City, 847 F.Supp.2d 573, 576 (S.D.N.Y. 2012) (citing Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)); Bess v. City of New York, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("[I]n keeping with the pleading requirements imposed by Twombly and Iqbal, a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed."). "[A] conclusory, boilerplate assertion of a municipal policy or custom [is] insufficient to survive a motion to dismiss." Plair v. City of New York, 789 F.Supp.2d 459, 469 (S.D.N.Y. 2011) (quoting Santiago v. City of New York, No. 09 Civ. 0856 (BMC), 2009 WL 2734667, at *7 (E.D.N.Y. Aug. 18, 2009) (citing Smith v. City of New York, 290 F.Supp.2d 317, 322 (E.D.N.Y. 2003))); see also Brodeur v. City of New York, No. 99 Civ. 661 (WHP), 2002 WL 424688, at *6 (S.D.N.Y. Mar. 18, 2002) (Monell claim dismissed where complaint asserted a policy but contained no "specific factual allegations sufficient to establish that a municipal policy or custom caused [the plaintiff's] alleged injury").

**B. Analysis**
Here, Plaintiff alleges—in conclusory fashion—that "the City of New York and Corizon had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged[.]" (Am. Cmplt. (Dkt. No. 36) ¶¶ 38, 48) Plaintiff also claims that the "City

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 171 of 217

Isaac v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1322196

of New York and Corizon failed to properly train, screen, supervise, or discipline employees," and that "the City of New York has been aware of the routine, dangerous, and constitutionally inadequate medical care." (See id. ¶¶ 40-41, 57) These boilerplate allegations are plainly insufficient to demonstrate that the City of New York or Corizon had an unconstitutional policy or custom. See, e.g., Duncan v. City of New York, No. 11 Civ. 3826, 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) ("[B]oilerplate statements" that New York City " 'has a custom and policy of making illegal and false arrests with excessive force [and] without probable cause,' " and that the City had a " 'custom and policy of tolerating ... false arrest.... [and] excessive force,' " "are insufficient to state a claim of municipal liability under Monell."); Bradley v. City of New York, No. 08 Civ. 1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The Complaint's conclusory, boilerplate language—that the City 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused Plaintiff to be arrested without probable cause." (internal citation omitted)).

**\*7** In an attempt to bolster his allegations, Plaintiff refers to "major investigations into patterns of abuse by [Department of Corrections] staff on Rikers Island," to news reports that Riker's Island is going to be shut down, to the City's announcement that it would not renew its contract with the Corizon, and to the results of an investigation that "found that Corizon did not provide adequate screening or supervision of its employees, and [that] the City did not properly oversee this taxpayer-funded vendor, ignoring multiple red flags." (See Am. Cmplt. (Dkt. No. 36) ¶¶ 42-46) However, Plaintiff has not alleged facts suggesting that the events at Rikers Island were in any way linked to a specific policy that resulted in pretrial detainees being deprived of adequate medical care. Plaintiff has also not provided a "factual description of the injurious policy or custom," and "nowhere details which deficient training program or manners of supervision caused the violations suffered by both Plaintiff and ... other inmates." See Vassallo v. City of New York, No. 15 Civ. 7125 (KPF), 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016) (dismissing Monell claims against the City and Corizon); Simms v. The City of New York, No. 10 Civ. 3420 (NGG) (RML), 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing Monell claim because the complaint did "not provide any facts that would allow the court to infer what city

policies, practices, or customs contributed to or caused the deficiency"), aff'd sub nom. Simms v. City of New York, 480 Fed.Appx. 627 (2d Cir. 2012).

Plaintiff's conclusory allegations regarding the alleged deprivation of adequate medical care that he suffered (see Am. Cmplt. (Dkt. No. 36) ¶¶ 25-33) are likewise not sufficient to establish a municipal custom or policy. See Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."); Vassallo, 2016 WL 6902478, at *14 ("Plaintiff's allegations consist essentially of a recitation of the inadequate medical treatment received and generic claims that such inadequacies were a product of harmful customs and practices or failures to train or supervise.... Such boilerplate allegations are insufficient to state a Monell claim." (internal citation omitted)).

Because Plaintiff has not pled facts sufficient to support an inference of a custom or policy that caused Plaintiff's alleged constitutional violation, Plaintiff's Monell claim will be dismissed.

## IV. MEDICAL MALPRACTICE CLAIM

Defendants contend that Plaintiff's medical malpractice claim must be dismissed because (1) Plaintiff has not pled facts sufficient to state a claim; and (2) Plaintiff did not comply with the notice of claim requirement set forth in New York General Municipal Law § 50-e(1). (Def. Br. (Dkt. No. 48) at 19-21)

"Under New York law, the requisite elements of proof in a medical malpractice action are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." Melvin v. Cty. of Westchester, No. 14 Civ. 2995 (KMK), 2016 WL 1254394, at *19 (S.D.N.Y. Mar. 29, 2016) (citing Torres v. City of New York, 154 F.Supp.2d 814, 819 (S.D.N.Y. 2001)); see also Banks v. United States, No. 10 Civ. 6613 (GBD) (GWG), 2011 WL 4100454, at *16 (S.D.N.Y. Sept. 15, 2011) ("In order to make out a prima facie case for medical malpractice, plaintiff must allege that (1) the physician owed a duty of care to the plaintiff; (2) the physician breached that duty by deviating from accepted medical practice; and (3) the alleged deviation proximately caused plaintiff's injuries." (citations omitted), report and recommendation adopted, No. 10 Civ. 6613 (GBD) (GWG), 2011 WL 5454550 (S.D.N.Y. Nov. 9, 2011). Accordingly, in order to state a claim for medical

2018 WL 1322196

malpractice, a plaintiff must specify the injuries he suffered and allege sufficient facts to demonstrate how his injuries were caused by a deviation from the standard of care. See, e.g., Radin v. Tun, No. 12 Civ. 1393 (ARR) (VMS), 2015 WL 4645255, at *18 (E.D.N.Y. Aug. 4, 2015) ("As with Plaintiff's § 1983 claim, Plaintiff's factually unsupported allegations that the [defendant] attempted to provide her with unwanted psychiatric care is insufficient to state a claim. Plaintiff concludes that the [defendant] breached the standard of care without providing any specific factual allegations from which such a conclusion might be drawn.... Furthermore, Plaintiff does not identify the alleged injuries she suffered as a result of these actions."); Koulkina v. City of New York, 559 F.Supp.2d 300, 329-30 (S.D.N.Y. 2008) (dismissing medical malpractice claim because "plaintiffs do not allege how [defendant's] alleged conduct deviated from accepted medical practice and caused them any harm").

**\*8** Here, Plaintiff has not alleged sufficient facts to state a claim for medical malpractice. Plaintiff's boilerplate statements that "the individual defendants deviated from the acceptable standards of medical care during their evaluation and treatment" of Plaintiff, and that these "acts ... were the direct and proximate cause of [plaintiff's] injury," are not sufficient to state a claim. (See Am. Cmplt. (Dkt. No. 36) ¶¶ 50-53) Plaintiff does not explain how the delay in providing him with unidentified prescription medication deviated from accepted medical practice. Moreover, as discussed above, Plaintiff does not identify his medical condition, disclose the prescribed medication, or describe the length of the delay. Nor does he specify what injuries he allegedly suffered as a result of the alleged medical malpractice. Absent such factual allegations, Plaintiff cannot demonstrate a deviation from the standard of care or that this deviation from the standard of care caused him injury. Accordingly, Plaintiff's medical malpractice claim will be dismissed for failure to state a claim.[4]

[4]  Because Plaintiff's medical malpractice claim fails for failure to state a claim, this Court does not reach Defendants' argument that Plaintiff's claim is barred for failure to file a notice of claim. This Court notes, however, that while "a notice of claim is a condition precedent to bringing a tort claim against a municipality," see Fincher v. Cty. of Westchester, 979 F.Supp. 989, 1002 (S.D.N.Y. 1997); N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(l), the notice of claim requirement applies "to claims against a municipal employee only to the extent

that the employee has a right to indemnification." Nieblas-Love v. New York City Hous. Auth., 165 F.Supp.3d 51, 77 (S.D.N.Y. 2016). Under New York General Municipal Law Section 50-k(3), the City is only required to indemnify an employee "if his liability arose from conduct 'within the scope of his employment and in the discharge of his duties[,]' [that was] 'not in violation of any rule or regulation of his agency,' ' and where "the injury was not caused by 'intentional wrongdoing or recklessness on the part of the employee.' " Tulino v. City of New York, No. 15 Civ. 7106 (JMF), 2016 WL 2967847, at *3 (S.D.N.Y. May 19, 2016) (quoting N.Y. Gen. Mun. Law § 50-k(3)). Accordingly, to the extent that Plaintiff is asserting a state law claim against non-municipal Defendants on the basis that they acted recklessly or outside of the scope of their employment (see Am. Cmplt. (Dkt. No. 36) ¶ 28), it is not clear that the notice of claim requirements would apply.

## V. <u>LEAVE TO AMEND</u>

Plaintiff has requested leave to amend in the event that this Court grants Defendants' motion to dismiss.

District courts "ha[ve] broad discretion in determining whether to grant leave to amend," Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000), and leave to amend should generally be "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a)(2). "Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted." Wright v. Ernst & Young LLP, No. 97 Civ. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), aff'd, 152 F.3d 169 (2d Cir. 1998) (citing Oliver Sch., Inc. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991)).

Based on the current record, this Court cannot conclude that any amendment would be futile. Accordingly, leave to amend is granted. Plaintiff will file any Second Amended Complaint by March 28, 2018.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion to dismiss is granted. Plaintiff is granted leave to file a Second Amended Complaint. Any Second Amended Complaint will be filed by March 28, 2018. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 47, 55).

2018 WL 1322196

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1322196

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 174 of 217

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)

2022 WL 16572045

2022 WL 16572045
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James P. MHINA, Plaintiff,

v.

CITIZENS BANK, N.A., et al., Defendants.

5:22-cv-427 (BKS/ML)
|
Signed November 1, 2022

**Attorneys and Law Firms**

Plaintiff pro se: James P. Mhina, Syracuse, NY 13204.

For Defendant Citizens Bank, N.A.: Geoffrey W. Millsom, Brenna Anatone Force, Adler Pollock & Sheehan P.C., One Citizens Plaza, 8th Floor, Providence, RI 02903.

For Defendants Woodhaven Apartments and Vinod Luthra: John C. Nutter, Woods Oviatt Gilman LLP, 1900 Bausch & Lomb Place, Rochester, NY 14604.

For Defendants City of Syracuse, Anthony Collavita, and David Burske: Susan R. Katzoff, Corporation Counsel, City of Syracuse, Danielle R. Smith, Sarah M. Knickerbocker, Assistant Corporation Counsel, 300 City Hall, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*1** Pro se plaintiff James P. Mhina brings this action against fourteen Defendants: (1) Citizens Bank, N.A.; (2) Bank of America, N.A.; (3) Key Bank, N.A.; (4) Woodhaven Apartments and Vinod Luthra, "President, C.E.O. Woodhaven Apartment" (together, the "Woodhaven Defendants"); (5) John Cruize, "V.P. Security, Key Bank"; (6) Onondaga County; (7) Beth VanDoren, "A.D. Attorney, Onondaga County"; (8) Cathleen Nash, "C.E.O., President of Citizens Bank"; (9) Amy Bidwell, "Bank of America Bank Branch Manager"; (10) City of Syracuse, Syracuse City Police Detective Anthony Collavita, and Syracuse City Police Detective David Burske (together, the "City Defendants"); and (11) Linda Mossulu, "V.P. Key Bank." (Dkt. No. 6 (amended complaint)). [1] Plaintiff's amended complaint

appears to assert claims under 42 U.S.C. §§ 1983, 1985, as well as claims for "breached fiduciary duty, unjust enrichment, [and] breach of contract." (Id. at 13). Plaintiff seeks monetary damages of "$800.00 billion dollars" plus "$300 billion cash down payment for 20 years guarantee on 705 letters of credit." (Id. at 15). Presently before the Court are: (1) Citizens Bank's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(4), 12(b)(5), and 12(b)(6), (Dkt. No. 28); (2) the Woodhaven Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6), (Dkt. No. 33); (3) the City Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. No. 15); and (4) Plaintiff's motion for summary judgment, (Dkt. No. 18). The parties have filed responsive papers. (Dkt. Nos. 19, 20, 21, 22, 29, 31, 43, 44). For the following reasons, the Court grants the three motions to dismiss and denies Plaintiff's motion for summary judgment.

[1]     In a prior related case, J. & W. Trading & Leasing Inc. v. Van Doren, No. 15-cv-327 (GLS/ML) (N.D.N.Y. Mar. 20, 2015), Plaintiff named "John Cruse," the Vice President of Security for Citizens Bank as a defendant. (See Dkt. No. 15-8, at 6 n.5). In that action Plaintiff also named defendants with last names of "Colavita" and "Buske." (Id. at 5 n.4). The Court uses the spellings and positions Plaintiff uses in this lawsuit.

**II. BACKGROUND**

**A. Amended Complaint** [2]

[2]     These facts are drawn from the amended complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011).

The amended complaint alleges that Defendants "violated their fiduciary duty and contracts" "to collect [Plaintiff's] 705 letters of credit very valuable, 20 years guarantee and $300.00 billion cash that [Plaintiff's] business associate had sent as down payment for the 20 years guarantee." (Dkt. No. 6, at 1, 6). Plaintiff alleges that Defendants violated his Fourteenth Amendment due process rights "for not collecting 705 very [illegible] letters of credit." (Id. at 13). He further alleges that Defendants conspired to bring "unfounded criminal charges by using wrong law and irrelevant evidence" in violation of 42 U.S.C. § 1985, his Fourteenth Amendment due process rights, and his right to a fair grand jury. (Id.). Finally, Plaintiff alleges

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 175 of 217

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)

2022 WL 16572045

that Defendants "falsely and fraudulently lied" before an Onondaga County grand jury and at Plaintiff's criminal trial in violation of Plaintiff's Fifth and Sixth Amendment rights. (*Id.*). Plaintiff alleges that his indictment was "dismissed on April 9, 2014 after spending 10 years in maximum security prisons of State of New York." (*Id.*).

**\*2** Plaintiff seeks "monetary damages of total U.S. $800.00 billion dollars, for the total [illegible] 705 letters of credit, plus $300 billion cash down payment for 20 years guarantee on 705 letters of credit." (*Id.* at 15).

**B. Prior Related Case:** *J&W Trading*
In March 2015, Plaintiff commenced a lawsuit in this Court against substantially the same Defendants as in the instant matter. *J. & W. Trading & Leasing Inc. v. Van Doren*, No. 15-cv-327 (GLS/ML) (N.D.N.Y. Mar. 20, 2015) ("*J&W Trading*"). Plaintiff alleged that he was prosecuted and convicted of several offenses which were overturned on appeal, and that several of his bank accounts were closed, which hurt his credit rating. *See J&W Trading*, Dkt. No. 11, at 2–3 (July 8, 2015). Ultimately, all of Plaintiff's claims were dismissed. *See id.*, Dkt. Nos. 11, 22, 115, 175, 215. Plaintiff appealed to the Second Circuit, which dismissed his appeal as "lack[ing] an arguable basis either in law or in fact." *Mhina v. Buske*, No. 20-cv-444, 2021 WL 5286679, at *1, 2021 U.S. App. LEXIS 34315 at *1 (2d Cir. May 13, 2021). Plaintiff then filed a petition for a writ of certiorari to the United States Supreme Court, which was denied. *Mhina v. Van Doren*, —— U.S. ——, 142 S. Ct. 484, 211 L.Ed.2d 294 (2021).

**III. STANDARD OF REVIEW**

**A. Rules 12(b)(4) and 12(b)(5)—Insufficient Process and Insufficient Service of Process**
"Objections to sufficiency of process under [Rule] 12(b)(4) must identify substantive deficiencies in the summons, complaint or accompanying documentation." *DiFillippo v. Special Metals Corp.*, 299 F.R.D. 348, 352–53 (N.D.N.Y. 2014) (citation omitted). A Rule 12(b)(4) motion properly challenges "noncompliance with the provisions of Rule 4(b) or any applicable provision incorporated by Rule 4(b) that deals specifically with the content of the summons." *Soos v. Niagara County*, 195 F. Supp. 3d 458, 462 (W.D.N.Y. 2016) (citation and internal footnote omitted).

A Rule 12(b)(5) motion, by contrast, "is the proper vehicle for challenging the mode of delivery or lack of delivery of

the summons and complaint." *Id.* "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). "Absent consent, this means there must be authorization for service of summons on the defendant." *Id.* A court "must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). "When a defendant raises a Rule 12(b) (5) 'challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy.' " *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting *Preston v. New York*, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002)). A plaintiff must, "through specific factual allegations and any supporting materials, make a prima facie showing that service was proper." *Kwon v. Yun*, No. 05-cv-1142, 2006 WL 416375, at *2, 2006 U.S. Dist. LEXIS 7386 (S.D.N.Y. Feb. 21, 2006) (citations omitted).

A dismissal under Rule 12(b)(4) or Rule 12(b)(5) "is not on the merits and has no res judicata effect." 5B C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1353 (3d ed.).

**B. Rule 12(b)(6)**
**\*3** To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint that has been filed pro se "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). "Nonetheless, a pro se complaint must state a plausible claim for relief." *Id.*

Case 9:21-cv-01090-BKS-TWD Document 43 Filed 02/01/24 Page 176 of 217
Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)
2022 WL 16572045

## IV. ANALYSIS

The three motions to dismiss raise arguments for dismissal under Rules 12(b)(4), Rule 12(b)(5), and 12(b)(6). The Court first addresses arguments relating to insufficient process or service of process before turning to arguments going to the merits under Rule 12(b)(6). *See DiFillippo*, 299 F.R.D. at 352 ("As Defendants have raised a motion to dismiss under Rules 12(b)(2), 12(b)(4), 12(b)(5), 12(b)(6) and 12(c), the Court must first address the arguments concerning jurisdictional and service deficiencies ... before addressing arguments as to the merits made under Rules 12(b)(6) and 12(c)."); *George v. Professional Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 442 & n.7 (S.D.N.Y. 2016) (noting that a Rule 12(b)(5) motion "go[es] to the Court's ability to exercise judicial power over the defendant" and therefore is ordinarily considered before any merits-based challenge).

### A. Citizens Bank's Motion to Dismiss

Citizens Bank moves to dismiss Plaintiff's claims against it (1) for insufficient process and insufficient service of process under Rules 12(b)(4) and 12(b)(5) and (2) as barred by res judicata, as time barred, and for failure to state a claim under Rule 12(b)(6). (*See generally* Dkt. No. 28-1). Citizens Bank argues that the process Plaintiff served on it is "clearly insufficient" for multiple reasons. (Dkt. No. 28-1, at 8).

According to Kevin Farrell, Litigation Manager at Citizens Bank, the Citizens Bank branch located on West Genesee Street in Syracuse received "certified mail" from Plaintiff on May 23, 2022. (Dkt. No. 28-2). The mailing contains only the first page of the summons, which is addressed to "Citizens Bank, N.A. et al., Attorneys Menter, Rubin, Trivelpiece, 125 E. Jefferson Street, Syracuse, N.Y. 13202." (Dkt. No. 28-3, at 2).[3] The summons does not indicate in which District Court this action was filed, and it does not include Plaintiff's address. (*Id.*). The mailing does not include a true and complete copy of the amended complaint; rather, it contains "various pages of a version of the Complaint that [Plaintiff] does not appear to have filed with the Court." (Dkt. No. 28-1, at 5; *see* Dkt. No. 28-3, at 3–7). The pages contained in the mailing contain language and factual allegations that are not included in the amended complaint. (*Compare* Dkt. No. 28-3, at 6 (mailing alleging that, in or about 2005, the CEO and President of Citizens Bank "accepted and ordered her employees to enter into a fiduciary duty and signed legal contract to collect the 235 very valuable expensive letters of credit and US $100.00 billion down payment"), *with* Dkt. No. 6 (amended complaint)). Finally, the mailing includes a

filing Plaintiff submitted in response to District Judge Gary L. Sharpe's order denying as moot Plaintiff's motion for summary judgment—which Plaintiff had filed the same day he filed the complaint. (Dkt. No. 28-3, at 8–17; *see also* Dkt. Nos. 4, 8, 11).

[3]

> It appears that Plaintiff previously attempted to serve Citizens Bank with process by delivering documents to the Barclay Damon LLP law firm in Syracuse, which is located at 125 East Jefferson Street. (Dkt. No. 12). Partner Mitchell Katz informed the Court that Menter Rudin & Trivelpiece, P.C. "merged into" Barclay Damon LLP in August 2018, and that Barclay Damon LLP "is not authorized to receive service of process on behalf of Citizens Bank" and has "not been retained by Citizens Bank, N.A. with respect to this matter." (*Id.*).

**\*4** Federal Rule of Civil Procedure 4(a)(1) provides that a summons must, among other things, "name the court and the parties," "be directed to the defendant," and "state the name and address of the plaintiff's attorney or—if unrepresented—of the plaintiff." Fed. R. Civ. P. 4(a)(1). "A summons must be served with a copy of the complaint." Fed. R. Civ. P. 4(c)(1). Citizens Bank argues that it was served with insufficient process because the summons is "missing the second page, does not indicate that the case is pending in this Court," does "not list Plaintiff's address," and is "not directed at Citizens Bank, N.A." (Dkt. No. 28-1, at 8). Moreover, Citizens Bank argues that it was not served with the "operative complaint," but rather with "pieces of an unfiled document and [Plaintiff's] response to the Court's order denying as moot his motion for summary judgment." (*Id.*). Plaintiff responds that Defendants are obligated under the Local Rules to notify the Court of all changes in address and to seek permission to withdraw as counsel, and that Plaintiff "never received a Court order informing him of the withdraw[al] or change of address or change of attorneys." (*See* Dkt. No. 31, at 3–6).

The Court agrees with Citizens Bank that the process served on it was insufficient and that Plaintiff's claims against it must be dismissed under Rule 12(b)(4).[4] While "minor or technical defects in a summons in certain circumstances do not render service invalid, defects that are prejudicial to the defendant or show a flagrant disregard for the rule do." *Soos*, 195 F. Supp. 3d at 463 (quoting *Osrecovery, Inc. v. One Grp. Int'l, Inc.*, 234 F.R.D. 59, 60 (S.D.N.Y. 2005)). The defects in the process served on Citizens Bank, taken together, amount

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)

2022 WL 16572045

to a "flagrant disregard" for the requirements of Rule 4, as the summons is incomplete, does not specify the Court, and does not include Plaintiff's address. Moreover, Plaintiff's failure to serve a true and accurate copy of the amended complaint renders process insufficient. *Cf. George v. N.Y. City Health & Hosp. Corp.*, No. 09-cv-3833, 2012 WL 1072274, at *2–3, 2012 U.S. Dist. LEXIS 44125 (E.D.N.Y. 2012) (dismissing complaint for insufficient service of process where the court found that "no complaint was ever served by plaintiff" on the defendant). Plaintiff's argument that Citizens Bank failed to notify the Court of a change in address or withdrawal of an attorney is unavailing, as the Local Rules he cites apply to attorneys of record in currently pending cases. *See* N.D.N.Y. L.R. 10.1(c)(2), 11.1. The *J&W Trading* case was closed in January 2020, and Defendants were not obligated thereafter to inform Plaintiff of any changes in address or attorney. Thus, the Court dismisses Plaintiff's claims against Citizens Bank without prejudice under Rules 12(b)(4) and 12(b)(5).

4      Citizens Bank argues in a footnote that Plaintiff served it "via certified mail instead of complying with the requirements for service of a corporate entity" but does not develop this Rule 12(b)(5) argument further. (Dkt. No. 28-1, at 8 n.2).

**B. Woodhaven Defendants' Motion to Dismiss**
The Woodhaven Defendants move to dismiss Plaintiff's claims against them on various grounds, including insufficient service of process, that Plaintiff has not sued the correct parties, statute of limitations, res judicata, and failure to state a claim to relief. (*See generally* Dkt. No. 33-10). The Woodhaven Defendants argue that Plaintiff's claims against them should be dismissed under Rule 12(b)(5) because Plaintiff's attempted service of process by United States Priority Mail to their counsel was improper under Rule 4. (*Id.* at 13–14).

John Nutter, counsel for the Woodhaven Defendants, received a package from Plaintiff on May 23, 2022. (Dkt. No. 33-1, ¶ 17 (Nutter Declaration)). Mr. Nutter received a Priority Mail envelope directed to him, which contained "the Complaint and Amended Complaint, along with a Summons for each pleading." (*Id.*; *see also* Dkt. Nos. 33-8, 33-9 (Priority Mail envelope and package contents)). It appears that the package contained select pages of the amended complaint, as well as Plaintiff's response to Judge Sharpe's order denying his first motion for summary judgment as moot. (Dkt. No. 33-9). The Woodhaven Defendants informed Mr. Nutter that "they

never were served with the Summons, Complaint or Amended Complaint." (Dkt. No. 33-1, ¶ 18).

 *5  The Court agrees with the Woodhaven Defendants that service of process on them was insufficient. "As a general matter, 'service of process on an attorney not authorized to accept service for his client is ineffective.' " *Macon v. Corr. Med. Care, Inc.*, No. 12-cv-6150, 2015 WL 4604018, at *3, 2015 U.S. Dist. LEXIS 99808 (W.D.N.Y. July 30, 2015) (quoting *Santos v. State Farm Fire & Cas. Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990)). Furthermore, "simply serving in the capacity of attorney, or representing the client previously, does not render the attorney an agent for service of process." *Id.* (citation omitted). Here, service by Priority Mail on the Woodhaven Defendants' attorney, who is not an agent for service of process merely by serving as their attorney, is plainly insufficient under Rule 4(e) and Rule 4(h).

Accordingly, the Court dismisses Plaintiff's claims against the Woodhaven Defendants without prejudice for insufficient service of process and does not reach the Woodhaven Defendants' remaining arguments.

**C. City Defendants' Motion to Dismiss**
The City Defendants move to dismiss Plaintiff's claims against them as barred by the doctrine of res judicata, as barred by the statute of limitations, and for failure to state a claim. (*See generally* Dkt. No. 15-8). Plaintiff responds that his claims for breach of fiduciary duty and breach of contract were "skipped" in the prior action and never "reviewed" or "presented" but does not respond to the City Defendants' other arguments. (*See generally* Dkt. No. 19). "[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). "Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff failed to plead timely claims." *Smith v. City of New York*, 1 F. Supp. 3d 114, 118 (S.D.N.Y. 2013). "Dismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.' " *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).

The Court concludes that all of Plaintiff's claims against the City Defendants are barred by the applicable statutes of limitations and therefore must be dismissed. Read liberally,

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 178 of 217

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)
2022 WL 16572045

Plaintiff's amended complaint asserts claims for breach of fiduciary duty, unjust enrichment, breach of contract, deprivation of constitutional rights under Section 1983, and conspiracy under Section 1985. (*See* Dkt. No. 6). The claims appear to arise out of business transactions and conduct leading to Plaintiff's arrest and conviction, for which he "spen[t] 10 years" in prison before the indictment was dismissed on April 9, 2014. (*Id.* at 13); *see also People v. Mhina*, 110 A.D.3d 1445, 972 N.Y.S.2d 767 (4th Dep't 2013) (reversing Plaintiff's judgment of conviction and remanding for a new trial). Thus, all of Plaintiff's claims accrued at the latest on April 9, 2014, more than eight years before he commenced this lawsuit on May 3, 2022. All of Plaintiff's claims, which are subject to a maximum limitations period of six years, are therefore untimely. *See Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) ("The statute of limitations for § 1983 actions arising in New York is three years."); *Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001) (statute of limitations for Section 1985 claims is three years); *Murphy v. Morlitz*, 751 F. App'x 28, 30 (2d Cir. 2018) (summary order) ("Breach of fiduciary duty claims that seek money damages only are subject to a three-year statute of limitations; those seeking equitable remedies are subject to a six-year statute of limitations." (citation omitted)); *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 64–66 (S.D.N.Y. 2020) (statute of limitations for unjust enrichment under New York law is three or six years); *Myers Indus., Inc. v. Schoeller Arca Sys, Inc.*, 171 F. Supp. 3d 107, 117 (S.D.N.Y. 2016) (statute of limitations for breach of contract is six years (citing N.Y. C.P.L.R. § 213(2))).

**\*6** Accordingly, the Court grants the City Defendants' motion to dismiss Plaintiff's claims against them.

### D. Plaintiff's Motion for Summary Judgment

Plaintiff filed a motion for summary judgment on May 27, 2022, seeking a "court order for Defendants to pay for [Plaintiff's] property they stole from Plaintiff[ ]." (Dkt. No. 18). Because the Court grants the motions to dismiss Plaintiff's claims against Citizens Bank, the Woodhaven Defendants, and the City Defendants, Plaintiff's motion is denied as moot to the extent it seeks summary judgment against those parties.

To the extent Plaintiff seeks summary judgment against the remaining eight Defendants who have not appeared in this action, the motion is denied as procedurally improper. Plaintiff's motion appears to be a memorandum of law which contains various assertions of fact and citations to

caselaw. (*See id.*). However, "[a] party asserting that a fact cannot be ... genuinely disputed must support the assertion" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Plaintiff has not pointed to any record evidence which supports his assertions, and his motion is not sworn or verified. *See Lamoureux v. AnazaoHealth Corp.*, No. 03-cv-1382, 2010 WL 4875870, at *2, 2010 U.S. Dist. LEXIS 122831 (D. Conn. Nov. 18, 2010) (describing requirements of an affidavit and unsworn declaration). Moreover, Plaintiff failed to comply with Local Rule 56.1, which requires any motion for summary judgment to contain "a separate Statement of Material Facts." N.D.N.Y. L.R. 56.1(a). The moving party's failure to "submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." *Id.* (emphasis omitted).

The Court therefore denies Plaintiff's motion for summary judgment. [5]

[5]    Plaintiff filed second and third motions for summary judgment, (Dkt. Nos. 35, 39), which this Court denied without prejudice to Plaintiff's seeking permission to refile them following the Court's ruling on Plaintiff's first motion for summary judgment, (*see* Dkt. No. 41). Plaintiff filed a letter requesting permission to refile these motions. (Dkt. No. 45). The Court denies this request in light of Plaintiff's failure to file proof of service on the remaining Defendants, discussed *infra* Section IV.F.

### E. Service on Citizens Bank and Woodhaven Defendants

"If a defendant is not served within 90 days after the complaint is filed, the court ... must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). "[I]f the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.* Here, Plaintiff has not shown good cause. *Cf. Amnay v. Del Labs*, 117 F. Supp. 2d 283, 285 (E.D.N.Y. 2000) (noting that "ignorance of the law, even in the context of pro se litigants, does not constitute good cause under Rule 4(m)" (brackets and citation omitted)); *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 597–98 (E.D.N.Y. 2013) ("Good cause is generally found only in exceptional circumstances where the plaintiff's

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 179 of 217

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)

2022 WL 16572045

failure to serve process in a timely manner was the result of circumstances beyond [his] control." (citation omitted)).

**\*7** However, "a district court may grant an extension in the absence of good cause." *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007); *see DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010) ("Under Rule 4(m), the Court *must* extend the time to serve if plaintiff has shown good cause, and *may* extend the time to serve even in the absence of good cause." (citing Fed. R. Civ. P. 4(m) advisory committee's note to 1993 amendments)). "Factors relevant to the exercise of this discretion include, *inter alia*, the relative prejudice to the parties (including whether the action would be barred by the statute of limitations and whether defendant had actual notice of the suit) and whether there is a 'justifiable excuse' for the failure properly to serve." *Mares v. United States*, 627 F. App'x 21, 23 (2d Cir. 2015); *see also DeLuca*, 695 F. Supp. 2d at 66 ("In determining whether a discretionary extension is appropriate in the absence of good cause, a court considers the following four factors: (1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service."). Here, in light of Plaintiff's failure to provide an adequate justification for his failure to serve the Citizens Bank and Woodhaven Defendants, his failure to file any proofs of service despite multiple reminders, and the fact that his claims are apparently time-barred, the Court declines to grant Plaintiff an extension of time to re-serve these Defendants. *See Deptula v. Rosen*, 558 F. Supp. 3d 73, 89 (S.D.N.Y. 2021) (declining to grant extension of time for service of process where the plaintiff did not articulate any "colorable excuse" for the failure to serve); *Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 406 (S.D.N.Y. 2020) (declining to grant extension of time for service of process where, inter alia, the defendants "would be obliged to spend time, money, and resources litigating apparently time-barred claims").

### F. Remaining Defendants

Defendants Bank of America, N.A., Key Bank, N.A., John Cruize, Onondaga County, Beth VanDoren, Cathleen Nash, Amy Bidwell, and Linda Mossulu have not appeared in this matter. [6] Plaintiff has not filed proof of service as to any Defendant in this matter, despite multiple orders and reminders to do so. (*See* Dkt. No. 17 (directing Plaintiff to file timely proofs of service pursuant to General Order

25); Dkt. No. 24 ("Plaintiff is reminded and directed to timely file proofs of service as to all Defendants pursuant to General Order 25."); Dkt. No. 34 (directing Plaintiff to file proofs of service or a detailed status report addressing the completion of service by July 22, 2022)). Before this case may proceed further, Plaintiff must file proof of service on the remaining eight Defendants. Plaintiff is therefore directed to file, by November 18, 2022, (1) proofs of service as to the eight remaining Defendants or (2) a detailed status report addressing the completion of service upon these Defendants. **Plaintiff is hereby warned that his failure to comply with this Court order may result in sanctions, up to and including dismissal of his case.**

[6]     On September 20, 2022, this Court received a letter from attorney Andrew Karamouzis of Moran Karamouzis LLP. (Dkt. No. 49). Mr. Karamouzis informed the Court that his office received a Priority Mail envelope from Plaintiff and that, while his firm represented KeyBank is a "prior related action brought by Plaintiff," it is "not authorized to accept service of process on behalf of KeyBank for this matter." (*Id.*).

## V. CONCLUSION
For these reasons, it is hereby

**ORDERED** that Citizens Bank's motion to dismiss (Dkt. No. 28) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against Citizens Bank are **DISMISSED without prejudice**; and it is further

**ORDERED** that the Woodhaven Defendants' motion to dismiss (Dkt. No. 33) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against Woodhaven Apartments and Vinod Luthra are **DISMISSED without prejudice**; and it is further

**ORDERED** that the City Defendants' motion to dismiss (Dkt. No. 15) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against the City of Syracuse, Anthony Collavita, and David Burske are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 18) is **DENIED**; and it is further

Mhina v. Citizens Bank, N.A., Not Reported in Fed. Supp. (2022)

2022 WL 16572045

**ORDERED** that Plaintiff's request for permission to refile his second and third motions for summary judgment (Dkt. No. 45) is **DENIED**; and it is further

**ORDERED** that Plaintiff is directed to file, by November 18, 2022, (1) proofs of service as to the eight remaining Defendants or (2) a detailed status report addressing the completion of service upon these Defendants. **Plaintiff is hereby warned that his failure to comply with this Court order may result in sanctions, up to and including dismissal of his case**; and it is further

**\*8 ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 16572045

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1508705
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Chaz ZACHARY, Plaintiff,

v.

CITY OF NEWBURGH, Officer Roman Scuadroni,
Carlos Mendez, Andres Arrestin, Daniel Volpe,
William Hinspeter, William Lahar, Sgt. Anderson,
Kevin Lahar, Jake Kirvy, Howard Ladlee, Defendants.

No. 13 CV 5737(VB).
|
Signed April 1, 2014.

***MEMORANDUM DECISION***

BRICCETTI, District Judge.

**\*1** Plaintiff Chaz Zachary, proceeding pro se, brings this Section 1983 action against defendants the City of Newburgh, Roman Scuadroni, Carlos Mendez, Andres Arrestin, Daniel Volpe, William Hinspeter, William Lahar, Sgt. Anderson, Kevin Lahar, Jake Kirvy, and Howard Ladlee, arising out of plaintiff's arrest in Newburgh on May 9, 2013.

Plaintiff asserts constitutional claims for excessive force and due process violations, and a municipal liability claim against the City of Newburgh. [1] Plaintiff also seeks a declaratory judgment and injunctive relief barring the City from arresting him in the future.

[1]    The amended complaint also includes an Eighth Amendment claim, a false arrest claim, and a malicious prosecution claim. Plaintiff voluntarily withdrew his Eighth Amendment claim in his submission in opposition to the instant motion (Doc. # 34), and his false arrest and malicious prosecution claims in a later submission to the Court. (Doc. # 46). Accordingly, those claims are dismissed with prejudice.

Now pending is defendants' partial motion to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6). Defendants seek dismissal of plaintiff's due process and municipal liability claims (but not his excessive force claim),

as well as his request for a declaratory judgment and injunctive relief. (Doc. # 19).

For the following reasons, the motion is GRANTED in part and DENIED in part.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

For purposes of deciding the pending motion, the Court accepts as true all well-pleaded allegations in the amended complaint and draws all reasonable inferences in favor of plaintiff.

Plaintiff alleges he was walking home from a store in Newburgh with a bottle of ginger ale in a brown paper bag on May 9, 2013, when he was arrested by defendant Officer Roman Scuadroni and other police officers. Plaintiff was allegedly subjected to excessive force, both during the arrest (including when Scuadroni allegedly placed his knee on plaintiff's neck "in direct violation of City of Newburgh Police Department General Order No. A–011 (5)(c)" (Am. Compl. at p. 2)), and after plaintiff was taken to the police station. [2]

[2]    Because defendants have not moved to dismiss plaintiff's excessive force claim, the Court does not recite plaintiff's allegations in support of that claim in full herein. In sum, plaintiff alleges he was assaulted and verbally threatened by officers at the scene and by all of the named defendants after he was taken to the police station, and that the officers also unreasonably sprayed pepper spray in his face and tased him in his back at the police station. After losing consciousness, plaintiff alleges, Officers Kevin Lahar and Carlos Mendez took plaintiff to the emergency room, where he was treated and then returned to the police station. Plaintiff alleges he suffered injuries including nerve damage to his left wrist, hand, and elbow.

Plaintiff further alleges he was deprived of his liberty without due process when, after he was arrested, he was incarcerated "for approximately 215 days" on the basis of "fabricated and defective instruments" manufactured by certain of the defendants. (*Id.* at p. 5).

Finally, plaintiff alleges the City of Newburgh "has been negligent in the enforcement of its policy and procedure which has emboldened some officers" to violate the rights of City residents; is aware of "numerous brutalities" inflicted by its officers and fails to stop them; has "vaguely defined policies which promote negligent handling of situations[,]" including policies concerning the use of pepper spray and tasers; and also lacks needed policies "in some instances." (*Id.* at pp. 1, 5).

## DISCUSSION

I. *Legal Standards*

A. *Rule 12(b) (1)*

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & CorteseCosta, P.C. v. Dupont,* 565 F.3d 56, 62 (2d Cir.2009) (internal quotation marks omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC,* 663 F.3d 89, 94 (2d Cir.2011) (internal quotation marks omitted). The party invoking the Court's jurisdiction bears the burden of establishing that jurisdiction exists. *Conyers v. Rossides,* 558 F.3d 137, 143 (2d Cir.2009).

**\*2** "An objection to standing is properly made on a Rule 12(b)(1) motion." *Tasini v. New York Times Co.,* 184 F.Supp.2d 350, 354 (S.D.N.Y.2002); see also *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 85 (2d Cir.2006). "An important component of the Article III jurisdictional limit of federal courts to deciding 'cases' or 'controversies' is standing.... 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d at 85 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, ——L.Ed.2d ——, 2014 WL 1168967 (Mar. 25, 2014))).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."

*Conyers v. Rossides,* 558 F.3d at 143 (internal quotation marks omitted). "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. N.Y. Yankees P'ship,* 486 F. App'x 894, 895 (2d Cir.2012) (summary order) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992)) (internal quotation marks omitted). [3] When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve ... disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." *Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000).

3      Plaintiff will be provided with copies of all unpublished opinions cited in this decision. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

B. *Rule 12(b) (6)*

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" outlined by the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. *Id.* at 678; *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." *Ashcroft v. Iqbal,* 556 U.S. at 678; *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

**\*3** The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam).

## II. *Injunctive and Declaratory Relief*

Plaintiff seeks injunctive relief and/or a declaratory judgment barring the City of Newburgh from, *inter* alia, arresting him in the future.

As defendants correctly argue, plaintiff lacks standing to seek such relief, thereby depriving the Court of subject matter jurisdiction.

Standing is a prerequisite to bringing suit in federal court. To establish constitutional standing to sue, a plaintiff must allege: (1) he suffered an "injury in fact"; (2) there was a causal connection between the injury and defendants' conduct; and (3) a federal court decision is likely to redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

With respect to his requests for injunctive and declaratory relief, plaintiff cannot demonstrate the first element of standing because he has not suffered an injury in fact. To satisfy this requirement, he must allege an injury that is both "concrete and particularized," and "actual or imminent"; that is, not "conjectural" or "hypothetical." *Id.* at 560. "In order to meet the constitutional minimum of standing to seek injunctive relief, [plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir.2004) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). To meet this burden, "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998).

The leading case on standing based on prospective harm, *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), is directly on point here. In *Lyons,* the Supreme Court held the plaintiff, who alleged a police officer placed him in an illegal chokehold, did not have standing to seek an injunction preventing City police officers from using such chokeholds, because he did not allege facts showing "a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105.

Here, plaintiff has not plausibly alleged a "sufficient likelihood that he will again be wronged in a similar way[,]" *id.* at 111, or a real and immediate threat that defendants will harass, physically harm, or "imprison [ ] plaintiff in retaliation [for] filing this law suit." (Am. Compl. at p. 6).

Plaintiff therefore lacks standing to seek injunctive or declaratory relief, and his claim is dismissed under Rule 12(b)(1).

## III. *Due Process Claims*

**\*4** Plaintiff asserts a Fourteenth Amendment claim for violation of the Due Process Clause. Because plaintiff does not indicate whether he is asserting a procedural or substantive due process claim, the Court will address each in turn.

### A. *Procedural Due Process*

To prevail on this claim, plaintiff must show he possessed a protected liberty or property interest and was deprived of that interest without due process. *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001). Whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause is a question of federal law. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

The Due Process Clause prohibits government officers acting in an investigative capacity from fabricating evidence when the fabrication results in a deprivation of liberty, and the Second Circuit has established that the harm caused by such conduct is redressable through a Section 1983 action for damages. *See Zahrey v. Coffey,* 221 F.3d 342, 348–49 (2d Cir.2000); see also *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997) ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."). [4]

[4]    Although the Supreme Court has held a similar cause of action (involving fabrication of evidence) fell under the Fourth Amendment, *see Albright v. Oliver,* 510 U.S. 266, 274–75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion), the Second Circuit has characterized this claim as a procedural due process violation. *Zahrey v. Coffey,* 221 F.3d at 348–49. As the Supreme Court noted,

the *Albright* plaintiff did not assert a claim for procedural due process. *Albright v. Oliver,* 510 U.S. at 271. "Because evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process." *Zahrey v. City of New York,* 2009 WL 1024261, at *8 n. 14 (S.D.N.Y. Apr.15, 2009).

Construing the pro se amended complaint liberally, as the Court must, plaintiff alleges he was deprived of his liberty when, after he was arrested, he was incarcerated "for approximately 215 days" on the basis of "fabricated and defective instruments" created by defendants. Plaintiff has thus plausibly pleaded a procedural due process claim.

Accordingly, defendants' motion to dismiss plaintiff's procedural due process claim is denied.

B. *Substantive Due Process*
"[T]he substantive component of the Fourteenth Amendment's Due Process Clause forbids the government from burdening, in a constitutionally arbitrary way, an individual's property [or liberty] rights." *O'Connor v. Pierson,* 426 F.3d 187, 204 (2d Cir.2005). "Substantive due process is an outer limit on the legitimacy of governmental action," *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999), which "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks omitted).

It is well-established that "[s]ubstantive due process analysis is ... inappropriate ... [where a] claim is 'covered by' the Fourth Amendment." *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1988)); see also *Albright v. Oliver,* 510 U.S. at 273 ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks omitted)).

**\*5** Plaintiff's remaining claims are premised on alleged conduct proscribed by the Fourth Amendment (specifically,

the use of excessive force). The Court concludes plaintiff's claims are therefore substantially "covered" by the Fourth Amendment.

Accordingly, defendants' motion to dismiss plaintiff's substantive due process claim is granted.

IV. *Municipal Liability Claim*
Defendants argue plaintiff has failed to state a claim for municipal liability against the City of Newburgh. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court agrees.

Under *Monell,* a municipality may be liable for deprivation of constitutional rights "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. A municipality may also be liable for inadequate training, supervision, or hiring when the failure to train, hire, or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, there are no allegations to support a *Monell* claim against the City. Plaintiff has not identified any specific municipal policy or custom that caused his injuries or provided any allegations supporting a plausible inference of a pattern and practice through a failure to train or supervise.

Plaintiff alleges individual defendants contravened "City of Newburgh Police Department General Order No. A–011 (5)(c)." This is the antithesis of a *Monell* claim. See, e.g., *Walker v. Shaw,* 2010 WL 2541711, at *7 (S.D.N.Y. June 23, 2010) (an alleged failure to follow a policy "is the antithesis of a link between policy and action"); see also *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("[T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights." (internal quotation marks omitted)).

Plaintiff also alleges the complete lack of policies and/or a lack of well-defined policies concerning the use of pepper spray and tasers. However, the absence of a policy is not a policy and is not actionable under *Monell. See Monell v. Dep't of Social Services,* 436 U.S. at 690–91.

Zachary v. City of Newburgh, Not Reported in F.Supp.3d (2014)

2014 WL 1508705

Moreover, "conclusory allegations that a municipality failed to train and supervise its employees" are insufficient to state a *Monell* claim absent supporting factual allegations. *Davis v. City of New York,* 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008); see also *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (conclusory allegations "are not entitled to the assumption of truth"). The allegations identified by plaintiff in his opposition as supporting a "deliberate indifference" theory-that the City is aware of and "fails to stop the brutality," and has been "negligent in the enforcement of its policy and procedure which has emboldened some officers" to violate the constitutional rights of Newburgh residents-are conclusory and unsupported by any specific factual allegations.

 **\*6** Accordingly, plaintiff's municipal liability claim against the City of Newburgh is dismissed.

V. *Leave to Amend*
Plaintiff requests leave to add "additional ... facts" as well as the "names of additional defendants as they are made known in the ongoing of this case." (Am. Compl. at p. 6).

The Court construes plaintiff's request to add additional facts as a motion for leave to replead. A district court ordinarily should not dismiss pro se claims "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)).

Here, after defendants filed their motion to dismiss the original complaint, the Court granted plaintiff leave to file an amended complaint to name newly-identified defendants.

(Doc. # 13). Plaintiff filed an amended complaint. (Doc. # 18). Plaintiff having failed to correct pleading deficiencies in his municipal liability claim, substantive due process claim, and claim for injunctive relief, despite being given the opportunity to do so, the Court sees no reason to grant plaintiff further leave to replead.

In any event, reading the amended complaint liberally, the Court does not find any allegations suggesting plaintiff has a valid municipal liability, substantive due process, or declaratory or injunctive relief claim he has merely "inadequately or inartfully pleaded" and therefore should "be given a chance to reframe." *Cuoco v. Moritsugu,* 222 F.3d at

112. On the contrary, the Court finds that repleading would be futile, because the problems with these causes of action are substantive, and supplementary and/or improved pleading will not cure their deficiencies.

Accordingly, plaintiff's request for leave to replead is denied.

With respect to plaintiff's request to add additional defendants to the amended complaint, if any new defendants are identified by plaintiff, under Rule 15(a)(2) of the Federal Rules of Civil Procedure, plaintiff must either (i) receive consent from counsel for defendants to amend the amended complaint to add such defendants, or (ii) request leave of the Court to so amend, which the Court will consider at the time the request is made.

*CONCLUSION*

Defendants' partial motion to dismiss the amended complaint is GRANTED in part and DENIED in part. Plaintiff's excessive force and procedural due process claims will proceed. The Clerk is directed to terminate defendant City of Newburgh.

The Clerk is further directed to terminate the pending motion. (Doc. # 19).

By April 8, 2014, counsel for defendants is directed to notify the Court by letter whether the three defendants named for the first time in plaintiff's amended complaint (Kevin Lahar, Jake Kirvy, and Howard Ladlee) have been served and, if not, whether counsel is willing to accept service of process on their behalf. If counsel is not willing to accept service, counsel shall advise the Court of the addresses at which these newly-named defendants can be served.

 **\*7** The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in *forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1508705

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 187 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

2020 WL 5665142
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anibal QUINONES, Plaintiff,

v.

NEW YORK CITY, et al., Defendants.

19cv05400 (LJL) (DF)

|

Signed 08/17/2020

**Attorneys and Law Firms**

Mr. Anibal K. Quinones, DIN No. 17R0361, Orleans
Correctional Facility, 3531 Gaines Basin Road, Albion, NY
14411-9199, Defendants' counsel (via ECF)

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge

**TO THE HONORABLE LEWIS J. LIMAN, U.S.D.J.:**

 **\*1**  In this *pro se* action, which has been referred to this
Court for general pretrial supervision and to report and
recommend on dispositive motions, plaintiff Anibal Quinones
("Plaintiff") has asserted claims against defendants New York
City (the "City") and Corrections Officer Artisha Bishop [1]
("Bishop") (collectively, "Defendants") [2] under both Title
VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e
to 2000e-17 ("Title VII"), and 42 U.S.C. § 1983 ("Section
1983"). As set out in more detail below, Plaintiff's claims arise
out of events that occurred while he was being held in City
custody at the Manhattan Detention Complex (the "MDC" or
the "Facility"), where he worked in the Facility's kitchen. He
essentially contends that his First Amendment right to free
speech was violated by a work supervisor who did not permit
him to speak in Spanish on the job, and that, after he filed
a grievance about this, he was fired from his kitchen job for
discriminatory and/or retaliatory reasons.

[1]    Although, in his Complaint, Plaintiff identified
Officer Bishop only by her surname, her first name
has since been provided by counsel. (*See* Dkt. 16.)

[2]    In his Complaint, Plaintiff also named the New
York City Department of Correction ("DOC") as a

defendant, but, by Order dated July 17, 2019, the
Honorable Valerie E. Caproni, U.S.D.J., to whom
the case was then assigned, dismissed Plaintiff's
claims against this defendant, based on the fact that
an agency of the City may not be sued. (*See* Dkt.
8, at 2.)

Currently before the Court is a motion by Defendants,
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure, seeking dismissal of the Complaint, in its entirety,
for failure to state a claim. For the reasons discussed below,
I recommend that Defendants' motion be granted, but that
Plaintiff be permitted to amend his Complaint to cure the
defects in certain of his claims.

**BACKGROUND**

 **A. Factual Background**

Liberally construed, Plaintiff's Complaint, dated May 30,
2019 ("Compl.") (Dkt. 2), alleges the following facts, which
are taken as true for the purposes of this motion:

On January 10, 2019, Plaintiff was detained at MDC (Compl.,
at ECF 23 [3]), apparently for a parole violation (*id.,* at
ECF 5). In February of 2019, Plaintiff began working in
the kitchen at the Facility, where, purportedly, he regularly
spoke Spanish with his fellow detainees or inmates [4] and the
officers who oversaw them. (*Id.* at ECF 23.) On or about the
third week of February, defendant Bishop was assigned to
supervise Plaintiff in the kitchen, and, according to Plaintiff,
Bishop then proceeded to make the kitchen work environment
"hostile" and a "nightmare." (*Id.*) Plaintiff alleges that, in
the weeks following Bishop's arrival in the kitchen, despite
no posted policy in the kitchen forbidding the inmates from
speaking Spanish, Bishop demanded that the inmates "not [ ]
speak Spanish to one another" (emphasis omitted), and would
make such demands even of inmates who spoke only Spanish.
(*Id.* at ECF 23, 25.) Apparently, some inmates were relieved
of their kitchen duties, and others voluntarily quit "because of
Bishop's attitude towards the way she spoke to others." (*Id.*
at ECF 23.)

[3]    Where pages of filed submissions are cited herein
as "ECF __," the citations are to the page numbers
affixed to the documents by the Court's Electronic
Case Filing system.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 188 of 217
Quinones v. New York City, Not Reported in Fed. Supp. (2020)
2020 WL 5665142

4     Although the MDC is a detention center, Plaintiff repeatedly refers in his Complaint to other "inmates," and, although he may have intended to refer to other "detainees," this Court will generally adopt his terminology here.

**\*2** On March 2, 2019, while working in the kitchen, Plaintiff asked, in Spanish, for one of the officers (who allegedly himself spoke Spanish) to pass him plastic bags used for preparing utensils for meals. (*Id.*) Upon hearing Plaintiff speak in Spanish, Bishop "told [Plaintiff] to get [his] personal belongings because [he] was going back to his housing unit[,] because he spoke in [S]panish." (*Id.*) Plaintiff alleges that he responded to Bishop that sending him back to his housing unit was "unconstitutional," that what he said to the other officer was not a "security matter," and that he and the other officer "would speak in [S]panish all the time." (*Id.*)

When Plaintiff returned to his housing unit, he reported Bishop's conduct to 311 and filed a grievance with MDC. (*Id.* at ECF 25.) Plaintiff then returned to work on March 3, and apparently continued his duties until March 6, without any admonishment from Bishop. (*Id.*) When Plaintiff tried to go to work on March 9, however, he was told by another officer that he was not allowed to work, although he was not told why. (*Id.*) Later, at an unspecified time, Plaintiff was notified that he had been fired from his job; Plaintiff alleges that he "found out that since [he] filed the grievance against [Bishop,] he was] fired." (*Id.*)

### B. Procedural History

Plaintiff filed his *pro se* Complaint on May 30, 2019, 5 naming the City, the DOC, and Bishop as defendants. (*See id.*) As noted above (*see supra*, at n.2), the DOC was dismissed from the case by Order dated July 18, 2019 (Dkt. 8). As against the City and Bishop, the Complaint, liberally construed, raises (1) a Title VII claim against the City, for allegedly subjecting him to a "hostile work environment" in the course of his employment at the Facility; (2) a Section 1983 claim against Defendants, for allegedly violating his First Amendment rights by forbidding him to speak in Spanish, and for allegedly retaliating against him for filing a grievance regarding Bishop's conduct. (*See id.* at ECF 25; *see also id.* at ECF 27, 29.)

5     Under the so-called "prison mailbox rule," A *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the

Court. *See Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). As the Complaint indicates that it was delivered for mailing as of May 30, 2019 (Compl. at ECF 21), the Court will treat the Complaint as filed as of that date.

After Defendants informed this Court, by letter dated October 9, 2019, that it anticipated filing a motion to dismiss the Complaint (*see* Dkt. 16), this Court set a schedule for the motion and stayed discovery pending its resolution (Dkt. 19). Three days before the motion was due to be filed, however, the Court received a letter from Plaintiff, in which he requested leave to amend his Complaint "so that [he could] correct any [deficiencies] to the initial [Complaint]." (Dkt. 26.) Plaintiff did not explain which "deficiencies" he sought to correct, nor did he attach a proposed amended complaint. (*Id.*) Nor, when Defendants proceeded to file their motion, directed towards Plaintiff's original Complaint, did Plaintiff, in response, propose a particular amendment to remedy any pleading defect that Defendants identified. Rather, as noted below, he merely filed an opposition.

Defendants filed their motion to dismiss on December 9, 2019, asserting that Plaintiff's claims should be dismissed in their entirety. (*See* Notice of Motion, dated Dec. 9, 2019 (Dkt. 23); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, dated Dec. 9, 2019 (Dkt. 24) ("Def. Mem."); Affirmation of Service, dated Dec. 9, 2019 (Dkt. 25).) Plaintiff timely filed his opposition on January 20, 2020 (Opposition of Notice of Motion, dated Jan. 20, 2020 ("Pl. Opp.") (Dkt. 27)), and the City filed a reply brief on February 6, 2020, (*see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, dated Feb. 5, 2020 ("Def. Reply Mem.") (Dkt. 28)).

### DISCUSSION

### I. RULE 12(b)(6) STANDARDS

**\*3** A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure where it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b) (6). In deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *accord Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997). The issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 189 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

on the evidence. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Thus, the court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 666, 129 S.Ct. 1937), *cert. denied*, 562 U.S. 1168, 131 S. Ct. 901, 178 L.Ed.2d 803 (2011).

Additionally, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.' " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting cases); *see also Hughes v. Rowe*, 449 U.S. 5, 9-10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (noting that a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("Even after *Twombly* ... we remain obligated to construe a *pro se* complaint liberally."); *Lerman v. Bd. of Educ.*, 232 F.3d 135, 139-40 (2d Cir. 2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency." This is especially true in the context of civil rights complaints. *See Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001); *see also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (noting that a court must be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations").

## II. DEFENDANTS' MOTION TO DISMISS

In their motion, Defendants challenge the viability of Plaintiff's Title VII claim by first briefly stating that Plaintiff cannot be considered to have been the City's "employee" for purposes of the statute, and by then arguing at greater length that the claim must be dismissed because Plaintiff failed to exhaust his administrative remedies prior to bringing suit, and because he has failed to plead that the hostile work environment he allegedly experienced was based on a protected characteristic (such as his national origin), rather than his mere speaking of Spanish. (Def Mem., at 3-5.) Turning to Plaintiff's Section 1983 claims, Defendants argue that the facts alleged by Plaintiff regarding Bishop's refusal to let him speak Spanish are insufficient to plead a violation of his First Amendment rights, and that, absent an underlying violation, Plaintiff can have no viable First Amendment retaliation claim. (*Id.*, at 5-10, 101 S.Ct. 173.) They also argue that Bishop, in any event, is entitled to qualified immunity on any asserted First Amendment claim. (*See id.*, at 16-18, 101 S.Ct. 173.) Finally, Defendants contend that Plaintiff has not pleaded a sufficient basis for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), so as to be able to maintain his Section 1983 claim against the City. (*Id.*, at 11-16, 101 S.Ct. 173.) [6] This Court will address these arguments, in turn.

[6]     In their moving brief, Defendants also include an argument directed to the viability of Plaintiff's originally asserted claim against the DOC (*see id.*, at 10, 101 S.Ct. 173 (arguing that the DOC is "a non-suable municipal agency")), apparently overlooking the fact that any claims that Plaintiff had initially been attempting to assert against the DOC have already been dismissed by the Court (*see supra*, at n.2).

### A. Viability of Plaintiff's Title VII Claim

#### 1. Title VII Standards

##### a. Exhaustion Requirement and Statutory Limitations Periods

**\*4** "It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court," *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 190 of 217
Quinones v. New York City, Not Reported in Fed. Supp. (2020)
2020 WL 5665142

2001)), and this requirement "applies to *pro se* and counseled plaintiffs alike," *id.* (citation omitted). In order to maintain a suit under the statute, an aggrieved employee must first file an administrative charge, either with the EEOC within 180 days, or with a state or local agency [7] within 300 days, of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). If the administrative complaint is dismissed or otherwise fails to result in resolution, then the EEOC will notify the complainant of his or her right to bring a civil action under Title VII. *Id.* § 2000e-5(f)(1). Such an action must be brought within 90 days of the complainant's receipt of a right-to-sue notice from the EEOC. *See id.*; *see also, e.g., Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) (citing statute).

[7]   By virtue of a work-sharing agreement between the EEOC and the New York City Commission on Human Rights ("NYC CHR"), "a filing with the NYC CHR constitutes a 'dual-filing' with the EEOC." *Isaacson v. N.Y. Organ Donor Network*, No. 08cv9545 (RMB) (THK), 2009 WL 9119999, at *2 n.2 (S.D.N.Y. Dec. 30, 2009) (citation omitted).

Exhaustion, however, is not a jurisdictional requirement. *Id.* Rather, the failure to exhaust is an affirmative defense, and thus "the burden of pleading and proving Title VII exhaustion lies with defendants." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018); *see also Burton v. Am. Fed. of Gov't Emps. (AFGE) 1988*, No. 11v1416 (SLT) (LB), 2012 WL 3580399, at *7 (E.D.N.Y. Aug. 17, 2012) (noting that "a plaintiff is not required to plead or demonstrate administrative exhaustion at the pleading stage"). Even so, an affirmative defense of a failure to exhaust can be raised on a Rule 12(b)(6) motion, where non-exhaustion is clear from the face of the plaintiff's complaint, or from documents attached thereto or incorporated therein. *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 594 n.5 (E.D.N.Y. 2013). In the Title VII context, a court may also take judicial notice of "public records and reports of relevant administrative bodies, as well as the facts set forth therein," in order to determine whether a complaint should be dismissed for lack of exhaustion. *Holmes v. Fresh Direct*, No. 13cv4657 (NGG) (CLP), 2015 WL 4885216, at *4 (E.D.N.Y. Aug. 5, 2015).

**b. Substantive Pleading Requirements**

Title VII forbids employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff plausibly alleges a *prima facie* case of disparate treatment if he or she proffers allegations that he or she: (1) belongs to a protected class; (2) was qualified for his or her position; and (3) suffered from an adverse employment action; together with (4) allegations showing at least "minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) ("to defeat a motion to dismiss ... in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision"). An "adverse employment action" is defined as "a materially adverse change in the terms and conditions of employment." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (internal quotations and citations omitted); *see also Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Schiano*, 445 F.3d at 609 (internal quotations and citations omitted).

*5 A plaintiff may also base a Title VII claim on allegations that he or she was subjected to a hostile work environment. For this type of claim to survive a Rule 12(b)(6) challenge, the plaintiff must plausibly allege that the employer required him or her "to work in a discriminatorily hostile or abusive environment." *Littlejohn*, 795 F.3d at 320. Courts have explained that a hostile work environment is one that is both "objectively" severe and pervasive (such that a reasonable person would find it hostile or abusive), and "subjectively" perceived as such, by the plaintiff. *See, e.g., Bell v. McRoberts Protective Agency, Inc.*, No. 15cv963 (JPO), 2016 WL 7192083, at *4 (S.D.N.Y. Dec. 12, 2016). Further, the hostile environment must have been created by the defendant "because" of the plaintiff's race, color, religion, sex, or national origin. *Id.*

**2. As Plaintiff Cannot Be Considered To Have Had the Status of an "Employee" For Purposes of Title VII, His Title VII Claim Should Be Dismissed With Prejudice.**

As a threshold matter, a plaintiff suing under Title VII must plead facts sufficient to suggest that his or her claim against the defendant arose from an employment relationship. As noted by the Second Circuit, "Title VII is an employment law, available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers." *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996) (citation omitted). "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006).

For the most part, Defendants appear to concede that at least some case law would support the conclusion that, for Title VII purposes, Plaintiff was "employed" by the City [8] at the MDC, and they therefore largely operate on that assumption, challenging Plaintiff's Title VII claim primarily on the grounds that Plaintiff has not pleaded exhaustion of the claim and has failed to allege facts sufficient to show that he was subjected to unlawful discrimination. (*See generally* Def. Mem., at 3-5 (focusing on these arguments); Def. Reply Mem., at 2-3 (citing *Reyes v. McKee*, No. 1:11-cv-1283, 2012 WL 718952, at *4-5, 2012 U.S. Dist. LEXIS 28500, at *11-13 (W.D. Mich. Mar. 5, 2012) for the proposition that "relevant case law has analyzed factual allegations similar to those in [P]laintiff's [C]omplaint – prisoners bringing suit over their work assignments – by assuming that prisoners were 'employees' ").) Nonetheless, even though they raise the issue in only a cursory manner, Defendants do state, in leading off the section of their moving brief that is directed to Plaintiff's Title VII claim, that "[P]laintiff has not pleaded sufficient facts to establish that he was a DOC 'employee' under 42 U.S.C. § 2000e(f), and thus entitled to file an action under [Title VII]." (Def. Mem., at 3.) Moreover, in response – while still trying to maintain his Title VII claim – Plaintiff seems to concede this point, as he states that he "never alleges being an 'employee.' " (Pl. Opp., at ECF 2.) Accordingly – and because, if Plaintiff may not be considered an "employee" for Title VII purposes, this would necessarily dispose of his claim – this Court will reach the issue.

[8]    "Individuals are not subject to liability under Title VII." *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 555 (S.D.N.Y. 2011) (internal alteration omitted) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)). Thus, Plaintiff cannot bring a Title VII claim against

Bishop, and this Court will analyze Plaintiff's claim as against the City only.

Those Circuits that have considered the question of whether inmates or detainees are excluded, as a matter of law, from Title VII's definition of "employee" have been split on the issue. *Compare Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 125 (9th Cir. 1988) (overruling dismissal of prisoner's Title VII claim), *with Wilkerson v. Samuels*, 524 Fed. App'x 776, 779 (3d Cir. 2013); *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (affirming dismissal of prisoner's Title VII claim; *see also Overholt v. Unibase Data Entry, Inc.*, 221 F.3d 1335 (Table) (6th Cir. 2000) ("It is unclear whether prisoners are protected under Title VII."); *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996) (noting the conflicting circuit authority regarding whether prisoners employed in the prison may be protected by Title VII). Although the question has not been squarely addressed by the Second Circuit, its reasoning in an analogous case suggests that it would likely side with those Circuits that have found the necessary employment relationship to be lacking.

**\*6** In particular, the Second Circuit has rejected the proposition that inmates participating in prison work programs may be considered "employees" for purposes of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA"). In that context, the court applied the "economic reality" test [9] to ascertain the relationship of the parties, and concluded that prison labor that "produces goods or services for institutional needs of the prison, whether voluntary or involuntary, inside or outside the institution, or in connection with a private employer, is not an employment relationship within the meaning of the FLSA." *Danneskjold v. Hausrath*, 82 F.3d 37, 43-44 (2d Cir. 1996) (holding inmate's work as a tutor to other student inmates did not qualify him to receive minimum wage under the FLSA because he was not an "employee" within the meaning of that statute). As a general matter, the court reasoned that "the voluntary performance of labor that serves institutional needs of the prison is not in economic reality an employment relationship." *Id., at* 43-44; *see also Kavazanjian v. Naples*, No. 06-CV-3390 (JG), 2006 WL 2795220, at *2 (E.D.N.Y. Sept. 26, 2006) (applying *Danneskjold* to hold that the FLSA does not apply to inmates assigned to work for the Department of Motor Vehicles, because the labor served "another state agency not engaged in commerce" and "the institutional needs of the prison").

[9]    The "economic reality" test sets forth four non-exclusive factors for courts to consider

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 192 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

in determining whether an employee-employer relationship exists, specifically whether, *inter alia,* the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis,* 722 F.3d 99, 109 (2d Cir. 2013) (quoting *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir. 1984), *holding modified by Danneskjold v. Hausrath,* 82 F.3d 37 (2d Cir. 1996), *and holding modified by Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61 (2d Cir. 2003)).

Like Title VII, the FLSA defines "employee" as "any individual employed by an employer." *Compare* 29 U.S.C. § 203(e)(1) *with* 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer"). Although, for Title VII cases, the Second Circuit has typically applied the so-called "agency" test in determining whether an employment relationship exists, [10] rather than the "economic reality" test that the court applied in *Danneskiold, see Knight,* 880 F.3d at 641, it is also true that the agency test "is not well suited to determining the status of [prison] labor" and "has little relevance to the unique status of a prisoner and his or her relationship to the correctional institution," *Danneskjold,* 82 F.3d at 40-43. On this point, the Second Circuit observed that prisoners "are not generally participants in the national economy," that they "have limited rights, and [that] their conduct is closely regulated." *Id.* at 43.

[10]     In analyzing employment relationships under the agency test, courts consider "a non-exhaustive list of thirteen factors," including:

the hiring party's right to control the manner and means by which the product is accomplished[;] ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of

employee benefits; and the tax treatment of the hired party.

*Knight v. State Univ. of New York at Stony Brook,* 880 F.3d 636, 641 (2d Cir. 2018) (citing *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

Notably, the Supreme Court has found that the FLSA "defines the verb 'employ' expansively" and "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). It follows from this that, if the Second Circuit has concluded that prisoners who provide labor in the form of "services for the use of the prison," *Danneskjold,* 82 F.3d at 43, are not "employees" even under the FLSA's expansive definition, then the court would not likely consider such individuals to be "employees" under the narrower "agency" test, or for purposes of Title VII.

**\*7** Furthermore, although the Second Circuit has not directly concluded that the protections of Title VII do not extend to prisoners, at least one district court within this Circuit has reached that conclusion, after surveying the existing case law on the issue. *See West v. Goord,* No. 05cv447 (FPG), 2017 WL 3251253, at \*16 (W.D.N.Y. July 31, 2017) (finding that "[f]ederal courts ... have repeatedly held that that Title VII, an employment discrimination statute, does not apply to inmates who are assigned to prison jobs" (collecting cases)). In addition, federal agency guidance suggests that Title VII should not be construed to cover prison workers. Indeed, the EEOC has stated, more than once, that prison inmates who are "required to work by or who does work for the prison ... is not an employee within the meaning of [Title VII]." 40 Fair Empl. Prac. Cas. 1892 (1986); *see also EEOC Informal Discussion Letter, Empl. Prac. Guide ¶ 5453, 2016 WL 3360229 (Mar. 26, 2016)* ("If the work, or lack of work, is based on incarceration, it is not covered by Title VII or other employment discrimination laws." (citing *Williams,* 926 F.2d at 997)).

Overall, even apart from Plaintiff's seeming concession that he was not an "employee" for purposes of Title VII, this Court concludes that the weight of authority, combined with the reasoning of the Second Circuit in the analogous FLSA context, compels the conclusion that Plaintiff may not, as a matter of law, be considered to have been an "employee" for purposes of Title VII, and that his Title VII claims should therefore be dismissed with prejudice.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 193 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

**3. Should the Court Determine That Plaintiff May Be Considered an "Employee" for Title VII Purposes, Then His Title VII Claim Should, in Any Event, Be Dismissed as Deficient, But With Leave To Amend.**

Given that – in light of the Circuit split and lack of any direct ruling by the Second Circuit on the point – there is some uncertainty in the law as to whether Plaintiff may be considered to have been in an "employment" relationship with the City for purposes of Title VII, this Court will go on to consider the other arguments that Defendants have raised for dismissal of Plaintiff's Title VII claim. While Defendant's principal argument (that Plaintiff has failed to plead exhaustion of his administrative remedies) is not persuasive, Defendants' additional argument (that Plaintiff cannot maintain a Title VII claim without factual allegations tending to support that he was discriminated against because of his membership in a protected class) has more force. If the claim were to be dismissed on this basis, though, Plaintiff should be given leave to amend to plead the facts that are missing from his current Complaint.

**a. Defendants' Argument Regarding Lack of Exhaustion Is Misplaced.**

The main argument that Defendant advances as to why Plaintiff's Title VII claim should be dismissed is that he has failed to plead that he exhausted his remedies with the EEOC prior to bringing the present suit. This argument is contrary to well-established law. As set out above, exhaustion is not a jurisdictional requirement, *Fowlkes*, 790 F.3d at 384; rather, the failure to exhaust is an affirmative defense, *Burton*, 2012 WL 3580399, at *7, that will be Defendants' burden to establish, *Hardaway*, 879 F.3d at 491. The position that Defendants seek to assert here – that Plaintiff was required to allege exhaustion – has been held to be a position that "would effectively subvert the Second Circuit's mandate that [exhaustion] is an affirmative defense." *Frederic v. NFC Amenity Mgmt.*, No. 17cv5769 (AJN), 2018 WL 4735715, at *3 (S.D.N.Y. Sept. 28, 2018) (reasoning that dismissing *pro se* plaintiff's claim for failure to allege that she exhausted her administrative remedies would incorrectly switch the burden from defendant to plaintiff).

Although, as set out above, the affirmative defense of lack of exhaustion may be appropriately raised on a Rule 12(b)(6) motion where the plaintiff's pleading, on its face (or documents attached thereto, incorporated by reference therein, or subject to judicial notice) demonstrate a lack of exhaustion, *see Hardaway*, 879 F.3d at 491; *Jordan*, 928 F. Supp. 2d at 594 n.5; *Holmes*, 2015 WL 4885216, at *4, no such circumstance is presented here. In this case, Plaintiff has not affirmatively pleaded that he did *not* exhaust his administrative remedies, and Defendants have pointed to no documents that the Court should consider at this stage that would warrant dismissal on the grounds of lack of exhaustion.

**\*8** Accordingly, to the extent Defendants have moved for dismissal of Plaintiff's Title VII claim because of his purported lack of administrative exhaustion, their motion should be denied.

**b. Defendants Are Correct That Plaintiff Has Not Adequately Pleaded Discrimination Based on Membership in a Protected Class.**

Defendants are correct, however, that – even if Plaintiff were considered an "employee" – his Title VII claim could not otherwise survive on the merits, as currently pleaded, as he has failed to allege that he experienced a hostile work environment on the basis of his membership in any protected class. While Title VII protects employees from discrimination on the basis of, *inter alia*, race and national origin, *see* 42 U.S.C. § 2000e-2(a), which includes ethnicity, *see Vill. of Freeport v. Barrella*, 814 F.3d 594, 607-08 (2d Cir. 2016) ("discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII" and "may *also* be cognizable under the rubric of national-origin discrimination" (emphasis in original)), the statute does not extend protection, *per se*, to speakers of non-English languages, *see Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009) (collecting cases); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006).

"In some circumstances," however, "a prohibition on speaking one's native language in the workplace can be an indication of unlawful race or national origin discrimination." *Ruiz v. City of New York*, No. 14cv5231 (VEC), 2015 WL 5146629, at *4 n.3 (S.D.N.Y. Sept. 2, 2015) (citing *Pacheco*). Ultimately, unsupported allegations that Bishop discriminated against Plaintiff based on his race, national origin, or ethnicity would not be enough to enable him to meet his burden of proving such discrimination, *see Castro*

Case 9:21-cv-01090-BKS-TWD Document 43 Filed 02/01/24 Page 194 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

*v. Local 1199,* 964 F. Supp. 719, 727 (S.D.N.Y. 1997) (at summary judgment stage, Plaintiff's "conclusory allegation" that supervisor "manifested an obvious dislike of Hispanics" when instructing Plaintiff to speak English was "a conclusory allegation of discrimination"), but, at the pleading stage, Plaintiff would not need to come forward with actual evidence of the necessary animus. He would merely need to allege facts from which a plausible inference could be drawn that the City discriminated against him or subjected him to a hostile work environment because of his race, national origin, or ethnicity.

At this point, Plaintiff has alleged no facts, aside from Bishop's insistence that he and other inmates refrain from speaking Spanish, that would indicate that the City subjected him to severe and pervasive hostile work environment on the basis of his membership in any class protected by Title VII, but it is possible that he would be able to do so, if given an opportunity to amend. For that matter, although he has currently framed his Title VII claim in terms of a "hostile work environment," Plaintiff might also be able to allege facts from which it could plausibly be inferred that the City terminated him from his job in the kitchen – *i.e.*, caused him to suffer an "adverse employment action" – based, at least in part, on his supervisor's known animus towards his race, national origin, or ethnicity. *See Vega,* 801 F.3d at 86.

**\*9** Under Rule 15 of the Federal Rules of Civil Procedure, a district court should "freely give leave to amend when justice so requires." Fed. R. Civ. P. 15(a)(2). Further, where there is any possibility that an amendment would cure pleading deficiencies, a court, as a general matter, should not dismiss claims asserted by a *pro se* plaintiff for failure to state a claim without granting at least one opportunity for the plaintiff to amend the complaint. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (holding that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir. 1999))). Accordingly, should the Court find that the "employment" requirement of Title VII does not bar Plaintiff's Title VII claim as a matter of law, then I would recommend that his Title VII claim against the City be dismissed with leave to amend his Complaint.

Upon such a ruling, I would further recommend that Plaintiff be directed that any amendment to his hostile-work-environment claim, as well as any assertion of a disparate-treatment claim based on his termination, should include

factual allegations from which it could reasonably be inferred that the alleged discriminatory conduct was motivated, at least in part, by animus towards his race, national origin, or ethnicity. In addition, with respect to his hostile-work-environment claim, Plaintiff should be instructed to include any factual allegations that could support an inference that, because of his race, national origin, or ethnicity, he was subjected to abuse at his job that was not only perceived by him as abusive, but that was objectively severe and pervasive. *See Bell,* 2016 WL 7192083, at \*4.

**B. Sufficiency of Plaintiff's Section 1983 Claims**

Plaintiff's Complaint sets forth two distinct claims under Section 1983: first, that his constitutional rights were violated when Bishop ordered him not to speak Spanish in the kitchen (*see* Compl., at ECF 23, 25, 27); and second, that he was retaliated against for exercising his First Amendment right to file a grievance against Bishop (*see id.*). As a general matter, throughout the Complaint, Plaintiff appears to assert the first claim only against Bishop, and the second only against the City. (*See generally* Compl.) Liberally construing the Complaint, however, and interpreting Plaintiff's allegations as a whole to raise the strongest arguments they suggest, it appears at least possible that Plaintiff is attempting to assert both claims against both Defendants. (*Id.* at ECF 27 (referencing Bishop's "retaliatory actions" and claiming "First Amendment Constitutional rights violations" by the City).) This Court will therefore examine Plaintiff's claims as if they were each asserted against both Defendants.[11]

[11]  This Court notes that Defendants also appeared to presume that each claim was asserted against both Defendants (*see, e.g.,* Def. Mem., at 8 (noting that, with regards to Plaintiff's claim of a First Amendment right to speak Spanish, "plaintiff has not identified any allegedly unconstitutional DOC policy"; *id.* at 10 (analyzing Plaintiff's retaliation claim as if asserted against Bishop)), and that Defendants should therefore be found to have had adequate an opportunity to brief all issues addressed herein.

**1. Section 1983 Standards**

Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under

2020 WL 5665142

the Constitution or federal law." *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 285 (S.D.N.Y. 2019); *see also* 42 U.S.C. § 1983. A claim under Section 1983 may be asserted against an individual state actor, or – with a sufficient factual predicate to satisfy the requirements set out in *Monell* – a municipality.

**\*10** In order for a Section 1983 claim asserted against an individual to survive a Rule 12(b)(6) motion to dismiss, the plaintiff "must [have] allege[d] facts showing the individual's direct and personal involvement in the alleged constitutional deprivation." *Tripathy v. City of New York*, 2020 WL 3578198, at \*4 (S.D.N.Y. June 30, 2020) (citing *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013)). The plaintiff may be sound to have sufficiently pleaded the requisite "direct and personal involvement" of the individual defendant where the plaintiff has pleaded any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (4) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Marom v. City of New York*, No. 15cv2017 (PKC), 2016 WL 916424, at \*14 (S.D.N.Y. Mar. 7, 2016)), *reconsideration granted, in part, on other grounds*, 2016 WL 5900217 (S.D.N.Y. July 29, 2016).

Under *Monell*, a municipality qualifies as a "person" under Section 1983, such that it may be subject to suit for violating another person's federal rights. *Monell*, 438 U.S. at 690-91, 98 S.Ct. 2985. A municipality, however, may not be held liable under Section 1983 solely because one of its employees violated a plaintiff's rights. *See id.* Instead, for Section 1983 liability to attach, a plaintiff must ultimately prove "(1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person *acting under the color of state law*." *Farrell v. City of New York*, No. 15cv8401 (PAE), 2018 WL 944400, at \*4 (S.D.N.Y. Feb. 15, 2018) (emphasis added) (citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). A municipality may be said to be "acting under the color of state law" only if the challenged conduct of its employee(s) is based on an official municipal policy, custom, or practice. *Monell*, 438 U.S. at 691-92, 98 S.Ct. 2985; *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("in *Monell* and subsequent cases, we have required a plaintiff ... to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury").

At the pleading stage, a plaintiff seeking to hold a municipality liable under Section 1983 "must allege facts tending to support, at least circumstantially, an inference that [an alleged] municipal policy or custom exists." *Matthews v. City of New York*, No. 15cv2311 (ALC), 2016 WL 5793414, at \*9 (S.D.N.Y. Sept. 30, 2016) (citations and internal quotation marks omitted); *see Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). To allege the plausible existence of an unconstitutional policy or custom, the plaintiff must allege either:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it 'amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.'

**\*11** *Berg v. Kelly*, 343 F. Supp. 3d 419, 425 n.2 (S.D.N.Y. 2018) (citations omitted).

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 196 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

"[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Johnson v. City of New York,* No. 06cv9426 (GBD), 2011 WL 666161 (S.D.N.Y. Feb. 15, 2011) (citing *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998)). Furthermore, a plaintiff must plead facts sufficient to raise a plausible inference that the policy, custom, or practice was the cause of plaintiff's alleged injury. *Berry v. Village of Millbrook,* 815 F. Supp. 2d 711, 717 (S.D.N.Y. 2011) (plaintiff's allegations in support of a *Monell* claim must raise a plausible inference that, "through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (citing *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir. 2008))).

Here, this Court will first consider whether Plaintiff has adequately stated his Section 1983 claims against Bishop, and then consider the question of the City's potential liability.

### 2. Plaintiff's Claims Against Bishop

### a. Plaintiff's Claim That Bishop Violated His First Amendment Rights by Prohibiting Him From Speaking in Spanish

As set forth below, this Court finds that, through his allegations that Bishop ordered him not to speak in Spanish, Plaintiff has stated a plausible claim for violation of a First Amendment right. Since that right is not clearly established, however, this Court is constrained to recommend that this claim be dismissed with prejudice, on the grounds that Bishop is entitled to qualified immunity.

### i. The Complaint States a Plausible Claim That Bishop Infringed Plaintiff's Right To Free Speech.

As a preliminary matter, the Court notes that, while Defendants state, in their moving brief, that "in the prison context, there is no general constitutional right to speak a foreign language" (Def. Mem., at 5), the main thrust of Defendants' argument is that, applying the multi-factor test set forth by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987),[12] Bishop should be found to have had a "legitimate penological interest" in directing Plaintiff not to speak Spanish, in light of considerations regarding prison security and officer safety

where Plaintiff spoke a language that Bishop purportedly could not understand (*see* Def. Mem., at 5-6 (citing *Turner*)). Thus, it appears that Defendants are prepared to assume that Plaintiff *did* have a constitutional right to speak a foreign language in the facility, but that, in the specific circumstances presented, Bishop was justified in impinging on that right.

[12]     The Supreme Court held, in *Turner*, that "a prison regulation [that] impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254. In analyzing whether a regulation is valid under this standard, the Supreme Court has directed courts to analyze (1) whether there is a "valid, rational connection" between the regulation and the legitimate government interest; (2) "whether there are alternative means of exercising the right that remain open"; (3) the impact accommodating the right will have on guards and other inmates; and (4) "the absence of ready alternatives" to the regulation. *Id.* at 89-90, 107 S.Ct. 2254.

**\*12**   On the underlying question of whether inmates or detainees should be recognizing as having the general right to speak in their native language, while in prison or detention, this Court has found no Supreme Court or Second Circuit authority that is directly on point. In an arguably analogous context, though, at least two Circuits have held that a blanket restriction on prisoners' sending and receiving of correspondence or publications in languages other than English is constitutionally impermissible, suggesting that, in fact, inmates may possess and retain a right to communicate in languages other than English and that restrictions on such communications must therefore satisfy the factors set forth in *Turner*. *See Kikumura v. Turner,* 28 F.3d 592, 598 (7th Cir. 1994) (finding prohibition on prisoner's receipt of all foreign language publications to be unconstitutional);[13] *Thongvanh v. Thalacker,* 17 F.3d 256, 258 (8th Cir. 1994) (applying *Turner* analysis to prison policy that forbid plaintiff from corresponding in his native language); *cf. Yniguez v. Arizonans for Official English,* 69 F.3d 920, 949 (9th Cir. 1995) (finding that a blanket ban on government employees speaking languages other than English in the performance of their duties violated the First Amendment), *vacated sub nom. Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (vacating opinion of the Ninth Circuit on the grounds that plaintiff lacked standing). In addition, as is evident from the case law cited

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 197 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)
2020 WL 5665142

by Defendant and discussed below, district courts, including at least one from within this Circuit, have implicitly accepted the underlying premise that a refusal to allow a prisoner to speak a foreign language within a facility – including while working in that facility – may be violative of the First Amendment, unless the *Turner* factors are satisfied. *See Allah v. Poole*, 506 F. Supp. 2d 174 (W.D.N.Y. 2007) (cited in Def. Mem. at 6-8); *Reyes v. McKee*, No. 1:11-CV-1283, 2012 WL 718952, at *1 (W.D. Mich. Mar. 5, 2012) (same). Without definitively deciding the question, this Court will therefore similarly assume that Plaintiff had the right to speak Spanish to others within the environment of the MDC, absent a legitimate penological interest justifying the restriction of that right.

13    *Cf. Boriboune v. Litscher*, 91 F. App'x 498, 500 (7th Cir. 2003) (in case involving plaintiff's challenge to prison policy of preventing him, absent permission from a social worker, from having telephone calls in his native language with those outside the prison, finding no constitutional violation, and distinguishing *Kikumura* on the grounds that *Kikumura* was " 'narrowly limited' to the situation in which 'a prison makes no effort at all to accommodate the constitutional rights of prisoners native in languages other than English' " (citing *Kikumura*, 28 F.3d at 598)).

As to Defendants' argument that Plaintiff's First Amendment claim should be dismissed pursuant to *Turner,* Defendants principally rely on the *Allah* and *Reyes* cases. In *Allah,* after the parties completed discovery, the defendants moved for summary judgment on a claim by the plaintiff, a commissary worker, that an officer's directive to him not to speak Spanish while at work violated his First Amendment rights. *See Allah,* 506 F. Supp. 2d at 181. The district court applied the *Turner* factors, and found that the directive not to speak Spanish was reasonably related to a legitimate penological interest, specifically because (1) the plaintiff could still communicate in English with his co-workers; (2) the plaintiff could speak Spanish when he was not working; and (3) the plaintiff had failed to demonstrate any genuine dispute of fact that providing interpreters or Spanish-speaking guards would create more than a *de minimis* burden on the prison. *Id.*, at 183-84.

Similarly, in *Reyes,* the plaintiffs alleged that they had been berated by a corrections officer for, and ultimately barred from, speaking Spanish while at work in the prison's kitchen. *Reyes,* 2012 WL 718952, at *1. Relying on *Allah,* the district

court dismissed the complaint for failure to state a claim, finding that, because the corrections officer did not speak Spanish, his "legitimate penological interest was patently obvious" and the order not to speak Spanish was "rationally related to that interest." *Id.*, at *6. Specifically, the Court noted that, although Plaintiff "could be accommodated by at all times ensuring that Spanish-speaking prison employees were present in the kitchen," *id.*, the burden on the prison to supply that accommodation would not be *de minimis,* and thus the *Turner* factors did not weigh in plaintiffs' favor, *id.*

Defendants' reliance on these cases is misplaced, as Defendants overlook that it is their own burden, not Plaintiff's, to articulate a legitimate penological interest in the first instance. *Salahuddin v. Goord,* 467 F.3d 263, 276 (2d Cir. 2006) ("Under [ ] *Turner* ..., once a prisoner shows that a prison regulation impinges on a protected right, *prison officials* must show that the disputed official conduct was motivated by a legitimate penological interest" (emphasis added)); *Hall v. Ekpe,* 408 F. App'x 385, 388 (2d Cir. 2010) (summary order) (once plaintiff has articulated a burden on a First Amendment right, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct" (citing *Salahuddin*)); *accord Lopez v. Cipolini,* 136 F. Supp. 3d 570, 587 (S.D.N.Y. 2015) (citation omitted).

*13    Consistent with this principle, *Allah* was decided at the summary-judgment stage, where the parties had the benefit of a discovery record regarding the officer's reasons for the directive not to speak Spanish, and regarding the relative benefits and burdens to plaintiff and the prison in accommodating Plaintiff's non-English communications. *See Allah,* 506 F. Supp. 2d at 183-84 (noting, *inter alia,* that "the stated rationale for [the officer's] order [was] to ensure her own safety," that "the officer was alone in the commissary," that "plaintiff could still communicate in English with his co-workers," and that "the restriction on his use of Spanish applied only while [plaintiff] was working in the commissary, and that he was generally free to communicate in Spanish elsewhere"). To the extent the court, in *Reyes*, dismissed the plaintiffs' claim at the motion-to-dismiss stage, without there having been discovery as to the relevant *Turner* factors, and relying on the court's opinion on summary judgment in *Allah,* this Court does not believe that *Reyes* was correctly decided. *See Washington v. Gonyea,* 538 F. App'x 23, 27 (2d Cir. 2013) (summary order) (noting that "assessing the reasonableness of penological interests is a factual and context-specific inquiry that in this case is inappropriate at [the motion-to-

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 198 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

dismiss] stage"); *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 264 (S.D.N.Y. 2014) (denying motion to dismiss First Amendment claim in part because "[t]his being a motion to dismiss, [d]efendants have not answered, and so have not yet articulated any "legitimate penological interest" or "compelling state interest" that would justify the alleged [First Amendment violation]"); *see also Hosannah v. Nassau Cty. Criminal Supreme Court Sergeant Officer(s)*, No. 16cv1045 (JFB) (AYS), 2017 WL 3207966, at *13 (E.D.N.Y. July 5, 2017) ("At this stage of the litigation, where [d]efendant has challenged, under Rule 12(b)(6), Plaintiff's pleading of his [First Amendment] claims, the Court need not address the question of ... whether the [d]efendant may be able to make an adequate showing of a 'legitimate penological interest' "), *report and recommendation adopted sub nom. Hosannah v. Sposato*, 2017 WL 3207750 (E.D.N.Y. July 26, 2017).

Moreover, in this case, neither the Complaint nor any evidence submitted by Defendants (assuming the Court could consider such evidence), supports what is now nothing more than a speculative suggestion that Bishop was not able to understand what Plaintiff was saying in Spanish. (*See* Def. Mem., at 7 (arguing that "[a] conversation between an inmate and a C.O. in Spanish raise the same penological interests [as were raised in *Allah*] – C.O. Bishop would need to hear and understand such a conversation so as to be aware whether or not [P]laintiff's words were threatening or were otherwise improper"); Def. Reply Mem., at 5 (arguing that "the courts have directly found that the dangers inherent in working in a prison kitchen – the specific situation presented in this case – mean that there is a penological interest in not allowing inmate employees in that kitchen to speak a language that a C.O. could not understand" (citing *Reyes*)).) Even apart from the fact that it is generally inappropriate, on a Rule 12(b)(6) motion, for a court to consider facts outside the plaintiff's pleading, *see, e.g., Braun v. United Recovery Sys., LP*, 14 F. Supp. 3d 159, 170 (S.D.N.Y. 2014) (at the 12(b)(6) stage, declining to consider facts proffered by Defendant that were neither contained in the Complaint nor subject to judicial notice), it is surely true that statements made or implied only in a defendant's legal brief cannot provide a factual predicate for the dismissal of a claim.[14]

---

[14]   In his opposition brief, Plaintiff expresses his own belief that Bishop could not understand Spanish and therefore felt threatened by those who spoke Spanish – including those who were not themselves inmates or detainees. (*See* Pl. Opp., at ECF 2 (Plaintiff stating that he "was discriminated

against by corrections officer Bishop not because of speaking [S]panish but because officer Bishop couldn't understand [S]panish ..." and that "C.O. Bishop never made any log entries or brought it to the attention of any of her supervis[o]rs that she felt threaten[e]d by the speaking of [S]panish by the inmates/detainees and by the civilian staff because she didn't understand [S]panish").) This Court acknowledges that there are times when it may be appropriate on a motion to dismiss a *pro se* complaint to consider factual allegations made by the plaintiff in his opposition to the motion. *See, e.g., Samuels v. Fischer*, 168 F. Supp. 3d 625, 645 n.11 (S.D.N.Y. 2016). Generally, though, the purpose of considering allegations made by a *pro se* plaintiff outside the pleadings is to ensure that his complaint is afforded its most favorable construction, prior to dismissal. *See Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 246-47 (S.D.N.Y. 1998) (citing "policy reasons favoring liberal construction"); *see also Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002) (noting that "[e]xamining such materials is consistent with the principle that a court may not dismiss a *pro se* complaint unless it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief (internal quotation marks and citations omitted)). Here, accepting as true Plaintiff's statements in his opposition brief regarding Bishop's lack of understanding of Spanish, and using that as a basis for dismissal, would be inappropriate, both because it would not serve the aim of reading Plaintiff's Complaint liberally in his favor, and also because, absent an explanation as to how Plaintiff had personal knowledge regarding what Bishop could or could not understand, much less how she felt upon hearing others speak Spanish, the statements in Plaintiff's opposition must be seen as just as speculative and conclusory as those in Defendants' briefs.

**\*14** In addition, the facts that are alleged in the Complaint demonstrate some key distinguishing points from *Allah* and *Reyes.* First, where the officer in *Allah* (and perhaps in *Reyes,* as well, although this is unclear) was reportedly alone with inmates, *see, Allah,* 506 F. Supp. 2d at 178; *Reyes,* 2012 WL 718952, at *4*, Plaintiff, here, alleges that Bishop was accompanied by other officers, including those who could allegedly speak Spanish, perhaps mitigating certain security

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 199 of 217

2020 WL 5665142

concerns. (Compl., at ECF 23; *see also* Pl. Opp., at ECF 23 (distinguishing *Allah*).) Second, where the inmates in *Allah* and *Reyes* claimed to have spoken Spanish to other inmates, *see Allah,* 506 F. Supp. 2d at 178; *Reyes,* 2012 WL 718952, at *4, Plaintiff here alleges that he was reprimanded for speaking Spanish to a Spanish-speaking *officer*. (Compl., at ECF 23.) Third, where the courts in *Allah* and *Reyes* concluded that the accommodation of having Spanish-speaking officers in the kitchen would not be a "*de minimis*" burden, *see Allah,* 506 F. Supp. 2d at 184; *Reyes,* 2012 WL 718952, at *6, Plaintiff alleges that he routinely spoke Spanish to officers in the kitchen, suggesting that perhaps there were sufficient number of Spanish-speaking officers to ensure that one was present in the kitchen without imposing a significant burden. (Compl., at ECF 23, 25.) [15] Finally, although the court, in *Allah*, specifically noted that the plaintiff was able to communicate with his co-workers in English, *Allah,* 506 F. Supp. 2d at 183, here, Plaintiff has alleged that certain inmates in the kitchen spoke only in Spanish (*see* Compl., at ECF 25), suggesting that Bishop's directive imposed an even greater burden on him, generally, than the one imposed in *Allah.* Each of these contrasts suggest that discovery, if allowed to proceed, could bear out a very different picture of the respective burdens on Plaintiff and the Facility, under the factors set forth in *Turner.*

[15]    As to Defendant's assertion that asking other officers to translate is "ludicrous," that the other officers had "a specific job to do," and "were not tasked with providing translation services" (Def. Reply Mem., at 5), those statements are merely conclusory, not buttressed by any facts in the Complaint, and miss the question of whether the officers could be asked to translate with only *de minimis* burden, or indeed whether translation would even be necessary.

In short, because Defendants have not shown that, on the face of the Complaint, the *Turner* factors weigh conclusively in their favor, their argument for dismissal of Plaintiff's First Amendment claim fails. Nevertheless, for the reasons set forth below, this Court is constrained to recommend that Plaintiff's claim be dismissed with prejudice, on the grounds that Bishop is entitled to qualified immunity with respect to this claim.

### ii. Bishop Is Entitled To Qualified Immunity on Plaintiff's Claim That Prohibiting Him From Speaking Spanish Was a Constitutional Violation.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The qualified immunity analysis consists of two steps: "first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was 'clearly established' at the time of the alleged violation." *Bacon v. Phelps,* 961 F.3d 533, 542 (2d Cir. 2020) (quoting *Pearson,* 555 U.S. at 232, 129 S.Ct. 808). The district court has discretion to address these two prongs in the order it deems appropriate. *Jones v. City of New York,* No. 18cv1937 (VSB), 2020 WL 1644009, at *13 (S.D.N.Y. Apr. 2, 2020).

For a right to be clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent ... [such] that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Jones,* 2020 WL 1644009 at *12 (quoting *District of Columbia v. Wesby,* —— U.S. ——, 138 S. Ct. 577, 589-90, 199 L.Ed.2d 453 (2018)). "Rights must be clearly established in a 'particularized' sense, rather than at a high level of generality; and such rights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally." *Grice v. McVeigh,* 873 F.3d 162, 166 (2d Cir. 2017) (quoting *White v. Pauly,* —— U.S. ——, 137 S. Ct 548, 196 L.Ed.2d 463 (2017)). Although a plaintiff who contests qualified immunity "is not required to find 'a case directly on point for a right to be clearly established' ... there must be some 'existing precedent [that has] placed the statutory or constitutional question beyond debate.' " *Wagschal v. Skoufis,* 442 F. Supp. 3d 612, 624 (S.D.N.Y. 2020) (quoting *White*).

**\*15** Given that qualified immunity constitutes an affirmative defense, the defendant bears the burden of showing that he or she is entitled to qualified immunity. *Bacon,* 961 F.3d at 542. While the applicability of qualified immunity is a fact-specific inquiry, it may be established at the motion-to-dismiss stage

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

if it is "based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

Plaintiff has cited to no Supreme Court or Second Circuit decision, and this Court has located none, which addresses the constitutional question of whether preventing workers from speaking in non-English languages in the workplace may – when done under color of state law – be considered a violation of a First Amendment right, let alone the parameters of that right as applied to detainees or prisoners. (*See generally* Discussion, *supra*, at Section (II)(B)(2)(a)(i); *see also Charles W. v. Maul*, 214 F.3d 350, 353 (2d Cir. 2000) ("A right may be said to be clearly established when it has been recognized either by the Supreme Court or by the applicable Circuit Court.").) Indeed, even broadening its search beyond the workplace context, this Court has located no controlling case authority addressing a more general right of an individual to speak in a non-English language. [16] This Court therefore cannot conclude that Plaintiff had a "clearly established" right to speak Spanish while carrying out his duties in the Facility's kitchen, so as to deny Bishop qualified immunity for her alleged conduct.

[16] As noted above, in *Arizonans for Official English*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170, the Supreme Court declined (on standing grounds) to reach the merits of a claim challenging, under the First Amendment, a state law that mandated state employees to speak only English on the job. Other Supreme Court cases involving the alleged deprivation of constitutional rights based on the refused use of non-English language have arisen from situations bearing little resemblance to the situation presented here. *See Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (holding that a state school district's failure to accommodate the needs of students who did not speak English constituted a violation of equal protection guarantees); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (invalidating, on due-process grounds, a state law banning the teaching of foreign language to schoolchildren). Similarly, on the issue of the prohibition of foreign-language use, the Second Circuit has not issued any First Amendment ruling that could be generally applicable to this case. *See, e.g.*, *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) (affirming dismissal of equal-protection claim made by Hispanic plaintiffs whose Social Security benefits were allegedly denied because of the defendant Secretary's failure to provide notices and oral instructions in Spanish).

Unsurprisingly, given the dearth of case law on this topic, other courts that have addressed similar claims regarding the use of non-English language by detainees or prisoners have reached the same conclusion. *See Allah*, 506 F. Supp. 2d at 184 ("assuming *arguendo* that prison inmates have some right to communicate with each other in a non-English language, the parameters of that right are far from clear"); *Reyes*, 2012 WL 718952, at *7 (dismissing First Amendment claim on qualified immunity grounds, noting that "few courts have addressed whether prohibitions on the speaking of a foreign language in the workplace violates the First Amendment ... [and] no case in this or any other circuit has ruled that such a prohibition in the prison work context violates the First Amendment"); *see also Kikumura*, 28 F.3d at 596 ("Whatever we might think about the constitutionality of [a blanket ban on incoming mail in Japanese], it surely is not 'clearly established' that [the Warden's] actions violated Kikumura's constitutional rights.").

**\*16** Finally, Plaintiff's implicit suggestion that on-point precedent is not needed here because Bishop's First Amendment violation was obvious (*see* Pl. Opp., at ECF 4 (arguing that Bishop "clearly violated the law when she discriminated against [Plaintiff]" for speaking Spanish)) does not help him. It is true that "a plaintiff may overcome the qualified immunity defense in the absence of precedent [ ] when the constitutional violation is 'obvious.' " *Wagschal*, 442 F. Supp. 3d at 627. As this Court has discussed, however, there is little case law addressing the question of whether any person has a constitutional right to speak a non-English language in the workplace, let alone whether a prisoner or detainee necessarily retains those rights in custody. Further, given that, on the few occasions where they have been addressed, "language bans" in the prison workplace have been upheld, it cannot be said that Bishop's conduct was so egregious or such a significant infringement of Plaintiff's rights that it was blatantly unconstitutional. Thus, this is not a case where the Court could reasonably conclude that Bishop "obviously" violated the Constitution when she directed Plaintiff not to speak Spanish. *See Wagschal*, 442 F. Supp. 3d at 627. [17]

[17] Given that Plaintiff complains that Bishop "discriminated" against him by prohibiting him from speaking English in the MDC workplace (Pl.

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

Opp., at ECF 4), it should also be noted that the law would also not support a finding that such alleged conduct was violative of Plaintiff's "clearly established" right to equal protection, under the 14th Amendment. (*See* cases discussed *supra*, at n.16.)

In sum, even assuming that Plaintiff has plausibly pleaded that Bishop violated a First Amendment right by ordering him not to speak Spanish while working in the MDC kitchen, Plaintiff cannot prevail on that claim because of Bishop's qualified immunity. Regardless of whether this is a desirable result, this Court is bound to follow the qualified-immunity doctrine as articulated by the Supreme Court, and, under that doctrine, this is the result that this Court is constrained to reach. I therefore respectfully recommend that Plaintiff's First Amendment claim against Bishop, based on Plaintiff's allegations that Bishop refused to allow him to speak Spanish during his work in the Facility kitchen, be dismissed with prejudice.

### b. **Plaintiff's Claim That Bishop Violated His First Amendment Rights by Retaliating Against Him For Filing a Grievance Regarding Her Conduct**

As noted above, to the extent Plaintiff is claiming, under Section 1983, that he suffered unlawful retaliation for having filed a grievance about Bishop's conduct, his Complaint and opposition papers suggest that he is principally asserting that claim against the City. Nonetheless, as this Court has liberally construed the Complaint to raise this claim against Bishop as well, this Court will address that claim here.

As to such a claim, this Court notes, at the outset, that Defendants appear to have misread the Complaint, as they argue, in their moving brief, that Plaintiff has failed to plead that he was retaliated against for speaking Spanish in the kitchen. (Def. Mem., at 9-10.) This reading of the Complaint does not appear to be suggested anywhere in either the Complaint itself or the Plaintiff's briefing, both of which make clear that Plaintiff claims he was retaliated against for filing a grievance against Bishop. (*See* Compl., at ECF 4 (alleging "First Amendment for Retaliation *from filing grievance*" (emphasis added)); *id.*, at ECF 17 (alleging "First Amendment for Retaliation *for filing formal grievance*" (emphasis added)); *id.*, at ECF 25 (alleging that Plaintiff "found out that *since [he] filed the grievance*" he was removed from kitchen duties and further alleging "retaliation *for filing [a] grievance against [ ] Bishop*" (emphasis

added)); ECF 27 (alleging a violation of his right "to be free from retaliation *for the filing of a formal grievance* (emphasis added)); *see also* Pl. Opp., at ECF 3 (noting that "there is a grievance on file in which the plaintiff was retaliated against for using such against [ ] Bishop" and asserting that "plaintiff was retaliated against for filing a formal grievance against [Bishop]").) Defendants do not point to any specific language in the Complaint that supports their interpretation of Plaintiff's claims, and this Court has located none. As a result, much of Defendants' opening briefing on this point is of little to no value in analyzing Plaintiff's claim, and their characterization of Plaintiff's opposition as raising a "new theory of the case" or "new claim" of retaliation (Def. Reply Mem., at 3-4) is simply incorrect.

 **\*17**  Turning to the claim that Plaintiff has actually attempted to plead, the law provides that, "[t]o state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly,* 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009)). As set out above, to make out a Section 1983 claim against an individual defendant, the plaintiff must also plead that the defendant had "direct and personal involvement in the alleged constitutional deprivation." *Tripathy,* 2020 WL 3578198, at *\*4*; *see* Discussion *supra*, at Section (II)(B)(1).

The Court may quickly dispose of Defendants' argument (made in its opening brief, based on its misunderstanding of Plaintiff's claim) that Plaintiff has failed to plead he engaged in protected speech. (*See* Def. Mem., at 9.) When addressing, on reply, Plaintiff's *actual* retaliation claim, Defendants make no suggestion that a grievance should not be considered protected speech (*see generally* Def. Reply Mem., at 3-4) – with good reason, as "it is well established that retaliation against a prisoner for pursuing a grievance ... is actionable under [Section] 1983." *Dolan,* 794 F.3d at 294 (internal quotation marks and citation omitted). Based on this settled law, Plaintiff has sufficiently pleaded the first element of his retaliation claim. As for the second element, Defendants do not challenge that Plaintiff's removal from kitchen duties may be considered an "adverse action" (*see* Def. Mem., at 9-10; Def. Reply Mem., at 3-4), seemingly conceding the point, at least for purposes of this motion.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 202 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

Defendants' chief argument appears to be that Plaintiff has failed to plead facts that could satisfy the third element – the presence of a causal connection between the protected speech and the adverse action. On this point, Defendants initially assert (again, seemingly focusing, wrongly, on Plaintiff's speaking in Spanish, rather than his filing of a grievance) that Plaintiff has "fail[ed] to allege any specific facts demonstrating a causal connection, let alone a substantial motivating factor, between the speech and the retaliatory act." (Def. Mem., at 9-10.) Then, in reply (addressing the grievance), Defendants state "the only factor [Plaintiff] has alleged in support of a causal connection ... is a temporal one" (Def. Reply Mem., at 4), which, they contend, is insufficient, standing alone, to support a retaliation claim (*id.*). This argument is both legally and factually wrong. First, at the motion-to-dismiss stage, temporal proximity (which Defendants appear to concede exists here, and would be hard-pressed to deny, given that the grievance and the alleged retaliatory act occurred a mere week apart) may, standing alone, be sufficient to support a causal connection for purposes of a retaliation claim. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009) (reversing district court's dismissal of First Amendment retaliation claim where only fact alleged to support a causal connection was temporal proximity between the grievance and retaliatory act).[18] Second, temporal proximity is not, in fact, the only allegation in the Complaint that could plausibly give rise to an inference of a causal connection between Plaintiff's grievance and his removal from kitchen duties; Plaintiff also alleges that he was expressly told that he was "fired since [he] filed the grievance against [ ] Bishop." (Compl., at ECF 25.) Taken together, this Court concludes that Plaintiff's allegations are sufficient, at this stage, to raise a plausible inference of retaliatory intent.[19] *See, e.g., Burton v. Lynch,* 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009) (temporal proximity, in conjunction with other facts to corroborate claim of retaliation, was sufficient to plead *prima facie* case of First Amendment retaliation).

[18]     Defendants' sole case in support of their proposition to the contrary is a summary-judgment case, and therefore inapposite. (Def. Mem., at 4 (citing *Gill v. DeFrank,* No. 98cv7851 (JSR) (AJP), 2000 WL 270854, at *16 (S.D.N.Y. Mar. 9, 2000), *report and recommendation adopted as modified,* 2000 WL 877012 (S.D.N.Y. June 30, 2000)).) That temporal proximity may, standing alone, be insufficient to raise a triable issue of fact at the summary judgment stage does not require a

conclusion that temporal proximity alone cannot, at the pleading stage, support a plausible claim for relief.

[19]     Defendants also argue in passing that there was a "proper reason" for Plaintiff's removal from the kitchen, as "it would be entirely appropriate for MDC to reassign a prisoner who has made a grievance away from the C.O. against whom he has filed the grievance." (Def. Mem., at 4.) There is nothing in the Complaint, however, to suggest that Plaintiff was reassigned to a different job, much less that the person who made the decision to reassign him did so for a non-retaliatory reason. Such facts might be adduced during discovery, but, at this stage, as they have merely been suggested in Defendants' brief, they cannot defeat Plaintiff's claim.

**\*18** Defendants also argue, albeit in a cursory manner, that Plaintiff's retaliation claim must fail because he has not specifically pleaded that Bishop is the one who committed the alleged retaliatory act. (Def. Mem., at 10; Def. Reply Mem., at 4.) As Defendants correctly note, the Complaint does not contain any factual allegations that plausibly suggest that Bishop made the decision to terminate Plaintiff's work assignment, or that she suggested, recommended, or otherwise participated in that decision in any way (*see generally* Compl.), and, in the absence of any such allegations, Plaintiff's claim cannot survive as pleaded, *see Littlejohn,* 795 F.3d at 314 (dismissing Section 1983 claims against plaintiff's work supervisors where plaintiff failed to allege supervisors were "personally involved" in her demotion).

It is possible, however, that Plaintiff could plead facts giving rise to a plausible inference that Bishop was personally involved in the decision to remove him from his kitchen job, and, for this reason, Plaintiff should be permitted to attempt to cure this defect through amendment. On this point, this Court notes that, although Defendants generally argue that Bishop is entitled to qualified immunity on "all" of Plaintiff's claims (Def. Mem., at 16-18), they do not actually raise a qualified-immunity argument with respect to a retaliation claim premised on Plaintiff's filing of a grievance, as opposed to his speaking Spanish (*see id.*). Nor could Defendants convincingly argue that Bishop would be entitled to qualified immunity on a claim that she unlawfully terminated Plaintiff's job because he filed a grievance against her, as it has been clearly established that an officer may not retaliate against

2020 WL 5665142

inmates for filing grievances. *See Vincent v. Sitnewski,* 117 F. Supp. 3d 329, 342 (S.D.N.Y. 2015). Thus, should Plaintiff be able to plead Bishop's personal involvement, such amendment would not be futile.

For the reasons set forth above, this Court concludes that Plaintiff's First Amendment retaliation claim against Bishop should be dismissed, but without prejudice to replead. Further, if Plaintiff has reason to believe that individuals other than Bishop were personally involved in the termination of his work assignment, then he should also be given the opportunity to amend his Complaint in order to name such other individuals as defendants, and to plead the nature of their involvement in the claimed violation.

### 3. Plaintiff's Section 1983 Claims Against the City

Having (1) assumed that Plaintiff has pleaded a plausible First Amendment claim based on Bishop's order that he not speak Spanish in the workplace, but concluded that this claim must be dismissed, as against Bishop, on qualified immunity grounds, and (2) found that Plaintiff has pleaded all the elements of a First Amendment retaliation claim, but concluded that this claim must also be dismissed, as against Bishop, for failure to plead her personal involvement in the alleged violation, this Court now turns to Plaintiff's claims against the City. For the reasons set forth below, this Court concludes that these claims do not satisfy the requirements of *Monell* and should be dismissed on that basis, without prejudice to amend.

Before discussing the *Monell* defects in Plaintiff's pleading, this Court notes, as an initial matter, that neither of the defects noted above with respect to Plaintiff's claims against *Bishop* would absolve the City of potential Section 1983 liability. First, any qualified immunity to which an individual defendant may be entitled would not extend to the City. *See Askins v. Doe No. 1,* 727 F.3d 248, 254 (2d Cir. 2013) (discussing interplay between individual and municipal liability, and clarifying that dismissal of a claim against an individual municipal actor based on qualified immunity is "irrelevant to the liability of the municipality"). As explained by the Second Circuit, municipalities simply "have no immunity from damages for liability flowing from their constitutional violations." *Id.* (internal quotation marks and citations omitted). Rather,

**\*19** The doctrine that confers qualified immunity on individual state or municipal actors is designed to ensure that the persons carrying out governmental responsibilities will perform their duties boldly and energetically without having to worry that their actions, which they reasonably believed to be lawful at the time, will later subject them to liability on the basis of subsequently developed legal doctrine.... That policy, however, has no bearing on the liability of municipalities. Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights.

*Id.* (citations omitted); *see also Pearson,* 555 U.S. at 243, 129 S.Ct. 808, (noting that "the [Section 1983] plaintiff will presumably take into account the possibility that the individual defendant will be held to have qualified immunity, and presumably the plaintiff will seek damages from the municipality as well as the individual employee").

Second, even if Plaintiff were unable to plead that Bishop herself – or, for that matter, any other particular employee or employees of the City – made the decision to terminate his job in the MDC kitchen, he could still proceed against the City, provided he is able to plead facts giving rise to a plausible inference that the decision was made pursuant to an unlawful municipal policy or custom. *See Askins,* 727 F.3d at 253 ("It suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality."). Indeed, a plaintiff "need not sue the individual tortfeasors at all, but may proceed solely against the municipality." *See id.* (citation omitted). Thus, if Plaintiff could plead that it was a standard practice for City employees to terminate the work assignment of an inmate or detainee who filed a grievance against that inmate or detainee's work

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

supervisor, and that this practice was followed in his case, then Plaintiff could state a plausible *Monell* claim against the City, regardless of whether he can – or chooses to – name the actor(s).

Still, to proceed on his Section 1983 claims against the City, Plaintiff must plead the *Monell* requirements, and, at this point, he has not done so. Specifically, Plaintiff must adequately plead that an official policy, custom, or practice of the City caused the deprivations of his federal constitutional or statutory rights. *See Monell*, 438 U.S. at 694, 98 S.Ct. 2985. Here, Plaintiff does not allege that either Bishop's order that he not speak Spanish, or his removal from kitchen duties after the filing of his grievance, was the result of, or was effected in accordance with, any policy, custom, or practice of the City. (*See generally* Compl.)

Certainly, Plaintiff has not identified any formal policy, "officially endorsed" by the City, *Berg,* 343 F. Supp. 3d at 425 n.2, that either forbids the speaking of Spanish by inmates or detainees in a facility workplace, or that dictates the removal of inmates or detainees from assigned work duties based on their filing of grievances.[20] In fact, Plaintiff suggests, in his Complaint, that the City's *lack* of an appropriate policy was the cause of his injury (Compl., at ECF 27 (referring to the City's "lack of policies")), but, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy, *see Zachary v. City of Newburgh,* No. 13cv5737 (VB), 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) ("[T]he absence of a policy is not a policy and is not actionable under *Monell* ...." (citing *Monell,* 436 U.S. at 690-91, 98 S.Ct. 2018)). Moreover, Plaintiff has not pleaded that the claimed violation of his rights – either with respect to his being prohibited from speaking Spanish, or his being terminated from his job for retaliatory reasons – were "actions taken or decisions made by [City] officials responsible for establishing municipal policies," *Berg,* 343 F. Supp. 3d at 425 n.2, or that either claimed violation resulted from "a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials," *id.* (internal quotation marks and citation omitted)

20    In his Opposition, Plaintiff cites to several laws, which, as characterized by Plaintiff, were implemented "to deter any kind of retaliation and discrimination." (Pl. Opp., at ECF 4.) Plaintiff, however, misunderstands *Monell*, which requires not that the City be subject to anti-discrimination

or anti-retaliation policies, but rather that the City has implemented an *unlawful* policy, custom, or practice that has *caused* the harm for which Plaintiff seeks redress. *See Monell*, 438 U.S. at 694, 98 S.Ct. 2985. Plaintiff has failed to allege the existence of any such policy here.

**\*20** Plaintiff does, in his Complaint, make a passing reference to an alleged "failure" by the City "to properly train and supervise." (Compl., at ECF 27.) Although a failure to train or supervise can provide a basis for municipal liability under Section 1983, *see Berg,* 343 F. Supp. 3d at 425 n.2, such a failure must be alleged to exist "to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact," *id.* (internal quotation marks and citation omitted). Thus, a plaintiff must plead more than conclusory allegations in support of a *Monell* claim based on such failures. *See Triano v. Town of Harrison, NY,* 895 F. Supp. 2d 526, 538 (S.D.N.Y. 2012). In order to plead an adequate *Monell* claim based on a failure to train, a plaintiff must allege that the municipality acted "with deliberate indifference," *id.* at 540, and, similarly, in order to plead an adequate claim based on a failure to supervise, a plaintiff must allege that "the need for more or better supervision was obvious" and that the defendant "made no meaningful attempt to prevent the constitutional violation," *id.* at 539 (internal quotation marks, alterations, and citation omitted). In this case, Plaintiff's single conclusory allegation does not provide any facts from which this Court could plausibly infer that the City did not, in fact, train or supervise Bishop (or other City officers or employees) with respect to the particular constitutional violations alleged, let alone that the City was "deliberately indifferent[t]" to a gap in training, or that the need for supervision was "obvious." (*See generally* Compl.) Plaintiff's conclusory allegation regarding insufficient training and supervision therefore cannot save his *Monell* claims against the City.

For these reasons, I recommend that Plaintiff's claims against the City be dismissed. I further recommend, however, that this dismissal be without prejudice, as it is possible that Plaintiff may be able to allege additional facts that could support a plausible inference that the claimed violations of his First Amendment rights resulted from a City policy, custom, or practice, and he should therefore be afforded an opportunity to amend his Complaint, so as to plead such allegations.

**CONCLUSION**

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 205 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 5665142

For all of the foregoing reasons, I respectfully recommend that Defendants' motion to dismiss (Dkt. 23) be granted as follows:

1. Plaintiff's Title VII claim should be dismissed with prejudice, on the grounds that Plaintiff cannot be considered to have been a City "employee" under Title VII as a matter of law; [21]

2. Plaintiff's Section 1983 claim that his First Amendment rights were violated by Bishop's prohibiting him from speaking Spanish in the MDC workplace should be:

   a. dismissed with prejudice, as against Bishop, on qualified-immunity grounds, and

   b. dismissed without prejudice, as against the City, with leave for Plaintiff to amend his Complaint to plead, under *Monell*, that this alleged violation occurred as the result of a municipal policy, custom, or practice; and

3. Plaintiff's Section 1983 claim that his First Amendment rights were violated by his being terminated from his work assignment at the MDC in retaliation for his having filed a grievance against Bishop claim should be

   a. dismissed without prejudice, as against Bishop, with leave for Plaintiff to amend his Complaint to allege Bishop's personal involvement in his termination; and

   b. dismissed without prejudice, as against the City, with leave for Plaintiff to amend his Complaint to plead, under *Monell*, that the allegedly retaliatory conduct was pursuant to a municipal policy, custom, or practice.

[21]   As discussed above, if the Court disagrees with this conclusion, and determines that Plaintiff may be considered to have been an "employee" for purposes of Title VII, then I would still recommend that Plaintiff's Title VII claim against the City be

dismissed – but without prejudice to amend, so as to give Plaintiff the opportunity to plead that he was discriminated against in his employment based on his membership in a protected class (*i.e.*, his race, national origin, or ethnicity), rather than for speaking a non-English language.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis J. Liman, United States Courthouse, 500 Pearl Street, Room 2204, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Liman. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

**\*21**  If Plaintiff does not have access to cases cited herein that are reported only on Westlaw or LexisNexis, he may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5665142

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 206 of 217

Quinones v. New York City, Not Reported in Fed. Supp. (2020)

2020 WL 6901340

2020 WL 6901340
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anibal K. QUINONES, Plaintiff,

v.

NEW YORK CITY, et al., Defendants.

19-cv-5400 (LJL)
|
Signed 11/23/2020

**Attorneys and Law Firms**

Anibal K. Quinones, New York, NY, pro se.

Katherine Jane Weall, New York City Law Department, New York, NY, for Defendants.

ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** Currently pending is a motion to dismiss *pro se* plaintiff Anibal K. Quinones' complaint, which brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983 against Defendants New York City (the "City") and Corrections Officer Artisha Bishop ("Bishop"). Plaintiff claims that, while in City custody at the Manhattan Detention Complex, his First Amendment right to free speech was violated by a work supervisor who did not permit him to speak in Spanish during his job in the kitchen, and that, after he filed a grievance about this, he was fired from his kitchen job for discriminatory and/or retaliatory reasons. Defendants have moved to dismiss the claims for failure to state a claim.

Before the Court is the August 17, 2020 Report and Recommendation of the Hon. Debra Freeman, United States Magistrate Judge, recommending that the Court grant the motion to dismiss but permit Plaintiff to amend his complaint. Dkt. No. 30.

DISCUSSION

When reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party raises an objection to a report and recommendation, "the court is required to conduct a de novo review of the contested sections." *See Pizarro v. Bartlett*, 776 F. Supp. 815, 817 (S.D.N.Y. 1991). However, when a party does not raise an objection, the "court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) (citing Fed. R. Civ. P. 72 advisory committee's note (b)). "This is so even in the case of a pro se petitioner." *Perez v. Mason Tenders Dist. Council Tr. Funds*, 2017 WL 5125542, at \*2 (S.D.N.Y. Nov. 1, 2017), *aff'd*, 742 F. App'x 584 (2d Cir. 2018); *see also Ziga v. Int'l Ctr. for Transitional Justice, Inc.*, 821 F. App'x 49, 50 (2d Cir. 2020) (affirming district court decision that "reviewed some aspects of the R&R for clear error and some under de novo review").

On September 22, 2020, the Court directed the Clerk of Court to mail a copy of the Report and Recommendation to Plaintiff at his new residential address and granted Plaintiff forty-five (45) days from service of the Report and Recommendation to file written objections. Dkt. No. 31. As no party has submitted objections to the Report and Recommendation, review for clear error is appropriate.

The Court has reviewed the Report and Recommendation and finds no facial error in its conclusion that Plaintiff fails to plead a Title VII violation and in its conclusions with respect to the Section 1983 claims. The Court declines to consider the alternative basis for dismissal of Plaintiff's Title VII claim—that Plaintiff cannot be considered a City "employee" pursuant to Title VII—given its adoption of the recommendation that Plaintiff's Title VII claim should be dismissed on the merits.

**\*2** The Court also adopts Judge Freeman's recommendation that the Title VII claim, the Section 1983 claims against the City, and the Section 1983 claim against Bishop as it pertains to Bishop's personal involvement in Plaintiff's termination are all dismissed without prejudice to Plaintiff filing an amended complaint.

CONCLUSION

Having reviewed the Report and Recommendation for clear error, I hereby ADOPT the Report and Recommendation to

2020 WL 6901340

the extent it recommends granting dismissal of the action without prejudice for the reasons contained herein. I express no views on the recommendation that the action be dismissed with prejudice and will permit Defendants to renew their arguments that Title VII does not apply in a correctional setting should an amended complaint be filed.

Plaintiff shall have forty-five (45) days of this Order to file an amended complaint with additional factual allegations supporting his Title VII and Section 1983 claims, as described by the Report and Recommendation. If Plaintiff makes no such amendment, the Court will close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6901340

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 208 of 217

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

2021 WL 1338795
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jawaun FRASER, Plaintiff,

v.

CITY OF NEW YORK; Undercover Officer Number
84; Matthew Regina; and Jason Deltoro Defendants

No. 20-cv-04926 (CM)
|
Signed 04/09/2021

**Attorneys and Law Firms**

Haran Tae, Matthew A. Wasserman, Joel Barry Rudin, Law Offices of Joel B. Rudin, New York, NY, for Plaintiff.

Brian Christopher Francolla, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER
DENYING DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS**

McMahon, C.J.:

**\*1** Following an altercation on the evening of October 21, 2014, several narcotics officers from the New York Police Department – three of whom are defendants in this lawsuit – arrested Plaintiff Jawaun Fraser for robbery. Fraser was indicted and convicted at trial; the principal evidence against him was the testimony of these officers. He served two years in prison for the conviction.

In 2019, Fraser sought post-conviction relief in New York state court, after learning that the Manhattan District Attorney's Office had failed to disclose that members of the narcotics team had been sued no fewer than thirty-five times in federal court for allegedly falsifying evidence, making false statements, and making unlawful arrests. (Compl. at ¶ 80). The three defendant officers in this action, who had testified against Fraser, had been sued no fewer than twenty-nine times. (Compl. at ¶ 81–83). Had he known about these lawsuits, Fraser claims, he could have used them to impeach the officers' testimony, which might have led to an acquittal.

The New York Supreme Court granted Fraser's motion, holding that the civil lawsuits were material exculpatory evidence, and that the Manhattan DA had violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose them. The court vacated Fraser's robbery conviction. He was not retried.

Fraser now brings suit under 42 U.S.C. § 1983 against the three officers who had arrested him and testified against him, arguing that they violated their *Brady* obligations as police officers. He also sues the City of New York based on the policies of the NYPD and the Manhattan DA's Office that purportedly led to his conviction.

The defendants have filed a motion for a judgment on the pleadings on Fraser's *Brady*-dependent claims, arguing that Fraser's complaint does not state a claim upon which relief can be granted. That motion is denied.

## I. BACKGROUND

### A. The Parties
Plaintiff Jawaun Fraser is a resident of New Jersey.

The three individual defendants: Matthew Regina, Jason Deltoro, and Undercover Officer Number 84 ("UC 84"), were at all relevant times employed as narcotics officers with the NYPD.

Fraser has also sued New York City under a theory of municipal liability for the actions of the NYPD and the Manhattan DA's Office. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978).

### B. Allegations
Jawaun Fraser was arrested on the evening of October 21, 2014 following an interaction with UC 84 on the Lower East Side of Manhattan. Fraser claims that UC 84 approached him that evening in plainclothes and asked to purchase narcotics because he needed a "fix." (Compl. at ¶¶ 19–23). Fraser refused, and denied that he was selling drugs. But UC 84 was insistent and handed Fraser his photo identification to prove that he was not a police officer. Fraser alleges that when he took out his iPhone to take a picture of the I.D., UC 84 suddenly grabbed his wrist, causing Fraser to be alarmed and to drop the I.D. to the ground. Several other plainclothes police officers – among which included defendants Regina and Deltoro – then then rushed towards Fraser, further

2021 WL 1338795

increasing his alarm and causing him to flee. (Compl. at ¶ 31). After the officers apprehended Fraser, they searched him but did not find any narcotics. (Compl. at ¶ 32).

**\*2** Fraser alleges that – in order to justify the arrest – UC 84, Regina, and Deltoro created an entirely false story about how Fraser had robbed UC 84 of his I.D. and $20 in cash. (Compl. at ¶ 34). According to Fraser, Regina falsely claimed that he had found UC 84's I.D. on Fraser's person when he was arrested, even though the I.D. had fallen to the ground earlier. All three defendants also created false documents to support the story and Regina and UC 84 testified falsely to the grand jury to support an indictment. (Compl. at ¶¶ 35, 37, 48). These actions resulted in an indictment against Fraser for second-degree robbery on October 29, 2014, in violation of N.Y. Penal Law 160.10(1). (Compl. at ¶ 47).

Prior to trial, Fraser's defense counsel made a general request for *Brady* material. As part of the disclosures, Assistant District Attorney Gregory Sangermano provided Fraser with the names of two federal civil rights lawsuits that had been filed against some of the testifying officers: *Penn v. City of New York*, 10-cv-4907 (RJS); and *Baynes v. City of New York*, 12-cv-5903 (RJS). UC 84 was a defendant in the *Penn* case, and both UC 84 and Regina were defendants in the *Baynes* case. (Compl. at ¶¶ 56–57). Like Fraser's allegations, the plaintiffs in both lawsuits claimed that the defendant officers had fabricated stories to support their otherwise unlawful arrests and prosecutions. Both cases settled soon after they had been filed. [1]

[1]     This was not a fact that Fraser alleged in his complaint, but a court may take judicial notice of complaints filed in other public lawsuits in deciding a motion to dismiss. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

Trial began on November 17, 2015, where UC 84, Regina, and Deltoro all testified.

UC 84 testified that Fraser had threatened him and had forcibly taken his I.D., as well as $20 in marked buy money that UC 84 was carrying as part of the narcotics operation. (Compl. at ¶ 62). Regina testified that he observed the events described by UC 84, and that he found UC 84's I.D. in Fraser's possession. (Compl. at ¶ 63). Deltoro testified about how he and other officers moved in to arrest Fraser after UC 84 gave a non-verbal distress signal, and how he saw UC 84 and Fraser "grappling" with each other. (Compl. at ¶ 64).

Following the presentation of evidence, the jury deliberated for a full day and had to be read an *Allen* charge to alleviate an apparent deadlock. On November 24, 2015, it found Fraser not guilty of robbery in the second degree but found him guilty of the lesser-included offense of robbery in the third degree, in violation of N.Y. Penal Law 160.05. (Compl. at ¶ 70).

On January 13, 2016, Fraser was sentenced to a term of two to six years in prison and served approximately two years in custody before being released on parole. (Compl. at ¶¶ 74–75).

In May 2019, Fraser's appellate counsel moved to vacate Fraser's conviction under New York Criminal Procedure Law § 440.10, on the basis that the prosecution had failed to disclose *Brady* material to Fraser's defense counsel. The appeal claimed that the prosecution had only disclosed two of no less than thirty-five lawsuits that had been filed against members of the narcotics team that had arrested Fraser. (Compl. at ¶ 80). Of those thirty-five suits, ten had named UC 84 as a defendant; sixteen named Regina as a defendant; and three named Deltoro as a defendant. (Compl. at ¶¶ 81–83). Most of these lawsuits alleged what Fraser had claimed as his defense at trial – that the officers deliberately lied and fabricated stories to support their otherwise unlawful arrests of innocent civilians.

In response to the § 440 motion, ADA Sangermano acknowledged that, prior to trial, a search conducted by the Manhattan DA's Office had found thirteen lawsuits against the officers involved in Fraser's arrest. (Compl. at ¶¶ 84–85). Sangermano claimed that he had disclosed these thirteen lawsuits to Fraser's defense, but Fraser denied that was the case. Yet, regardless of whether these thirteen lawsuits had been disclosed, the DA's Office conceded that it also had constructive knowledge of at least an additional twelve lawsuits filed against Officer Regina that it did not disclose. One of these lawsuits also named UC 84 as a defendant. These lawsuits raised claims based on allegedly false arrests, malicious prosecutions, uses of excessive force, and illegal strip searches. *See People v. Fraser*, Ind. No. 4844/14 at 3 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019).

**\*3** On December 6, 2019, Justice Robert M. Stoltz of the New York County Supreme Court granted Fraser's motion and vacated his conviction for robbery in the third degree, holding that the State violated *Brady* by failing to disclose the

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 210 of 217

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

twelve lawsuits for which it had constructive knowledge. [2] Judge Stoltz thus vacated Fraser's robbery conviction, holding that "the suppressed lawsuits were material and that defendant was prejudiced by his inability to cross-examine the officers about instances of misconduct." *Ibid.*

[2]    Justice Stoltz's opinion begins by mentioning that Fraser claims he discovered "at least 35 civil lawsuits alleging misconduct by UC/84, Regina, and other members of the field team." *People v. Fraser*, Ind. No. 4844/14 at 3 (Sup. Ct. N.Y. Cnty. Dec. 6, 2019). However, Justice Stoltz only specifically details twenty-five of these thirty-five lawsuits: the twelve lawsuits for which the Manhattan DA had constructive knowledge but were not disclosed, and the thirteen lawsuits over which the State and Fraser contest suppression. This discrepancy in the number of lawsuits goes unexplained in Justice Stoltz's opinion. Fraser, in his civil complaint, now claims that the Manhattan DA had constructive knowledge of *twenty-two* (not twelve) lawsuits. (Compl. at ¶¶ 86–87).

The State of New York decided not to retry Fraser. Instead, Fraser entered into a plea agreement where he pled guilty to disorderly conduct – a violation that is not a criminal offense. *See* N.Y. Penal Law § 240.20.

**C. Current Proceedings**

Fraser commenced this instant action on June 26, 2020. At the time of filing, Fraser claims that he had uncovered at least thirty-eight lawsuits alleging civil rights violations against the six officers of the narcotics team that had arrested him in 2014 – three more than was considered by Justice Stoltz. (Compl. at ¶ 111).

Fraser alleges five distinct causes of action: § 1983 claims against the individual defendants for (1) denial of liberty and due process (Count I); (2) malicious prosecution (Count II); and (3) denial of a fair trial due to *Brady* (Count III); and *Monell* claims against the City for (4) the NYPD's involvement in the *Brady* violation (Count IV); and (5) the Manhattan DA's involvement in the *Brady* violation (Count V).

On March 1, 2021, the defendants moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). They did not move to dismiss all of the claims, only the counts that implicate *Brady* (Counts III through V). They

insist – contrary to the New York court's ruling – that there has been no *Brady* violation that can give rise to any § 1983 or *Monell* claim.

As part of the defendants' motion for judgment on the pleadings, they also moved to stay *Monell* discovery pending the resolution of their motion. This Court has already denied that request for a stay, holding that defendants' failure to move to dismiss the *Monell* claims until March 1, 2021 – which was only 12 weeks away from the discovery deadline – appeared "to have been belatedly made in order to try to avoid producing long-promised *Monell* discovery." (Dkt. No. 36).

For the reasons that follow, the rest of defendants' motion is denied.

**II. DISCUSSION**

**A. Legal Overview**

1. Standard of Review

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). In deciding such a motion, a court presumes all well-pleaded facts to be true and draws all reasonable inferences in favor of the pleader.

**\*4** To survive a motion for a judgment on the pleadings, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The complaint "does not need detailed factual allegations," but must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 556 U.S. at 680.

2021 WL 1338795

## 2. *Brady*

" 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Poventud v. City of New York*, 750 F. 3d 121, 133 (2d Cir. 2014) (en banc) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)).

Given that a state post-conviction court has already established that there *was* a *Brady* violation, one might wonder why that decision does not preclude defendants from arguing in this litigation that there has not been a *Brady* violation. But any doctrine of preclusion – whether that is collateral estoppel or law-of-the-case – requires the party against which the preclusion is applied to have been a party in both litigations. For a New York state court decision to have preclusive effect in federal court, "the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (citation omitted).

The defendants, here (the City and the individual officers), were not parties to Fraser's criminal proceedings, and thus had no ability to present their positions. The analysis is fundamentally different: a "State Court's decision does not prevent Defendants from asserting in this proceeding that the facts do not support a finding of a constitutional violation *entitling Plaintiff to damages*." *Poventud v. City of New York*, No. 07-cv-3998 (DAB), 2015 WL 1062186, at *6 (S.D.N.Y. Mar. 9, 2015) (emphasis added).

Federal courts have therefore always independently evaluated the appropriateness of § 1983 claims against individual or municipal defendants, even if a state post-conviction court has held that the *State* had violated *Brady* in obtaining a criminal conviction. *See, e.g., Poventud*, 2015 WL 1062186 at *6; *Anderson v. City of Rockford*, 932 F.3d 494, 500–01 (7th Cir. 2019); *Burge v. St. Tammany Parish*, 336 F.3d 363, 368–69 (5th Cir. 2003).

Several Courts of Appeals have held that, for a police officer to be liable under § 1983 for a *Brady* violation, there needs to be proof that the officer either intentionally suppressed the evidence or otherwise acted in bad faith. *See, e.g., Jean v. Collins*, 221 F. 3d 656, 663 (4th Cir. 2000) (en banc) (per

curiam) (Wilkinson, J. concurring); *Porter v. White*, 483 F. 3d 1294, 1306–07 (11th Cir. 2007); *cf Armstrong v. Daily*, 786 F.3d 529, 539–40 (7th Cir. 2015). This effectively adds an element to the traditional *Brady* analysis, which – in the criminal context – requires a State to disclose exculpatory evidence "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

**\*5** The Second Circuit has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F. 3d 727, 751 n.23 (2d Cir. 2019); *see also Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2017) (summary order). Ultimately, regardless of whether Fraser needs to plead that the defendant-officers acted intentionally, his complaint survives defendants' motion to dismiss.

### A. Count III of the Complaint States a § 1983 Claim Against the Individual Defendants for a *Brady* Violation

Count III alleges that the officer-defendants violated their *Brady* obligations by intentionally failing to disclose that they had been sued multiple times for allegedly falsifying evidence in other criminal proceedings. Since Fraser's defense at trial centered on the officers' credibility, he claims that had he known about the lawsuits, he would have used them to impeach the officers' testimonies against him. But since the lawsuits were withheld, it unjustly led to Fraser's conviction and incarceration.

The defendant-officers do not assert a qualified immunity defense at this stage of the litigation. They also do not dispute that the existence of the civil lawsuits could have been used for impeachment purposes, or that their non-disclosure prejudiced Fraser – satisfying the first and third parts of a traditional *Brady* analysis. *See Poventud*, 750 F. 3d at 133.

Instead, they make two arguments contending that the lawsuits were not "suppressed": First, that no civil lawsuit that has been publicly docketed can ever be considered "suppressed" for purposes of *Brady*; and second, that police officers – as a matter of law – do not have an obligation under *Brady* to disclose their involvement in unrelated civil rights lawsuits. (Dkt. No. 33 at 7–8, 12). Neither argument is sufficient.

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 212 of 217

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

### 1. Public Records Can Be
### "Suppressed" for Purposes of *Brady*

Defendants rely mostly on an unpublished Second Circuit summary order, *Layton v. Philips*, 340 F. App'x 687 (2d Cir. 2009), as standing for the proposition that almost nothing in the public record can be "suppressed" for purposes of *Brady*. Since the lawsuits against the defendant-officers were civil rights lawsuits filed in federal court, defendants contend that a simple search would have alerted Fraser or his lawyer to their existence. In essence, defendants claim that Fraser's allegations do not state a claim because it was his lawyer's incompetence – not a *Brady* violation – that led to his inability to use the lawsuits as impeachment material.

In *Layton*, an inmate seeking habeas relief alleged that New York had violated *Brady* because the prosecutor failed to disclose "the fact that the victim had filed a civil lawsuit against [the inmate] by the time of the criminal trial." *Id.* at 688. The district court denied Layton's habeas petition, holding that not only was there no reason why Layton would have been unaware of a lawsuit filed against *him*, but also that the absence of the lawsuit from the evidentiary record did not materially affect his receiving a fair trial. *Layton v. Philips*, No. 04-cv-4032 (DRH), 2008 WL 413785, at *6–7 (E.D.N.Y. Feb. 13, 2008).

The Second Circuit affirmed, holding that there was no *Brady* violation because, "Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *Layton*, 340 F. App'x at 689 (quoting *United States v. Gonzalez*, 110 F. 3d 936, 944 (2d Cir. 1997)). Since Layton was the defendant in the civil lawsuit, and there was no indication that he had not been properly served, he would have had reason to know of the lawsuit.

**\*6** These facts show that *Layton* – besides being an unpublished summary order – is wholly inapplicable to the case at hand.

First, unlike Layton, Fraser is not alleging that the suppressed evidence was a lawsuit involving *him*, but rather multiple lawsuits filed by total strangers against the defendant-officers who testified against him. Layton clearly had reason to know of a lawsuit in which he was the defendant; the same is not

true for Fraser with respect to the lawsuits filed against the testifying officers.

Second, and more critically, Second Circuit precedent establishes that a "government's duty to produce [exculpatory material]" is not "eliminated by that document's availability in a public court file." *United States v. Payne*, 63 F. 3d 1200, 1209 (2d Cir. 1995). The true standard – also articulated in *Layton*, but conveniently ignored by defendants – is whether the defendant or his counsel "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *Payne*, 63 F.3d at 1208 (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)); *see also DiSimone v. Philips*, 461 F.3d 181, 198 (2d Cir. 2006). [3]

> [3]  Many of the other cases that defendants cite to in an attempt to persuade the Court for their incorrect proposition also follow this general rule. *See, e.g., United States v. Esposito*, 834 F.2d 272, 275 (2d Cir. 1987) (no suppression because the litigant "had actual possession of the transcripts prior to trial"); *United States v. Teman*, 465 F. Supp.3d 277, 342–43 (S.D.N.Y. 2020) (noting that the main reason why there was no *Brady* violation was because the government did not have the evidence in its possession, but had "disclosed what it had"); *United States v. Svendsen*, 72 F. Supp.2d 149, 160 (E.D.N.Y. 1999) (noting that the alleged *Brady* material was "irrelevant to Svendsen's defense" anyways).

Thus, whether documents in the public record are "suppressed" for purposes of *Brady* is evaluated under the same metric as any other piece of evidence. Whether Fraser actually knew or should have known about the lawsuits filed against the officers is an issue of fact that will be decided at a later stage of the proceedings. *See, e.g., Rosario v. City of New York*, No. 18-cv-4023 (LGS), 2019 WL 4450685, at *5 (S.D.N.Y. Sep. 16, 2019) (denying motion to dismiss). But when looking solely at Fraser's complaint – as a court must at this stage of the proceedings – he has sufficiently alleged that he did *not* know about the lawsuits, and that the individual officers "suppressed" them by withholding that information from prosecutors.

Fraser's complaint contains detailed allegations against each of the officer-defendants. Fraser alleges that members of the narcotics team of which UC 84, Regina, and Deltoro were members had been named as defendants in no less than 38

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 213 of 217

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

lawsuits in total – 23 of which had "alleged that police officers had fabricated evidence." (Compl. at ¶ 112). Of the 38 total lawsuits, Regina "knew that he had been sued at least 14 times"; UC 84 "knew that he had been sued at least eight times"; and Deltoro "knew that he had been sued at least five times." (Compl. at ¶¶ 114, 117, 120). Of these suits, at least two had alleged that Regina made false statements to support otherwise unlawful arrests/prosecutions, but Regina did not disclose them to ADA Sangermano. (Compl. at ¶ 116). Six had alleged that UC 84 had made false statements or fabricated evidence, and three had alleged the same of Deltoro; yet neither UC 84 nor Deltoro had disclosed these lawsuits to Sangermano. (Compl. at ¶¶ 119, 123).

**\*7** ADA Sangermano's ignorance of these lawsuits resulted in his failure to disclose them to Fraser's defense counsel. And since the main evidence against Fraser was the testimony of these three officers, his inability to impeach their credibility by referencing these lawsuits could have resulted in the guilty verdict from the jury. These allegations are sufficient to state a claim.

### 2. Police Officer-Witnesses Have an Obligation to Disclose Potential Impeachment Evidence to Prosecutors

In the alternative, defendants argue that the lawsuits could not have been "suppressed" because – as a matter of law – police officers have no obligation to disclose civil lawsuits unrelated to their investigation of the defendant.

It is technically true that police officer witnesses have no obligation to disclose anything directly to a criminal defendant; it is the prosecution's obligation to make that disclosure. But "When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*." *Bellamy*, 914 F. 3d at 751; *see also Bermudez v. City of New York*, 790 F. 368, 376 n.4 (2d Cir. 2015); *Poventud*, 750 F. 3d at 128. The question here is whether that obligation extends to requiring testifying officers to disclose civil lawsuits filed against them that alleged that they had falsified evidence – whether such lawsuits can be considered "exculpatory or impeaching." *Bellamy*, 914 F.3d at 751.

The answer is clearly yes.

The Supreme Court established in *Giglio v. United States*, 405 U.S. 150 (1972), that where:

> the Government's case depend[s] almost entirely on [an individual's] testimony; without [which] there could have been no indictment and no evidence to carry the case to the jury. [The individual's] credibility as a witness [is] therefore an important issue in the case ... and the jury [is] entitled to know of it. *Id.* at 154–55.

If police officers are the main witnesses for the prosecution, then the credibility of those officers is undoubtedly "an important issue in the case." *Id.* at 155. Similarly, there is no doubt that multiple allegations that an officer has falsified evidence or testified falsely in other criminal cases would bear on that officer's "credibility as a witness." *Ibid.*; *see also Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (holding that the personnel file of a testifying officer detailing that he had been suspended for sexual misconduct – and that he had lied about it – was impeachment evidence that needed to be disclosed); *cf United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008) (noting that materials relating to an officer's misconduct investigation were favorable to the defense, but that there was no *Brady* violation because there was overwhelming evidence of guilt).

Put simply, for purposes of § 1983, "police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), and evidence that bears on the credibility of testifying officers – if they are key witnesses – constitutes potentially exculpatory evidence under *Giglio*. An officer does not need to disclose the impeachment evidence directly to the defense, but *must* share that information with the prosecution.

Defendants contend that no such obligation exists under New York state law, citing a New York Court of Appeals case, *People v. Garrett*, 23 N.Y.3d 878, 890 (2014).

**\*8** The facts in Garret are similar to ours. Garrett was convicted at trial in 2000 of depraved indifference murder and felony murder, based in part on a confession obtained by Detective Vincent O'Leary. In December 2009, Garrett

Case 9:21-cv-01090-BKS-TWD    Document 43    Filed 02/01/24    Page 214 of 217

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

moved for post-conviction relief under New York CPL § 440.10, arguing that the prosecution had failed to disclose the existence of a federal civil rights lawsuit against O'Leary – filed before Garrett's trial – that had alleged "that O'Leary coerced the plaintiff ... into confessing to third-degree arson by repeatedly striking [the plaintiff] in the head with a telephone book while he was handcuffed and physically forcing him to sign a written confession." *Id.* at 883. Since O'Leary had been part of the team that obtained Garrett's confession and had testified at trial, Garrett claimed that the government's nondisclosure of the lawsuit violated *Brady* and *Giglio*.

The New York Court of Appeals disagreed with Garrett, holding that the State has "no affirmative duty to search the dockets of every case in every federal and state court in New York for complaints against their police witnesses." In declining to "construe the [State's] *Brady* obligations so broadly," the Court concluded that " '[I]t is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case.' " *Id.* at 890 (quoting *United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010)). Critical to the Court's holding was its view that "there is a distinction between the nondisclosure of police misconduct 'which has some bearing on the case against the defendant,' and the nondisclosure of such material which has 'no relationship to the case against the defendant, except insofar as it would be used for impeachment purposes.' " *Id.* at 889 (citations omitted).

Unfortunately for defendants, the Court of Appeals' decision has no implication for the § 1983 case currently before this Court.

First, both *Garrett* and *Robinson* – the Fourth Circuit case *Garrett* relied upon – involved post-conviction proceedings that scrutinized a prosecutor's actions, not the actions of police officers for purposes of § 1983. They concerned questions of whether an officer's knowledge could be imputed onto the prosecution, not whether the individual officer had violated any actionable duty under § 1983. As discussed, police officers have a clear, independent duty to share with the prosecution any potentially "exculpatory or impeaching evidence" they possess. *See, e.g.,* Bellamy, 914 F.3d at 751. The fact that the impeachment evidence consists of allegations against the testifying officers themselves

is immaterial to whether Fraser has sufficiently pled a constitutional violation for § 1983 purposes against the officer defendants.

Second, I am unpersuaded by the "distinction" noted in *Garrett* between allegations of misconduct "which has some bearing on the case against the defendant" and those that apparently have "no relationship" to the defendant "insofar as it would be used for impeachment purposes." As long as the evidence could be used to impeach a key witness, a police officer is obligated to share that information with the prosecutor because "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Payne*, 63 F.3d at 1210 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). It makes no difference whether material directly implicates physical evidence in the case, or whether it impeaches a key witness who happens to be a testifying officer. The distinction in *Garrett* is one that – to my knowledge – no federal court assessing § 1983 claims has ever made. Put simply, police officers who are key prosecution witnesses in a criminal trial are obligated under *Brady* to disclose the existence of civil lawsuits or other allegations of misconduct filed against them that bear on their credibility.

**\*9**  Granted, not *all* evidence that could be used for impeachment purposes will necessarily be disclosed to the defendant. Prosecutors are "charged with the task of determining which evidence" will ultimately be material *Brady* evidence that must be shared with the defense. *Walker*, 974 F.2d at 299. But a *police officer* satisfies his obligations under *Brady* only if the officer turns over all exculpatory evidence in his possession to the prosecutor. *Ibid.*

Here, the defendant officers do not contest that the nondisclosed lawsuits were material to Fraser's case. (Dkt. No. 38 at 2 n.1). And Fraser has alleged that they "had a constitutional duty to inform the prosecution of information known to them that was favorable" to Fraser, but that they "failed to disclose such civil lawsuits to the prosecutor ... intentionally." (Compl. at ¶¶ 126, 130). The failure to disclose was "material to the outcome of the trial" and "was a substantial and proximate cause" of Fraser's injuries. (Compl. at ¶¶ 128–29). These allegations are sufficient to survive a motion for judgment on the pleadings. The motion to dismiss Count III is denied.

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)

2021 WL 1338795

## B. Counts IV and V of the Complaint
## State Claims Against the City

"*Monell* does not provide a separate cause of action ... it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). To state a claim for municipal liability under *Monell*, a plaintiff must allege: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). Since "*Monell* expressly prohibits *respondeat superior* liability for municipalities ... a plaintiff must demonstrate that 'through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* at 98 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla v. Brown*, 520 U.S. 397, 404 (1997)).

Counts IV and V allege that New York City is liable for the unconstitutional policies of the NYPD and Manhattan DA's Office – specifically, that neither agency required police to disclose, or prosecutors to inquire about, potential impeachment evidence in the form of civil lawsuits against testifying officers.

### 1. Count IV states a claim for relief based on the policies of the NYPD

A municipality can be liable under *Monell* for the policies of its police department. *See, e.g, Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Count IV states a *Monell* claim based on the NYPD's policy of not making "timely disclosure to prosecutors of material evidence or information favorable to criminal defendants, including evidence or information impeaching the credibility of prosecution witnesses, including the police officers themselves." (Compl. at ¶ 133). Although "policymaking officials at the NYPD knew that members of the force often acted as essential witnesses in criminal prosecutions and that many of them face, or have faced, lawsuits alleging they engaged in various types of misconduct, including fabricating evidence" and "other acts of dishonesty," the NYPD "adopted no policy ... requiring such police witnesses to provide such

civil lawsuit information to District Attorneys or Assistant District Attorneys." (Compl. at ¶¶ 135–36).

**\*10** Fraser alleges that the NYPD's policy – really the absence of a policy requiring certain impeachment evidence to be disclosed – resulted in the *Brady* violation in his case, and amounted to "deliberate indifference to the constitutional rights" of citizens who are "prosecuted for alleged criminal activities." (Compl. at ¶ 146). As discussed above, individual officers have a duty to share exculpatory or impeachment evidence with the prosecution. Therefore, a city could be liable if its police department does not have an adequate policy ensuring that officers are aware of such a duty and that such disclosures are consistently made. *Monell* liability exists "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Ibid.*

It remains to be seen whether policymakers at the NYPD truly had such a policy (or lack thereof) or were actually indifferent to the alleged constitutional violations taking place under their watch. But we are not at present dealing with the merits. We are dealing with the pleadings. Looking only at them, Fraser has more than sufficiently alleged a *Monell* claim based on the NYPD's actions. *See, e.g., Buari v. City of New York*, 18-cv-12299 (MKV), 2021 WL 1198371, at *25 (S.D.N.Y. Mar. 30, 2021) (denying motion to dismiss because plaintiff alleged that the NYPD failed "to train officers on *Brady* obligations" or to "disclose *Brady* material").

### 2. Count V states a claim for relief based on the policies of the Manhattan District Attorney's Office

The Second Circuit recently held that New York City is the proper defendant for constitutional violations resulting from allegedly unlawful policies enacted by the Queens District Attorney's Office. *Bellamy*, 914 F.3d at 757. The plaintiff in *Bellamy* was originally convicted of murder in state court, but the conviction was vacated after newly discovered evidence implicated another individual as the murderer. *Id.* at 734. Bellamy sued the City, arguing that it was liable under *Monell* for the actions of the Queens DA, which had failed to disclose that a witness against Bellamy had been promised $2,800

Fraser v. City of New York, Not Reported in Fed. Supp. (2021)
2021 WL 1338795

Case 9:21-cv-01090-BKS-TWD   Document 43   Filed 02/01/24   Page 216 of 217

in exchange for her testimony. Although Bellamy's criminal conviction had not been vacated based on a *Brady* violation, his § 1983 suit claimed that the DA's Office had a policy of not disclosing certain types of impeachment evidence to the defense, which contributed to his wrongful conviction.

The City argued that it could not be "liable as a matter of law for any constitutional harms inflicted by the alleged policies of the [Queens DA's] office ... because those were not policies for which the City is responsible." *Id.* at 756–57. The district court agreed and dismissed the lawsuit. The Second Circuit reversed, and allowed the lawsuit to proceed, holding that, "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with the narrow exception ... being the decision whether, and on what charges, to prosecute." *Id.* at 759. Because prosecutors' actions are "generally controlled by municipal policymakers for purposes of *Monell*," *ibid*, "the City is the proper policymaking authority for purposes of Bellamy's *Monell* claims," *id.* at 761.

Following *Bellamy*, district courts in this Circuit have consistently refused to dismiss *Monell* claims alleging that a county prosecutor's office has sanctioned an unlawful practice. *See, e.g., Galgano v. Cnty. of Putnam*, No. 16-cv-3572 (KMK), 2020 WL 3618512, at *10 (S.D.N.Y. July 2, 2020) (falsifying warrant applications and incentivizing witnesses to fabricate allegations); *O'Hara v. City of New York*, No. 17-cv-4766, 2019 WL 2326040, at *9 (E.D.N.Y. May 31, 2019) (fabricating evidence, intimidating witnesses, and eliciting false testimony); *Newsom v. City of New York*, No. 16-cv-6773 (ILG), 2019 WL 3997466, at *6 (Aug. 23, 2019) (violating *Brady* by withholding evidence).

 **\*11** *Newsom* is particularly instructive. Newsom was arrested and charged with murder for an August 2010 shooting after he arrived at the scene of the crime shortly after it had occurred. Newsom denied his involvement, and the NYPD found evidence exculpating him shortly thereafter – namely, that the shell casings recovered from the scene matched those that had been recovered from two other shootings that were known to have been committed by someone else. *Newsom*, 2019 WL 3997466, at *2. Although the NYPD knew about this evidence by April 2011, the Queens DA continued prosecuting Newsom and did not disclose this information to his lawyer until May 2014, after jury selection already begun. *Ibid*. The judge declared a mistrial, but the DA did not retry Newsom until fall of 2015 and Newsom remained incarcerated during the interim. *Id.* at

*4. Newsom was acquitted of the murder at the retrial, and subsequently brought a § 1983 claim against the City based on the actions of the Queens DA and the NYPD.

The district court denied the City's motion to dismiss Newsom's claim based on the Queens DA's *Brady* violation because Newsom had sufficiently alleged that "the City instituted and implemented 'unlawful policies, procedures, regulations, practices and/or customs concerning the continuing obligation to make timely disclosure to the defense' " and that there was " 'deliberate indifference by policymaking officials at the [QCDA] in its obligation to properly train, instruct, supervise and discipline its employees, including the ADAs involved in the prosecution of the plaintiff's case, with respect to such matters.' " *Id.* at *8 (quoting the Amended Complaint).

The conclusion to be drawn from these cases is that the City can be liable under *Monell* for policies of the Manhattan District Attorney's Office. Thus, the only remaining question in this case is whether Fraser has adequately pled that the office had a "policy or custom" that was unconstitutional. *See, e.g., Bellamy*, 914 F.3d at 761. He has.

The allegations in Fraser's complaint mirror the allegations in *Newsom*. Fraser states that the Manhattan DA had an "unlawful policy ... for prosecutors to refrain from asking police officer-witnesses about civil suits or allegations of misconduct against them unrelated to the prosecution at hand." (Compl. at ¶ 154). The purpose of the policy (or lack thereof) "was to avoid obtaining actual knowledge of information that such prosecutors would be obligated under *Brady* to disclose" and "signaled to trial prosecutors that the Office was indifferent to disclosure of such information generally and encouraged a lax attitude about disclosing such information even when prosecutors knew about it." (Compl. at ¶¶ 155–56). As a result of this policy, "ADA Sangermano failed to learn about and/or to disclose" the numerous lawsuits filed against the officers who testified against Fraser, leading to his unjust conviction. (Compl. at ¶ 157).

These allegations state a plausible *Monell* claim. Under *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That includes "even evidence that is 'known only to police investigators and not to the prosecutor.' " *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Kyles*, 514 U.S. at 438). A prosecutor is

2021 WL 1338795

"presumed ... to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 437).

The City suggests that prosecutors do not have a duty to learn of unrelated civil lawsuits against testifying police officers, but *Brady* and its progeny do not contain such an exception. As already discussed, when an officer's testimony is critical to the case against the accused, allegations of misconduct against the officer that specifically accuse him of being unreliable or otherwise incredible is impeachment evidence that must be disclosed if material to the case.

 **\*12**  A prosecutor is not excused from their "duty to learn of any favorable evidence" just because the witnesses on the stand are police officers. When the primary evidence against the defendant is the testimony of police officers, prosecutors have a duty to inquire about potential impeachment material that reflects on the credibility of those officers. The

Constitution does not endorse a "don't ask don't tell" policy with respect to *Brady* material.

As the New York post-conviction court concluded, the lawsuits against the testifying officers would surely have aided Fraser in his trial if he had known about them. Fraser has alleged that the Manhattan DA's Office had an obligation to seek out impeachment evidence, but that because of office policy, it failed to do so. This is enough to state a claim.

### CONCLUSION

For the reasons set forth above, defendants' collective motion for a judgment on the pleadings is denied.

The Clerk of the Court is respectfully directed to remove the motion at Dkt. No. 32 from the Court's list of pending motions.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1338795

---

  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

  © 2024 Thomson Reuters. No claim to original U.S. Government Works.